0296



DEC 1 1 2014

IN THE SUPERIOR COURT OF PENNSYLVANIA
WESTERN DISTRICT

1194 WDA 2013

COMMONWEALTH OF PENNSYLVANIA,
Appellee
v.
MATTHEW EBO,
Appellant

*A441*

## BRIEF FOR APPELLANT

Appeal from the Judgment of Sentence imposed on November 28, 2012,
in the Court of Common Pleas of Allegheny County, Pennsylvania – Criminal
Division, by the Honorable Beth A. Lazzara, at CC 201202821.

<table>
<tr><td>ELLIOT HOWSIE<br>Public Defender<br>PA I.D. # 83441</td><td>JESSICA L. HERNDON<br>Assistant Public Defender<br>Counsel of Record<br>PA I.D. # 93388</td></tr>
</table>

ATTORNEYS FOR APPELLANT

OFFICE OF THE PUBLIC DEFENDER
400 County Office Building
542 Forbes Avenue
Pittsburgh, Pennsylvania  15219-2904
(412) 350-2403

Respondents' Exhibit 38

# TABLE OF CONTENTS

**PAGE(S)**

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE SCOPE AND STANDARD OF REVIEW ........................2

ORDERS IN QUESTION......................................................................................5

STATEMENT OF THE QUESTIONS INVOLVED................................................7

STATEMENT OF THE CASE................................................................................9

A. *PROCEDURAL HISTORY*...............................................................................9

B. *FACTUAL HISTORY*....................................................................................13

SUMMARY OF THE ARGUMENT ....................................................................21

ARGUMENT .......................................................................................................23

I.   THE  EVIDENCE  THAT  THE  CO-DEFENDANT  WAS
     INVOLVED IN GUN VIOLENCE TWO WEEKS AFTER THE
     HOMICIDE WAS INADMISSIBLE EVIDENCE OF OTHER
     BAD  ACTS  AGAINST  MATTHEW  EBO.    ALSO,  THE
     IRRELEVANT  EVIDENCE  HAD  NO  CONNECTION  TO
     MATTHEW  AND  IT  SHOULD  NOT  HAVE  BEEN
     PRESENTED  AS  EVIDENCE  THAT  MATTHEW  WAS
     SOMEHOW INVOLVED IN THE HOMICIDE. ...........................................23

II.  THE HIGHLY SUGGESTIVE PRETRIAL IDENTIFICATION
     PROCEDURE  TAINTED  THE  MAIN  COMMONWEALTH
     EYEWITNESS'  IDENTIFICATION  OF  MATTHEW  EBO
     AND ANY INFORMATION ABOUT THE WITNESS' PHOTO
     ARRAY  IDENTIFICATION  AND  HER  SUBSEQUENT  IN-
     COURT  IDENTIFICATION  SHOULD  HAVE  BEEN
     SUPPRESSED. ..............................................................................................38

III. THE  TRIAL  COURT  ABUSED  ITS  DISCRETION  BY
     FAILING  TO  GRANT  MATTHEW  EBO  A  NEW  TRIAL
     SINCE  THE  VERDICT  WAS  AGAINST  THE  WEIGHT  OF
     THE EVIDENCE WHEN THE UNRELIABLE TESTIMONY
     OF THE EYEWITNESS CONNECTING MATTHEW TO THE
     CRIME  WAS  SO  UNTRUSTWORTHY  THAT  BASING  A

Respondents' Exhibit 38

0298

GUILTY VERDICT ON THIS EVIDENCE WAS MANIFESTLY UNREASONABLE. ...........................................................50

IV. THE TRIAL COURT'S IMPOSITION OF THE MANDATORY MINIMUM SENTENCE UNDER 42 PA.C.S.A. § 9712, AN UNCONSTITUTIONAL STATUTE, WAS ILLEGAL SINCE THE FACTFINDER NEVER FOUND THE REQUIRED FACTS BEYOND A REASONABLE DOUBT FOR THE IMPOSITION OF THE MANDATORY AS REQUIRED BY THE UNITED STATES SUPREME COURT IN *ALLEYNE V. UNITED STATES,* 133 S.CT. 2151 (2013)......................................................56

CONCLUSION.....................................................................................63

Appendices

Opinion in the Trial Court by
    The Honorable Beth A. Lazzara ........................................................Appendix A

Statement of Errors Complained of on Appeal........................................ Appendix B

Respondents' Exhibit 38

# TABLE OF CITATIONS

## PAGE(S)

### CASES

*Alleyne v. United States*, 133 S.Ct. 2151 (2013)....................... 56, 57, 58, 59, 60, 61

*Apprendi v. New Jersey*, 530 U.S. 466 (2000).............................................56, 57, 61

*Bowling v. Office of Open Records,* 75 A.3d 453 (Pa. 2013)....................................4

*Commonwealth v. Arest*, 734 A.2d 910 (Pa. Super. 1999).......................................4

*Commonwealth v. Brown*, 52 A.3d 320 (Pa. Super. 2012)..................................33, 34

*Commonwealth v. Cascardo*, 981 A.2d 245 (Pa. Super. 2009)...............................24

*Commonwealth v. Champney*, 832 A.2d 403 (Pa. 2003)........................................50

*Commonwealth v. Clay,* 64 A.3d 1049 (Pa. 2013) ...........................................50, 51

*Commonwealth v. Davis*, 17 A.3d 390 (Pa. Super. 2011).......................................48

*Commonwealth v. Drumheller,* 808 A.2d 893 (Pa. 2002).......................................24

*Commonwealth v. Fowler*, 352 A.2d 17 (Pa. 1976) .......................43, 45, 46, 47, 48

*Commonwealth v. Karth*, 994 A.2d 606 (Pa. Super. 2010).......................................4

*Commonwealth v. Laich*, 777 A.2d 1057 (Pa. 2001)........................................34, 35

*Commonwealth v. McAdoo*, 46 A.3d 781 (Pa. Super. 2012).....................................3

*Commonwealth v. Meadows*, 369 A.2d 1266 (Pa. 1977).........................................50

*Commonwealth v. Miles,* 846 A.2d 132 (Pa. Super. 2004)................................35, 36

*Commonwealth v. Moore*, 633 A.2d 1119 (Pa. 1993) .......................................43, 44

Respondents' Exhibit 38

0300

*Commonwealth v. Munday,* 78 A.3d 661 (Pa. Super. 2013) .............4, 56, 60, 61, 62

*Commonwealth v. Newman*, 99 A.3d 86 (Pa. Super. 2014).............56, 58, 59, 60, 62

*Commonwealth v. Pantalion,* 957 A.2d 1267 (Pa. Super. 2008)...............................4

*Commonwealth v. Porter*, 569 A.2d 942 (Pa. 1990) .................................................48

*Commonwealth v. Reid,* 811 A.2d 530 (Pa. 2002)......................................................2

*Commonwealth v. Rivera*, 983 A.2d 1211 (Pa. 2009) ..............................................50

*Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998)..............................30, 31, 32

*Commonwealth v. Robinson*, 931 A.2d 15 (Pa. Super. 2007) ....................................4

*Commonwealth v. Ross*, 57 A.3d 85 (Pa. Super. 2012)................................24, 29, 30

*Commonwealth v. Strong*, 825 A.2d 658 (Pa. Super. 2003)........................................3

*Commonwealth v. Valentine*, 101 A.2d 801(Pa. Super. 2014) ..............22, 56, 58, 60

*Commonwealth v. Weakley*, 972 A.2d 1182 (Pa. Super. 2009)..............................2, 3

*Commonwealth. v. Brown*, 52 A.3d 320 (Pa. Super. 2012)......................................23

*Neil v. Biggers*, 409 U.S. 188 (1972).......................................................................43

*Simmons v. United States*, 390 U.S. 377 (1968).........................................38, 39, 43

<u>STATUTES</u>

42 Pa.C.S.A. § 742 .....................................................................................................1

42 Pa.C.S.A. § 9712..................................................................................22, 58, 59, 60

42 Pa.C.S.A. § 9712.1..........................................................................................60, 61

42 Pa.C.S.A. § 9712.1(c) ..........................................................................................61

42 Pa.C.S.A. § 9714(g) ..............................................................................................59

Respondents' Exhibit 38

0301

42 Pa.C.S.A. § 9716 ................................................................................................. 59

## RULES

Pa.R.A.P. 341(a) .................................................................................................... 1

Pa.R.E. 403 ............................................................................................................ 33

Pa.R.E. 404(b) ...................................................................................................... 24

Pa.R.E. 404(b)(1) ............................................................................................ 23, 24, 30

Pa.R.E. 404(b)(2) .................................................................................................. 24

## CONSTITUTIONAL PROVISIONS

U.S. CONST. AMEND. VI ........................................................................................ 60

v

Respondents' Exhibit 38

## STATEMENT OF JURISDICTION

Jurisdiction of this Honorable Court is invoked pursuant to the Judicial Code, Act of July 9, 1976, P.L. 586, No. 142, as amended, 42 Pa.C.S.A. § 742 (exclusive appellate jurisdiction in the Superior Court of Pennsylvania from final orders of the Court of Common Pleas), and the Pennsylvania Rules of Appellate Procedure, Rule 341(a) (appeals as of right from final orders of a lower court).

Respondents' Exhibit 38

## STATEMENT OF THE SCOPE AND STANDARD OF REVIEW

## ADMISSIBILITY OF THE EVIDENCE

When determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Relevant evidence establishes a material fact in the case or supports a reasonable inference regarding a material fact. A court may find that evidence is relevant, but nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact. *Commonwealth v. Reid,* 811 A.2d 530, 550 (Pa. 2002) (citations omitted).

The Pennsylvania Supreme Court has noted that the standard of review governing the admissibility of evidence at the trial level is a matter vested within the discretion of the trial court, and such a decision shall be reversed upon a showing that the trial court abused its discretion. *Id.* (citations omitted).

An abuse of discretion is the misapplication of the law, the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will, or partiality. *Commonwealth v. Weakley*, 972 A.2d 1182, 1188-89 (Pa. Super. 2009) (citations omitted). Further, an abuse of discretion occurs where the trial court improperly weighs the probative value of the evidence against its prejudicial impact. *Id.* at 1189 (citations omitted). "When a trial court indicates its reason for its ruling, '[the appellate court's] scope of review is limited to an examination of

2

Respondents' Exhibit 38

that stated reason.'" *Id.* (citing *Commonwealth v. Strong*, 825 A.2d 658, 665 (Pa. Super. 2003)).

## SUPPRESSION OF EVIDENCE

This Honorable Court has noted the following scope and standard of review when addressing suppression challenges on appeal:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (Pa. Super. 2012) (citations omitted).

## LEGALITY OF THE SENTENCE

An illegal sentencing claim implicates the fundamental legal authority of the court to impose the sentence. *Commonwealth v. Robinson*, 931 A.2d 15, 21 (Pa.

Respondents' Exhibit 38

Super. 2007).  If no statutory authorization exists to impose a particular sentence, then the sentence is illegal and must be vacated.  *Commonwealth v. Arest,* 734 A.2d 910, 912, n.2 (Pa. Super. 1999) (citations omitted).  "A challenge to the legality of the sentence may be raised as a matter of right, is non-waivable, and may be entertained so long as the reviewing court has jurisdiction." *Commonwealth v. Munday,* 78 A.3d 661, 664 (Pa. Super. 2013) (citations omitted). When addressing the proper interpretation of a statute, including a sentencing statute, the appellate court's standard of review is *de novo* and the scope of review is plenary.  *Bowling v. Office of Open Records,* 75 A.3d 453, 466 (Pa. 2013) (citations omitted); *Commonwealth v. Karth,* 994 A.2d 606, 607 (Pa. Super. 2010) (citation omitted); *Commonwealth v. Pantalion,* 957 A.2d 1267, 1271 (Pa. Super. 2008) (citations and quotations omitted).

Respondents' Exhibit 38

## ORDERS IN QUESTION

Commonwealth of Pennsylvania
v.
Matthew Ebo

IN THE COURT OF COMMON PLEAS OF
ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

DOCKET NO: CP-02-CR-0002821-2012
OTN: G5477032

## ORDER OF SENTENCE

AND NOW, this 28th day of November, 2012, the defendant having been convicted in the

above-captioned case is hereby sentenced by this Court as follows.   The defendant is to pay

all applicable fees and costs unless otherwise noted below:

**Count 1 - 18 §2501 §§A - Criminal Homicide -(H1)**
To be confined for a Period of Life at SCI Camp Hill.

**Count 2 - 18 §3701 §§A11 - Robbery-Inflict Serious Bodily Injury -(F1)**

A determination of guilty without further penalty.

**Count 3 - 18 §3702 §§A - Robbery Of Motor Vehicle -(F1)**
To be confined for a Minimum Term of 10 years and a Maximum Term of 20 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 1 Confinement

**Count 4 - 18 §6108 §§A1 - Firearms Not To Be Carried W/O License -(F3)**
To be confined for a Minimum Term of 3 years and 6 months and a Maximum Term of 7 years at
SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 3 Confinement

**Count 5 - 18 §6105 §§A1 - Possession Of Firearm Prohibited -(M1)**
To be confined for a Minimum Term of 2 years and 6 months and a Maximum Term of 5 years at
SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 4 Confinement

**Count 6 - 18 §903 §§C - Conspiracy - Robbery-Inflict Serious Bodily Injury -(F1)**
To be confined for a Minimum Term of 10 years and a Maximum Term of 20 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 5 Confinement

**Count 7 - 18 §903 §§C - Conspiracy - Criminal Homicide -(H1)**
To be confined for a Minimum Term of 20 years and a Maximum Term of 40 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 6 Confinement

By the Court

AOPC 2086 REV. 11/28/2012

5

Respondents' Exhibit 38

0307

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA          )          CC No.:201202821
                                                 OTN:    G 547703-2
                    vs.              ORIGINAL   Charge: Criminal Homicide
                                     Criminal Division      1st_Degree Murder
_____MATTHEW EBO_____         Dept. of Court Records
                                    Allegheny County, PA.

### ORDER OF COURT IMPOSING LIFE SENTENCE

AND NOW, to-wit, this 28th day of November, 2012 in open
Court, the Defendant having been convicted of First Degree Murder,
appearing with counsel, and pursuant to 18 Pa.C.S.A. §1102 and 42
Pa.C.S.A. §9711, the sentence of the Court is that you, MATTHEW
EBO, undergo imprisonment for the period of your natural life and
stand committed; and be committed to the custody of the Department
of Corrections for confinement in such State Correctional Facility
authorized to receive males, and shall be delivered to the State
Correctional Facility as determined by the Department of
Corrections, there to be kept, fed, clothed and treated as the law
directs.

This sentence to begin and take effect as of November 28,
2012.

6

Respondents' Exhibit 38

## STATEMENT OF THE QUESTIONS INVOLVED

I.   WAS EVIDENCE THAT THE CO-DEFENDANT WAS INVOLVED IN GUN VIOLENCE AND POSSESSED A FIREARM TWO WEEKS AFTER THE HOMICIDE INADMISSIBLE EVIDENCE OF OTHER BAD ACTS RELATING TO THE DEFENDANT AND WAS IT COMPLETELY IRRELEVANT TO WHETHER THE DEFENDANT WAS INVOLVED IN THE HOMICIDE WHEN THE SUBSEQUENT INCIDENT HAD NO CONNECTION TO THE DEFENDANT?

*Answered in the negative by the court below.*

II.   SHOULD IDENTIFICATION EVIDENCE HAVE BEEN SUPPRESSED WHEN THE HIGHLY SUGGESTIVE PRETRIAL IDENTIFICATION PROCEDURE TAINTED THE MAIN EYEWITNESS' IN-COURT IDENTIFICATION OF THE DEFENDANT?

*Answered in the negative by the court below.*

III.   DID THE TRIAL COURT ABUSE ITS DISCRETION BY FINDING THAT A GUILTY VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE WHEN THE UNRELIABLE TESTIMONY OF THE MAIN EYEWITNESS WAS SO UNTRUSTWORTHY THAT TO BASE A VERDICT ON THIS EVIDENCE WAS MANIFESTLY UNREASONABLE?

*Answered in the negative by the court below.*

IV.   WAS THE TRIAL COURT'S IMPOSITION OF SENTENCE UNDER THE UNCONSTITUTIONAL STATUTE, 18 PA.C.S.A. § 9712, ILLEGAL WHEN THE FACTFINDER NEVER FOUND THE FACTS NECESSARY BEYOND A REASONABLE DOUBT FOR THE IMPOSITION OF THE MANDATORY MINIMUM SENTENCE, AS REQUIRED BY THE UNITED STATES

Respondents' Exhibit 38

**SUPREME COURT IN *ALLEYNE V. UNITED STATES*, 133 S.CT. 2151 (2013)?**

*Not answered by the trial court.*

Respondents' Exhibit 38

## STATEMENT OF THE CASE

A.  *Procedural History*:

Matthew Ebo (hereinafter "Matthew") was charged by criminal information at CC 201202821 and convicted after a jury trial of one count of First Degree Murder (18 Pa.C.S.A. § 2502(a)); one count of Robbery – Inflict Serious Bodily Injury (18 Pa.C.S.A. § 3701(a)(1)(i)); one count of Robbery of a Motor Vehicle (18 Pa.C.S.A. § 3702(a)); one count of Firearms Not to be Carried Without a License (18 Pa.C.S.A. § 6106(a)(1)); one count of Possession of Firearms Prohibited (18 Pa.C.S.A. § 6105(a)(1)); one count of Conspiracy to Commit Robbery (18 Pa.C.S.A. § 903(c)); and one count of Conspiracy to Commit Homicide (18 Pa.C.S.A. § 903(c)).  Docket Entry, hereinafter "DE," at 1, 3, 27.

Randall McKinney, Esquire, entered his appearance on April 23, 2012.  DE 5.  Wendy Williams, Esquire, represented the co-defendant, Thaddeus Crumbley.

On May 30, 2012, the Commonwealth filed Notification of Commonwealth's Intention to Present Evidence of Other Crimes, Wrongs, or Acts Pursuant to Rule 404(b)(2).  DE 10.  The Commonwealth argued that it should be permitted to offer evidence of a June 2, 2011 shooting, where co-defendant Crumbley was the shooting victim.  Notification of Commonwealth's Intention to Present Evidence of Other Crimes, Wrongs, or Acts Pursuant to Rule 404(b)(2), filed May 30, 2012, at 2.  According to the Commonwealth, the firearm evidence

Respondents' Exhibit 38

obtained during the June 2, 2011 shooting of Crumbley was also related to the shooting of Todd Mattox in the present case, which occurred several weeks earlier. *Id.* at 2-3. Crumbley's counsel filed a response to this request on July 25, 2012. The matter was litigated during a hearing on July 27, 2012. Matthew's counsel joined in the objections. Notes of Testimony of the July 27, 2012 Motions Hearing, hereinafter "MH," at 7. Crumbley's counsel presented arguments and Matthew's attorney noted that he had nothing further to add. MH 58. The Commonwealth argued and the trial court agreed that this evidence was admissible to show identity. MH 56-58.

Crumbley's counsel filed a Motion to Suppress Identification on August 3, 2012. Docket Entry Part II, hereinafter "DE2," at 60; Stipulation to Supplement Certified Record, filed October 22, 2014, Attachment 2. Matthew's counsel joined in the objections of co-defense counsel, Notes of Testimony of the August 21, 2012 Jury Trial, hereinafter "NT," at 34-35, when the trial court addressed suppression matters at a hearing immediately before the trial on August 21, 2012. NT 28-215. The witness' identification of Matthew was not suppressed. NT 214-15.

The jury trial before the Honorable Beth A. Lazzara spanned from August 21, 2012 through September 4, 2012. DE 27. Matthew was found guilty of all counts. Many motions were filed by the parties and ruled on by the trial court prior

Respondents' Exhibit 38

to, during, and after trial, up to sentencing.  DE 6, 7, 8, 9, 10, 12, 13, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 28, 29, 30, 31, 32.

The Commonwealth sought the mandatory minimum sentence at counts three and six, under 42 Pa.C.S.A. § 9712.  DE 32.  Sentencing occurred on November 28, 2012.  DE 33, 34.  Matthew received a life sentence on the homicide conviction and an aggregate sentence of forty-six to ninety-two years of incarceration on the remaining counts.  At counts three and six, the court imposed consecutive ten to twenty year sentences, which were above the mandatories.

Attorney McKinney asked to withdraw his appearance on November 30, 2012 and that request was granted by order filed on December 12, 2012.  DE 35, 36.

Appellate Counsel was appointed and filed an Emergency Petition for Leave to File Post-Sentence Motions *Nunc Pro Tunc* and a Post-Sentence Motion *Nunc Pro Tunc* on December 19, 2012.  DE 38, 39.  The trial court granted the Motions on December 21, 2012.  DE 40, 41.  A Supplemental Post-Sentence Motion was filed on April 19, 2013.  DE 42.  The Motion was denied by operation of law on June 26, 2013.  DE 45.

Appellate Counsel filed a Notice of Appeal on July 25, 2013.  DE 46.  A Statement of Errors was filed on August 20, 2013.  DE 49.  The trial court filed its Opinion on June 25, 2014.  DE 50.  A briefing schedule was issued.  Appellate

11

Respondents' Exhibit 38

Counsel requested a second extension of time to file the brief and on October 10, 2014, this Honorable Court ordered that a brief be filed on or before December 14, 2014.

This timely brief in support of Matthew's appeal follows.

Respondents' Exhibit 38

B. *Factual History:*

Todd Mattox was shot to death on May 16, 2011.  NT 224, 262.  Witness,

Saday Robinson, testified that she observed Matthew Ebo and Thaddeus Crumbley

shoot Mr. Mattox.  NT 526-27, 531; Trial Court Opinion, at 4-5.  She looked out of

her living room window and saw the co-defendants push Mr. Mattox out of the

front door of the building.  NT 527-28.  Mr. Mattox walked backwards and the two

perpetrators had their backs to Ms. Robinson.  NT 577.  She testified that she saw

Matthew shoot Mr. Mattox and search his pants pockets, and then she saw

Crumbley shoot Mr. Mattox in the head.  NT 531-33; Trial Court Opinion, at 4-5.

She observed both men get into Mr. Mattox's white vehicle and leave.  NT 534.

This vehicle was later found after it had been set on fire.  NT 757-59, 782-87; Trial

Court Opinion, at 5.  There was a lighter fluid can found near the car that had Craig

Coleman's fingerprints on it.  NT 767, 807.  None of the prints matched either co-

defendant.  NT 836.  Craig Coleman, otherwise known as Craig Clark, testified

that his prints were on the can because he took the can to Roman Herring, who

burned the car using the lighter fluid.  NT 945.

Multiple casings were recovered from the scene of Mr. Mattox's shooting.

There were two spent .40 caliber S&W casings that were discharged from one

firearm.  NT 444-45, 447.  There were five other .40 caliber S&W casings that

Respondents' Exhibit 38

were discharged from a different firearm.  NT 450.  There were also two .357 Sig caliber cartridge casings that were discharged from another firearm.  NT 454.

Two nine millimeter caliber bullets were recovered from Mr. Mattox and they were fired from the same firearm.  NT 455-56.  The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon.  NT 460-61.

According to the firearm expert, Raymond Everett, there were a total of three different guns discharged.  NT 461.  The firearm expert tried to match the .40 caliber bullets with the Springfield Armory firearm that was subsequently recovered from Asa Thompkins.  The expert noted that the five spent .40 caliber cartridges all came from the same gun and the rifling characteristics matched the test cartridge casings from the Springfield Armory pistol recovered from Asa Thompkins.  NT 450, 475.  However, the expert stated that he could not identify or eliminate those casings as having been fired from that gun.  NT 475-76.  In fact, there are many .40 caliber weapons that have the same class characteristics.  NT 476-77.  The expert could not tell whether the projectiles came from the Springfield firearm or another .40 caliber firearm.  NT 477.

John Gardone testified that he saw the shooting from fifteen yards away. NT 490.  He saw two men chasing Mr. Mattox and one of the men shot Mr. Mattox several times before leaving in a vehicle.  NT 491-92.  He did not identify anyone.

Respondents' Exhibit 38

Yurri Lewis saw someone go through Mr. Mattox's pockets and drive away in a white car.  NT 515.  He only heard the shots and he did not know if the person going through the pockets was even the shooter.  NT 520.  He never identified anyone.

Brandon Smith saw the shooting.  NT 661.  He heard some sounds in the hallway and then he heard gunshots.  He looked out of the window and saw two men running away.  NT 662.  He never identified the men.

Thomas Brown testified that he heard co-defendant Crumbley say that he killed Mr. Mattox.  NT 698.  Nothing was said about Matthew's involvement.  Thomas Brown had a history of offering police information about different homicide cases when he got into criminal trouble.  NT 702-38.  On multiple occasions, he informed police about confessions someone made to him regarding murdering another person.  NT 728.

Co-defendant Crumbley was the victim in a subsequent shooting on June 2, 2011.  NT 843-47.  Thomas Morgan and Deborah Tator testified about the shooting of co-defendant Crumbley on June 2, 2011, as experts in firearms and tool marks.  NT 859-60, 923-25.  There were spent .40 caliber S&W casings and nine millimeter casings found at that scene, which were discharged by two different firearms.  NT 885.  The nine millimeter casings were all discharged by the Ruger firearm that was also discovered at that scene.  NT 869-70, 925.  The spent .40

Respondents' Exhibit 38

caliber S&W casings were all fired from the same firearm and matched the Springfield Armory pistol that Asa Thompkins possessed on June 9, 2011. NT 360, 923-25, 927. Asa Thompkins happened to be present at the scene of Crumbley's shooting on June 2, 2011. NT 847, 852-53, 857; Trial Court Opinion, at 6.

Asa Thompkins was arrested on June 9, 2011 and, according to Detective Perry, he had a gun "used in the homicide of Mr. Mattox."[1] NT 360. Thompkins said the gun belonged to him. NT 1009-11.

Asa Thompkins and Leron Brown were friends with Crumbley. NT 695-96; Trial Court Opinion, at 7. Leron Brown and Roman Herring, Crumbley's cousin, were found dead in a car. NT 948, 991; Trial Court Opinion, at 7. Roman Herring was allegedly involved in burning the white vehicle that the perpetrators used to leave the scene of the Mattox shooting. NT 945; Trial Court Opinion, at 7. Leron Brown was the son of witness, Thomas Brown, who testified in this case that he heard Crumbley admit to killing Mr. Mattox. NT 695, 698; Trial Court Opinion, at 7.

---

[1] Even though casings found at the scene of the Todd Mattox shooting matched the rifling characteristics of the casings discharged from the Springfield Armory firearm, Mr. Mattox was shot with two nine millimeter bullets. NT 450, 455-56, 475. According to one of the firearms experts, the two nine millimeter bullets recovered from the Mattox autopsy could not have been fired from a .40 caliber weapon. NT 460-61. The Springfield Armory firearm was a .40 caliber weapon. NT 927. The expert also noted that he could not identify or eliminate the casings found at the scene as having been fired from that Springfield gun. NT 475-77.

16

Respondents' Exhibit 38

Crumbley became a suspect in the Todd Mattox murder in September of 2011, when Detective Anthony Perry received a report that connected the firearm used in Mr. Mattox's homicide with the weapon used in the shooting of Crumbley and when witness, Thomas Brown, provided information that Crumbley admitted to killing Mr. Mattox. NT 1017, 1020-21; Trial Court Opinion, at 7. Matthew also became a suspect during that time, although the record is unclear exactly why. NT 1017, 1023.

No prints or DNA connected Matthew to the shooting. NT 1073-74, 1102.

At trial, the only witness who directly identified Matthew as a shooter was Saday Robinson, who admitted lying to police.[2] NT 574, 582, 585, 594-95, 638. Ms. Robinson was shown an array containing a photograph of Crumbley on September 16, 2011, November 11, 2011, and July 24, 2012; however, the array is now missing from the case file. NT 356-58.

According to Ms. Robinson, she was shown an array with Matthew's image and an array with Crumbley's picture. NT 548, 549. She testified that she recognized both men, but she did not identify them because she was scared. NT 548-49; Trial Court Opinion, at 8. Ms. Robinson testified that she purposely picked out someone who she knew was not involved in the homicide prior to

---

[2] Richard Carpenter never testified in this case, but the police noted that he identified Matthew as a suspect prior to July 23, 2012, when Ms. Robinson identified Matthew. Mr. Carpenter received substantial payments from law enforcement and his own criminal sentence was reconfigured "for his own safety." NT 1037, 1040, 1116-17, 1132, 1230, 1235.

Respondents' Exhibit 38

viewing the array of Matthew on November 4, 2011. NT 59, 551-52, 554, 555, 611-17, 621. She told police that someone in the array looked like a perpetrator. NT 555. She saw an array that had Matthew in it and picked someone that looked like Matthew, even though she knew it was the wrong person. NT 67, 163, 166-67, 611-18, 640, 641. The police had no record of that occurring. NT 410, 1000-1001. Contrary to Ms. Robinson's testimony, the police noted that the first array presented to her containing Matthew's picture was on November 4, 2011. NT 416. The police confirmed that she did not pick out Matthew's picture during the November 4, 2011 array. NT 204-05.

She also looked at photo arrays multiple other times and did not pick anyone as a perpetrator until July 24, 2012. NT 55, 197-98, 409-10, 604, 607.

She said that she did not discuss this matter with anyone before moving from the area, but she heard rumors about who shot Mr. Mattox. NT 43, 58, 62-63. Someone named Ace provided her with information about who he thought was responsible for the homicide and she provided that information to police. NT 603. Also, immediately after the incident, a neighbor told her who that person thought did it. NT 637.

She told police that a lighter skinned perpetrator, who she now claims is Matthew, was only 5'7" or 5'8" tall. NT 48, 553, 592-93. Matthew is actually 6'2" tall. NT 413.

Respondents' Exhibit 38

0320

She moved away and returned at the request of the police in the summer of 2012 since the police had suspects in custody and they wanted her to testify. NT 68, 69, 70, 172, 557. The police told her that they thought they knew who was involved. NT 174. Ms. Robinson noted on cross examination:

> DEFENSE COUNSEL: When you were looking at the photo arrays was it your understanding that the men that they arrested were in the photo arrays, some of – at least two of the 25 or 30 pictures they were showing you?
>
> MS. ROBINSON: Yes.
>
> DEFENSE COUNSEL: Who told you that?
>
> MS. ROBINSON: No one.

NT 183-84.

The police provided her with reports while traveling to view the array on July 24, 2012. NT 72, 160, 568. She was shown the array, at which time she identified both Crumbley and Matthew. NT 558, 648-50; Trial Court Opinion, at 8. This is the first and only time prior to trial that she identified Matthew as a perpetrator. NT 558. She made this identification less than two weeks before trial was supposed to start. NT 574. During the fourteen months from the time of the shooting until Ms. Robinson made an identification of Matthew, people talked to her about what occurred that night and who they thought was responsible. NT 559.

She testified that prior to October of 2011, she did not have access to the internet or a computer; however, she had a Facebook account with pictures of her

19

Respondents' Exhibit 38

and her child that was created in 2009.  NT 628, 633.  She said her friend created and maintained the account of her, also commenting on her behalf.  NT 632-33, 645-46.  She stated that she saw no pictures of either defendant on the internet.  NT 638.  A local paper published an article on December 15, 2011, which included pictures of the co-defendants.   NT 403; DE2 60; Stipulation to Supplement Certified Record, filed October 22, 2014, Attachment 1.  Several months after this article was published, Ms. Robinson was able to identify the co-defendants, although she said that she never saw media coverage.  NT 68, 71, 158-59, 403-04.

Respondents' Exhibit 38

**0322**

## SUMMARY OF THE ARGUMENT

First, the trial court erred by admitting irrelevant other crimes evidence that the co-defendant was involved in gun violence weeks after the shooting of Todd Mattox.  This incident regarding the co-defendant's involvement in a subsequent shooting had no relation to the issue of whether Matthew Ebo killed Todd Mattox. This irrelevant information did nothing more than confuse the jury by providing the jury with evidence of gun violence pertaining to an incident that had nothing to do with Matthew.  Even worse, the testimony prejudiced Matthew because it made him appear that he involved himself with individuals who wielded guns and participated in gun violence.  This was highly prejudicial considering that Matthew was on trial for killing another person with a gun.

Second, the highly suggestive pretrial identification procedure tainted the main Commonwealth eyewitness' in-court identification.  The only eyewitness who identified Matthew as the shooter at trial had previously failed to identify Matthew as the perpetrator for fourteen months and she even admitted to misidentifying someone else as the shooter.  The witness made her identification long after the incident, and only after police showed her Matthew's image multiple times and then told her that the suspect had been apprehended.  The eyewitness believed that the perpetrator who killed Mr. Mattox was present in the eight-person array when she viewed the array and identified Matthew as the shooter.  As such,

21

Respondents' Exhibit 38

any evidence relating to this witness' identification of Matthew should have been suppressed.

Next, the trial court abused its discretion by finding that the verdict was not against the weight of the evidence. The only direct evidence presented at trial tying Matthew to this incident was the eyewitness testimony of Saday Robinson who admitted to lying to and misleading police during this investigation, and even accusing the wrong person of murder. Moreover, her questionable testimony was completely inconsistent and incredible in numerous respects. As such, her subsequent identification of Matthew and her testimony of his involvement in this incident are highly suspect, and basing a verdict on this testimony shocks the conscience.

Finally, the mandatory sentence imposed here was illegal. The recent Pennsylvania case, *Commonwealth v. Valentine*, 101 A.3d 801 (Pa. Super. 2014), has held the mandatory sentencing statute at 42 Pa.C.S.A. § 9712 is unconstitutional since facts leading to an increase in a mandatory minimum sentence are elements of a crime that must be submitted to a jury and proven beyond a reasonable doubt. Since that statute was utilized by the sentencing court, rather than the jury, to impose a mandatory sentence in Matthew's case, based only on a preponderance of the evidence, his sentence is illegal and must be remanded for resentencing.

Respondents' Exhibit 38

0324

## ARGUMENT

I.   **THE EVIDENCE THAT THE CO-DEFENDANT WAS INVOLVED IN GUN VIOLENCE TWO WEEKS AFTER THE HOMICIDE WAS INADMISSIBLE EVIDENCE OF OTHER BAD ACTS AGAINST MATTHEW EBO. ALSO, THE IRRELEVANT EVIDENCE HAD NO CONNECTION TO MATTHEW AND IT SHOULD NOT HAVE BEEN PRESENTED AS EVIDENCE THAT MATTHEW WAS SOMEHOW INVOLVED IN THE HOMICIDE.**

The bad acts evidence that co-defendant, Thaddeus Crumbley, was involved in a shooting two weeks after the homicide of Todd Mattox was absolutely irrelevant to the issue of whether Matthew Ebo shot Mr. Mattox. The Commonwealth presented no evidence of a connection between Matthew and the irrelevant gun violence evidence involving Crumbley, which severely prejudiced Matthew in this serious case. As such, a new trial is warranted.

According to the Pennsylvania Rules of Evidence, evidence of a crime, wrong, or other act is inadmissible to prove a person's character in an attempt to show that on a particular occasion that person acted in accordance with the bad character. Pa.R.E. 404(b)(1); *see Commonwealth. v. Brown*, 52 A.3d 320, 325 (Pa. Super. 2012) (citations omitted) ("Bad acts evidence is inadmissible to prove a defendant acted in conformity with those acts or to demonstrate a criminal propensity.").

Respondents' Exhibit 38

Rule 404(b) seeks to prevent the misuse of the other crimes evidence since jurors could ultimately convict a defendant based on the defendant's bad character or propensity to commit crimes. *Commonwealth v. Cascardo*, 981 A.2d 245, 251 (Pa. Super. 2009) (citations and quotations omitted). This is important because "[t]he Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts." *Commonwealth v. Ross*, 57 A.3d 85, 98-99 (Pa. Super. 2012) (citations omitted).

Other crimes evidence is inadmissible under Rule 404(b)(1), unless the Commonwealth can present a statutorily acceptable purpose stated in Rule 404(b)(2) for its admission. Other crimes evidence may be admissible if it is relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident. However, even if the evidence is admissible for one of these limited purposes, this evidence may not be used if the potential for unfair prejudice outweighs the probative value of the evidence. Pa.R.E. 404(b)(2). Relevant evidence establishes a material fact in the case or supports a reasonable inference regarding a material fact. *Commonwealth v. Drumheller*, 808 A.2d 893, 904 (Pa. 2002) (citations omitted).

Respondents' Exhibit 38

**0326**

The other bad acts evidence presented against Matthew here, consisting of subsequent gun violence involving the co-defendant, had no relevant connection to the issue of whether Matthew shot Todd Mattox and it failed to prove his identity as a shooter.

Todd Mattox was killed on May 16, 2011.  NT 224, 262.  Multiple casings were recovered from the scene of Mr. Mattox's shooting.  There were two spent .40 caliber S&W casings that were discharged from one firearm.  NT 444-45, 447. There were five other .40 caliber S&W casings that were discharged by a different firearm.  NT 450.  There were also two .357 Sig caliber cartridge casings that were discharged by a firearm.  NT 454.  According to the firearm expert, Raymond Everett, there were a total of three different guns discharged during the incident. NT 461.

Two nine millimeter caliber bullets were recovered from Mr. Mattox and they were fired from the same firearm.  NT 455-56.  The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon.  NT 460-61.

The firearm expert tried to match the .40 caliber bullets discovered at the Todd Mattox scene with the Springfield Armory firearm that was subsequently recovered from Asa Thompkins.  The expert noted that the five spent .40 caliber cartridges all came from the same gun and the rifling characteristics matched the

Respondents' Exhibit 38

test cartridge casings from the Springfield Armory pistol recovered from Thompkins.  NT 450, 475.  However, the expert stated that he could not identify or eliminate those casings as having been fired from that gun.  NT 475-76.  In fact, there are many .40 caliber weapons that have the same class characteristics.  NT 476-77.   The expert could not tell whether the projectiles came from the Springfield firearm or another .40 caliber firearm.  NT 477.

Crumbley was the victim in a shooting on June 2, 2011.  NT 843-47.   .40 caliber S&W casings, nine millimeter casings, and a Ruger firearm were found at the scene.  NT 859-60, 869-70, 885.  The casings were fired from two separate firearms.  NT 885.

Deborah Tator, an expert in firearms and tool marks, testified about the evidence obtained during the shooting of co-defendant Crumbley on June 2, 2011.  She examined the spent .40 caliber S&W casings and determined that they were all fired from the same firearm.  NT 923-25.  She also noted that the nine millimeter casings were all discharged by the Ruger firearm that was discovered at that scene.  NT 925.  The spent .40 caliber S&W casings matched Asa Thompkins' Springfield Armory pistol[3].  NT 360, 927.

Thompkins was arrested on June 9, 2011 and according to Detective Perry, Thompkins had a gun "used in the homicide of Mr. Mattox."  NT 360.  However,

_____

[3] Thompkins said the gun belonged to him and he happened to be present at the scene of Crumbley's shooting on June 2, 2011.  NT 847, 852-53, 857, 1009-11; Trial Court Opinion, at 6.

Respondents' Exhibit 38

to clarify, even though casings found at the scene of the Todd Mattox shooting might or might not have been fired from the Springfield Armory firearm, Mr. Mattox was shot with two nine millimeter bullets. NT 455-56. The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon. NT 460-61. The Springfield Armory firearm was a .40 caliber weapon, NT 927, so it could not have been used to kill Mr. Mattox. Moreover, the firearms expert could not definitively connect the Springfield gun to the .40 caliber casings discovered at the scene of the Mattox shooting. NT 475-76.

Asa Thompkins' Springfield firearm, discovered in his possession, almost a month after the homicide was completely irrelevant to the issue of whether Matthew committed the homicide of Mr. Mattox. Additionally, the shooting of co-defendant Crumbley and the Ruger firearm discovered at that scene had no relevance to Matthew's trial.

The Springfield firearm was connected to Thompkins because he was in possession of it on June 9, 2011 and he claimed ownership of it. It was connected to co-defendant Crumbley because casings from the gun were found at the scene of Crumbley's subsequent shooting and casings from the gun might have been found at the Mattox scene. However, no evidence presented by the Commonwealth connected the Springfield gun, the Ruger gun, or any other evidence related to Crumbley's June 2, 2011 shooting to Matthew in any way. This evidence had

Respondents' Exhibit 38

nothing to do with the issue of whether Matthew was involved in the Todd Mattox homicide and it failed to connect him to the homicide.  The evidence was completely irrelevant to the issue of whether Matthew killed Todd Mattox.  There was absolutely no probative value to this extremely prejudicial other bad acts evidence involving Crumbley and Thompkins.

The Commonwealth argued at the hearing that this information was necessary, stating, "[I]t is physical evidence that would link Mr. Crumbley to the crime scene of the shooting[.]"  Notes of Testimony from the July 27, 2012 Motions Hearing, hereinafter "MH," at 56.  The Commonwealth noted:

> [T]here was a .40-caliber handgun used during the May 16th shooting death[4], and that .40-caliber under 404(b) on June 2, 17 days later, was discharged at least eight times during the shoot-out and the casings are inside the car.  A week after that, on June 9th, Asa Thompkins, the witness we are speaking about got arrested with that .40-caliber handgun and has been linked scientifically.

MH 35.  The Commonwealth later said, "The other crime is that he was involved in an exchange of gunfire.  That's criminal activity.  Having casings in your car is not a crime, but it is physical evidence of a link to the previous incident."  MH 59.  The Commonwealth said nothing about how this incident involving Crumbley linked Matthew to the Mattox shooting.

---

[4] The firearms expert could not definitively connect the Springfield gun to the casings discovered at the scene of the Mattox shooting.  NT 475-76.

Respondents' Exhibit 38

0330

Matthew's counsel joined in the objections made by Crumbley's attorney at the beginning of the hearing on these various pretrial motions and objections.  MH 7.   At the conclusion of the arguments presented by Crumbley's counsel, Matthew's attorney noted that he had no further arguments to add.  MH 58.

The trial court allowed the evidence in to show identity of both Matthew and Crumbley as participating in the Mattox shooting.  MH 55-56.  In order to properly admit other crimes evidence to show identity, there must be such a high correlation in the details of the crimes, that proof that someone committed one of the crimes makes it unlikely that a different person committed the other crime. *Commonwealth v. Ross*, 57 A.3d 85, 102 (Pa. Super. 2012) (citations and quotations omitted).

Contrary to the reasoning by both the Commonwealth and the trial court, the admission of this firearm does not prove Matthew's identity as the shooter in the Mattox homicide.  When discussing the admission of this other crimes evidence, the parties seemed to be addressing how this evidence showed co-defendant Crumbley's identity, not Matthew's identity.  No evidence was presented that Matthew had any connection to the Springfield gun, that he had any connection to Crumbley's shooting on June 2, 2011 where the Springfield gun was involved, or that he had any connection at all with Asa Thompkins, who was at the scene of the

Respondents' Exhibit 38

June 2, 2011 shooting of Crumbley and who was in possession of the Springfield firearm on June 9, 2011.

To find that a subsequent gun battle involving Crumbley or that Thompkin's possession of the Springfield firearm that ejected casings that may have been found at the Mattox murder scene somehow identifies Matthew as the shooter in the Todd Mattox homicide case is pure speculation. Even if that firearm somehow connected Thompkins or Crumbley to the scene of Mr. Mattox's murder, it in no way tied Matthew to that scene. The connection of this Springfield firearm to the gunfight involving Crumbley and Thompkin's possession of this particular gun in June of 2011 does not make it any more likely that Matthew killed Mr. Mattox in May of 2011 and it should not have been admissible under Pa.R.E. 404(b)(1).

"While Rule 404(b)(1) gives way to recognized exceptions, the exceptions cannot be stretched in ways that effectively eradicate the rule." *Commonwealth v. Ross*, 57 A.3d 85, 104 (Pa. Super. 2012).

In *Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998), the Pennsylvania Supreme Court disagreed with a somewhat analogous argument made by the Commonwealth. In *Robinson*, the Court found it erroneous for the trial court to have admitted photographs of a defendant posing with a nine millimeter handgun to show that he had experience with nine millimeter guns, when the testimony

Respondents' Exhibit 38

0332

showed that a different make of nine millimeter gun was used in the murder. *Id.* at 351.

In *Robinson*, someone shot the defendant's ex-girlfriend and killed her paramour. The ex-girlfriend identified the defendant as the shooter. Police recovered nine millimeter casings at the scene, which were all fired from the same gun. The murder weapon would have been manufactured by one of four possible companies, one of which was Lorcin. *Id.* at 349. The police searched the defendant's residence and found documents in a locked safe relating to a nine millimeter Lorcin gun. They did not find the murder weapon. They also found a picture of the defendant holding a nine millimeter Star gun, a Federal .44 SPL revolver with ammunition, and a bulletproof vest. *Id.* at 350.

The defendant argued that the revolver, the ammunition, the bulletproof vest, and the photographs of the defendant with guns were not relevant. *Id* The Commonwealth stated that the photographs showed that the defendant was capable of using a nine millimeter gun, the type of gun used in the murder. *Id.* at 351. The Supreme Court disagreed, noting that there was no evidence that the nine millimeter Star gun shown in the photograph was used to commit the murder; thus, it was simply not relevant. *Id.* Even if the photographs of the defendant with a nine millimeter gun were relevant to show experience with nine millimeter guns, the Court held that the prejudicial impact of these photographs outweighed any

Respondents' Exhibit 38

probative value.  *Id.*  The Commonwealth used the pictures to show that the defendant was a person capable of committing these crimes.  *Id.*  The Court also held that the unrelated revolver was not relevant or admissible since the revolver was not used in the shooting.  *Id.* at 352.  Finally, the bulletproof vest and the ammunition were irrelevant because there was no logical connection between that evidence and the issues presented.[5]  *Id.* at 353.

    *Robinson* provides guidance here since, like the situation in *Robinson*, the gun evidence should not have been admitted against Matthew due to its irrelevance to any issues in Matthew's trial.  Although the firearm found on Thompkins may have had a connection to the Todd Mattox crime scene and it definitively had a connection to the Crumbley shooting, it in no way connected Matthew to these incidents.  Just because this evidence may somehow connect Crumbley to the Todd Mattox murder scene, it does not automatically mean that Matthew is also connected just because he was charged as a co-defendant.  For these reasons, the gun evidence admitted against Matthew was completely irrelevant and did not show Matthew's identity as a shooter.

    To the extent that this Honorable Court finds the evidence relevant, this Court may still exclude relevant evidence if the probative value is outweighed by the danger of its unfair prejudicial effect, its ability to confuse the issues, or the

---

[5] These errors were harmless since there was substantial properly admitted evidence at trial establishing the defendant's guilt. *Robinson,* 721 A.2d at 351-53.

Respondents' Exhibit 38

danger that it will mislead the jury. Pa.R.E. 403. Unfair prejudice involves a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Pa.R.E. 403, *Comment.*

This evidence that Crumbley was involved in a subsequent shooting and that Crumbley may have had a connection to a gun used at the Mattox crime scene was confusing since it had nothing to do with Matthew. The jury could have inferred that the presentation of this evidence somehow connected Matthew with the Mattox crime scene and the subsequent gun violence involving Crumbley. It was prejudicial since it appeared that Matthew, as a co-defendant of Crumbley, had some kind of connection with these men who involved themselves with gun violence involving Crumbley, thereby making it more likely that he shot Mr. Mattox. Crumbley's subsequent shooting had no bearing on Matthew's trial and likely diverted the jury's attention from the issue at hand, which was whether Matthew committed the intentional murder of Todd Mattox in May of 2011. The absolute irrelevance of this evidence makes the prejudice all the worse.

In *Commonwealth v. Brown*, 52 A.3d 320, 325, 332-33 (Pa. Super. 2012), this Honorable Court held that the trial court abused its discretion by admitting evidence of prior bad acts and granted the defendant a new trial. *Brown* involved a trial regarding accusations that the defendant engaged in illegal drug activity in his capacity as a physician. The trial court in *Brown* permitted the Commonwealth to

33

Respondents' Exhibit 38

introduce evidence of allegations that the defendant obtained his medical degree by fraud. Significant portions of the Commonwealth's case involved the defendant's alleged improper receipt of his medical degree many years before and his submission of altered documents to obtain his medical license. *Id.* at 321-22. The Commonwealth proceeded as though the defendant was on trial for crimes pertaining to his medical degree, which the trial court dismissed due to the statute of limitations. *Id.* at 332.

This Court noted that the prejudicial nature of this evidence outweighed the probative value. The crimes were not similar and there was an extensive time lapse between the crimes. *Id.* "The prejudicial effect of the admission of this evidence, which bore a scant relationship to the actual charges being pursued, cannot be understated." *Id.*

Like *Brown,* the admission of this other crimes evidence severely prejudiced Matthew by presenting the jury with irrelevant evidence that had nothing to do with Matthew and that was no doubt confusing for the jury.

The admission of this evidence was not harmless error. An error is not harmless if there is a reasonable possibility that the error could have contributed to the verdict. *Commonwealth v. Laich,* 777 A.2d 1057, 1062 (Pa. 2001). The Commonwealth must show that either the error did not prejudice the defendant, the erroneously admitted evidence was cumulative of other untainted, substantially

Respondents' Exhibit 38

0336

similar evidence, or the properly admitted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict. *Id*. at 1062-63.

Matthew was on trial for murder and he faced the severe consequence of a life in prison. It was imperative that the members of the jury address the facts of this case without any type of prejudicial or confusing information biasing them in making their decision. The fact that the Commonwealth presented the jury with this information and the jury had it for consideration when deciding Matthew's fate prejudiced him in this life-changing case.

This Court in *Commonwealth v. Miles*, 846 A.2d 132 (Pa. Super. 2004), found that trial court error in admitting evidence of other bad acts so significantly prejudiced the defendant that a new trial was warranted. *Id*. at 137-38. In *Miles*, the evidence of the defendant's guilt consisted of the testimony of the two victims, who each identified the defendant as the perpetrator and indicated that the defendant robbed them within a short period of time in the same geographic vicinity. *Id*. at 138. The Commonwealth presented other bad acts testimony consisting of the defendant's commission of another robbery in the same location. The evidence that the defendant involved himself in another crime was not *de minimus*, it was not cumulative of other evidence, and the prejudicial impact was significant enough to have contributed to the verdict. *Id*. This other crimes

Respondents' Exhibit 38

evidence of an unrelated robbery provided a compelling fact from which the jury could have inferred and concluded that the defendant committed the robberies for which he was on trial. This Court noted that although two victims identified the defendant, the severe prejudice that resulted from admitting evidence of other bad acts outweighed the identification evidence presented by the two victims. *Id.*

Similarly, in the present case, this other crimes evidence relating to Crumbley was confusing and it likely contributed to Matthew's verdict. The evidence of Matthew's guilt was not overwhelming, making the admission of this prejudicial evidence extremely harmful. There were no fingerprints or DNA evidence tying Matthew to the scene. NT 836, 1073-74, 1102. The only evidence linking Matthew to this incident was the questionable identification by Saday Robinson, which was not overwhelming evidence of guilt. She admitted to lying to police throughout the investigation and she misidentified someone else as the perpetrator. NT 551-52, 554, 574, 582, 585, 594-95, 611-17, 638. She saw an array that had Matthew in it and picked someone that looked like Matthew, even though she knew that person was not the shooter. NT 617-18, 640, 641. She finally identified Matthew as a shooter fourteen months after the incident and mere weeks before trial was scheduled to begin. NT 558, 574, 648-50; Trial Court Opinion, at 8. During the fourteen months from the time of the shooting until Ms.

Respondents' Exhibit 38

0338

Robinson made her identification, people talked to her about what occurred that night and who they thought was responsible for the Todd Mattox murder. NT 559.

When considering the very limited evidence connecting Matthew to the shooting of Todd Mattox, the fact that the trial court admitted irrelevant evidence of Crumbley's subsequent connections to gun violence was absolutely confusing and prejudicial. It lacked any connection to Matthew's case and the jury could only infer that Matthew had something to do with the subsequent gun activities involving Crumbley and Thompkins. This no doubt affected the jury and contributed to the verdict. For the above reasons, the trial court's error in admitting this irrelevant other crimes evidence significantly prejudiced Matthew, thereby necessitating a new trial.

Respondents' Exhibit 38

## II. THE HIGHLY SUGGESTIVE PRETRIAL IDENTIFICATION PROCEDURE TAINTED THE MAIN COMMONWEALTH EYEWITNESS' IDENTIFICATION OF MATTHEW EBO AND ANY INFORMATION ABOUT THE WITNESS' PHOTO ARRAY IDENTIFICATION AND HER SUBSEQUENT IN-COURT IDENTIFICATION SHOULD HAVE BEEN SUPPRESSED.

Saday Robinson's identification of Matthew Ebo was tainted and should have been suppressed. The police continued to show her photo arrays that included the image of Matthew even though Ms. Robinson did not identify anyone for approximately fourteen months. Finally, the police told her that they had the two individuals in custody a few weeks before trial was scheduled to begin and that the individuals were in the photo array. At that point, Ms. Robinson suddenly identified Matthew as a perpetrator. This suggestive procedure tainted her subsequent in-court identification.

The United States Supreme Court has stated that the danger of an incorrect identification is increased if the police show a person "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized. The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime." *Simmons v. United States*, 390 U.S. 377, 383 (1968) (citations omitted). The witness is therefore likely to retain the image of the

Respondents' Exhibit 38

photograph, rather than of the person that she actually witnessed, which reduces the trustworthiness of subsequent lineup or courtroom identification. *Id.* (citations omitted).

In the present case, Saday Robinson, the only witness to present trial testimony that she saw Matthew shoot Todd Mattox, identified Matthew after the highly suggestive photographic identification procedure. Ms. Robinson was not able to identify Matthew until fourteen months after the incident. NT 558. Law enforcement created a photo array containing Matthew's photograph in October of 2011 and showed it to Ms. Robinson on November 4, 2011. NT 338-39, 415-16. She could not identify anyone at that time.[6] NT 204-205, 1000-01. According to police, they also showed her an array containing Matthew's photograph on July 24, 2012. NT 338. That was the first time that she identified Matthew as a perpetrator. NT 648-49. Ms. Robinson testified that she looked at a third array that contained Matthew's picture and she identified a different person, but the police had no record of that occurring.[7] NT 66-67, 193-94, 409-10, 551-52, 622-23.

---

[6] She later testified that she failed to identify anyone prior to July 24, 2012 because she was scared. NT 548.

[7] There arguably seemed to be an issue with police keeping track of the many photo arrays shown to Ms. Robinson in this case. In addition to the police having no record of Ms. Robinson identifying another person during a photo array involving Matthew, the police also noted that one of the arrays of co-defendant Crumbley was missing from the file, although the police still had the pictures. NT 356-58, 1249. Detective Perry also testified they were unaware that Ms. Robinson was shown a photo array of women the day after the incident. NT 197, 637-38.

Respondents' Exhibit 38

Police showed up at Ms. Robinson's grandmother's house while Ms. Robinson was in Pittsburgh on November 4, 2011. NT 156. They wanted to show her some photos. NT 157. She failed to identify Matthew at that time. NT 188, 205, 413-16.

Interestingly, months later, immediately prior to Ms. Robinson identifying Matthew as the perpetrator, the police told her that they knew who was responsible for the Mattox killing, that they had arrested two people in relation to this crime, and it was her understanding that the two perpetrator's pictures were in the arrays police showed her on July 24, 2012. NT 174, 182, 183-84.

Detective Perry had contacted Ms. Robinson's grandmother, asking that Ms. Robinson contact him. NT 69. Ms. Robinson contacted Detective Perry around the beginning of July 2012. NT 69-70. He inquired whether she would travel back to Pittsburgh to look at another photo array and testify in court. She agreed. NT 70. He also testified that she was subpoenaed to testify at trial and he made her aware of that fact. He told her that since she lived far away no one could harm her. NT 417.

Detective Perry picked her up at the hotel and had her review her first interview with police. NT 71-72, 380. He told her that two perpetrators had been

---

Detective Perry said no one was in charge of this investigation, while Detective Hitchings said that Detective Perry was the lead detective. NT 1030-31, 1256.

Respondents' Exhibit 38

arrested in this case.  NT 380-82.  He thought that telling her this would put her at ease.  NT 381-82.

This identification procedure was highly suggestive.  Law enforcement showed Ms. Robinson a photo array including Matthew's picture on at least two occasions, arguably more.  Ms. Robinson was familiar with Matthew from her neighborhood and she saw him with Crumbley.  NT 536-37.  They were always together when she saw them.  NT 537.  Crumbley's photograph was also shown to Ms. Robinson on multiple occasions.  Ms. Robinson very well could have made an association that Matthew was involved in the Mattox shooting due to the fact that the police kept showing her photographs of Matthew and Crumbley, who she knew associated with one another.  If she saw Crumbley at the scene of Todd Mattox's shooting, she may have inferred that Matthew was there as well when police showed her arrays including his picture on multiple occasions.

Moreover, the police procedure was extremely suggestive considering that prior to the array on July 24, 2012, the police told her that they had arrested the two suspects and they needed her to testify at the upcoming trial on this case.  She moved away and returned at the request of the police in the summer of 2012 since the police had suspects in custody and they wanted her to testify.  NT 68, 69, 70, 172, 557.  The police told her that they thought they knew who was involved.  NT 174.

Respondents' Exhibit 38

It was her belief that the two perpetrators were included in the photo arrays.

Ms. Robinson noted on cross examination:

> DEFENSE COUNSEL: When you were looking at the photo arrays was it your understanding that the men that they arrested were in the photo arrays, some of – at least two of the 25 or 30 pictures they were showing you?
>
> MS. ROBINSON: Yes.
>
> DEFENSE COUNSEL: Who told you that?
>
> MS. ROBINSON: No one.

NT 183-84.

The police provided her with reports while traveling to view the array on July 24, 2012. NT 72, 160, 568. She was shown the array, at which time she identified both Crumbley and Matthew. NT 558, 648-50; Trial Court Opinion, at 8. This is the first and only time that she identified Matthew as a perpetrator prior to trial. NT 558. She made this identification less than two weeks before trial was supposed to start. NT 574. Considering that she reviewed Matthew's picture believing that the perpetrator was in the array, she had been shown his image multiple times over the course of this investigation, and she knew Matthew from the area as an associate of Crumbley, she would have been more likely to identify him even if he was not involved. For the above reasons, any evidence pertaining to Ms. Robinson's identification of Matthew from the photo array should have been suppressed.

Respondents' Exhibit 38

Due to the suggestiveness of the photo identification procedure, Ms. Robinson's in-court identification of Matthew was tainted. The Commonwealth bears the burden of establishing that any identification testimony offered is free from taint of the initial illegality. *Commonwealth v. Moore,* 633 A.2d 1119, 1125 (Pa. 1993) (citations omitted). "In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification." *Id.* (citing *Simmons v. United States,* 390 U.S. 377 (1968); *Neil v. Biggers,* 409 U.S. 188 (1972)).

Improper employment of photographs by law enforcement can cause witnesses to err in identifying perpetrators. It is this likelihood of misidentification that violates a defendant's right to due process. *Commonwealth v. Fowler,* 352 A.2d 17, 25 (Pa. 1976) (citing *Simmons v. United States,* 390 U.S. 377, 383 (1968); *Neil v. Biggers,* 409 U.S. 188, 198 (1972)).

"Following a suggestive pre-trial identification procedure, a witness should not be permitted to make an in court identification unless the prosecution establishes by clear and convincing evidence that the totality of the circumstances affecting the witness's identification did not involve a substantial likelihood of misidentification." *Commonwealth v. Fowler,* 352 A.2d 17, 19 (Pa. 1976) (citations omitted).

Respondents' Exhibit 38

The trial court "should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of time between the incident and the court identification." *Moore*, 633 A.3d at 1125-26 (citations omitted).

When reviewing the totality of the circumstances, in the present case, there was not a sufficient independent basis for Ms. Robinson's identification of Matthew. Ms. Robinson saw the incident in the evening at approximately 7:37 p.m. NT 387. Although it was still daylight outside and she said that she watched the perpetrator for about five minutes, Ms. Robinson was approximately eighty feet from where the incident occurred. NT 384-85, 536, 538. She thought she was only ten or fifteen feet away, but law enforcement confirmed that she was actually approximately eighty feet away. NT 168-69, 384-85. She was understandably very upset and very nervous by what she witnessed. NT 1172. This may have affected her focus on the incident and the perpetrators.

In fact, she initially told police that the person who she ultimately identified as Matthew was 5'7" or 5'8" tall with a medium build, even though Matthew was much taller and heavier at 6'2" and 230 pounds. NT 48, 167, 413, 553, 1166,

Respondents' Exhibit 38

1183.  She also provided very general information that the perpetrator was a light-skinned black male, with a mini-afro and goatee, wearing black pants, a black hoody, and a white tee-shirt.  NT 1166.  This description could fit many people.

Furthermore, even though Ms. Robinson viewed Matthew's picture in the past, she failed to identify him until fourteen months after the incident and she testified that she previously misidentified someone as the perpetrator.  NT 66-67, 193-94, 409-10, 551-52, 622-23, 648-49.

Considering the discrepancies between Ms. Robinson's description and Matthew's appearance, her failure to previously identify him, her testimony of a prior misidentification, and the fact that fourteen months elapsed between the incident and her identification of Matthew, the suggestive identification procedure very well could have swayed Ms. Robinson's in-court identification of Matthew.

In *Commonwealth v. Fowler*, 352 A.2d 17 (Pa. 1976), the Pennsylvania Supreme Court addressed a situation involving a highly suggestive photographic identification, which entitled the defendant to a new trial.  *Id*. at 19.  In *Fowler,* two men entered the premises and a woman who was present glimpsed them.  She got face-down on the floor and she heard one of the men tell the other to shoot her father.  She heard shots and her father fell.  She remained on the floor until the men fled.  Her father died.  *Id*. at 23.  The woman described the one man to police.  *Id*. As a result of an independent investigation, the defendant became a suspect.  Over

45

Respondents' Exhibit 38

the next three months, the woman was repeatedly shown groups of photographs to see if she could identify anyone as the perpetrator. She testified that the defendant's picture was included multiple times in the hundreds of photographs. Each time that she saw his photograph, she held it out because she thought that he resembled the perpetrator; however, she never identified him. *Id.*

The woman was interviewed numerous times within the three month period. There were no records regarding the photographs shown to her; however, the defense was able to establish that she was shown the defendant's picture on at least three occasions. *Id.* The defendant's picture differed slightly from most of the other photographs, in that his photograph was not a mug shot. *Id.* at 23-24. During this three month period, the woman saw the defendant in a restaurant and she heard his voice. She notified police and they showed her another photo array, but she still could not identify anyone. *Id.* at 24.

Police arrested the defendant and placed him in a lineup. The woman asked him to speak and she was suddenly able to identify him as the perpetrator. *Id.* At trial, she identified him. *Id.*

The Pennsylvania Supreme Court concluded that based on the totality of the circumstances, this identification process was unnecessarily suggestive and the Commonwealth failed to establish that the in-court identification had an independent basis in the witness' observations at the time of the incident. *Id.* The

Respondents' Exhibit 38

repetitive display of the defendant's photograph, along with the fact that the defendant's photograph was different, increased the danger that the process could lead to misidentification. *Id.* at 24-25. Furthermore, when viewing the totality of the circumstances, the Court concluded that the witness' in-court identification did not originate in her observations at the time of the homicide. She had little opportunity to view the perpetrator, her description of the perpetrator was general, and her description of the age of the perpetrator did not match the defendant. *Id.* at 25. Finally, only after three months of repeated viewings of his photograph was the witness able to recognize the defendant. *Id.* Since this pretrial identification procedure was so suggestive, the Court reversed the defendant's conviction and granted him a new trial. *Id.*

The situation in *Fowler* has some similarities to Matthew's case. For example, in Matthew's case, Ms. Robinson was unable to identify Matthew as a perpetrator until fourteen months after the incident and after she reviewed his photograph in arrays multiple times. In *Fowler*, the witness was unable to make an identification until three months of repeated viewings of the defendant's photograph. Also, like the situation in *Fowler*, Ms. Robinson provided a description of Matthew that did not match his physical characteristics. Her description of Matthew's height and weight differed significantly and the rest of the information that she provided about the perpetrator was very general. There

are many light-skinned black males with mini-afros and facial hair who own black clothing. Like the situation in *Fowler*, the suggestive identification procedure here tainted Ms. Robinson's in-court identification of Matthew. *Cf. Commonwealth v. Davis*, 17 A.3d 390, 394-95 (Pa. Super. 2011) (an independent basis for the identification existed, even though the identification was suggestive, since the witness described the defendant in detail to police and the description remained unchanged throughout the pendency of the case, the witness identified the defendant quickly and decisively, and the witness observed the defendant from several feet away); *also cf. Commonwealth v. Porter*, 569 A.2d 942, 945-46 (Pa. 1990) (an independent basis existed for the identification when the witness saw the defendant in good lighting and gave the police an accurate description of the defendant, and she continued to identify him as the perpetrator throughout the proceedings, even though she failed to identify the defendant in a photo array a few days after the incident because she said she was scared and she did not identify him until she saw his picture in a news broadcast).

In the present case, Ms. Robinson failed to identify Matthew as the perpetrator until fourteen months after the incident, after police had presented her with his picture multiple times and told her that they had the perpetrators in custody awaiting trial. This taint affected her in-court identification, especially considering that she was also unable to provide reliable details about Matthew to

Respondents' Exhibit 38

police and she misidentified someone in a photo array.   For these reasons, any evidence relating to her identification of Matthew should have been suppressed.

Respondents' Exhibit 38

III.   **THE TRIAL COURT ABUSED ITS DISCRETION BY FAILING TO GRANT MATTHEW EBO A NEW TRIAL SINCE THE VERDICT WAS AGAINST THE WEIGHT OF THE EVIDENCE WHEN THE UNRELIABLE TESTIMONY OF THE EYEWITNESS CONNECTING MATTHEW TO THE CRIME WAS SO UNTRUSTWORTHY THAT BASING A GUILTY VERDICT ON THIS EVIDENCE WAS MANIFESTLY UNREASONABLE.**

A defendant may be granted a new trial if the verdict is against the weight of the evidence. *Commonwealth v. Meadows*, 369 A.2d 1266, 1270 (Pa. 1977) (citations omitted). The role of the trial court is to determine whether certain facts are so clearly of greater weight that to ignore them or give them equal weight with all the facts, denies the defendant justice. *Commonwealth v. Rivera*, 983 A.2d 1211, 1225 (Pa. 2009) (citation omitted). An appellate court cannot substitute its judgment for that of the fact-finder, but a reversal of the trial court's verdict is warranted if it is so contrary to the evidence as to shock one's sense of justice and the award of a new trial is imperative so that right may be given another opportunity to prevail. *Commonwealth v. Clay,* 64 A.3d 1049, 1055 (Pa. 2013) (citations omitted); *Commonwealth v. Champney*, 832 A.2d 403, 408 (Pa. 2003) (citations omitted).

Although an appellate court must give great consideration to the findings and reasons advanced by the trial court when reviewing a trial court's

Respondents' Exhibit 38

determination that the verdict is against the weight of the evidence, the trial court's

exercise of discretion is not unfettered.  *Clay,* 64 A.3d at 1055 (citations omitted).

> Discretion must be exercised on the foundation of reason, as opposed
> to prejudice, personal motivations, caprice or arbitrary actions.
> Discretion is abused where the course pursued represents not merely
> an error of judgment, but where the judgment is manifestly
> unreasonable or where the law is not applied or where the record
> shows that the action is a result of partiality, prejudice, bias or ill-will.

*Id.* (citations omitted).

In the present case, Saday Robinson was the only witness who presented

testimony directly connecting Matthew to this shooting.   No other witnesses

testified with any first-hand knowledge about Matthew's involvement as a

perpetrator in the shooting.[8]  Additionally, no prints or DNA connected Matthew to

the shooting.  NT 1073-74, 1102.  Considering that Ms. Robinson's testimony was

completely untrustworthy for a variety of reasons, this matter should be remanded

for a new trial.

First, Ms. Robinson's willingness to mislead police during their

investigation and accuse the wrong person of murder makes her subsequent

identification of Matthew and her testimony of his involvement in this incident

highly suspect.  Considering that the Commonwealth presented no other direct

---

[8] Although Richard Carpenter never testified in this case, the police noted that he identified
Matthew as a suspect prior to July 23, 2012, when Ms. Robinson identified Matthew.  Mr.
Carpenter received substantial payments from law enforcement and his own criminal sentence
was reconfigured "for his own safety."  NT 1037, 1040, 1116-17, 1132, 1230, 1235.

Respondents' Exhibit 38

evidence of Matthew's involvement in this incident, Ms. Robinson's questionable identification of Matthew was instrumental to the Commonwealth's case.

Ms. Robinson admitted to lying to police on numerous occasions and she purposefully misidentified people as perpetrators in murder. NT 574, 582, 585, 594-95, 638. For example, she was shown an array with Matthew's image and another array with co-defendant Crumbley's image on November 4, 2011. NT 548, 549. She testified that she recognized both men, but she did not point them out because she was scared. NT 548-49; Trial Court Opinion, at 8. She moved away and returned at the request of the police in the summer of 2012, since the police had suspects in custody. NT 557. She was shown another array on July 24, 2012, at which time she identified Crumbley and Matthew. NT 558, 648-50; Trial Court Opinion, at 8. This is the first and only time that she identified Matthew as a perpetrator prior to trial. NT 558. She did not identify Matthew until over a year after the incident and less than two weeks before trial was scheduled to begin. NT 574.

She even went so far as to pick out someone who she knew was not involved in the homicide. NT 551-52, 554, 611-17. She stated that she told police that someone in the array looked like a perpetrator, but she later clarified that she picked out the wrong person. NT 555, 611-17. She saw an array that had Matthew in it and picked someone that looked like Matthew, even though she knew that

Respondents' Exhibit 38

person was not the shooter. NT 617-18, 640, 641. She proceeded through this investigation acting dishonestly.

Furthermore, her initial description of the perpetrator who she later identified as Matthew did not correlate to what Matthew actually looked like. According to Detective Anthony Diulius, Ms. Robinson gave him a description on the night of the incident and she seemed honest and certain in her description of the perpetrator. NT 1160, 1163-64, 1166, 1183, 1185. She initially described the person who she later identified as Matthew, as only 5'7" or 5'8" tall with a medium build. NT 48, 167, 413, 553, 592-93, 1166, 1183. However, Matthew is actually 6'2" tall and weighs 230 pounds. NT 413.

Even worse, during the fourteen months from the time of the shooting until Ms. Robinson identified Matthew, people talked to her about the incident and who they thought shot Mr. Mattox. NT 559, 601-02. For example, someone named Ace said that Matthew was responsible for this incident. NT 58, 603, 657, 748. She provided police with this information. NT 603. She was also told by a neighbor immediately after the incident who that person thought committed the crime. NT 637. She testified that on the day of the shooting, this neighbor told Ms. Robinson that the man that she knew as Matthew did this. NT 43. This information no doubt affected who Ms. Robinson assumed committed this crime.

Respondents' Exhibit 38

Additionally, Ms. Robinson's testimony regarding whether she reviewed any outside information about this case was unbelievable.  Although she testified that she never looked up information about this case and she testified that prior to October of 2011 she did not have access to the internet or a computer, this is incredible considering that she had a Facebook account, created in 2009, displaying pictures of her and her child.  NT 628, 633.  She said her friend created and maintained the account of her, also commenting on her behalf about her child.  NT 632-33, 645-46.  This seems rather questionable.  Also, a local paper published an article online on December 15, 2011, which contained Matthew's picture and information about his arrest.  NT 403; DE2 60; Stipulation to Supplement Certified Record, filed October 22, 2014, Attachment 1.  Ms. Robinson could have looked online to see who police had apprehended as a suspect prior to testifying for trial.  Even though she stated that she saw no pictures of either defendant on the internet, interestingly, several months after this article was published, Ms. Robinson was able to identify Matthew for the first time.  NT 403-04; 638.

Ms. Robinson's testimony, which was the only direct evidence presented at trial identifying Matthew as a perpetrator, was completely unbelievable.  Her description of Matthew did not match, she did not identify him as a suspect until fourteen months after the incident and immediately before trial was beginning, and she only identified him after looking at numerous arrays over a fourteen month

Respondents' Exhibit 38

0356

period.   She was completely dishonest over the course of the investigation, testifying that she lied to police during the investigation and that she identified the wrong person as the shooter.  She also testified that she never researched into this case and she did not have access to the internet; however, she had a Facebook account with pictures of her and her child that included personal responses to comments posted about her pictures.  Considering that people in the community were also telling her who they thought committed the crime, her identification of Matthew as the perpetrator was completely untrustworthy.   Since the Commonwealth presented no other evidence directly tying Matthew to this incident, the verdict was against the weight of the evidence and the trial court erred by failing to grant Matthew a new trial.

Respondents' Exhibit 38

IV.  **THE TRIAL COURT'S IMPOSITION OF THE MANDATORY MINIMUM SENTENCE UNDER 42 PA.C.S.A. § 9712, AN UNCONSTITUTIONAL STATUTE, WAS ILLEGAL SINCE THE FACTFINDER NEVER FOUND THE REQUIRED FACTS BEYOND A REASONABLE DOUBT FOR THE IMPOSITION OF THE MANDATORY AS REQUIRED BY THE UNITED STATES SUPREME COURT IN *ALLEYNE V. UNITED STATES,* 133 S.CT. 2151 (2013).**

Based on the United States Supreme Court holding in *Alleyne v. United States*, 133 S.Ct. 2151 (2013), and the recent holdings in *Commonwealth v. Valentine*, 101 A.3d 801 (Pa. Super. 2014) and *Commonwealth v. Newman*, 99 A.3d 86 (Pa. Super. 2014), Matthew Ebo's mandatory sentence, imposed under 42 Pa.C.S.A. § 9712, is illegal since the statute is unconstitutional.  As required by *Alleyne,* the jury never made the determination that the mandatory elements applied based on proof beyond a reasonable doubt; thus, the imposition of the mandatory sentence is illegal here.

A claim raising the legality of the sentence is not waivable and can be entertained by the appellate court as long as that court has jurisdiction. *Commonwealth v. Munday*, 78 A.3d 661, 664 (Pa. Super. 2013) (citation omitted). A claim implicating the rule in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), presents an illegal sentencing claim.  *Munday*, 78 A.3d at 664 (citation omitted). This is the type of illegal sentencing claim presented in the instant case and it cannot be waived.

Respondents' Exhibit 38

In *Apprendi*, the United States Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The Court also noted that it is unconstitutional for the legislature to remove from the factfinder the assessment of facts that increase the range of penalties to which a defendant is exposed and such facts must be established by proof beyond a reasonable doubt. *Id.* (citations and quotations omitted).

The Supreme Court went further in *Alleyne v. United States*, 133 S.Ct. 2151, 2155 (2013), stating that, "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Id.* (citations omitted) Under *Alleyne*, the jury, as factfinder, must make this decision based on proof beyond a reasonable doubt. *Id.* at 2160-61 (citations omitted).

In the present case, although this legality of the sentence issue was not preserved below, it cannot be waived on appeal. "[A] challenge to a sentence premised upon *Alleyne* likewise implicates the legality of the sentence and cannot

Respondents' Exhibit 38

be waived on appeal." *Commonwealth v. Newman*, 99 A.3d 86, 90 (Pa. Super. 2014).

In *Newman*, 99 A.3d at 89-91, even though the appellant initially failed to challenge his mandatory sentence based on *Alleyne* on direct appeal, the appellant was able to raise this illegal sentencing question for the first time in an application for reconsideration/reargument since the legality of the sentence could not be waived on appeal. *See also Valentine*, 101 A.3d at 809 (even though the appellant did not raise the claim that 42 Pa.C.S.A. § 9712 was unconstitutional before the trial court, this issue was not waived on appeal because the application of a mandatory minimum was an illegal sentencing issue). As such, in the present case, even though this illegal sentencing claim was not preserved below, it can be raised for the first time on appeal.

The application of the mandatory under section 9712 is illegal in Matthew's case since that statute is unconstitutional under *Alleyne* and the jury never made the determination beyond a reasonable doubt whether all of the factors applied in order to validly impose the mandatory on Matthew.

In the recent Superior Court case, *Commonwealth v. Valentine*, this Honorable Court confirmed that the mandatory sentencing statute, 42 Pa.C.S.A. § 9712, which was the sentencing statute utilized in Matthew's case, was unconstitutional under both *Alleyne* and *Newman* since the sentencing judge

Respondents' Exhibit 38

decided that these elements applied based on the wrong burden of proof. *Valentine*, 101 A.3d at 811-12.

According to 42 Pa.C.S.A. § 9712:

> **(a) Mandatory sentence.--**Except as provided under section 9716 (relating to two or more mandatory minimum sentences applicable), any person who is convicted in any court of this Commonwealth of a crime of violence as defined in section 9714(g) (relating to sentences for second and subsequent offenses), shall, if the person visibly possessed a firearm or a replica of a firearm, whether or not the firearm or replica was loaded or functional, that placed the victim in reasonable fear of death or serious bodily injury, during the commission of the offense, be sentenced to a minimum sentence of at least five years of total confinement notwithstanding any other provision of this title or other statute to the contrary. Such persons shall not be eligible for parole, probation, work release or furlough.

> **(b) Proof at sentencing.--***Provisions of this section shall not be an element of the crime* and notice thereof to the defendant shall not be required prior to conviction, but reasonable notice of the Commonwealth's intention to proceed under this section shall be provided after conviction and before sentencing. The applicability of this section shall be determined at sentencing. *The court shall consider any evidence presented at trial* and shall afford the Commonwealth and the defendant an opportunity to present any necessary additional evidence and *shall determine, by a preponderance of the evidence, if this section is applicable.*

42 Pa.C.S.A. § 9712 (emphasis added).

Respondents' Exhibit 38

In the instant case, when Matthew was sentenced, according to the language in section 9712, the Commonwealth had to demonstrate to the sentencing court by a preponderance of the evidence that Matthew visibly possessed a gun and the victim was placed in reasonable fear of death for the mandatory to apply. However, under *Alleyne*, any facts that lead to an increase in the mandatory minimum are elements of the crime and must be addressed by the jury and proven beyond a reasonable doubt. *Valentine*, 101 A.3d at 809 (citation omitted). The *Alleyne* decision renders Pennsylvania's mandatory minimum statutes, such as section 9712, infirm since they permit a sentencing judge to automatically increase a defendant's sentence based on a preponderance of the evidence standard. *Id.* at 811-12 (citations and quotations omitted). *See also Newman*, 99 A.3d at 103 (*Alleyne* rendered 42 Pa.C.S.A. § 9712.1 unconstitutional so the application of the mandatory minimum under section 9712.1 cannot stand).

By following the mandate of section 9712, the sentencing court here imposed an illegal sentence by depriving Matthew of his Sixth Amendment right to a trial by jury since the jury had to find beyond a reasonable doubt that Matthew visibly possessed a firearm that placed the victim in fear of death.

*Commonwealth v. Munday*, 78 A.3d 661 (Pa. Super. 2013), provides additional guidance on the legality of the imposition of the mandatory minimum in this case. In *Munday*, this Honorable Court addressed how the ruling in *Alleyne*

Respondents' Exhibit 38

interacted with the mandatory sentencing statute under 42 Pa.C.S.A. § 9712.1, which involved an increased mandatory minimum sentence if a person was convicted of possession with intent to deliver and that person was in possession or control of a firearm. *Id.* at 662.

Like the statute in question in Matthew's case, according to section 9712.1(c), the sentencing court determines the applicability of the mandatory based on a preponderance of the evidence standard. *Id.* at 666 (citing and discussing 42 Pa.C.S.A. § 9712.1). This Court noted that it presumed that the sentencing court followed the mandate set forth in section 9712.1(c) to determine whether the defendant possessed a firearm during the offense and that the sentencing court treated that fact as a sentencing factor based on a preponderance standard. *Id.*

*Munday* discusses the ruling in *Alleyne,* noting that *Alleyne* establishes that "when a mandatory minimum sentence is under consideration based on judicial factfinding of a 'sentencing factor,' that 'sentencing factor' is, in reality, 'an element of a distinct and aggravated crime' and, thus, requires it be proven beyond a reasonable doubt." *Id.* (citing *Alleyne,* 133 S.Ct. at 2163). This Court concluded that the imposition of the mandatory violated the rule in *Apprendi* as interpreted by *Alleyne*. *Id.* As such, this Honorable Court vacated the sentence and remanded for resentencing. *Id.* at 662-63, 664, 666.

Like the situation in *Munday*, the sentencing court in the present case found

61

Respondents' Exhibit 38

by a preponderance of the evidence that certain facts were proven to support the imposition of the mandatory, even though the facts, such as whether Matthew visibly possessed a firearm, were never specifically submitted to the factfinder to find beyond a reasonable doubt. "[A]ny fact that served to aggravate the minimum sentence must be found by a jury beyond a reasonable doubt." *Newman,* 99 A.3d at 96. Like this Court held in *Munday*, this finding by the sentencing court based on a preponderance of the evidence standard makes the sentence illegal.

In conclusion, since the sentencing court, rather than the jury, found by a preponderance of the evidence, rather than beyond a reasonable doubt, that the unconstitutional mandatory sentencing statute applied at counts three and six, Matthew is entitled to a new sentencing hearing without consideration of this unconstitutional sentencing provision.

Respondents' Exhibit 38

**0364**

## CONCLUSION

For the foregoing reasons, Matthew requests that this Honorable Court vacate the judgment of sentence, remand to the trial court for a new trial, remand to the trial court for resentencing, or grant any other relief that law and justice require.

Respectfully Submitted,

ELLIOT HOWSIE
Public Defender

JESSICA L. HERNDON
PA I.D. # 93388
Appellate Counsel
Counsel of Record

Respondents' Exhibit 38

0365

## <u>CERTIFICATE OF COMPLIANCE</u>

The applicable portions of the Brief for Appellant do not exceed 14,000 words.

Respectfully submitted,

JESSICA L. HERNDON
PA I.D. # 93388
Appellate Counsel
Counsel of Record

Respondents' Exhibit 38

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION


COMMONWEALTH OF PENNSYLVANIA,     No. CR 2820-2012

    v.

THADDEUS CRUMBLEY,

    Defendant.

**ORIGINAL**
Criminal Division
Dept. of Court Records
Allegheny County, PA.


COMMONWEALTH OF PENNSYLVANIA,     No. CR 2821-2012

    v.

MATTHEW EBO,     OPINION

    Defendant.     BETH A. LAZZARA, JUDGE
Court of Common Pleas

Copies Sent To:

Michael W. Streily, Esquire
Office of the District Attorney
Allegheny County Courthouse
Pittsburgh, PA 15219

Sally Frick, Esquire
437 Grant Street
Suite 407
Pittsburgh, PA 15219

Jessica L. Herndon, Esquire
Office of the Public Defender
400 County Office Building
542 Forbes Avenue
Pittsburgh, PA 15219

# APPENDIX A

Respondents' Exhibit 38

THE COURT OF COMMON PLEAS
OF ALLEGHENY COUNTY, PENNSYLVANIA

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | CRIMINAL DIVISION |
| vs. | |
| THADDEUS CRUMBLEY, | CC: 2820-2012 |
| Defendant. | |
| COMMONWEALTH OF PENNSYLVANIA, | CRIMINAL DIVISION |
| vs. | |
| MATTHEW EBO, | CC: 2821-2012 |
| Defendant. | |

## OPINION

This is an appeal following the imposition of sentences to life imprisonment for both Defendants following a jury trial in which both Defendants were found guilty of First Degree Murder, Robbery -- Serious Bodily Injury, Robbery -- Motor Vehicle, Carrying a Firearm without a License, Conspiracy -- Robbery and Conspiracy -- Murder. The trial occurred between August 22, 2012 and September 4, 2012, and the Defendants were sentenced on November 28, 2012. On appeal, the Defendants have raised numerous allegations of error, which will be set forth and discussed below. Many of the issues raised by the Defendants are identical, which is why this court has chosen to address them in a single opinion.

Respondents' Exhibit 38

I.   <u>ALLEGATIONS OF ERROR</u>

The Defendants have raised numerous allegations of error in their Concise Statements of Matters Complained of on Appeal.  These are listed below, by Defendant, and it is further noted at which section of this opinion the alleged error is discussed.

*Defendant Crumbley:*

1.  The court failed to exclude the testimony of Saday Robinson due to alleged violations of Pa. R. Crim. Proc. 573. (Section III. A.)

2.  The court failed to exclude the testimony of Saday Robinson due to police taint or bias in the identification. (Section III. B.)

3.  The court erred in admitting evidence of a subsequent shooting involving Defendant Crumbley, failed to give a limiting instruction regarding the evidence and failed to exclude evidence relating to a Ruger handgun. (Section III. C.)

4.  The court failed to either strike a comment, or provide a curative instruction related to the comment, made by the Assistant District Attorney referring to Defendant Crumbley as "the Angel of Death."  Additionally, Defendant Crumbley has alleged ineffective assistance of counsel due to his counsel's lack of objection to the comment. (Section III. D.)

5.  The court failed to exclude testimony of certain "jailhouse" witnesses due to alleged violations of Pa. R. Crim. Proc. 573. (Section III. E.)

6.  The court failed to give a "missing witness" instruction as to witness Richard Carpenter. (Section III. F.)

Respondents' Exhibit 38

7. The court violated Defendant Crumbley's right to a speedy trial by granting a continuance on June 7, 2012 (Section III. G.)

8. The evidence was insufficient to sustain the verdict. (Section III. H.)

9. The verdict was against the weight of the evidence. (section III. H.)

*Defendant Ebo:*

1. The court failed to exclude the testimony of Saday Robinson due to alleged violations of Pa. R. Crim. Proc. 573. (Section III. A.)

2. The court erred in admitting evidence of a subsequent shooting involving Defendant Crumbley, failed to give a limiting instruction regarding the evidence and failed to exclude evidence relating to a Ruger handgun. (Section III. C.)

3. The court failed to exclude the testimony of Saday Robinson due to police taint or bias in the identification. (Section III. B.)

4. The verdict was against the weight of the evidence. (section III. H.)

This court disagrees with the Defendants' allegations of error and asserts that it has committed no errors. This court requests that its rulings, the jury's verdict and the sentences of the Defendants be upheld.

3

Respondents' Exhibit 38

## II.   FACTUAL BACKGROUND

On May 16, 2011, Todd Mattox was shot to death in the parking lot of the Leechburg Garden apartments in Penn Hills.  (T.R. 8/20/12, p. 240)[1].  He had suffered three (3) gunshot wounds, two (2) to the trunk and one (1) fatal shot to the head.  (T.R. 8/20/12, pp. 246-261, Ex. 4-16).

An eyewitness, Saday Robinson, described the sounds of an altercation above her apartment in the minutes before the shooting, followed by the noise of people running down stairs.  (T.R. 8/20/12, pp. 527-528).  She then saw Mr. Mattox being pushed out the front door of the apartment complex by two (2) African-American males with handguns.  (T.R. 8/20/12, pp. 528-529).  She was able to hear Mr. Mattox pleading for his life, offering the two (2) males everything that he had, and backing away from them with his hands up.  (T.R. 8/20/12, pp. 529, 531).  The eyewitness described seeing a man that she later identified as Defendant Ebo shooting at Mr. Mattox three (3) times. (T.R. 8/20/12, p. 531).  Mr. Mattox fell to the ground after the gunshots were fired.  (T.R. 8/20/12, p. 531).  The witness then described seeing Defendant Ebo going through the pants pockets of Mr. Mattox before she saw a person that she later identified as Defendant Crumbley walk up to Mr. Mattox, stand over his body as it lay in the parking lot, and shoot him directly in the head. (T.R. 8/20/12, pp. 532-534).  She then indicated that she saw the Defendants get into Mr. Mattox's white Nissan and speed out of the parking lot.  (T.R. 8/20/12, p. 534).  Mr. Mattox's vehicle was later found after it had

---

[1] The notation "T.R. 8/20/12" refers to Volumes I and II of the trial transcript for August 20, 2012 through September 4, 2012.

Respondents' Exhibit 38

been set on fire on Hill Street in Penn Hills.  (T.R. 8/20/12, pp.757-759, 762-780, 782-787, 804, 818, 841; Ex. 58-63, Ex. 66-67).

It should be noted that other witnesses corroborated key points contained in Ms. Robinson's description of the events that night.  For example, John Gardone also testified that Mr. Mattox was chased by two (2) African-American males before he was shot several times in the parking lot of the Leechburg Gardens.  (T.R. 8/20/12, pp. 591-592).  He also saw the two (2) suspects enter a white vehicle and speed from the parking lot.  (T.R. 8/20/12, pp. 492-493).  Another witness, Yurri Lewis, heard multiple shots that day, although he did not witness the shooting.  (T.R. 8/20/12, p. 513).  He did, however, see an African-American male going through the pockets of a man lying in the parking lot of Leechburg Garden Apartments.  (T.R. 8/20/12, p. 515).  He saw the man who had been rifling through the victim's pockets enter a white car and speed out of the parking lot.  (T.R. 8/20/12, p. 515).  Detective Anthony Perry confirmed that the right front pants pocket of Mr. Mattox was pulled out when he arrived at the scene.  (T.R. 8/20/12, pp. 302-304, 330-334, Ex. 41).  The left front pocket was in its normal position. (T.R. 8/20/12, pp. 302-304).

Despite the fact that there were several eyewitnesses to the events that occurred on May 16, 2011, none of the witnesses interviewed by either Penn Hills police officers or Allegheny County detectives were able to positively identify the actors.

Respondents' Exhibit 38

The Defendants became suspects in the Todd Mattox murder following a string of events occurring over the course of the several months following the slaying.  On June 2, 2011, Defendant Crumbley was involved in a shooting in Swissvale, in which he was shot several times. (T.R. 8/20/12, pp. 855-858).  Two types of shell casings were recovered from the scene, including the same type of shell casings that were found at the Todd Mattox murder scene, those being from a .40 caliber Smith and Wesson Springfield Armory pistol. (T.R.  8/20/12, pp. 885-886).   A friend of Defendant Crumbley's, Asa Thompkins, was present at the scene of the shooting. (T.R. 8/20/12, pp. 847, 852).  One week later, on June 9, 2011, Asa Thompkins was pulled over for a traffic stop in South Park. (T.R. 8/3/12, p. 20; T.R. 8/20/12, p. 1009). A Springfield Armory pistol was found under the front passenger seat of the car, and Mr. Thompkins said that the gun was his. (T.R. 8/20/12, pp. 1010-1011).

On September 6, 2011, Thomas Julian Brown wrote a letter from the Allegheny County jail to Detective Garlicki, of the Allegheny County police, asking that he be put in touch with the detective who was handling the Todd Mattox homicide. (T.R. 8/20/12, p. 697).   He indicated that he was willing to provide information on that case.  (T.R. 8/20/12, pp. 697-698). Mr. Brown further indicated that he had heard, several months earlier, Defendant Crumbley saying that he had "smoked" Todd Mattox. (T.R. 8/20/12, pp. 698-699).  Mr. Brown's cousin was Asa Thompkins, and Mr. Brown's son, Leron Brown, was a friend of Defendant Crumbley.  (T.R. 8/20/12, pp. 695-696). Leron Brown

6

Respondents' Exhibit 38

was found shot dead in January or February 2012, inside a car with Roman Herring, a cousin of Defendant Crumbley's, who was also found dead in that same car. (T.R. 8/20/12, pp. 948, 991). Roman Herring was allegedly involved in the burning of a vehicle on Hill Street in Penn Hills. (T.R. 8/20/12, p. 945).

Defendant Crumbley became a suspect in the Todd Mattox murder In September 2011, after Detective Anthony Perry received a report connecting the handguns used in the Todd Mattox homicide with the weapons used in the Swissvale shooting on June 2, 2011, and after witness Thomas Brown came forward with information about the homicide. (T.R. 8/20/11, pp. 1017, 1020, 1021, 1025). Defendant Ebo also became a suspect at that time. (T.R. 8/20/11, p. 1017).

Eyewitness Saday Robinson was shown photo arrays containing photographs of the Defendants on September 16, 2011(Defendant Crumbley only) and November 4, 2011 (both Defendants). (T.R. 8/20/12, pp. 356-357). However, on neither date did she select either of the Defendants from the arrays, although she testified that she was aware at the time of viewing the arrays that the Defendants were present in them. (T.R. 8/20/12, pp. 548-549). She indicated that she did not make the identifications on these dates because she was afraid, and her family and friends were telling her not to get involved. (T.R. 8/20/12, p. 548). Ms. Robinson also indicated in her testimony that she identified someone as "looking like" Defendant Ebo during one of the times when she was presented with photo arrays. (T.R. 8/20/12, p. 548). She indicated that she did

Respondents' Exhibit 38

this deliberately. (T.R. 8/20/12, p. 549).  However, no detective involved with presenting her with photo arrays ever indicated that there had been an identification of anyone on either September 16, 2011 or November 4, 2011. (T.R. 8/20/12, pp. 349-356, 337-344). Ms. Robinson moved out of Leechburg Gardens in July 2011.  She left the Allegheny County area and moved across the country in October 2011. (T.R. 8/20/12, p. 546). She returned to the area to testify upon the request of the police, who informed her that they had suspects in custody. (T.R. 8/20/12, p. 546).   She was shown photo arrays on July 24, 2012, at which time she identified Defendant Crumbley after an approximately fifteen (15) second pause, and she identified Defendant Ebo immediately.   (T.R. 8/20/12, pp. 540-543).

## III.   ARGUMENT

### A. Alleged Discovery Violation regarding Saday Robinson

The Defendants' first allegation of error is that this court erred in admitting the testimony of eyewitness Saday Robinson.  The Defendants argue that the testimony should have been excluded as a sanction for the Commonwealth's violation of Pa. R. Crim Proc. 573.  The Defendants allege that the Commonwealth failed to provide full and timely discovery by failing to provide information to the Defendants regarding Ms. Robinson's "misidentification" during presentation of a photo array.

Respondents' Exhibit 38

**0375**

During testimony taken on August 21, 2012 in connection with a pre-trial motion seeking exclusion of Ms. Robinson's identification of the Defendants on the basis that the identification was the product of bias and taint, Ms. Robinson indicated that, during one of the photo arrays prior to July 24, 2012, she had pointed to a photograph and said that the individual in the photograph "looked like" Defendant Ebo. (T.R. 8/20/12, pp. 59-61).   However, this alleged misidentification was not reported in any police report by either Penn Hills officers or Allegheny County homicide detectives. (T.R. 8/20/12, p. 82). After Ms. Robinson's pretrial testimony about the alleged intentional misidentification, and defense counsel's request for any report that detailed the misidentification, this court advised the Commonwealth that, if discovery related to the misidentification was not turned over to the Defendants, Ms. Robinson would not be permitted to testify. (T.R. 8/20/12, p. 83).

The following day, while the jury was at lunch, Assistant District Attorney Steven Stadtmiller indicated that, after speaking with the officers involved in the investigation, he was advised that the misidentification did not occur.   (T.R. 8/20/12, pp. 152-154). Detective Hitchings, who had shown Ms. Robinson the November 4, 2011 lineup, which was the first photo array to contain Defendant Ebo, indicated that no identification at all had occurred on that date.  (T.R. 8/20/12, p. 153).

Ms. Robinson took the stand on August 22, 2012 to continue her testimony related to the pre-trial motion.  (T.R. 8/20/12, p. 155).  She again stated that she had

**Respondents' Exhibit 38**

previously pointed to someone who looked like Defendant Ebo in a photo array prior to July 24, 2012. (T.R. 8/20/12, pp. 166-167). Her clearest discussion of the issue was in the following exchange with Defense Attorney Wendy Williams:

Q.    Okay. Are you saying now that you mistakenly said that or that you were lying under oath yesterday?

A.    You are confusing me.

Q.    Did that in fact occur? Did you point to somebody else and say that this is the guy that did the crime?

A.    No, I said that this looks like the guy who did the crime.

Q.    Okay.   And you pointed to somebody other than Mr. Ebo and Mr. Crumbley?

A.    Yes.          (T.R. 8/20/12, p. 163).

Ms. Robinson also testified that the misidentification occurred when she was in a car with Detective Perry before her grandmother died. (T.R. 8/20/12, pp. 176-177). It should be noted that only the September 16, 2011 photo array meets all three (3) of these criteria.  Ms. Robinson also specifically denied that Detective Hitchings was present during the alleged misidentification. (T.R. 8/20/12, p. 176).


Following Ms. Robinson's testimony, Detective Anthony Perry took the stand and testified regarding the photo arrays that he had shown to Ms. Robinson.  (T.R. 8/20/12,

Respondents' Exhibit 38

pp. 186-203).  Detective Perry had shown Ms. Robinson two (2) photo arrays, one in June 2011 containing Asa Thompkins (T.R. 8/20/12, pp. 187, 189) and one in September 2011 containing Defendant Crumbley. (T.R. 8/20/12, p. 187). He did not show Ms. Robinson any photo arrays containing a picture of Defendant Ebo.  (T.R. 8/20/12, p. 188).  A photo array containing Mr. Ebo's photo was not prepared until October 2011, and that array was presented to Ms. Robinson in November, 2011 by Detectives Hitchings and Langan. (T.R. 8/20/12, p. 188).  Detective Perry emphatically stated that any alleged misidentification by Ms. Robinson did not occur when he showed Ms. Robinson any photo arrays.  (T.R. 8/20/12, pp. 193, 195, 196). He clearly stated that no identifications at all were made when he presented photo arrays to her (T.R. 8/20/12, pp. 195-196), and that, had there been an identification, he would have followed his regimented protocol of having her circle  or initial the person identified. (T.R. 8/20/12, p. 193).


Detective Steven Hitchings also provided testimony related to the issue of a misidentification. (T.R. 8/20/12, pp. 204-207).  He indicated that he showed Ms. Robinson two (2) photo arrays on November 4, 2011, one containing a photo of Defendant Crumbley and the other containing a photo of Defendant Ebo. (T.R. 8/20/12, p. 204).  Detective Hitchings clearly indicated that Ms. Robinson made no identifications from either photo array and, further, that she did not indicate that any of the photos "looked like" one of the actors. (T.R. 8/20/12, pp. 204-5, 206, 207).  In fact, he was "absolutely sure" that no identifications occurred on November 4, 2011. (T.R. 8/20/12, p. 207).

Respondents' Exhibit 38

**0378**

Following the testimony of Ms. Robinson and Detectives Perry and Hitchings, this court found that there was conflicting evidence regarding any alleged discovery violation and any alleged misidentification, but stated that the issue could be revisited later, after further development of trial testimony, if necessary.  (T.R. 8/20/12, pp. 214-215).

On appeal, the Defendants assert that the court erred in permitting Ms. Robinson to testify because the Commonwealth had not turned over police reports detailing a prior misidentification.  Rule 573(e) of the Pennsylvania Rules of Criminal Procedure provides that, if a party has failed to comply with a discovery request, the court may, *inter alia*, prohibit a party from introducing the evidence not disclosed, or may order any other remedy that it deems just under the circumstances.   Pa. R. Crim. P 573.  The Commonwealth does not violate Rule 573 when it fails to disclose to the defense evidence that it does not possess and of which it is unaware. <u>Com. v. Collins</u>, 957 A.2d 237, 253 (Pa. 2008).

In this case, there was no clear evidence of a discovery violation at all, let alone one of such seriousness to justify complete exclusion of Ms. Robinson's testimony. There was clearly conflicting evidence as to whether a prior identification or misidentification had even occurred.  While Ms. Robinson said that she had pointed to someone in a photo array and said it "looked like" Defendant Ebo, not a single detective who had presented a photo array to her had any recollection of this occurring.  Each

Respondents' Exhibit 38

detective was also aware of his responsibility to place an identification or misidentification in a police report. (T.R. 8/20/12, pp. 193, 198, 205). None of the police reports indicate any identification occurred. (T.R. 8/20/12 p. 79; Ex. A, C). This court was presented with no evidence, facts or questioning from which it could conclude that any of the detectives testifying during pre-trial motions or who were involved in the presentation of photo arrays to Ms. Robinson had lied, hid information or were in any way negligent or lacking in their duties.


In failing to find that an identification or misidentification occurred, this court is not indicating that it in any way disbelieved Ms. Robinson's testimony. On the contrary, Ms. Robinson was a tremendously compelling witness, who clearly became involved in this case against her best interests and all of the advice of her family and friends. It was obvious that she was terrified as she testified during the pre-trial motion proceeding, and again when she gave her trial testimony. Ms. Robinson shook and trembled throughout the entirety of her testimony. As to the misidentification, it is possible that she indicated to police that someone else "looked like" Mr. Ebo. It is also possible that she remembers thinking that someone looked like Mr. Ebo, but did not actually verbalize that thought to the detectives. Ms. Robinson even indicated at one point in her testimony that she did not tell the officers when she picked out the wrong person, with her answer being somewhat ambiguous as to whether she told the officers that she had picked someone or whether she told the officers that it was the wrong person. (T.R. 8/20/12, p. 67). It is also possible that she mentioned someone looking like Defendant Ebo to the detectives, but was so vague about it that the detectives did not consider it to

Respondents' Exhibit 38

0380

be an "identification" as they understand that word.  No matter what occurred at the time, there was no clear evidence of a discovery violation having occurred, and, therefore, this court did not err in failing to exclude evidence or testimony in order to cure a non-existent violation.


### B. Alleged Error Regarding Tainted Identification Given by Saday Robinson

Defendant Crumbley's second allegation of error, and Defendant Ebo's third allegation of error, is that this court erred in permitting Saday Robinson to testify because her identification was the product of taint and bias.  More specifically, the Defendants assert that her identification of them on July 24, 2012 resulted from taint, bias and influence from the media exposure related to this case, from information provided to her by neighbors or friends, and from comments made by the police to her prior to that identification.


Questions regarding the admission and exclusion of evidence are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion.  Com. v. Kendricks, 30 A.3d 499, 503 (Pa. Super. 2011).  An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a showing that the trial court's conclusion was the result of manifest unreasonableness, or partiality, prejudice, bias or ill-will, or such lack of support as to be clearly erroneous.  Com. v. Brougher, 978 A.2d 373, 376 (Pa. Super. 2009).

Respondents' Exhibit 38

0381

A photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. Com. v. DeJesus, 860 A.2d 102, 112 (Pa. 2004). Photographs used in photo array line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted in the array all exhibit similar facial characteristics. Com. v. Fisher, 769 A.2d 1116, 1126 (Pa. 2001). The photographs in the array should all be the same size and should be shot against similar backgrounds. Kendricks, supra, at 504. When an out-of-court identification is alleged to be tainted, an in-court identification may still stand if, again considering the totality of the circumstances, the identification had an origin sufficiently distinguishable to be purged of the primary taint. Kendricks, supra, at 506. The factors a court should consider in determining whether there was an independent basis for identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. Com. v. Abdul-Salaam, 678 A.2d 342 (Pa. 1996).

Before Ms. Robinson testified in front of the jury at trial, this court heard lengthy testimony by her regarding the circumstances surrounding her identification of the Defendants, including her interviews by police, her exposure to media coverage of the

Respondents' Exhibit 38

case prior to her July 2012 identification of the Defendants, and information that she may have heard in the community regarding this murder.  She was subjected to extensive cross-examination on these issues by the attorneys for both Defendants. This court ultimately ruled that Ms. Robinson was permitted to testify and that she was permitted to provide testimony regarding her July 2012 identification of the Defendants. She was further permitted to make an in-court identification of the Defendants.

The Defendants assert that several factors tainted the identification of the Defendants by Ms. Robinson, including media exposure, information from neighbors identifying the alleged shooters and improper comments from the police.  In terms of media exposure, it is true that there was media coverage of this case, which included televised and printed photos of the Defendants following their arrest, and there may have been media coverage of Mr. Crumbley as a result of the shooting in which he was a victim in early June 2011. Ms. Robinson denied seeing any such coverage repeatedly during her testimony regarding the pre-trial motion *in limine*.

Ms. Robinson moved from Allegheny County across the country in mid-October 2011. (T.R. 8/20/12, pp. 41, 68).  Aside from a brief return to Pittsburgh in November 2011 for the funeral of her grandmother, she did not return to the area until July 2012, when detectives asked her to return to make an identification of the shooters. (T.R. 8/20/12, p. 42). Ms. Robinson testified that she saw no media coverage, pictures or video of the Defendants either before she left the area or after. (T.R. 8/20/12, p. 42).

Respondents' Exhibit 38

She specifically indicated that she saw no photos of Defendant Crumbley prior to being shown the first photo array in September 2011. (T.R. 8/20/12, pp. 64, 68).  She also denied seeing any media coverage from the time of the shooting until being contacted by telephone by detectives in late June, early July, 2012. (T.R. 8/20/12, pp. 70-71). She advised the detectives during that phone contact that she had seen no media coverage regarding the case. (T.R. 8/20/12, pp. 158-159). She also indicated that she did not have a computer until she started school, which did not occur until after October 2011, when she left Pennsylvania. (T.R. 8/20/12, pp. 157-158).  The credible testimony in the case was that Ms. Robinson had seen no media coverage related to the Defendants prior to her identification of them in July 2012 as the shooters.  It should be noted that Ms. Robinson testified consistently to this lack of exposure to media coverage during her trial testimony.  (T.R. 8/20/12, pp. 624, 626-628).


During her pre-trial motion testimony, Ms. Robinson also addressed the issue of whether her identifications were the product of information from community members. On the night of the murder, a neighbor indicated to Ms. Robinson that "Mo" was the shooter. (T.R. 8/20/12, pp. 42-43). Later, a friend named Ace told her that "Mat-Mat" was responsible. (T.R. 8/20/12, p. 58). Ms. Robinson was clear that: she did not know Defendant Ebo to be called "Mo" prior to the shooting (T.R. 8/20/12, pp. 42-43); she did not know anyone named "Mo" prior to the shooting (T.R. 8/20/12, p. 169); she never learned Defendant Crumbley's name (T.R. 8/20/12, p. 68); she did not know Defendant Ebo's name when she saw him at the apartment complex (T.R. 8/20/12, pp. 169-170); she did not know anyone named "Mat-Mat" (T.R. 8/20/12, p. 171); she never found out

Respondents' Exhibit 38

who "Mat-Mat" was (T.R. 8/20/12, p. 71); and she did not know anybody named "Mo" or "Mat-Mat" when she picked out Defendant Ebo's photo. (T.R. 8/20/12, pp. 178-179). Ms. Robinson was very clear that she selected the Defendants' photos from the photo arrays because she saw them shoot Mr. Mattox. (T.R. 8/20/12, pp. 44, 178-179). Again, the credible testimony did not support that Ms. Robinson's identification was in any way tainted, biased or even influenced by the comments made by her neighbor and friend.


Lastly, the issue of whether police comments had tainted Ms. Robinson's identification was explored. Ms. Robinson was contacted in late June or early July by detectives who asked her to return to Pittsburgh to look at photo arrays. At the time that she was contacted, she was told that two gentlemen had been arrested (T.R. 8/20/12, pp. 182, 183) and that the detectives thought that these men were responsible for the murder of Todd Mattox. (T.R. 8/20/12, pp. 174-175). At no point did the detectives tell her the names of who they thought was responsible for the shooting. (T.R. 8/20/12, p. 175). The detectives also did not suggest who they thought was responsible for the murder when they showed Ms. Robinson the photo arrays. (T.R. 8/20/12, p. 175). Ms. Robinson did have an understanding that photos of the responsible people were contained in the photo arrays that she was shown, but no detective told her that. (T.R. 8/20/12, pp. 183-185). Additionally, she was unaware that a trial was scheduled to begin at the point when the police contacted her in July, 2012. (T.R. 8/20/12, p. 183). The credible testimony eliminated from further consideration this issue of possible taint from police comments in the identification of the Defendants by Ms. Robinson at the photo array in July, 2012.

Respondents' Exhibit 38

Even though this court does not believe that there was any taint, bias or suggestion in Ms. Robinson's identifications, the court will note that there are strong independent bases supporting Ms. Robinson's identifications here. It has never been disputed that Ms. Robinson's vantage point from her apartment window gave her a clear view of Todd Mattox's murder. Her window was approximately 8-10 feet from the front door of the building and 70-80 feet from the parking lot. (T.R. 8/20/12, pp. 283, 1179; Ex. 28). According to Detective Perry, Ms. Robinson had the best vantage point to see the events that night. (T.R. 8/20/12, p. 377). There were no obstructions of her view of the parking lot from her window. (T.R. 8/20/12, p. 167). The Defendants were only ten (10) feet away from her during the incident, and it occurred while it was still light outside. (T.R. 8/20/12, pp. 168-169). Additionally, she indicated that the entire incident lasted ten (10) minutes, that she watched the entire incident, (T.R. 8/20/12, p. 178), and she had seen both Defendants in her apartment building prior to the shooting, (T.R. 8/20/12, pp. 44, 177-178), making them familiar to her at the time of the shooting.

What Ms. Robinson witnessed was a brutal, unprovoked shooting of a man begging for his life, and then the execution of a wounded, fallen man. Images from such violent events tend to remain imprinted in one's mind, especially the faces of the perpetrators of such a horrific event. Ms. Robinson indicated this herself during her trial testimony, stating that the faces of the Defendants were "stuck in her head." (T.R. 8/20/12, p. 547). While not exceptionally descriptive, Ms. Robinson did provide

Respondents' Exhibit 38

relatively accurate descriptions of the two men involved in this shooting, including skin tone, relative size and clothing.  (T.R. 8/20/12, pp. 413, 590-593, 1166-1170).  Even if her identification was in some way tainted by media coverage or comments from neighbors, friends or police, which this court strongly believes is not the case, Ms. Robinson certainly had independent bases upon which to make her July, 2012 identifications.

Although defense counsel focused on Ms. Robinson's failure to select either Defendant from previous photo array lineups as strong evidence that her July, 2012 identification must have been the product of taint or bias, this court instead focused on Ms. Robinson's understandable fear to be a witness in this case.  Ms. Robinson was immediately interviewed after the shooting and made herself available for questioning. (T.R. 8/20/12, p. 540). However, even from this beginning interaction with the police, she was afraid, telling the police officers of her fear on the night of the shooting and inviting them into her apartment so that she would not be seen talking with them. (T.R. 8/20/12, p. 53).  As was mentioned earlier, Ms. Robinson shook through the entirety of her testimony, both during the pre-trial proceedings and at trial.  Her entire demeanor reflected her fear of being involved in this case.

Ms. Robinson also certainly verbalized her fear during her trial testimony, indicating that she did not want involved in this case because of the culture in her community that perpetuated the phrase "snitches get stitches" (T.R. 8/20/12, pp. 535-

Respondents' Exhibit 38

536), a sentiment echoed by another witness to the shooting, John Gardone. (T.R. 8/20/12, pp. 493-494). Her fear throughout her involvement in the case was clear through her actions: by her waiting until her neighbors left before she talked to the police (T.R. 8/20/12, p. 535); by her taking the police into her apartment so no one would see her talking to them (T.R. 8/20/12, p. 53); by only agreeing to meet detectives elsewhere for subsequent meetings so that no one would see her talking to them (T.R. 8/20/12, p. 583); by her testimony that she deliberately failed to identify the Defendants in photo arrays even though she was sure that they were there (T.R. 8/20/12, p. 552); by the fact that she told Detective Perry that she moved because she was fearful (T.R. 8/20/12, p. 381); and by the fact that she finally identified the Defendants only after moving across the country and being informed that suspects were in custody. (T.R. 8/20/12, p. 550). Ms. Robinson's own family warned her that she should not become involved in this case for fear that something would happen to her if she did. (T.R. 8/20/12, p. 548).


This court does not believe that prior failures to identify the Defendants in any way support a contention that the identifications in July, 2012 were the result of taint, bias or suggestion. Rather, the prior failures to identify the Defendants were the product of a fear so intense that Ms. Robinson exhibited physical manifestations of that fear over fifteen (15) months after the incident that she witnessed. This court permitted Ms. Robinson to testify at trial regarding her eyewitness identification of the Defendants, finding that there was no media taint and no taint from community or police sources.

Respondents' Exhibit 38

There was an independent basis for her identification. (T.R. 8/20/12, pp. 214-215). This court's ruling in this regard is well-supported by the record and should be upheld.

### C. Alleged Error Regarding Admission of Evidence of June 2, 2011 Shooting

Defendant Crumbley's third allegation of error, and Defendant Ebo's second, is that this court erred in admitting testimony regarding the June 2, 2011 shooting in which Defendant Crumbley was a victim. More specifically, the Defendants assert that this evidence was improperly admitted under Pa. Rule of Evidence 404(b)(2), that this court erred in not granting the Defendants' Motion *in Limine* regarding the evidence and that the court erred in not providing a limiting instruction during trial.

There were two (2) arguments held on the issue of the admissibility of the June 2, 2011 shooting. The first took place on July 27, 2012, and the court ruled, after argument, that the subsequent shooting involving Defendant Crumbley would be admissible as to the issue of identity only, i.e. to show that, because the same gun, a .40 caliber, was used in a shooting that occurred two (2) weeks after Mr. Mattox's shooting where Defendant Crumbley was present, it is circumstantial evidence that he was present at the Todd Mattox shooting where shell casings from the same gun were found. (T.R. 7/27/12, pp. 58-59).

Respondents' Exhibit 38

On August 21, 2012, a second argument on the issue of the June 2, 2011 shooting took place.  In this argument, the court entertained Defendants' Motion *in Limine* regarding a Ruger handgun found at the scene of the June 2, 2011 shooting in Swissvale.  A Ruger handgun was found outside of the vehicle where the shooting had occurred, and Defendant Crumbley's blood was found on it.  (T.R. 8/20/12, p. 10).  Defendant Crumbley argued that the evidence of the Ruger was irrelevant to the May 6, 2011 shooting of Todd Mattox and was prejudicial to the Defendants in that all that it showed was that Defendant Crumbley must have had a gun in his hand in the Swissvale shooting so he must also have had a gun at the Todd Mattox shooting.  (T.R. 8/20/12, pp. 11, 17).  The Commonwealth argued that photos of the Ruger showed blood on the side of the gun and the barrel, which was identified as Defendant Crumbley's.  (T.R. 8/20/12, p. 12).  It was the intention of the prosecution to argue that Defendant Crumbley had the .40 caliber gun at the time of the Swissvale shooting, providing it with circumstantial evidence that Defendant Crumbley must have had that same gun two (2) weeks earlier when Todd Mattox was killed.  (T.R. 8/20/12, p. 14).  This court, with some misgiving, ruled that evidence regarding the Ruger would be permitted, but would be limited to the issue of identity only.  (T.R. 8/20/12, p. 20).

On August 30, 2012, counsel and this court discussed the closing jury instructions, including a court suggested limiting instruction based on Standard Jury Instruction 3.08 -- Evidence of Other Offenses as Proof of Guilt.  (T.R. 8/20/12, p. 1317).  Defendant Crumbley's attorney, Ms. Wendy Williams, stated that she did not want a

Respondents' Exhibit 38

limiting instruction regarding the June 2, 2011 shooting. (T.R. 8/20/12, p. 1318). This court read its proposed limiting instruction to all counsel:

> I [sic] have heard evidence tending to prove that the defendant Thaddeus Crumbley was involved in a shooting incident for which he is not on trial. I'm speaking of testimony to the effect that Mr. Crumbley was involved in a shooting incident in Swissvale on June 2, 2011. This evidence is before you for a limited purpose, that is for the identity of Mr. Crumbley as a participant in the May 16, 2011 incident at Leechburg Gardens. This evidence must not be considered by you in any way other than for the purpose I just stated. You must not regard this evidence as showing that the defendant, Mr. Crumbley, is a person of bad character or criminal tendencies from which you might be inclined to infer guilt. (T.R. 8/20/12, pp. 1318-1319).

The Commonwealth did not object to the limiting instruction, but Defendant Crumbley's attorney did, indicating that she would like time to think about it overnight, and would advise the court the next day prior to the closing instructions being read to the jury whether she wanted the instruction. (T.R. 8/20/12, p. 1321).

The following day, during Defendant Crumbley's closing argument, his attorney, Ms. Williams, addressed the June 2, 2011 shooting at length and reiterated the defense position that he was nothing more than a victim in that shooting. (T.R. 8/20/12, pp. 1363-1368). This court then again discussed its proposed limiting instruction with counsel outside the presence of the jury. (T.R. 8/20/12, p. 1411). Counsel for both Defendants agreed that they did not want the limiting instruction read to the jury. (T.R. 8/20/12, p. 1411). As such, this court did not give a limiting instruction in its closing charge to the jury.

Respondents' Exhibit 38

0391

A trial court's decision to grant or deny a Motion *in limine* is subject to an evidentiary abuse of discretion standard of review. <u>Com. v. Reese</u>, 31 A.3d 708, 715 (Pa. Super. 2011). Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion. <u>Com. v. Drumheller</u>, 808 A.2d 893, 904 (Pa. 2002). Admissibility depends on relevance and probative value. <u>Id.</u> Evidence is relevant if it tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding a material fact. <u>Id.</u>

Evidence of other crimes may be admitted for other relevant purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," though such evidence should only be admitted if the probative value of the evidence outweighs its potential for prejudice. Pa. R.E. 404(b)(2)-(3), <u>Com. v. Tedford</u>, 960 A.2d 1, 37 (Pa. 2008). The particular prejudice that Rule 404(b)(3) seeks to prevent is the misuse of other-offense evidence. Specifically, the rule is designed to generally eliminate other-offense evidence, unless admissible for some specific purpose as indicated above, so that jurors do not convict a defendant simply because they perceive that the defendant has a bad character or a propensity to commit crimes. <u>Reese</u>, *supra*, at 723. Evidence that the defendant possessed a device or instrument that could have been the murder weapon is admissible. *See* <u>Com. v. Miller</u>, 897 A.2d 1281 (Pa. Super. 2006). Evidence will not be prohibited merely because it is harmful to the defendant. <u>Com. v. Dillon</u>, 925 A.2d 131, 141 (Pa. 2007). When other-offense evidence is admitted, the Defendant is entitled to request a jury instruction

Respondents' Exhibit 38

explaining to the jury that the specific evidence was only admitted for a limited purpose. Com. v. Billa, 555 A.2d 835, 841-842 (Pa. 1989). The trial court is permitted to use its own form of expression to explain difficult legal concepts to the jury. Com. v. Spotz, 759 A.2d 1280, 1287 (Pa. 2000).

Here, the evidence regarding the shooting on June 2, 2011 and the presence of the Ruger handgun were properly admitted. While certainly prejudicial to the Defendants, as all evidence tends to be, the evidence of the subsequent bad acts was relevant to make a fact in the case, i.e., whether Defendant Crumbley was present at the scene of the Todd Mattox murder two (2) weeks earlier, more or less probable. The evidence also was relevant to support the inference that Defendant Crumbley was in possession of the .40 caliber gun used in Mr. Mattox's murder. Clearly, the evidence of the June 2nd shooting is not dispositive of these issues, but there is no requirement in the law that the evidence of other bad acts be dispositive on some disputed issue. The jurors had the opportunity to hear effective cross-examination on the evidence presented, as well as hear the informed arguments of all counsel on the relevance of the subsequent shooting.

The fact that the jurors found the Defendants guilty of all charges does not mean that they misused the evidence of the June 2nd shooting. Certainly, the strength and compelling nature of the eyewitness testimony from the time of Mr. Mattox's murder led

Respondents' Exhibit 38

Case 2:22-cv-00930-PLD   Document 10-38   Filed 09/16/22   Page 98 of 108

0393

more to the verdict than evidence of this subsequent event. This court committed no error in the admission of this evidence.

### D. *Error Regarding "Angel of Death" Comment in Commonwealth's closing*

Defendant Crumbley's fourth allegation of error is that this court failed to strike the "Angel of Death" comment made by Assistant District Attorney Stadtmiller in his closing, and that this court failed to give a curative instruction to the jury regarding this same comment. On appeal, Defendant Crumbley also asserts that he was denied effective assistance of counsel when his attorney failed to object to the comment or request a curative instruction.

In his closing on behalf of the Commonwealth, Assistant District Attorney Steven Stadtmiller made the following statement: "She (Saday Robinson) wasn't afraid to say that and describe him (Matthew Ebo), but that angel of death over there, Thaddeus Crumbley, with his hood up, that has what it takes to walk up to a man, stand over him and blow his brains out, she wasn't as hot on identifying." (T.R. 8/20/12, p. 1437). No objection was made by either defense attorney at the time that the comment was made or immediately following the Commonwealth's closing. In fact, this issue was not raised at all until Defendant Crumbley's Post-Trial Motion.

Respondents' Exhibit 38



ORIGINAL
Criminal Division
Dept. of Court Records
Allegheny County, PA.

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

COMMONWEALTH OF          :
PENNSYLVANIA             :        CRIMINAL DIVISION
                         :
        v.               :        CC 201202821
                         :
MATTHEW EBO,             :
                         :
        Defendant.       :

## STATEMENT OF ERRORS COMPLAINED OF ON APPEAL

AND NOW COMES the Defendant, Matthew Ebo, by his attorneys from the

Law Office of the Public Defender, Allegheny County; Elliot Howsie, Public

Defender of Allegheny County; Suzanne Swan, Chief-Appellate Division; and

Jessica L. Herndon, Appellate Counsel, and respectfully submits this Statement of

Errors Complained of on Appeal in accordance with Rule 1925(b) of the

Pennsylvania Rules of Appellate Procedure, whereof the following is a statement:

APPENDIX 8    Respondents' Exhibit 38

1.  On March 28, 2012, Mr. Ebo was charged by criminal information at CC 201202821 with one count of Criminal Homicide (18 Pa.C.S.A. § 2501(a)) and various other crimes.

2.  On April 23, 2012, Randall H. McKinney, Esquire, entered his appearance on behalf of Mr. Ebo.

3.  Mr. Ebo proceeded to a jury trial before this Honorable Court and he was found guilty of first degree murder on September 4, 2012.

4.  On November 28, 2012, Mr. Ebo was sentenced to life imprisonment.

5.  On November 30, 2012, Attorney McKinney filed a Motion to Withdraw as Counsel.

6.  The Office of the Public Defender was appointed to represent Mr. Ebo on December 12, 2012.

7.  On December 19, 2012, Undersigned Counsel requested permission to file a Post-Sentence Motion *Nunc Pro Tunc* and requested leave to supplement the Post-Sentence Motion once she received the transcripts.

8.  On December 21, 2012, this Honorable Court granted the Motion and directed Mr. Ebo to file any amendments or supplements to the Post-Sentence Motion within twenty-one days of receipt of the transcripts.

9.  Counsel received the final transcript on April 12, 2013.

2

Respondents' Exhibit 38

10.   A timely Supplemental Post-Sentence Motion was filed on April 19, 2013.

11.   The Post-Sentence Motion was denied by operation of law on July 9, 2013.

12.   A timely Notice of Appeal was filed on July 25, 2013.

13.   The trial court issued an Order dated July 30, 2013, directing Appellate Counsel to file a Statement of Errors on or before August 20, 2013.

14.   This timely Statement of Errors follows.

15.   On appeal, Mr. Ebo will raise the following issues:

   a.   The trial court abused its discretion by failing to grant Mr. Ebo a new trial due to the discovery violations involving the photo arrays presented to Saday Robinson.  Robinson testified regarding a photo array that had not been provided to defense counsel.  Law enforcement confirmed that there were multiple officers performing tasks on this case and showing different people multiple photo arrays.  No one was in charge of monitoring what was occurring with these photo arrays.  Law enforcement noted at trial that there was evidence that was not provided to the defense.  Since Robinson was the only eyewitness to testify regarding Mr. Ebo's involvement in this case and there was no physical evidence tying Mr. Ebo to this case, it was imperative

3

Respondents' Exhibit 38

for the defense to have all information pertaining to the identification of Mr. Ebo by Robinson.   This information was necessary for the defense to properly cross-examine Robinson.  As such, Mr. Ebo was prejudiced and he is entitled to a new trial.

b.      The trial court abused its discretion by admitting any testimony and physical evidence, such as the handgun, related to the shooting of co-defendant, Thaddeus Crumbley, that occurred on June 2, 2011.   This evidence was completely irrelevant to whether Mr. Ebo was a perpetrator in the events that occurred on May 16, 2011.  This evidence involving the shooting of Mr. Crumbley on June 2, 2011 did not prove Mr. Ebo's identity in the commission of the events of May 16, 2011.  In addition to having no relevance, this evidence was prejudicial since the evidence made it appear that Mr. Ebo was somehow linked to this gun violence.  Also, this evidence regarding completely unrelated events was very confusing since the jury was presented with a significant amount of evidence and testimony relating to a subsequent shooting that had absolutely no relevance to Mr. Ebo's involvement in the May 16, 2011 shooting for which he was on trial.

c.      The trial court erred and abused its discretion by admitting evidence that Saday Robinson reviewed a photo array and identified Mr. Ebo as the

4

Respondents' Exhibit 38

perpetrator, and by permitting her subsequent in-court identification of Mr. Ebo. Robinson's identification of Mr. Ebo was not sufficiently reliable and the trial court's failure to suppress her unreliable identification violated Mr. Ebo due process rights. The photo array procedure was highly suggestive. She failed to identify Mr. Ebo as the perpetrator for fourteen months, and she could only identify him in a photo array after law enforcement continued to show her arrays with Mr. Ebo's image and told her that the suspects had been arrested. Also, people had told her that Mr. Ebo was the perpetrator and there was significant media coverage on this matter. The suggestiveness and taint surrounding Robinson's photo array identification gave rise to a substantial likelihood of misidentification. Moreover, the Commonwealth did not establish by clear and convincing evidence that Robinson's in-court identification of Mr. Ebo had an independent origin in her observations at the time of the incident. For example, Robinson had limited opportunity to view these events, she could not provide any significant description of the actors, and the description that she provided of Mr. Ebo did not correlate to what Mr. Ebo actually looked like. Thus, this evidence should have been suppressed.

d.     The trial court abused its discretion by failing to grant a new trial

Respondents' Exhibit 38

since the verdict on all counts was against the weight of the evidence. There was no physical evidence connecting Mr. Ebo to the crime scene or to the victim or co-defendant. The only evidence presented at trial linking Mr. Ebo to the incident consisted of Saday Robinson's questionable identification of him. There was no other testimony that Mr. Ebo was present at the crime scene, that he ever had contact with the murder weapon, or that he even knew the victim or the co-defendant, much less interacted with them during this incident. Robinson's testimony and her identification of Mr. Ebo were vague, tenuous, and uncertain at best. Robinson was only able to identify Mr. Ebo as a participant in this incident fourteen months after the incident. Although she had been shown photo arrays multiple times over the fourteen month period, she never identified Mr. Ebo until one month before trial. Additionally, Robinson's testimony was so incredible that it simply cannot support the verdict. During the fourteen months prior to Robinson's identification of Mr. Ebo, she had the opportunity to look into news stories and social media postings on this matter. She also discussed this incident with people in the community who informed her who they thought participated in this murder. Thus, she was likely influenced to identify Mr. Ebo since he was a suspect awaiting trial on this matter. Moreover,

6

Respondents' Exhibit 38

Robinson's story was completely untrustworthy because she presented incredible testimony under oath. She initially accused a different person of committing murder in this matter, she admitted to lying to police officers about this incident, the description that she provided of the perpetrator did not match Mr. Ebo's description, and her description of what occurred changed over time. She also testified about her lack of internet access during this time period, even though she had a Facebook account with postings on it regarding her young child. There was limited testimony from law enforcement that another individual, who received substantial payments for his participation in this investigation, may have identified Mr. Ebo as a suspect; however, this person never testified under oath regarding his alleged identification so it is unclear whether he could identify Mr. Ebo. Robinson was the only person who could identify Mr. Ebo at trial as participating in the incident. Her testimony was the only evidence linking Mr. Ebo to this crime, but her testimony was so incredible that basing a conviction on this meager evidence shocks the conscience.

Respondents' Exhibit 38

Respectfully submitted,

ELLIOT HOWSIE
Public Defender

SUZANNE M. SWAN
Chief – Appellate Division

JESSICA L. HERNDON
Appellate Counsel
PA I.D. # 93388

ATTORNEYS FOR THE DEFENDANT

8

Respondents' Exhibit 38

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY,
PENNSYLVANIA

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | CRIMINAL DIVISION |
| | : | |
| v. | : | CC 201202821 |
| | : | |
| MATTHEW EBO, | : | |
| | : | |
| Defendant. | : | |

## **PROOF OF SERVICE**

I, JESSICA L. HERNDON, ASSISTANT PUBLIC DEFENDER, hereby certify that on the *20th* day of *August*____, 2013, the Statement of Errors Complained of on Appeal was served on the following persons by hand delivery or personal service, which satisfies the requirements of Pa.R.A.P. 121:

The Honorable Beth A. Lazzara
510 Allegheny County Courthouse
436 Grant Street
Pittsburgh, PA  15219

Michael W. Streily, Esquire
District Attorney's Office
301 Allegheny County Courthouse
436 Grant Street
Pittsburgh, PA  15219

Thomas McCaffrey
Criminal Court Administrator
535 Allegheny County Courthouse
436 Grant Street
Pittsburgh, PA  15219

_____
JESSICA L. HERNDON
Appellate Counsel
PA I.D. # 93388

Respondents' Exhibit 38

IN THE SUPERIOR COURT OF PENNSYLVANIA
WESTERN DISTRICT

_____

COMMONWEALTH OF PENNSYLVANIA,
          Appellee

v.

1194 WDA 2013

MATTHEW EBO,
          Appellant

## PROOF OF SERVICE

I, Jessica L. Herndon, Assistant Public Defender, Appellate Counsel of the Allegheny County Office of the Public Defender, hereby certify that two true and correct copies of this Appellant's Brief have been served by hand-delivery upon the following counsel of record:

> Michael W. Streily, Deputy District Attorney
> Office of the District Attorney
> Appellate Division
> 401 Allegheny County Courthouse
> 436 Grant Street
> Pittsburgh, PA 15219

Respectfully submitted,

JESSICA L. HERNDON
PA I.D. # 93388
Appellate Counsel
Counsel of Record

DATE:  December 12, 2014

Respondents' Exhibit 38