# IN THE

# SUPERIOR COURT OF PENNSYLVANIA

# PITTSBURGH DISTRICT

———————

## NO.   1194      WDA   2013

———————

## COMMONWEALTH OF PENNSYLVANIA,
### *Appellee*

## V.

## MATTHEW EBO      ,
### *Appellant*

———————

## BRIEF FOR APPELLEE

———————

**Appeal from the Judgment of Sentence entered November 28, 2012 at No. CP-02-CR-0002821-2012 in the Court of Common Pleas of Allegheny County as made final by the denial of post sentence motions on June 26, 2013.**

———————

**STEPHEN A. ZAPPALA, JR.**
*District Attorney*

**MICHAEL W. STREILY\***
*Deputy District Attorney*
**PA. I.D. NO. 43593**

**Office of the District Attorney**
**401 Allegheny County Courthouse**
**Pittsburgh, Pennsylvania 15219-2489**
**(412) 350-4377**

**\*Counsel of Record**

Respondents' Exhibit 39

0405

# <u>TABLE OF CONTENTS</u>

SUMMARY OF THE ARGUMENT ................................................................... 1

ARGUMENT ................................................................................................... 2

    I.    THE TRIAL COURT DID NOT ERR IN ADMITTING EVIDENCE OF A SUBSEQUENT SHOOTING INCIDENT INVOLVING CO-DEFENDANT CRUMBLEY. ........................................................ 2

    II.   THE TRIAL COURT DID NOT ERR IN ADMITTING TESTIMONY CONCERNING MS. ROBINSON'S IDENTIFICATION OF APPELLANT IN A PHOTO ARRAY AND DID NOT ERR IN ADMITTING MS. ROBINSON'S IN-COURT IDENTIFICATION OF APPELLANT. .............................................................................. 25

    III.   THE TRIAL COURT DID NOT ERR IN RULING THAT THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE. ...................................................................... 43

    IV.   THIS COURT COULD FIND THAT THE CASE NEEDS REMANDED FOR RESENTENCING. ...................................... 50

CERTIFICATE OF COMPLIANCE ............................................................... 51

CONCLUSION ............................................................................................. 52

i

Respondents' Exhibit 39

## Cases

, *Commonwealth v. Brown,* 648 A.2d 1177 (Pa. 1994)....................................................44

*Commonwealth v. Brown,* 359 A.2d 393 (Pa. 1976) ......................................................16

*Commonwealth v. Clayton,* 532 A.2d 385 (Pa.1987) ....................................................16

*Commonwealth v. Collins,* 703 A.2d 418 (Pa. 1997)....................................................20

*Commonwealth v. Dennis,* 618 A.2d 972 (Pa. 1992) ....................................................15

*Commonwealth v. Evans,* 481 A.2d 625 (Pa. Super. 1984) reversed on other grounds

512 A.2d 626 (Pa. 1986) ....................................................................................20

*Commonwealth v. Farquharson,* 354 A.2d 545 (Pa. 1976) ...........................................49

*Commonwealth v. Flamer,* 53 A.3d 82 (Pa. Super. 2012)..............................................20

*Commonwealth v. Fulmore,* 25 A.3d 340 (Pa. Super. 2011)..........................................41

*Commonwealth v. Green,* 505 A.2d 321 (Pa. Super. 1986) ......................................7, 20

*Commonwealth v. Hoover,* 16 A.3d 1148 (Pa. 2011). ..............................................7, 25

*Commonwealth v. Kendricks,* 30 A.3d 499 (Pa. Super. 2011) ................................26, 27

*Commonwealth v. Kyle,* 533 A.2d 120 (Pa. Super. 1987) ..............................................40

*Commonwealth v. Moore,* 633 A.2d 1119 (Pa. 1993) ...................................................26

*Commonwealth v. Reid,* 626 A.2d 118 (Pa. 1993) ........................................................16

*Commonwealth v. Robinson,* 721 A.2d 344 (Pa. 1998).................................................23

*Commonwealth v. Sherwood,* 982 A.2d 483 (Pa. 2009)............................................6, 25

Respondents' Exhibit 39

0407

*Commonwealth v. Smith,* 467 A.2d 1120 (Pa. 1983) ....................................................... 46

*Commonwealth v. Tolbert,* 670 A.2d 1172 (Pa. Super. 1995) ........................................ 15

*Commonwealth v. Valentine,* 101 A.3d 801 (Pa. Super. 2014) ...................................... 50

*Commonwealth v. Widmer* 744 A.2d 745 (Pa. 2000) ..................................................... 44

*State v. Collins,* 10 A.3d 1005 (Supreme Court of Connecticut, 2011).......................... 19

*United States v. Snead,* 447 F.Supp. 1321 (E.D.Pa.)..................................................... 16

<u>Rules</u>

Pa.R.A.P. 2117 ............................................................................................................. 2

Pa.R.A.P. 302 ............................................................................................................... 2

Respondents' Exhibit 39

## SUMMARY OF THE ARGUMENT

Given the evidence that appellant and co-defendant Crumbley conspired and acted as accomplices to kill Mr. Mattox, evidence establishing that the murder weapon was subsequently fired in a vehicle in which Crumbley was riding, and was later recovered, was relevant in establishing appellant's identity/guilt as an accomplice and principle in the murder as well as in the conspiracy to murder Mr. Mattox.

In the present case, police did not suggest that Ms. Robinson should pick out appellant's photograph, Ms. Robinson explained her inability to select appellant's photo from earlier arrays, and she also affirmatively stated that she hadn't seen appellant's photograph on television or social media. She selected his photo from the array because, in her own testimonial words: "I seen him shoot the victim."

The verdict was not against the weight of the evidence. The jury knew why Ms. Robinson refused to identify appellant until after she moved from Pennsylvania. Her testimony was corroborated by the forensic evidence as well as testimony from other witnesses.

This Court has ruled 42 Pa.C.S. §9712 to be unconstitutional.

Respondents' Exhibit 39

0409

<u>ARGUMENT</u>

I.    THE TRIAL COURT DID NOT ERR IN ADMITTING EVIDENCE
      OF A SUBSEQUENT SHOOTING INCIDENT INVOLVING CO-
      DEFENDANT CRUMBLEY.

Initially, the Commonwealth requests that this Honorable Court determine whether the present issue has been properly preserved.   The Commonwealth respectfully disagrees with appellant's statement that the following referenced comment of trial counsel preserved this issue for appellant: "Matthew's counsel joined in the objections made by Crumbley's attorney at the beginning of the hearing on these various pretrial motions and objections. MH 7."   (Brief for Appellant at p.29; see also p.10 of appellant's brief).[1]

Pa.R.A.P. 302 **Requisites for Reviewable Issue** provides in relevant part:

> **(a)    General rule.**  Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.
>
> Pa.R.A.P.  2117(c) **Statement  of  the  Case** requires  an

---

[1]    It is noted that some of the transcripts in this case are contained in the record filed at No. 1997 WDA 2012 involving co-defendant Crumbley's appeal.

2

Respondents' Exhibit 39

appellant to, *inter alia,* reference the portion of the record where the issue was preserved.

Prior to trial the Commonwealth filed a Notification pursuant to Pa.R.E. 404(b)(2) in which it asserted:

> 2.   At the above trial, the Commonwealth intends to offer evidence tending to prove that the co-defendant, Thaddeus Crumbley has committed other crimes, wrongs, or acts that bear upon the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Specifically, the Commonwealth intends to offer evidence tending to prove that:
>
> > (a)  on June 2, 2012 (sic), the co-defendant, Thaddeus Crumbley, was involved in a shootout in Swissvale, Pennsylvania, during which a .40 caliber handgun was discharged in his automobile 8 times.  Eight .40 caliber casings were located by police in Crumbley's vehicle during the investigation of the June 2, 2011 shooting. These .40 caliber casings were matched to one of the two handguns that were used to shoot and kill Todd Mattox in the Criminal Homicide presently before the Court.   A Firearms expert from the Allegheny County Crime Lab will testify that the .40 caliber casings found at the May 16, 2011 Homicide of Todd Mattox and the .40 caliber casings found in the car Thaddeus Crumbley was in during the June 2, 2011 Shooting in Swissvale were all discharged from the same handgun.
>
> 3.   Discovery materials pertaining to evidence of such other crimes, wrongs, or acts have been disclosed to the defendant.
>
> 4.   It is believed and therefore averred that the probative value of evidence of such other crimes, wrongs, or acts outweighs its potential for prejudice, especially in light of the availability of a proper cautionary instruction, in that it places the Murder

3

weapon from the within case in a car with Crumbley 17 days after the Homicide occurred.

Docket Entry 10.

A similar notification was filed in co-defendant Crumbley's case (see record at No. 1997 WDA 2012; docket entry 10). Crumbley's counsel filed responses to the Commonwealth's pretrial filings and a hearing was held on July 27, 2012 (See Docket Entry 86 in the Crumbley Appeal at No. 1997 WDA 2012). The first issue addressed at that hearing concerned admission of photographs. The comment of appellant's counsel, which appellant provides to this Court in an effort to demonstrate preservation, was made in response to the issue concerning admission of various photographs, it had nothing to do with the admission of 404(b) evidence:

> MR. STADTMILLER: There is one that is extremely inflammatory that I am not going to be introducing unless we come to the issue. It is the skull where the bullet went through the top of the head. It is not coming in unless something relevant comes in.
>
> MS. WILLIAMS: My position of these, number one - -
>
> MR. STADTMILLER: They are not numbered.
>
> MS. WILLIAMS: Number one, the first picture we were shown, which is a bullet, deformed gray metal bullet core next to an envelope, bullet envelope marked number one, I don't have any objection to on behalf of Mr. Crumbley. The second photo - -
>
> MR. McKINNEY: No objection on behalf of Mr. Ebo.

Respondents' Exhibit 39

> MS. WILLIAMS:  The second photo is a bullet, and it was recovered from the femoral head, and I would object to this being shown in color.  There is blood, it looks like possibly tissue matter, things like that.  I think this photo would be identical descriptive and of evidentiary value in black and white.
>
> With respect to number three, which is a bullet core recovered from the lower lumbar spine, we would have no objection to that photo.
>
> THE COURT:  Mr. McKinney?
>
> MR. McKINNEY:  I would join in Ms. Williams' objections and non-objections.

Docket Entry 86, No. 1997 WDA 2012, at pp. 6-7.

The comment of appellant's counsel went directly to the issue of the photographs and the "objections" and "non-objections" co-defendant Crumbley's attorney had to the photo (i.e., the color photograph was objectionable but the same photograph in black and white would not be objectionable); not to other issues which had not yet been discussed, and not to the admission of 404(b) evidence.  After the photograph issue was resolved, other issues were dealt with by the court.  The final issue involved the 404(b) evidence:

> THE COURT:  Okay.  So the call is in.  I am thinking this is the last issue - - correct me if I'm wrong - - notification of Commonwealth's intention to present evidence of other crimes, wrongs, or acts pursuant to Rule 404(b)(2). (…)

Docket Entry 86, No. 1997 WDA 2012, at p.55.  The court heard argument from the Commonwealth and Crumbley's attorney on the issue.  When

Respondents' Exhibit 39

invited by the court to make an argument, appellant's counsel had "nothing

to add" and **did not** join Crumbley's counsel's argument:

> THE COURT:  All evidence is prejudicial.  I mean, that's the whole idea behind presenting it.  You would not want to present it if it was not prejudicial.  It is.  Is it more fairly prejudicial is the inquiry.
>
> There is circumstantial evidence of him being the person who was the shooter in the prior incident.  That doesn't mean you can't rebut it.  I think you have good arguments to rebut that, and you can raise those.  I think that all goes to the weight of the evidence as opposed to admissibility.  I am inclined at this point to allow it in.  Mr. McKinney?
>
> MR. McKINNEY:  I have nothing to add, Your Honor.

Docket Entry 86, No. 1997 WDA 2012, at p.58.  The issue was not litigated

by appellant and he did not explicitly join co-defendant's effort to have the

evidence excluded.  When Mr. McKinney wanted to join in a motion which

was being litigated by Ms. Williams, he explicitly informed the court of that

decision.  **See** TT 34.  The issue is waived.

Even if this Court finds the issue preserved, it lacks merit.

"The admissibility of evidence is a matter for the discretion of

the trial court and a ruling thereon will be reversed on appeal only upon a

showing that the trial court committed an abuse of discretion."

*Commonwealth v. Sherwood,* 982 A.2d 483, 495 (Pa. 2009).  "An abuse of

discretion is not a mere error in judgment but, rather, involves bias, ill will,

partiality, prejudice, manifest unreasonableness, or misapplication of law."

6

Respondents' Exhibit 39

*Commonwealth v. Hoover,* 16 A.3d 1148, 1150 (Pa. 2011).

> The general rule, of course, prohibits testimony regarding unrelated criminal acts of the accused. *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984); *Commonwealth v. Reiss,* 503 Pa. 45, 468 A.2d 451 (1983); *Commonwealth v. Davis,* 331 Pa.Super. 285, 480 A.2d 1035 (1984); *Commonwealth v. Shealey,* 324 Pa.Super. 56, 471 A.2d 459 (1984). There are, however, special circumstances justifying exceptions to the general rule: for example, when the evidence of other criminal acts tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; (5) the identity of the person charged with the commission of the crime on trial; or (6) that the evidence is part of the same transaction as the case on trial. *Commonwealth v. Murphy,* 346 Pa.Super. 438, 499 A.2d 1080 (1985); *Commonwealth v. Shirey,* 333 Pa.Super. 85, 481 A.2d 1314 (1984); *Commonwealth v. Thomas,* 328 Pa.Super. 393, 477 A.2d 501 (1984); *Commonwealth v. Shealey, supra; Commonwealth v. Boyd,* 315 Pa.Super. 308, 461 A.2d 1294 (1983). Even if one of these exceptions applies, however, the trial court must balance the need for the evidence against its potential prejudice in order to determine its admissibility. *Commonwealth v. Ulatoski, supra; Commonwealth v. Shirey, supra; Commonwealth v. Middleton, supra.*

*Commonwealth v. Green,* 505 A.2d 321, 324-325 (Pa. Super. 1986).

In the present case the victim, Todd Mattox, was shot to death on May 16, 2011 at the Leechburg Gardens Apartment complex in Penn Hills, Allegheny County.  Saday Robinson testified that on the day of the shooting she lived at the complex in a first floor apartment.  Immediately prior to the shooting she was in her apartment when she heard screaming

Respondents' Exhibit 39

and loud noises coming from the third floor of her apartment building.   She went out into the hallway to investigate but retreated into her apartment as the noises got closer to her first floor apartment.   While looking out her window she saw appellant and Thaddeus Crumbley push Mr. Mattox out the front door.  Both appellant and Crumbley had guns in their hands.  The victim backed up towards the parking lot with his hands in the air while saying to appellant and Crumbley: "Don't shoot me.  I'll give you everything I have."   Appellant fired approximately 3 shots and the victim fell to the ground.  Appellant and Crumbley then ran to a nearby vehicle at which time Ms. Robinson saw the victim pull out a gun while lying on the ground. (Brandon Smith, who also witnessed part of the shooting, also testified that he saw the victim with a gun and it was lying on the ground after the victim was shot.)   Ms. Robinson heard 2 shots being fired as appellant and Crumbley ran towards the car.  After the shots, she saw appellant return to the victim and go through his pockets, taking some of his belongings. Appellant returned to the vehicle at which point Crumbley walked over to the victim and shot him in the head.   Appellant and Crumbley fled in a vehicle which was subsequently set afire by Roman Herring, a cousin to Mr. Crumbley.  Another cousin of Mr. Crumbley's-Craig Clark, provided Mr. Herring with the accelerant used to torch the getaway vehicle (TT 525-640;

8

Respondents' Exhibit 39

939-973).[2]

Police officers and forensic personnel investigating the scene of the shooting found seven .40 caliber shell casings and two 357 Sig shell casings.  Tests revealed that two of the .40 caliber shell casings were fired from one gun; five of the .40 caliber shell casings were fired from another gun; and the two 357 caliber shell casings were fired from a third gun. Thus, three different guns had been fired during the shooting incident involving Mr. Mattox. One spent bullet projectile was found by the victim's head and one was found in a beam of one of the apartment buildings.  No murder weapon was found at the scene and the gun possessed by the victim was missing from the scene when police arrived (TT 277-297; 440-470).

An autopsy revealed that Mr. Mattox had been shot three times. One bullet wound was in his upper back; one wound was in his buttocks and this bullet fractured his hip socket; he had also suffered a fatal bullet wound to his head.  During the autopsy of Mr. Mattox the Medical Examiner

---

[2]     Numerals in parentheses preceded by the letters "TT" refer to pages of the trial transcript.

9

Respondents' Exhibit 39

recovered 3 bullets from the victim's body.   Two of the bullets, recovered from the back and buttocks wounds, were 9 mm bullets and matched each other.   The remaining bullet from the head wound was not suitable for comparison purposes although rifling characteristics (lands, grooves, twist) were able to be observed (TT 241-261; 440-470).

On June 2, 2011 at approximately 1:08 a.m. Crumbly was in a vehicle with 2 other people, which was involved in a shootout.   Sergeant Tony Costa of the Swissvale Police was called to the scene.   Upon arrival he saw Crumbley walking down the street while being assisted by a female. Crumbley was bleeding profusely and had been shot.   A male by the name of Asa Thompkins was observed at the scene by Sergeant Costa.   It would later be learned that Mr. Thompkins had been in the vehicle with Mr. Crumbley.   Mr. Thompkins was detained by police and then released (TT 843-859).

A forensic examination of the vehicle in which Crumbley was traveling when shot revealed a number of spent cartridge casings inside the vehicle, confirming that the occupants had also fired shots at whoever was firing at them.   Spent casings were found outside of the vehicle, too.   A 9mm handgun was also found outside the vehicle on the driver's side of the

Respondents' Exhibit 39

car.  The spent casings in the vehicle were of two different types-9mm and .40 caliber (TT 440-470, 859-938).

On June 9, 2011 Asa Thompkins was a passenger in a vehicle which was stopped by police.  A search of the vehicle revealed a .40 caliber Springfield Armory pistol.  A test fire of that gun resulted in spent projectiles that had the same characteristics, in terms of lands, grooves, and twist, as one of the spent projectiles recovered from Mr. Mattox's body (the bullet in his head). The .40 caliber casings found at the Mattox shooting matched the casings which were test fired from the gun recovered from Mr. Thompkins:

> [Testimony of Raymond Everett, Forensic Firearms Examiner:]
>
> A    The bullets in this case, 40 caliber bullets as I stated before the one projectile was not suitable for identification purposes.  It did not have enough individual characteristics for me to make an identification.  However, it did have the same - - it did have the same rifling characteristics of six lands and grooves with a right-hand twist and those class characteristics were the same as the class characteristics on a Springfield Armory pistol, serial number US365053.  Now, that comparison was made because the item 1A2 cartridge cases though were the five spent 40 caliber S&W caliber cartridge cases, those matched the test cartridge cases from that Springfield Armory pistol with serial number US365053.

(TT 475; See further TT 440-470, 922-938).

Respondents' Exhibit 39

The .40 caliber casings found at the scene of the Crumbley shootout were also determined to have been fired from the Springfield Armory pistol recovered from Mr. Asa Thompkins:

[Testimony of Thomas Morgan, Forensic Examiner:]

Q    And so as to what you examined, how many handguns can you definitively rule in and rule out as being fired at tis scene?

A    Once again I didn't perform that actual firearm tool mark examination of all of the evidence here.   There is another scientist that will follow my testimony I believe that will be able to shed some light on that.

Q    Well, I am just asking for your answer as to what you examined.

A    For my answer I did test fire the Springfield Armory pistol that I mentioned before and I did make a comparison with the 40 caliber S&W caliber cartridge casings from the scene.  And what I can say for sure is one firearm was fired.

(TT 901).

Appellant and Crumbley were both charged with the murder of Mr. Mattox; as principals as well as coconspirators.  The evidence of the June 2, 2011 shootout established that Crumbley was present in a vehicle in which a gun was fired and that gun, when fired, left markings on its casings which were identical to the markings found on casings at the Mattox shooting, and also left characteristics on its bullets which were similar to the lands, grooves, and twist on a bullet recovered from Mr.

12

Respondents' Exhibit 39

Mattox's body, thus supporting the inference that Crumbley had been involved with appellant in the Mattox shooting and had used that gun to shoot Mr. Mattox in the head, after appellant had brought him to the ground with 2 shots from a 9 mm.  Given the evidence establishing that appellant and Crumbley conspired and acted as accomplices[3] to kill Mr. Mattox, any evidence linking Crumbley to the murder was also relevant in establishing appellant's guilt as an accomplice in the murder as well as in the conspiracy to murder Mr. Mattox.  Given the fact that two 9 mm bullets were recovered from the body of Mr. Mattox and appellant was identified as being the individual who first fired his weapon which resulted in Mr. Mattox failing to the ground; and given the fact that forensic evidence proved that a .40 caliber weapon had also been fired and a bullet was recovered in Mr. Mattox's head and testimony established that Mr. Crumbley stood over Mr. Mattox and fired a shot into his head, the evidence was circumstantial

---

[3] "An accomplice knowingly or voluntarily cooperates with or aids another in the commission of a crime. *Commonwealth v. Manchas,* 430 Pa.Super. 63, 633 A.2d 618, 627 (1993), *allocatur denied,* 539 Pa. 647, 651 A.2d 535 (1994). The aid rendered makes that person guilty of the substantive offense."  *Commonwealth v. Tolbert,* 670 A.2d 1172, 1185 (Pa. Super. 1995).

Respondents' Exhibit 39

evidence which established the conspiracy and supported the credibility of the witnesses who described the separate and shared roles and actions of appellant and Crumbly in the murder.  The trial court explained its rationale in admitting this evidence as follows:

> Evidence of other crimes may be admitted for other relevant purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," though such evidence should only be admitted if the probative value of the evidence outweighs its potential for prejudice.  Pa.R.E. 404(b)(2)-(3), *Commonwealth v. Tedford,* 960 A.2d 1, 37 (Pa. 2008).  The particular prejudice that Rule 404(b)(3) seeks to prevent is the misuse of other-offense evidence.  Specifically, the rule is designed to generally eliminate other-offense evidence, unless admissible for some specific purpose as indicated above, so that jurors do not convict a defendant simply because they perceive that the defendant has a bad character or a propensity to commit crimes.  *Reese, supra,* at 723,  Evidence that the defendant possessed a device or instrument that could have been the murder weapon is admissible.  *See Commonwealth v. Miller,* 897 A.2d 1281 (Pa. Super. 2006).  Evidence will not be prohibited merely because it is harmful to the defendant. *Commonwealth v. Dillon,* 925 A.2d 131, 141 (Pa. 2007).  When other-offense evidence is admitted, the Defendant is entitled to request a jury instruction explaining to the jury that the specific evidence was only admitted for a limited purpose. *Commonwealth v. Billa,* 555 A.2d 835, 841-842 (Pa. 1989). The trial court is permitted to use its own form of expression to explain difficult legal concepts to the jury.  *Commonwealth v. Spotz,* 759 A.2d 1280, 1287 (Pa. 2000).

> Here, the evidence regarding the shooting on June 2, 2011 and the presence of the Ruger handgun were properly admitted.  While certainly prejudicial to the Defendants, as all evidence tends to be, the evidence of the subsequent bad acts

14

Respondents' Exhibit 39

was relevant to make a fact in the case, i.e., whether Defendant Crumbley was present at the scene of the Todd Mattox murder two (2) weeks earlier, more or less probable.  The evidence also was relevant to support the inference that Defendant Crumbley was in possession of the .40 caliber gun used in Mr. Mattox's murder.  Clearly, the evidence of the June 2nd shooting is not dispositive of these issues, but there is no requirement in the law that the evidence of other bad acts be dispositive on some disputed issue.  The jurors had the opportunity to hear effective cross-examination on the evidence presented, as well as hear the informed arguments of all counsel on the relevance of the subsequent shooting.

The fact that the jurors found the Defendants guilty of all charges does not mean that they misused the evidence of the June 2nd shooting.  Certainly, the strength and compelling nature of the eyewitness testimony from the time of Mr. Mattox's murder led more to the verdict than evidence of this subsequent event.  This court committed no error in the admission of this evidence.

Opinion at pp. 25-27.

The trial court did not err.  "[A] jury is entitled to infer an agreement between participants from the actions they take[.]" *Commonwealth v. Tolbert,* 670 A.2d 1172, 1182 (Pa. Super. 1995).  "[T]he law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators [even if he was not physically present when the acts were committed] if such acts are done in pursuance of the common design or purpose of the conspiracy."  *Commonwealth v. Dennis,* 618 A.2d 972, 977 (Pa. 1992).  "[T]he use of a deadly weapon on a vital part of the body can

Respondents' Exhibit 39

be the basis for a finding of specific intent to kill[.]" *Id., at 1181.* Even where a weapon cannot conclusively be identified as the weapon used in a crime, where circumstances justify that inference, the weapon can be admitted. *See Commonwealth v. Brown,* 359 A.2d 393 (Pa. 1976); *Commonwealth v. Clayton,* 532 A.2d 385 (Pa.1987). *See also United States v. Snead,* 447 F.Supp. 1321 (E.D.Pa.), affirmed 577 F.2d 730 (3rd Cir.), cert. denied 436 U.S. 930, 98 S.Ct. 2829, 56 L.Ed.2d 775 and 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 154 (1978) (testimony clearly relevant and probative with respect to one defendant was properly admitted over co-defendant's claim of prejudice). By establishing that the weapon that was capable of, and had most likely caused the death of Mr. Mattox, was tied to Crumbley and that Crumbley and appellant had both been identified as shooters in the death of Mr. Mattox, the Commonwealth was able to establish appellant's shared responsibility for the killing as both an accomplice and coconspirator.

The Commonwealth directs this Court to the decision in *Commonwealth v. Reid,* 626 A.2d 118 (Pa. 1993). The facts of *Reid* were as follows:

The facts of the case are that in the early evening of March 7, 1989 a group of boys was throwing snowballs at

16

passing cars in the neighborhood of 29th and Tasker Streets in Philadelphia. The car driven by Reid was struck as it drove by. Reid stopped the car and got out. The boys scattered as Reid shouted at them. Reid's two passengers also exited the car. Reid asked two bystanders whether they were involved in throwing the snowballs and they denied any participation. Reid reached his hand inside his jacket and replied, "You better hope none was your family." To his passengers he said, "Well, let's at least get one of them." A third bystander, apparently not realizing what Reid intended, suggested that Reid ride around the corner in order to "get one."

As Reid and his passengers drove around the block, some of the boys who had thrown the snowballs pulled a stop sign into the middle of a street which Reid would drive down. When he reached the stop sign, Reid drove the car on the sidewalk, and then gunfire came from the passenger side of Reid's car. Michael Waters, a sixteen year old youth, was killed by a bullet of unknown caliber, which struck him in the back and exited his chest. Reid and his passengers then fled.
Two bullets and two shell casings were found. One thirty-eight caliber bullet fell from Waters' jacket at the hospital; another was recovered from a window frame. The bullet in Waters' jacket had not entered his body. The two shell casings were ten millimeter caliber.

Six days later, in a separate incident, Reid used a ten millimeter handgun to murder another victim, Neal Wilkinson. In this incident, Reid and a confederate, Bowman, asked Wilkinson and Woods to accompany them to collect a debt. When Wilkinson and Woods ascended stairs in the projects in order to knock on the door of the alleged debtor, Bowman shot them both with a shotgun, and then Reid shot them again with a handgun. Miraculously, Woods survived and gave police a statement naming Reid as one of two shooters. Ten millimeter shell casings found at the Wilkinson murder scene were fired from the same gun as was used in the Waters shooting six days earlier.

Respondents' Exhibit 39

0425

*Id.,* 626 A.2d at 119-120.  In ruling that the Trial Court properly allowed the

Commonwealth to introduce evidence of the subsequent shooting during

the trial arising from the snowball killing, the Supreme Court held:

> Reid's first claim is that it was error for the trial court to allow into evidence testimony about an unrelated murder which occurred six days after the Waters murder. The Commonwealth's reason for seeking to admit this information was its theory that empty shell casings found at both murder scenes from the same handgun and Reid's identification as one of two shooters in the second murder make the evidence admissible to show that Reid was a shooter in both murders. In short, the evidence with respect to the second murder was offered to establish the identity of Reid as a shooter in the first murder.
>
> In *Commonwealth v. Jones,* 457 Pa. 563, 575, 319 A.2d 142, 149 (1974), this court held testimony that a defendant charged with murder was in possession of the murder weapon two to five hours after the murder is admissible because it tends to show the identity of the person who committed the murder. In the present case, as in *Jones,* there were no eyewitnesses. Evidence of Reid's guilt, therefore, must be circumstantial. Reid asserts that admission of evidence concerning the second murder does not establish his identity as the shooter in the first murder because (1) no one established that he was in possession of any weapon, including a ten millimeter handgun; (2) the shooting came from the passenger side of Reid's car when Reid was driving, and two other persons were in the car; (3) the shell casings found at the scene of the first murder may have been there for some time before the murder; (4) the witness-victim in the second murder recanted his earlier statements to police and testified at trial that Reid did not shoot him or the other victim; (5) this witness stated that at the time the witness was shot, Reid possessed a .357 magnum which he had obtained from someone else, not a ten millimeter handgun; and finally, (6) that the only conclusion which may be

Respondents' Exhibit 39

drawn from the Commonwealth's evidence is that shell casings from the same ten millimeter handgun were found at both murder scenes.

The Commonwealth asserts that as to the first murder (boys throwing snowballs), Reid could easily have leaned across the seat to shoot from the passenger side of the car; the ten millimeter shell casings came from the same weapon as the casings found at the scene of the second murder; although the projectile which killed the boy in the first murder was not recovered, so its caliber is not known, the projectile recovered from the head of the victim in the second murder was of ten millimeter caliber. As to the second murder (shotgun and handgun wounds inflicted at close range in a hallway), the Commonwealth asserts that the surviving witness who denied at trial that Reid was one of the two people who shot him and left him for dead had given statements to police shortly after the shooting identifying Reid as one of the shooters, the one who used a handgun.

Since the circumstances of the second murder (shotgun and handgun wounds inflicted at close range in a hallway) place a weapon used in both murders in the hands of Reid at the time of the second murder, the question is whether a jury may draw an inference that Reid was the shooter in the first murder. Because empty shell casings from the same weapon were found at both murder scenes, and Reid was identified as the handgun shooter in the second murder, in which a ten millimeter bullet was found in the victim's head, evidence of the second murder is admissible to establish Reid's identity as the shooter in the first. Reid's real objection, although couched in terms of admissibility of evidence, is to the weight of the evidence. That is for the jury. This claim of error is without merit.

*Id.,* 626 A.2d at 120-121.   *See also State v. Collins,* 10 A.3d 1005 (Supreme Court of Connecticut, 2011) which discusses the issue and

19

collects cases favoring admission of this type of evidence.

Another decision which supports the trial court's decision in this case is *Commonwealth v. Flamer,* 53 A.3d 82 (Pa. Super. 2012) where this Court ruled that a murder committed by a third party was relevant evidence in the defendant's pending trial for murder.  *See also Commonwealth v. Evans,* 481 A.2d 625 (Pa. Super. 1984) reversed on other grounds 512 A.2d 626 (Pa. 1986) (evidence of burglary by two accomplices in which they stole weapon used in charged offense admissible against defendant even though he was not involved in the prior crime).

The fact that the Crumbley shooting occurred after the murder of Mr. Mattox is not controlling and does not render it inadmissible under Rule 404(b).   "[E]vidence of a subsequent offense can still show the defendant's intent at the time of the prior offense."   *Commonwealth v. Collins,* 703 A.2d 418, 423 (Pa. 1997).   *See also Commonwealth v. Wattley,* 880 A.2d 682 (Pa. Super. 2005); *Commonwealth v. Green,* 505 A.2d 321, 324-325 (Pa. Super. 1986)(footnote omitted):

> Appellant argues that the trial court erred in admitting testimony during the trial that appellant was involved in a later conspiracy to rob a convenience store. Specifically, part of appellant's written statement to the police contained the following exchange, which was admitted into evidence at trial:

Respondents' Exhibit 39

Q. Did you ask Pew why he shot the man?

A. Yeah. He said so the dude couldn't identify him.

Q. Did you after that go to the AM–PM Mini Mart at 17th and Derry?

A. We walked to the crossroads, me, him, and about two more people. There was a whole lot of peoples with us.

Q. How many shots did Pew fire that night?

A. One. That's all I know of. We was down at the AM–PM and I couldn't find him. And then I went back to 14th and Regina and we couldn't find him. And we went back to the AM–PM again, when I seen Pew again.

Q. I thought you still had the gun. Explain that statement.

---

A. Pew gave me the gun back. Then he wanted to rob the AM–PM and I gave the gun back to him. Then later on at the AM–PM, I got it back from him.

Q. Did Pew rob the AM–PM store?

A. No. He said there was too many people there.

N.T., Trial, at 104–05.

Appellant objected to this testimony on the ground that the statement involved evidence of an unrelated robbery.

Where the trial court has admitted evidence of other crimes committed by a defendant and his cofelon(s), our scope of review is whether the trial court abused its discretion in allowing the admission of such evidence. *Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d 186 (1977); *Commonwealth v. Middleton,* 320 Pa.Super. 533, 467 A.2d 841 (1983).

The general rule, of course, prohibits testimony regarding unrelated criminal acts of the accused. *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984); *Commonwealth v. Reiss,* 503 Pa. 45, 468 A.2d 451 (1983); *Commonwealth v. Davis,* 331 Pa.Super. 285, 480 A.2d 1035 (1984); *Commonwealth v. Shealey,* 324 Pa.Super. 56, 471 A.2d 459 (1984). There are, however, special circumstances justifying exceptions to the general rule: for example, when the evidence of other criminal acts tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme,

21

Respondents' Exhibit 39

plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; (5) the identity of the person charged with the commission of the crime on trial; or (6) that the evidence is part of the same transaction as the case on trial. *Commonwealth v. Murphy,* 346 Pa.Super. 438, 499 A.2d 1080 (1985); *Commonwealth v. Shirey,* 333 Pa.Super. 85, 481 A.2d 1314 (1984); *Commonwealth **325 v. Thomas,* 328 Pa.Super. 393, 477 A.2d 501 (1984); *Commonwealth v. Shealey, supra; Commonwealth v. Boyd,* 315 Pa.Super. 308, 461 A.2d 1294 (1983). Even if one of these exceptions applies, however, the trial court must balance the need for the evidence against its potential prejudice in order to determine its admissibility. *Commonwealth v. Ulatoski, supra; Commonwealth v. Shirey, supra; Commonwealth v. Middleton, supra.*

The lower court admitted the contested testimony as evidence going to show appellant's state of mind. "Evidence of an unrelated crime is admissible to show state of mind only when it is so close in time to the alleged offense as to have bearing upon [the accused's] state of mind at that time." *Commonwealth v. Martinez,* 301 Pa.Super. 121, 127, 447 A.2d 272, 275 (1982). (quotations omitted). While we recognize that evidence of *subsequent* offenses is less strongly probative of intent than *prior* offenses since it does not establish that a defendant possessed the requisite intent prior to the commission of the crime being tried, *id.,* we nonetheless agree with the lower court that the testimony admitted went to show the state of mind or intent of appellant at the time the victim was killed.

At trial, appellant denied that he and Mr. Pew had formulated a plan to rob someone, or that he had obtained the gun for purpose of robbing someone. In effect, appellant testified that he was an unwitting bystander, who just happened to be in Pew's company, when Pew suddenly held up the victim and shot him. Furthermore, appellant stated at trial that after he ran from the site of the murder, he did not see Pew later at the AM–PM store, or anywhere else until the next day. Obviously this testimony was in direct conflict with appellant's inculpatory statement made at the time of his arrest, and subsequently admitted at trial.

22

Respondents' Exhibit 39

The testimony concerning the planned robbery of the AM–PM store took place close in time and space to the slaying of the victim. The same weapon was involved. The same persons were involved.

> Because the testimony is relevant to events close in time and place to the shooting of [the victim], it tends to demonstrate the appellant's criminal intent with regard to the shooting. Moreover, the testimony shows the appellant's continued association with [Pew] and participation in further criminal acts that evening. As such it tends to rebut the appellant's assertion that he lacked the necessary state of mind to establish second degree murder....

*Commonwealth v. Middleton, supra,* 320 Pa. at 550–51, 467 A.2d at 849–50. *See also Commonwealth v. Styles,* 494 Pa. 524, 431 A.2d 978 (1981); *Commonwealth v. Brown,* 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Evans,* 460 Pa. 313, 333 A.2d 743 (1975); *Commonwealth v. Barnhart,* 290 Pa.Super. 182, 434 A.2d 191 (1981). We cannot say that the lower court abused its discretion in admitting the statement concerning the AM–PM store.

Appellant's reliance on *Commonwealth v. Robinson,* 721 A.2d 344 (Pa. 1998) is inapposite.  In the present case the .40 caliber Springfield Armory pistol was demonstrated, via the markings that it left on casings, to be one of the weapons that was used to murder Mr. Mattox.  The rifling characteristics that it left on test bullets, although not definitive, added further weight to that finding.  Crumbley and appellant were identified by an eyewitness as having been the shooters.  Appellant ignores the fact that relevance is established because appellant and Crumbley were coconspirator and accomplices in this murder.  The probative value clearly

Respondents' Exhibit 39

outweighed any prejudice.  Neither Crumbley or Asa Thompkins were charged as a result of the June 2nd shootout.  Crumbley was simply a victim.  The trial court offered to instruct the jury that the evidence of the June 2nd shooting should only be considered for identification purposes as it related to Mr. Crumbley's role in the shooting of Mr. Mattox.  When the court first offered to instruct the jury, Crumbley's counsel didn't want the instruction and appellant's counsel never bothered to voice an opinion either way (TT 1318-1323).  When the court again offered to give a limiting instruction, appellant's counsel didn't want the instruction (TT 1411).  The evidence was properly admitted.

Respondents' Exhibit 39

0432

II.   THE TRIAL COURT DID NOT ERR IN ADMITTING TESTIMONY CONCERNING MS. ROBINSON'S IDENTIFICATION OF APPELLANT IN A PHOTO ARRAY AND DID NOT ERR IN ADMITTING MS. ROBINSON'S IN-COURT IDENTIFICATION OF APPELLANT.

"The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." *Commonwealth v. Sherwood,* 982 A.2d 483, 495 (Pa. 2009).  "An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." *Commonwealth v. Hoover,* 16 A.3d 1148, 1150 (Pa. 2011).

As to an allegation of taint involving a witness' identification:

[T]he Commonwealth bears the burden of establishing that any identification testimony to be offered at trial is free from taint of initial illegality. *Commonwealth v. Turner,* 454 Pa. 520, 314 A.2d 496 (1974); Pa.R.Crim.P. 323(h). In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In making this determination, the court should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's

25

Respondents' Exhibit 39

0433

appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of \*\*1126 time between the incident and the court identification. *Commonwealth v. Fowler,* 466 Pa. 198, 352 A.2d 17 (1976); *United States v. Higgins,* 458 F.2d 461 (3d Cir.1972).

*Commonwealth v. Moore,* 633 A.2d 1119, 1125-1126 (Pa. 1993).

When an out-of-court identification is alleged to be tainted, an in-court identification may still stand if, considering the totality of the circumstances, the identification "had an origin sufficiently distinguishable to be purged of the primary taint." *Commonwealth v. Abdul–Salaam,* 544 Pa. 514, 678 A.2d 342 (1996); *see also Commonwealth v. James,* 506 Pa. 526, 486 A.2d 376 (1985). The factors a court should consider in determining whether there was an independent basis for the identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 380.

*Commonwealth v. Kendricks,* 30 A.3d 499, 506 (Pa. Super. 2011).

Judge Lazzara has provided this Court with a very extensive and well-reasoned discussion on this issue:

Defendant Crumbley's second allegation of error, and Defendant Ebo's third allegation of error, is that this court erred in permitting Saday Robinson to testify because her identification was the product of taint and bias. More specifically, the Defendants assert that her identification of them on July 24, 2012 resulted from taint, bias and influence from the media exposure related to this case, from information provided to her by neighbors or friends, and from comments made by the police to her prior to that identification.

Questions regarding the admission and exclusion of evidence

Respondents' Exhibit 39

are within the sound discretion of the trial court and will not be reversed on appeal absent an abuse of discretion. *Commonwealth v. Kendricks,* 30 A.3d 499, 503 (Pa. Super. 2011).   An abuse of discretion may not be found merely because an appellate court might have reached a different conclusion, but requires a showing that the trial court's conclusion was the result of manifest unreasonableness, or partiality, prejudice, bias or ill-will, or such lack of support as to be clearly erroneous. *Commonwealth v. Brougher,* 978 A.2d 373, 376 (Pa.Super. 2009).

A photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *Commonwealth v. DeJesus,* 860 A.2d 102, 112 (Pa. 2004).   Photographs used in photo array line-ups are not unduly suggestive if the suspect's picture does not stand out more than those of the others, and the people depicted in the array all exhibit similar facial characteristics. *Commonwealth v. Fisher,* 769 A.2d 1116, 1126 (Pa. 2001).   The photographs in the array should all be the same size and should be shot against similar backgrounds. *Kendricks, supra,* at 506.   The factors a court should consider in determining whether there was an independent basis for identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. *Commonwealth v. Abdul-Salaam,* 678 A.2d 342 (Pa. 1996).

Before Ms. Robinson testified in front of the jury at trial, this court heard lengthy testimony by her regarding the circumstances surrounding her identification of the Defendants, including her interviews by police, her exposure to media coverage of the case prior to her July 2012 identification of the Defendants, and information that she may have heard in the community regarding this murder. She was subjected to extensive cross-examination on these issues by the attorneys for both Defendants.  This court ultimately ruled that Ms. Robinson was permitted to testify and that she was permitted to provide testimony regarding her July 2012 identification of the Defendants.   She was further permitted to make an in-court

Respondents' Exhibit 39

identification of the Defendants.

The Defendants assert that several factors tainted the identification of the Defendants by Ms. Robinson, including media exposure, information from neighbors identifying the alleged shooters and improper comments from the police.  In terms of media exposure, it is true that there was media coverage of this case, which included televised and printed photos of the Defendants following their arrest, and there may have been media coverage of Mr. Crumbley as a result of the shooting in which he was a victim in early June 2011. Ms. Robinson denied seeing any such coverage repeatedly during her testimony regarding the pre-trial motion *in limine.*

Ms. Robinson moved from Allegheny County across the country in mid-October 2011.  (T.R. 8/20/12, pp. 41, 68).  Aside from a brief return to Pittsburgh in November 2011 for the funeral of her grandmother, she did not return to the area until July 2012, when detectives asked her to return to make an identification of the shooters.  (T.R. 8/20/12, p. 42).  Ms. Robinson testified that she saw no media coverage, pictures or video of the Defendants either before she left the area or after.  (T.R. 8/20/12, p. 42).  She specifically indicated that she saw no photos of Defendant Crumbley prior to being shown the first photo array in September 2011.  (T.R. 8/20/12, pp. 64, 68).  She also denied seeing any media coverage from the time of the shooting until being contacted by telephone by detectives in late June, early July, 2012.  (T.R. 8/20/12, pp. 70-71).  She advised the detectives during that phone contact that she had seen no media coverage regarding the case.  (T.R. 8/20/12, pp. 158-159).  She also indicated that she did not have a computer until she started school, which did not occur until after October 2011, when she left Pennsylvania.  (T.R. 8/20/12, pp. 157-158).  The credible testimony in the case was that Ms. Robinson had seen no media coverage related to the Defendants prior to her identification of them in July 2012 as the shooters.   It should be noted that Ms. Robinson testified consistently to this lack of exposure to media coverage during her trial testimony.  (T.R. 8/20/12, pp. 624, 626-628).

During her pre-trial motion testimony, Ms. Robinson also addressed the issue of whether her identifications were the product of information from community members.  On the night of the murder, a

Respondents' Exhibit 39

0436

neighbor indicated to Ms. Robinson that "Mo" was the shooter. (T.R. 8/20/12, pp. 42-43). Later, a friend named Ace told her that "Mat-Mat" was responsible. (T.R. 8/20/12. P. 58). Ms. Robinson was clear that she did not know Defendant Ebo to be called "Mo" prior to the shooting (T.R. 8/20/12, p. 169); she never learned Defendant Crumbley's name (T.R. 8/20/12, p. 68); she did not know Defendant Ebo's name when she saw him at the apartment complex (T.R. 8/20/12, pp. 169-170); she did not know anyone named "Mat-Mat" (T.R. 8/20/12, p. 171); she never found out who "Mat-Mat" was (T.R. 8/20/12, p. 71); and she did not know anybody named "Mo" or "Mat-Mat" when she picked out Defendant Ebo's photo. (T.R. 8/20/12, pp. 178-179). Ms. Robinson was very clear that she selected the Defendants' photos from the photo arrays because she saw them shoot Mr. Mattox. (T.R. 8/20/12, pp. 44, 178-179). Again, the credible testimony did not support that Ms. Robinson's identification was in any way tainted, biased or even influenced by the comments made by her neighbor and friend.

Lastly, the issue of whether police comments had tainted Ms. Robinson's identification was explored. Ms. Robinson was contacted in late June or early July by detectives who asked her to return to Pittsburgh to look at photo arrays. At the time that she was contacted, she was told that two gentlemen had been arrested (T.R. 8/20/12, pp. 182, 183) and that the detectives thought that these men were responsible for the murder of Todd Mattox. (T.R. 8/20/12, pp. 174-175). At no point did the detectives tell her the names of who they thought was responsible for the shooting. (T.R. 8/20/12, p. 175). The detectives also did not suggest who they thought was responsible for the murder when they showed Ms. Robinson the photo arrays. (T.R. 8/20/12, p. 175). Ms. Robinson did have an understanding that photos of the responsible people were contained in the photo arrays that she was shown, but no detective told her that. (T.R. 8/20/12, pp. 183-185). Additionally, she was unaware that a trial was scheduled to begin at the point when the police contacted her in July, 2012. (T.R. 8/20/12. P. 183). The credible testimony eliminated from further consideration this issue of possible taint from police comments in the identification of the Defendants by Ms. Robinson at the photo array in July, 2012.

Even though this court does not believe that there was any

Respondents' Exhibit 39

taint, bias or suggestion in Ms. Robinson's identifications, the court will note that there are strong independent bases supporting Ms. Robinson's identifications here. It has never been disputed that Ms. Robinson's vantage point from her apartment window gave her a clear view of Todd Mattox's murder. Her window was approximately 8-10 feet from the front door of the building and 70-80 feet from the parking lot. (T.R. 8/20/12, pp. 283, 1179; Ex. 28). According to Detective Perry, Ms. Robinson had the best vantage point to see the events that night. (T.R. 8/20/12, p. 377). There were no obstructions of her view of the parking lot from her window. (T.R. 8/20/12, p. 167). The Defendants were only ten (10) feet away from her during the incident, and it occurred while it was still light outside. (T.R. 8/20/12, pp. 168-169). Additionally, she indicated that the entire incident lasted ten (10) minutes, that she watched the entire incident, (T.R. 8/20/12, p. 178), and she had seen both Defendants in her apartment building prior to the shooting, (T.R. 8/20/12, pp. 44, 177-178), making them familiar to her at the time of the shooting.

What Ms. Robinson witnessed was a brutal, unprovoked shooting of a man begging for his life, and then the execution of a wounded, fallen man. Images from such violent events tend to remain imprinted in one's mind, especially the faces of the perpetrators of such a horrific event. Ms. Robinson indicated this herself during her trial testimony, stating that the faces of the Defendants were "stuck in her head." (T.R. 8/20/12, p. 547). While not exceptionally descriptive, Ms. Robinson did provide relatively accurate descriptions of the two men involved in this shooting, including skin tone, relative size and clothing. (T.R. 8/20/12, pp. 413, 590-593, 1166-1170). Even if her identification was in some way tainted by media coverage or comments from neighbors, friends or police, which this court strongly believes is not the case, Ms. Robinson certainly had independent bases upon which to make her July, 2012 identifications.

Although defense counsel focused on Ms. Robinson's failure to select either Defendant from previous photo array lineups as strong evidence that her July, 2012 identification must have been the product of taint or bias, this court instead focused on Ms. Robinson's understandable fear to be a witness in this case. Ms. Robinson was immediately interviewed after the shooting and made herself

Respondents' Exhibit 39

0438

available for questioning.   (T.R. 8/20/12, p. 540).   However, even from this beginning interaction with the police, she was afraid, telling police officers of her fear on the night of the shooting and inviting them into her apartment so that she would not be seen talking with them.  (T.R. 8/20/12, p. 53).  As was mentioned earlier, Ms. Robinson shook through the entirety of her testimony, both during the pre-trial proceedings and at trial.   Her entire demeanor reflected her fear of being involved in this case.

Ms. Robinson also certainly verbalized her fear during her trial testimony, indicating that she did not want involved in this case because of the culture in her community that perpetuated the phrase "snitches get snitches" (T.R. 8/20/12, pp. 535-536), a sentiment echoed by another witness to the shooting, John Gardone.  (T.R. 8/20/12, pp. 493-494).   Her fear throughout her involvement in the case was clear through her actions: by her waiting until her neighbors left before she talked to the police (T.R. 8/20/12, p. 535); by her taking the police into her apartment so no  one would see her talking to them (T.R. 8/20/12. P. 53); by only agreeing to meet detectives elsewhere for subsequent meetings so that no one would see her talking to them (T.R. 8/20/12, p. 583); by her testimony that she deliberately failed to identify the Defendants in photo arrays even though she was sure that they were there (T.R. 8/20/12, p. 552); by the fact that she told Detective Perry that she moved because she was fearful (T.R. 8/20/12, p. 381); and by the fact that she finally identified the Defendants only after moving across the country and being informed that suspects were in custody.  (T.R. 8/20/12, p. 550). Ms. Robinson's own family warned her that she should not become involved in this case for fear that something would happen to her if she did.  (T.R. 8/20/12, p. 548).

This court does not believe that prior failures to identify the Defendants in any way support a contention that the identifications in July, 2012 were the result of taint, bias or suggestion.  Rather, the prior failures to identify the Defendants were the product of a fear so intense that Ms. Robinson exhibited physical manifestations of that fear over fifteen (15) months after the incident that she witnessed. This court permitted Ms. Robinson to testify at trial regarding her eyewitness identification of the Defendants, finding that there was no media taint and no taint from community or police sources.  There

Respondents' Exhibit 39

was an independent basis for her identification.   (T.R. 8/20/12, pp.
214-215).   This court's ruling in this regard is well-supported by the
record and should be upheld.

Opinion at pp. 14-22.  The trial court did not err in this regard.

This incident occurred right outside of Ms. Robinson's

apartment.  She watched the whole incident which lasted between 5 and 10

minutes.  When the actors exited the building they were approximately 10

feet from her window.  When they shot the victim, they were approximately

70 feet from her window.  Ms. Robinson had the opportunity to look at

appellant's face.   She had seen appellant in the apartment complex on

prior occasions:

> Q     When you were living in Leechburg Garden Apartments
> you said that you saw Mr. Ebo a number of times before the
> shooting?
> A     Yes.
>
>                    *              *              *              *
> Q     I'm talking about the day of the shooting.
> A     Oh, I seen him when he came out my front building door.
> Q     How long did this whole incident last until they left in the
> car?
> A     I want to say about ten minutes.
> Q     Okay.  Did you watch the whole time or part of the time?
> A     I watched the whole thing.
> Q     Someone told you MO did it, someone told you Mac-Mac
> did it, you said earlier you didn't know anyone by those names.
> Did you pick out Mr. Ebo's picture because someone told you
> Mo and Mac-Mac did it or did you pick him out because you
> recognized him?
> A     Because I recognized him.
> Q     When you picked out his picture did you know - - did you

32

yet know anybody - - know anybody named Mo or Mac-Mac?

A    No.

Q    Did you know Mr. Ebo's name when you picked his picture out?

A    No.

           *          *          *          *

Q    Why did you pick him out of the photo array?

A    Because I seen him shoot the victim.

Q    Did you see his face?

A    Yes.

Q    Had you seen him before that?

A    Yes.

Q    How many times?

A    About three or four times.

Q    Those three or four times how close were they, where was it you did see him?

A    In the building behind me.

Q    That's in Leechburg Garden Apartments?

A    Yes.

Q    And how far in advance of the shooting on May 16 of 2011 did you see him in that complex?

A    I seen him probably a week after the shooting.

Q    How about before the shooting?

A    A couple of days, I'm not quite sure.

Q    How many times did you see him before the shooting?

A    Three or four times.

           *           *          *          *

Q    Do you remember telling them that you could absolutely pick out the light-skinned actor if you saw him again because you had seen him numerous times in the complex but that you could not be certain of the other male as he had a hoody over his head?

A    Yes.

           *           *          *          *

Q    Did you have any trouble seeing?

A    No.

Respondents' Exhibit 39

Q      Could you see their faces?

A      Yes.

Q      Did either of them have a hoody on?

A      Yes.

Q      Who did?

A      The gentleman in the yellow shirt.

Q      So Crumbley had a hoody on?

A      Yes.

Q      How could you see his face then?

A      When he was going back to the car

Q      Had you ever seen his face before that day?

A      Yes.

Q      Where?

A      In the apartment building.

Q      How many times would you say you had seen him before you saw him do this killing?

A      About two or three times I seen him up there.

Q      Did you ever see Mr. Ebo before?

A      Yes.

Q      Where?

A      At Leechburg Gardens.

Q      About how many times?

A      The same amount, two or three times.

Q      Did you ever see them together?

A      Yes.

                  *           *           *           *

Q      This event that you have described to the jury observing, how long did it last from the time you heard the banging upstairs, coming outside, the shootings, the shot to the head and driving off in the case, how much time elapsed?

A      About ten minutes.

Q      Of this ten minutes how much of that time were they outside for you to observe them?

A      About five.

Q      Was there anything covering defendant Ebo's face during that five minutes?

A      No.

Q      How good a look did you get at Mr. Crumbley who had the hoody on?

34

Respondents' Exhibit 39

A      I got a good look.

*          *          *          *

Q      Before you came back to look at the photo arrays, did you indicate whether you would be able to pick the suspect out of the photo arrays?
A      Yes.
Q      What did you say?
A      I said that I would be able to pick them out.
Q      Why did you think you would be able to pick them out?
A      Because I seen their faces.
Q      It had been 15 months, were you concerned that you wouldn't be able to?
A      No.
Q      Why?
A      Because their faces were stuck in my head.

(TT 177, 178-179, 44, 48, 536-537, 538, 547).

Ms. Robinson thus had a clear sight of the shooting and watched the entire event unfold.  Nothing interfered with her observation of appellant's face.  She was familiar with appellant, having seen him before.  The jury knew that she was a young woman of 20 with a young son and she was afraid to get too involved with the police investigation, given the fact that informants often got killed and her own family advised her not to identify the shooters.  She honestly admitted to intentionally failing to identify appellant in various photo arrays because she was fearful.  It was not until she had moved out of state that she felt secure enough to fully cooperate with the investigation:

35

Respondents' Exhibit 39

Q      This happened in May and you testified earlier that you told the police you had seen them before and can I.D. them, do you remember that?

A      Yes.

Q      In the end of September of 2011, about four months after, did the police show you this photo array, No. 51, with these pictures and the picture of Mr. Crumbley in it?

A      Yes.

Q      Did you see Mr. Crumbley in that photo array?

A      Yes.

Q      Did you recognize him?

A      Yes.

Q      Did you tell the police that's him at that time in September of 2011?

A      No.

Q      Why not?

A      Because my friends and family were telling me not to get involved and I was scared.

Q      Why were you supposed to not be involved?

A      Because they didn't want something to happen to me.

Q      Same thing with this photo array, Commonwealth Exhibit 52, the one with defendant Ebo in it.  Did you see this photo array in early November of 2011?

A      Yes.

Q      And did you recognize Mr. Ebo when you saw it in 2011?

A      Yes.

Q      And did you point him out for the police at that time?

A      No.

Q      Why not?

A      Because I was scared and my friends and family told me not to get involved.

*          *          *          *

Q      What changed between September and November and July of 2012 that you decided to testify here today and to pick these two men out of the photo array?

A      Well, me and my girlfriend were talking and she said if it was the right thing to do, she told he what if it was my brother or my uncle or someone.

36

Respondents' Exhibit 39

Q    Has your new location had any impact on your desire to testify?

A    Yes.

Q    Why is that?

A    Because I was far away.

TT 547-550.

Ms. Robinson was insistent that she had not seen the defendant's photographs on television or social media and that she did not have access to a computer until she started school in October of 2011. When she returned to Allegheny County the police told her that they thought that they knew who committed the killing but they did not provide her with any names of the suspects, did not tell her that photographs of the alleged shooters would be in the arrays, and certainly did not suggest that she pick the defendant's photo from the array (TT 158-159, 172-177, 183-184).

Contrary to appellant's assertion, the fact that police showed Ms. Robinson multiple arrays containing appellant's photo between May 2011 and July 2012 does not make the identification tainted. Nor does the fact that she described appellant as being between 5'7" and 5'9" (TT 167, 591-592) when he is actually 6'2" (TT 413) render the identification improper. Ms. Robinson looked at appellant in court and testified that even though he might be taller than 6 foot, he still looked like he was shorter to

37

Respondents' Exhibit 39

her:

> Q      But when you first talked to the police you said you
> wanted to I.D. the people, do everything you could, did that
> change?
> A      Yes.
> Q      How so?
> A      I was scared and my family said don't get involved.
> Q      I mean, when you are talking to the police right after it?
> A      Yes.
> Q      How did that - - why did that change?
> A      Because I wanted to corroborate but in the back of my
> head I didn't.
> Q      Five-eight, five-nine, how tall does Ebo look to you, the
> same as when you saw him the day of the shooting, taller,
> shorter?
> A      The same.
>
> MR. MCKINNEY:  Objection, I would like Mr. Ebo to stand up
> before we guess what his height is.
>
>                   *          *          *          *
>
> Q      Miss Robinson, how tall are you?
> A      Five-six.
> Q      You're five-six?
> A      Yes.
> Q      Mr. Ebo, can you stand up.  You realize the difference
> between five-six and five-seven is one inch, right?
> A      Yes.
> Q      Does Mr. Ebo look like he is one inch taller than you?
> A      Yes.

TT 639, 643.  The Pennsylvania Supreme Court has recognized that the

stress of a criminal episode may cause some witnesses to be unsure of

various details including the number of people present and the height and

weight of the alleged perpetrator; yet such discrepancies do not render an

38

Respondents' Exhibit 39

identification *per se* unreliable; nor does the fact that an array containing

multiple pictures of the same defendant is shown to a witness render an

identification suggestive and tainted.  *See Commonwealth v. Moore, supra,*

633 A.2d at 1126:

> Next, appellant claims that the trial court erred in denying his motion to suppress pre-trial photographic identification by Mrs. Romanchick, resulting in a fatal taint upon his trial.
>
> We recognize that in response to this challenge, the Commonwealth bears the burden of establishing that any identification testimony to be offered at trial is free from taint of initial illegality. *Commonwealth v. Turner,* 454 Pa. 520, 314 A.2d 496 (1974); Pa.R.Crim.P. 323(h). In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In making this determination, the court should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of **1126 time between the incident and the court identification. *Commonwealth v. Fowler,* 466 Pa. 198, 352 A.2d 17 (1976); *United States v. Higgins,* 458 F.2d 461 (3d Cir.1972).
>
> Prior to the suppression hearing Mrs. Romanchick had properly selected the photos of appellant from a photo array and also identified him at the preliminary hearing. Nevertheless, while Mrs. Romanchick was once again able to specifically identify appellant as present at the suppression hearing, she also selected one photograph of appellant and a photograph of another man when appellant's counsel attempted to re-create the photo array.
>
> In addition to appellant's claim that this occurrence alone required suppression, appellant also claims that the original photo array was suggestive, because out of the fifteen photographs showed

Respondents' Exhibit 39

to Mrs. Romanchick, two were of the defendant, two were of another man, and the remaining photographs were of an assortment of other men. He alleges further suggestiveness because of the nature of the mug shot and surveillance photograph, and because the police officer asked Mrs. Romanchick to select two photographs, one with glasses and one without. Appellant also challenges Mrs. Romanchick's ability to observe appellant during the crime as evidenced by her inability to state how many men were in the room, and discrepancies between her description of appellant and his actual appearance.

Mrs. Romanchick, a victim, was in a small well lit room, a few feet from appellant with her eyes trained on him as he held a gun on her for an extended period of time. Under such circumstances, she had an extraordinarily good opportunity to observe appellant. It is not significant that she was unable to remember just how many men there were in the room during the ordeal, or fix appellant's height or weight with a high degree of specificity. Nor are we persuaded that the methods employed in connection with the initial photo array were suggestive. No information is offered concerning the photographs of the other men, nor is it alleged that the police officer directed Mrs. Romanchick to select the photographs which she did in fact choose. Even if we were to conclude that the photographic identification was unreasonably suggestive, the other factors present in this case convince us that there was little chance of misidentification of appellant.

Based upon the record evidence supporting correct identification, we agree with the trial court that there was not a very substantial likelihood of irreparable misidentification by Mrs. Romanchick.

See also Commonwealth v. Kyle, 533 A.2d 120, 132 (Pa. Super.

1987)(finding that defendant claimed initial identification by victim did not

match photo of defendant selected by victim is an issue dealing with

credibility, not undue suggestiveness).

40

Respondents' Exhibit 39

0448

In *Commonwealth v. Fulmore,* 25 A.3d 340, 347-348 (Pa.

Super. 2011) this Court was confronted with the following issue and

resolved it in the Commonwealth's favor:

> We now turn to the suppression court's concern relating to Detective Harrigan's usage of the phrase "which one comes to mind." (Order, 4/20/09 at 4, ¶ 25.) Detective Harrigan's instruction to Hernandez to close his eyes, think back on the incident, and tell him which one of the individuals depicted comes to mind may have implied that the assailant was included within the array. However, as there was no evidence that Detective Harrigan directed Hernandez's attention to a specific picture, the phrase may have been construed as merely a "catch phrase" of no special significance. Moreover, providing such information to the witness before he views the lineup does not render the identification procedure unduly suggestive. After all, why else would a victim be shown a photo array unless the police believed the suspect's photo was included.
>
> For instance, in *Kubis, supra,* the detective told the witness the suspect's picture was in the array. After the witness picked out two photos, the witness was told one of the people he selected was the suspect. A panel of our court found that procedure did not produce a substantial likelihood of misidentification. *Kubis,* 978 A.2d at 397. In *Love, supra,* we upheld an identification where "the detective told the victim there was a suspect in custody" during the identification procedure. *Love,* 646 A.2d at 1236. Thus, we do not find that Detective Harrigan's statements created a substantial likelihood for misidentification. We conclude that the witnesses' belief that one of the pictures included in the photographic array was the perpetrator did not render the pre-trial identification unnecessarily suggestive.

Respondents' Exhibit 39

In the present case, police did not suggest that Ms. Robinson should pick out appellant's photograph, Ms. Robinson explained her inability to select appellant's photo from earlier arrays, and she also affirmatively stated that she hadn't seen appellant's photograph on television or social media.  She selected his photo from the array because, in her own testimonial words: "I seen him shoot the victim."  (TT 44).

Respondents' Exhibit 39

III.    THE TRIAL COURT DID NOT ERR IN RULING THAT THE VERDICT WAS NOT AGAINST THE WEIGHT OF THE EVIDENCE.

Appellant's claim is based mostly on the fact that Ms. Robinson intentionally refused to identify appellant in the first two arrays shown to her and misled police by telling them that one of the men "looked like" the shooter, when she knew that appellant's photo was in the array and that he was one of the shooters.   As discussed in the previous argument, Ms. Robinson explained why she did not identify appellant in the arrays, even though she knew him to be one of the shooters and from the witness stand acknowledged that although appellant might be 6'2", to her perception, he didn't look much taller than she (5'6").   Ms. Robinson had seen appellant in the weeks preceding the shooting and had a clear view of his face during the shooting.   She insisted that she hadn't seen media reports containing his photograph or name.   And her account of the shooting-3 guns being fired (victim, appellant, and Crumbley), multiple shots into the victim's body by appellant and a head shot by Crumbley, conformed to the forensic evidence and autopsy results.   That discussion is incorporated herein.[4]

---

[4]    It is noted that the jury was also informed that Richard Carpenter had been an eyewitness to the shooting and

(continued ...)

43

Respondents' Exhibit 39

As to a weight of the evidence claim, the Pennsylvania

Supreme Court in *Commonwealth v. Widmer* 744 A.2d 745, 753 (Pa. 2000)

(citations omitted) provided the following guidance for appellate courts:

> Appellate review of a weight claim is a review of the exercise of discretion, not of the underlying question of whether the verdict is against the weight of the evidence. *Brown,* 648 A.2d at 1189. Because the trial judge has had the opportunity to hear and see the evidence presented, an appellate court will give the gravest consideration to the findings and reasons advanced by the trial judge when reviewing a trial court's determination that the verdict is against the weight of the evidence. *Commonwealth v. Farquharson,* 467 Pa. 50, 354 A.2d 545 (1976). One of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice. *Brown, supra.*

> See also, *Commonwealth v. Brown,* 648 A.2d 1177,

1189-1190 (Pa. 1994):

> ... "One of the least assailable reasons for granting [or denying] a new trial is the lower court's conviction that the verdict was [or was not] against the weight of the evidence and that new process was [or was not] dictated by the interests of justice. With reasons for this action given or appearing in the record, only a palpable abuse of discretion will cause us to overturn the court's action." In determining whether or not the grant of a new trial constituted an abuse of discretion, it is our duty to review the entire record.
> An appellate court by its nature stands on a different plane than that of a trial court. Whereas a trial court's decision

---

identified appellant as one of the shooters (TT 363-368).

44

to grant or deny a new trial is aided by an on-the-scene evaluation of the evidence, an appellate court's review rests solely upon a cold record. Because of this disparity in vantage points an appellate court is not empowered to merely substitute its opinion concerning the weight of the evidence for that of the trial judge. Rather our court has consistently held that appellate review of the trial court's grant of a new trial is to focus on whether the trial judge has palpably abused his discretion, as opposed to whether the appellate court can find support in the record for the jury's verdict....

In reviewing the entire record to determine the propriety of a new trial, an appellate court must first determine whether the trial judge's reasons and factual basis can be supported. Unless there are facts and inferences of record that disclose a palpable abuse of discretion, the trial judge's reasons should prevail. It is not the place of an appellate court to invade the trial judge's discretion any more than a trial judge may invade the province of a jury, unless both or either have palpably abused their function.

To determine whether a trial court's decision constituted a palpable abuse of discretion, an appellate court must "examine the record and assess the weight of the evidence; not however, as the trial judge, to determine whether the preponderance of the evidence opposes the verdict, but rather to determine whether the court below in so finding plainly exceeded the limits of judicial discretion and invaded the exclusive domain of the jury." Where the record adequately supports the trial court, the trial court has acted within the limits of its judicial discretion.

Judge Lazzara has provided this Court with extensive discussion of the facts. As to this issue the trial court provides the following guidance:

Here, the jury found the Defendants guilty of all charges after hearing both direct and circumstantial evidence of the Defendants involvement in the brutal murder of Todd Mattox. Although the Defendants attempt to argue that there was no direct evidence implicating them in Mr. Mattox's murder, the

45

Respondents' Exhibit 39

jury clearly found the testimony of Saday Robinson to be compelling. She was an eyewitness to the events of May 16, 2011, and she was able to describe what she saw and heard to the jury in great detail. (T.R. 8/20/12, 525-644). Even though defense counsel engaged in a lengthy cross-examination of Ms. Robinson in an attempt to discredit her and sully her credibility, the jury chose to believe her version of what happened that day, which is within their province. (T.R. 8/20/12, pp. 561-637, 641-647). As this court stated earlier, Ms. Robinson was a compelling witness. It certainly does not shock this court's conscience or sense of justice that the jurors found her credible. In fact, this court found her to be credible and truthful as well. Her testimony, alone, when believed, is sufficient evidence to uphold this verdict. It should also be noted that there were witnesses present who corroborated Ms. Robinson's testimony, thereby lending it even more credibility. *See* Trial Court Opinion, II. Factual Background, p.5.

In addition to the testimony of Ms. Robinson, the jury heard testimony regarding the eyewitness identification of Richard Carpenter. (T.R. 8/20/12, pp. 365-366). The jurors also listened to the testimony of Mr. Thomas Brown, another fearful witness (T.R. 8/20/12, pp. 673-676), who heard Defendant Crumbley essentially admitting to the murder of Todd Mattox (T.R. 8/20/12, pp. 698-699), and who identified Defendant Ebo as "Mat-Mat." (T.R. 8/20/12, p. 748). They heard the testimony of Anthon Snyder, who identified "Mat-Mat" as Defendant Ebo (T.R. 8/20/12, p. 657), and who had previously told detectives that the victim had told him that he was going to see Mat-Mat just prior to the shooting. (T.R. 8/20/12, pp. 657-661). The jurors heard Ms. Robinson relate that she had been told by "Ace" that Mat-Mat was involved in the shootings. (T.R. 8/20/12, pp. 601-603). The jurors also had evidence of the presence of the murder weapon at the scene of a shooting involving Defendant Crumbley two weeks later. (T.R. 8/20/12, 885, 927-928, 1011, 1017).

Opinion at pp. 48-49.

In *Commonwealth v. Smith,* 467 A.2d 1120 (Pa. 1983) the

Respondents' Exhibit 39

Pennsylvania Supreme Court was confronted with a rather egregious situation of an unreliable witness, yet the Court still refused to find the verdict to be based upon surmise or conjecture:

> The first claim that must be considered is appellant's charge that the quality of the evidence offered by the Commonwealth was of such a nature as to require the grant of his motion in arrest of judgment. Appellant argues that the Commonwealth's principal fact witnesses, Georgianne Lewis and Edith Smith, her sister, presented testimony so inconsistent and contradictory as to be incapable of supporting the verdict of guilt.
>
> *          *          *          *
>
> While it is true that Ms. Lewis' various statements contained contradictions and some inconsistencies, we do not conclude that her testimony was so inherently unreliable as to justify a finding that a verdict based upon it must as a matter of law be set aside. In her first statement to police Ms. Lewis related the facts surrounding the death of Lonnie Hinerman without mentioning her presence or the presence of her sister. At appellant's extradition hearing Ms. Lewis testified that Donald Smith was not in Pennsylvania at the time the Hinerman killing occurred. She also at one point maintained that she had no personal involvement in the incident, a fact clearly refuted by her subsequent testimony.
>
> The witness offered as an explanation for these contradictions and inconsistencies her alleged fear of appellant. The jury was aware of the intimate relationship that existed between Ms. Lewis and appellant when these inconsistencies and contradictory statements were being made. The jury was also acquainted with the fact that the prosecution had granted Ms. Lewis immunity for her involvement in the incident provided she would testify against appellant and tell the truth. Thus the jury had a reasonable basis for rejecting her former statements and accepting her trial testimony as being truthful. [fn.#1]
>
> Moreover, the significant inconsistencies and contradictions did not relate to the fact of the killing of Lonnie Hinerman or the circumstances surrounding it, but rather to the

Respondents' Exhibit 39

persons involved in the incident.  Thus was  reasonable to assign Ms. Lewis' initial reluctance to implicate herself and her sister to her fear of prosecution for their involvement.  The appellant argues that the grant of immunity provided the motive for Ms. Lewis' efforts to shift the blame upon him. [fn.#2]  While this is a legitimate argument arising from the evidence presented, it was equally legitimate to conclude that the grant of immunity inspired her to tell the whole truth.  The trial court properly left the resolution of this question to the jury.

As to the testimony of Ms. Smith, Ms. Lewis' sister, the appellant reluctantly concedes in his brief "that Ms. Lewis and Ms. Smith were able to come up with substantially the same testimony".  Both ladies were eyewitnesses to the incident.  The thrust of appellant's arguments relating to Ms. Smith's testimony centered upon various discrepancies that were clearly matters to be considered by the fact finder in its assessment of the credibility of the witnesses appearing before it.  None of these "discrepancies" reached a level which would make reconciliation impossible.  The mere existence of conflict in the evidence does not mean the trier of fact was required to resort to speculation.  *Commonwealth v. Duncan, supra.*

Here the jury was properly charged as to how they should assess the evidence received from persons they deemed to be accomplices. (…)  In addition, the mere existence of conflict in the prosecution's evidence is not fatal because the Commonwealth is not bound by everything its witnesses say and the jury has the discretion in believing all, part, or none of the testimony. (…)  We are therefore satisfied the jury could properly reconcile the conflicting testimony and that the evidence from these witnesses when considered together, along with all of the other testimony presented, does not demonstrate the degree of unreliability requiring a finding that the verdict was based upon mere conjecture.

Fn.#1:  Ms. Lewis testified at trial that on October 6, 1980, Mr. Hinerman invited her sister, Ms. Smith, over for a drink and that she and the appellant drove Ms. Smith to Mr. Hinerman's home in West Virginia and went in for a drink.  When Mr. Hinerman became intoxicated and passed out, the appellant took $30 form his wallet and took two calculators from an adjoining office

48

and all three left.  While driving away, Ms. Lewis testified that appellant decided to go back to Mr. Hinerman's house for the purpose of killing him.  Once there, he ordered Ms. Smith and Ms. Lewis to wipe off any fingerprints, and he took the intoxicated Mr. Hinerman out to his car.  Ms. Lewis stated that appellant then drove to Point Marion, Pa., where he hit Mr. Hinerman (apparently with his hands), then threw him into the Cheat River.

Fn.#2:  The jury was aware that Ms. Lewis had been granted immunity for testifying in this case.  She testified during the trial that the Fayette County District Attorney's Office had promised her immunity if she told the truth about everything that happened.  She further stated that she was told that she would be prosecuted for accessory to murder if she did not tell the truth.

*Commonwealth v. Smith, Id.,* 467 A.2d at 1122-1123, footnotes included.

Similarly in *Commonwealth v. Farquharson,* 354 A.2d 545 (Pa. 1976) the Pennsylvania Supreme Court again refused to find that a verdict was based upon conjecture when confronted with rather bizarre and deeply troubling circumstances surrounding a witness' identification of a defendant in a murder prosecution.  The present case does not begin to approach the above cases.  The verdict was not against the weight of the evidence.

Respondents' Exhibit 39

IV.   THIS COURT COULD FIND THAT THE CASE NEEDS REMANDED FOR RESENTENCING.

Appellant is correct in asserting that this Court has found 42 Pa.C.S. §9712 to be unconstitutional.   *Commonwealth v. Valentine,* 101 A.3d 801 (Pa. Super. 2014).   Although the Commonwealth filed notification of mandatory sentences under §9712, the court sentenced appellant above the 5 year mandatory at counts 3 and 6, so it doesn't appear to be a real issue; although this Court is probably constrained to remand for resentencing.

Respondents' Exhibit 39

<u>CERTIFICATE OF COMPLIANCE</u>

I certify that the brief does not exceed the 14,000 word count imposed by Pa.R.A.P. 2135.

Michael W. Streily
Deputy District Attorney
Pa.I.D. No. 43593

51

Respondents' Exhibit 39

0459

## CONCLUSION

WHEREFORE, the Commonwealth respectfully requests that the Judgment of Sentence be affirmed.

Respectfully submitted,

STEPHEN A. ZAPPALA, JR.
DISTRICT ATTORNEY

MICHAEL W. STREILY
DEPUTY DISTRICT ATTORNEY
PA. I.D. NO. 43593

Attorneys for Appellee

52

Respondents' Exhibit 39

## PROOF OF SERVICE

I hereby certify that I am this day serving two (2) copies of the within Brief for Appellee upon Counsel for Appellant in the manner indicated below which service satisfies the requirements of Pa. R.A.P 121:

**Service by Hand Delivery Mail addressed as follows:**

Jessica L. Herndon, Esquire
Office of the Public Defender
400 County Office Building
542 Forbes Avenue
Pittsburgh, PA 15219
(412) 350-2403

Dated: January  _22nd_, 2015

/s/ Michael W. Streily
MICHAEL W. STREILY
DEPUTY DISTRICT ATTORNEY
PA. I.D. NO. 43593

Office of the District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA 15219
(412) 350-4377

Respondents' Exhibit 39