Received 5/16/2016 9:15:46 AM Superior Court Western District

Filed 5/16/2016 9:15:00 AM Superior Court Western District
92 WDA 2016

0554

IN THE SUPERIOR COURT OF PENNSYLVANIA
WESTERN DISTRICT

92 WDA 2016

COMMONWEALTH OF PENNSYLVANIA,
Appellee
v.
MATTHEW EBO,
Appellant

**BRIEF FOR APPELLANT**

Appeal from the Judgment of Sentence imposed on November 28, 2012, and the
Order dated December 22, 2015, denying the Motion for a New Trial,
in the Court of Common Pleas of Allegheny County, Pennsylvania – Criminal
Division, by the Honorable Beth A. Lazzara, at CC 201202821.

ELLIOT HOWSIE
Public Defender
PA I.D. # 83441

BRANDON P. GING
Deputy – Appellate Division
PA I.D. # 207116

VICTORIA H. VIDT
Assistant Public Defender
PA I.D. # 67385
*Counsel of Record*

ATTORNEYS FOR APPELLANT

OFFICE OF THE PUBLIC DEFENDER
400 County Office Building
542 Forbes Avenue
Pittsburgh, Pennsylvania  15219-2904
(412) 350-2403

Respondents' Exhibit 49

## <u>TABLE OF CONTENTS</u>

<u>PAGE(S)</u>

STATEMENT OF JURISDICTION..........................................................................5

STATEMENT OF THE SCOPE AND STANDARD OF REVIEW .......................6

ORDERS IN QUESTION....................................................................................9

STATEMENT OF THE QUESTIONS INVOLVED ............................................8

STATEMENT OF THE CASE.............................................................................13

A. *PROCEDURAL HISTORY* .........................................................................13

B. *FACTUAL HISTORY*..................................................................................12

SUMMARY OF THE ARGUMENT ...................................................................25

ARGUMENT .......................................................................................................27

I.   THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT
     FAILED TO AWARD THE DEFENDANT A NEW TRIAL
     BASED UPON THE RECANTATION OF THE SOLE
     WITNESS CONNECTING HIM TO THE CRIME, SADAY
     ROBINSON. ..............................................................................................22

II.  THE EVIDENCE THAT THE CO-DEFENDANT WAS
     INVOLVED IN GUN VIOLENCE TWO WEEKS AFTER THE
     HOMICIDE WAS INADMISSIBLE EVIDENCE OF OTHER
     BAD ACTS AGAINST MATTHEW EBO.   ALSO, THE
     IRRELEVANT EVIDENCE HAD NO CONNECTION TO
     MATTHEW AND IT SHOULD NOT HAVE BEEN
     PRESENTED AS EVIDENCE THAT MATTHEW WAS
     SOMEHOW INVOLVED IN THE HOMICIDE. ...........................................35

III. THE HIGHLY SUGGESTIVE PRETRIAL IDENTIFICATION
     PROCEDURE TAINTED THE MAIN COMMONWEALTH
     EYEWITNESS' IDENTIFICATION OF MATTHEW EBO AND
     ANY INFORMATION ABOUT THE WITNESS' PHOTO
     ARRAY IDENTIFICATION AND HER SUBSEQUENT IN-
     COURT IDENTIFICATION SHOULD HAVE BEEN
     SUPPRESSED. ...........................................................................................48

IV.  THE TRIAL COURT'S IMPOSITION OF THE MANDATORY
     MINIMUM SENTENCE UNDER 42 PA.C.S. § 9712, AN
     UNCONSTITUTIONAL STATUTE, WAS ILLEGAL SINCE

Respondents' Exhibit 49

THE FACTFINDER NEVER FOUND THE REQUIRED FACTS BEYOND A REASONABLE DOUBT FOR THE IMPOSITION OF THE MANDATORY AS REQUIRED BY THE UNITED STATES SUPREME COURT IN *ALLEYNE V. UNITED STATES*, 133 S.CT. 2151 (2013). .................................................................64

CONCLUSION ........................................................................68

<u>Appendices</u>

Opinion in the Trial Court by
    The Honorable Beth A. Lazzara .......................................... Appendix A

Statement of Errors Complained of on Appeal........................................ Appendix B

Order of Court and Opinion denying motion
    for a new trial, dated December 22, 2015 ........................................... Appendix C

Respondents' Exhibit 49

# TABLE OF CITATIONS

## CASES

*Alleyne v. United States*, 133 S.Ct. 2151 (2013)....................................60, 61, 62, 63

*Apprendi v. New Jersey*, 530 U.S. 466 (2000)....................................................61, 62

*Bowling v. Office of Open Records,* 75 A.3d 453 (Pa. 2013) ....................................4

*Commonwealth v. Arest*, 734 A.2d 910 (Pa. Super. 1999) ........................................3

*Commonwealth v. Brown*, 52 A.3d 320 (Pa. Super. 2012)................................36, 45

*Commonwealth v. Cascardo*, 981 A.2d 245 (Pa. Super. 2009) ...............................37

*Commonwealth v. Davis*, 17 A.3d 390 (Pa. Super. 2011) ........................................58

*Commonwealth v. Fiore*, 780 A.2d 704 (Pa. Super. 2001).......................................34

*Commonwealth v. Fowler*, 352 A.2d 17 (Pa. 1976) .............................54, 56, 57, 58

*Commonwealth v. Karth*, 994 A.2d 606 (Pa. Super. 2010) ........................................4

*Commonwealth v. Laich*, 777 A.2d 1057 (Pa. 2001).........................................46, 47

*Commonwealth v. Loner*, 836 A.2d 125 (Pa. Super. 2003)*(en banc)*......................24

*Commonwealth v. McAdoo*, 46 A.3d 781 (Pa. Super. 2012) ......................................3

*Commonwealth v. McCracken*, 659 A.2d 541 (Pa. 1995) ....................24, 26, 27, 34

*Commonwealth v. Miles,* 846 A.2d 132 (Pa. Super. 2004).......................................46

*Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014) ...................................34

*Commonwealth v. Moore,* 633 A.2d 1119 (Pa. 1993) ........................................53, 54

*Commonwealth v. Mosteller*, 284 A.2d 786 (Pa. 1971)......................................33, 34

*Commonwealth v. Munday,* 78 A.3d 661 (Pa. Super. 2013) .....................................61

Respondents' Exhibit 49

*Commonwealth v. Newman*, 99 A.3d 86 (Pa. Super. 2014)...................60, 61, 62, 63

*Commonwealth v. Pantalion,* 957 A.2d 1267 (Pa. Super. 2008)............................4

*Commonwealth v. Reid,* 811 A.2d 530 (Pa. 2002)........................................2

*Commonwealth v. Rivera*, 939 A.2d 355 (Pa. Super. 2007)................................2, 23

*Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998).....................................43, 44

*Commonwealth v. Robinson*, 931 A.2d 15 (Pa. Super. 2007) .................................3

*Commonwealth v. Ross*, 57 A.3d 85 (Pa. Super. 2012) ....................................37, 42

*Commonwealth v. Valentine*, 101 A.2d 801(Pa. Super. 2014) .............22, 60, 61, 62

*Commonwealth v. Weakley*, 972 A.2d 1182 (Pa. Super. 2009)................................3

*Neil v. Biggers*, 409 U.S. 188 (1972)........................................................54

*Simmons v. United States*, 390 U.S. 377 (1968).........................................49, 50, 54

STATUTES

42 Pa.C.S. § 742..........................................................................1

42 Pa.C.S. § 9712............................................22, 60, 61, 62, 63

42 Pa.C.S. § 9712.1......................................................................63

RULES

Pa.R.A.P. 341(a) .........................................................................1

Pa.R.E. 403..............................................................................45

Pa.R.E. 404(b).........................................................................36

Pa.R.E. 404(b)(1) .................................................36, 37, 42

Pa.R.E. 404(b)(2) ......................................................................37

Respondents' Exhibit 49

0559

## <u>STATEMENT OF JURISDICTION</u>

Jurisdiction of this Honorable Court is invoked pursuant to the Judicial Code,

Act of July 9, 1976, P.L. 586, No. 142, as amended, 42 Pa.C.S. § 742.

Respondents' Exhibit 49

## STATEMENT OF THE SCOPE AND STANDARD OF REVIEW

The standard for determining whether to grant a new trial based upon newly discovered evidence is well-settled: "To warrant relief, after-discovered evidence must meet a four-prong test: (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely." *Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007).

When determining whether evidence should be admitted, the trial court must weigh the relevance and probative value of the evidence against the prejudicial impact of that evidence. Relevant evidence establishes a material fact in the case or supports a reasonable inference regarding a material fact. A court may find that evidence is relevant, but nevertheless conclude that such evidence is inadmissible on account of its prejudicial impact. *Commonwealth v. Reid,* 811 A.2d 530, 550 (Pa. 2002) (citations omitted). The standard of review governing the admissibility of evidence is a matter vested within the discretion of the trial court, and such a decision shall be reversed upon a showing that the trial court abused its discretion. *Id.* (citations omitted). An abuse of discretion occurs where the trial court improperly weighs the probative value of the evidence against its prejudicial impact

Respondents' Exhibit 49

0561

*Commonwealth v. Weakley*, 972 A.2d 1182, 1189 (Pa. Super. 2009) (citations omitted).

This Honorable Court has noted the following scope and standard of review when addressing suppression challenges on appeal:

> Our standard of review in addressing a challenge to the denial of a suppression motion is limited to determining whether the suppression court's factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. Because the Commonwealth prevailed before the suppression court, we may consider only the evidence of the Commonwealth and so much of the evidence for the defense as remains uncontradicted when read in the context of the record as a whole. Where the suppression court's factual findings are supported by the record, we are bound by these findings and may reverse only if the court's legal conclusions are erroneous. Where . . . the appeal of the determination of the suppression court turns on allegations of legal error, the suppression court's legal conclusions are not binding on an appellate court, whose duty it is to determine if the suppression court properly applied the law to the facts. Thus, the conclusions of law of the courts below are subject to our plenary review.

*Commonwealth v. McAdoo*, 46 A.3d 781, 783-84 (Pa. Super. 2012) (citations omitted).

An illegal sentencing claim implicates the fundamental legal authority of the court to impose the sentence. *Commonwealth v. Robinson,* 931 A.2d 15, 21 (Pa. Super. 2007).  If no statutory authorization exists to impose a particular sentence, then the sentence is illegal and must be vacated. *Commonwealth v. Arest,* 734 A.2d

7

910, 912, n.2 (Pa. Super. 1999) (citations omitted).  When addressing the proper interpretation of a statute, including a sentencing statute, the appellate court's standard of review is *de novo* and the scope of review is plenary.  *Bowling v. Office of Open Records,* 75 A.3d 453, 466 (Pa. 2013) (citations omitted); *Commonwealth v. Karth*, 994 A.2d 606, 607 (Pa. Super. 2010) (citation omitted); *Commonwealth v. Pantalion,* 957 A.2d 1267, 1271 (Pa. Super. 2008) (citations and quotations omitted).

Respondents' Exhibit 49

**0563**

# ORDERS IN QUESTION

| | |
|---|---|
| Commonwealth of Pennsylvania<br>v.<br>Matthew Ebo | IN THE COURT OF COMMON PLEAS OF<br>ALLEGHENY COUNTY, PENNSYLVANIA<br><br>CRIMINAL DIVISION<br><br>DOCKET NO: CP-02-CR-0002821-2012<br>OTN: G5477032 |

## ORDER OF SENTENCE

AND NOW, this 28th day of November, 2012, the defendant having been convicted in the above-captioned case is hereby sentenced by this Court as follows.  The defendant is to pay all applicable fees and costs unless otherwise noted below:

**Count 1 - 18 §2501 §§A - Criminal Homicide -(H1)**
To be confined for a Period of Life at SCI Camp Hill.

**Count 2 - 18 §3701 §§A1I - Robbery-Inflict Serious Bodily Injury -(F1)**

A determination of guilty without further penalty.

**Count 3 - 18 §3702 §§A - Robbery Of Motor Vehicle -(F1)**
To be confined for a Minimum Term of 10 years and a Maximum Term of 20 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 1 Confinement

**Count 4 - 18 §6106 §§A1 - Firearms Not To Be Carried W/O License -(F3)**
To be confined for a Minimum Term of 3 years and 6 months and a Maximum Term of 7 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 3 Confinement

**Count 5 - 18 §6105 §§A1 - Possession Of Firearm Prohibited -(M1)**
To be confined for a Minimum Term of 2 years and 6 months and a Maximum Term of 5 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 4 Confinement

**Count 6 - 18 §903 §§C - Conspiracy - Robbery-Inflict Serious Bodily Injury -(F1)**
To be confined for a Minimum Term of 10 years and a Maximum Term of 20 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 5 Confinement

**Count 7 - 18 §903 §§C - Conspiracy - Criminal Homicide -(H1)**
To be confined for a Minimum Term of 20 years and a Maximum Term of 40 years at SCI Camp Hill.
This sentence is to be served consecutive to:
CP-02-CR-0002821-2012 Ct # 6 Confinement

By the Court

AOPC 2066 REV. 11/28/2012

9

Respondents' Exhibit 49

0564

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA  )   CC No.:201202821
                                                     OTN:   G 547703-2
                    vs.                              Charge: Criminal Homicide
                                                             1st Degree Murder
_____MATTHEW EBO_____

**ORIGINAL**
Criminal Division
Dept. of Court Records
Allegheny County, PA.

ORDER OF COURT IMPOSING LIFE SENTENCE

        AND NOW, to-wit, this 28th day of November, 2012 in open
Court, the Defendant having been convicted of First Degree Murder,
appearing with counsel, and pursuant to 18 Pa.C.S.A. §1102 and 42
Pa.C.S.A. §9711, the sentence of the Court is that you, MATTHEW
EBO, undergo imprisonment for the period of your natural life and
stand committed; and be committed to the custody of the Department
of Corrections for confinement in such State Correctional Facility
authorized to receive males, and shall be delivered to the State
Correctional  Facility  as  determined  by  the  Department  of
Corrections, there to be kept, fed, clothed and treated as the law
directs.

        This sentence to begin and take effect as of November 28,
2012.

                                                          , J.

10

Respondents' Exhibit 49

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

COMMONWEALTH OF PENNSYLVANIA )
                                                      )
                    v.                                ) CC # 2012-2820
                                                      )
THADDEUS GRIMSLEY                                     )
                                                      )
                    Defendant                         )
                                                      )
_____                         )
                                                      )
COMMONWEALTH OF PENNSYLVANIA )
                                                      )
                    v.                                ) CC # 2012-2821
                                                      )
MATTHEW EBO                                           )
                                                      )
                    Defendant.                        )

### ORDER OF COURT

AND NOW, this ___22nd___ day of December, 2015, this case having been remanded from the Superior Court of Pennsylvania for the purposes of determining whether a new trial is warranted based on after discovered/newly discovered evidence and this court having conducted an evidentiary hearing on October 29, 2015, the court HEREBY FINDS THAT A NEW TRIAL IS NOT WARRANTED in the above-captioned cases.

In so finding, the court notes that it has given meaningful consideration to the evidence that was presented at the evidentiary hearing, including the post-trial recantation videotaped and handwritten statements made by Saday Robinson, the

1

_____

*first page of Order dated 12/22/15.  Full copy in Appendix.

11

Respondents' Exhibit 49

## STATEMENT OF THE QUESTIONS INVOLVED

I.  **DID THE TRIAL COURT ABUSE ITS DISCRETION IN FAILING TO AWARD THE DEFENDANT A NEW TRIAL BASED UPON THE RECANTATION OF THE SOLE WITNESS CONNECTING HIM TO THE CRIME?**

*Answered in the negative by the court below.*

II.  **WAS EVIDENCE THAT THE CO-DEFENDANT WAS INVOLVED IN GUN VIOLENCE AND POSSESSED A FIREARM TWO WEEKS AFTER THE HOMICIDE INADMISSIBLE EVIDENCE OF OTHER BAD ACTS AND WAS IT COMPLETELY IRRELEVANT TO WHETHER THE DEFENDANT WAS INVOLVED IN THE HOMICIDE WHEN THE SUBSEQUENT INCIDENT HAD NO CONNECTION TO THE DEFENDANT?**

*Answered in the negative by the court below.*

III.  **SHOULD IDENTIFICATION EVIDENCE HAVE BEEN SUPPRESSED WHEN THE HIGHLY SUGGESTIVE PRETRIAL IDENTIFICATION PROCEDURE TAINTED THE MAIN EYEWITNESS' IN-COURT IDENTIFICATION OF THE DEFENDANT?**

*Answered in the negative by the court below.*

IV.  **WAS THE TRIAL COURT'S IMPOSITION OF SENTENCE UNDER THE UNCONSTITUTIONAL STATUTE, 18 PA.C.S. § 9712, ILLEGAL WHEN THE FACTFINDER NEVER FOUND THE FACTS NECESSARY BEYOND A REASONABLE DOUBT FOR THE IMPOSITION OF THE MANDATORY MINIMUM SENTENCE?**

*Not answered by the trial court.*

Respondents' Exhibit 49

## STATEMENT OF THE CASE

*Procedural History*:

Matthew Ebo (hereinafter "Matthew") was charged by criminal information at CC 201202821 and convicted after a jury trial of one count of First Degree Murder (18 Pa.C.S. § 2502(a)); one count of Robbery – Inflict Serious Bodily Injury (18 Pa.C.S. § 3701(a)(1)(i)); one count of Robbery of a Motor Vehicle (18 Pa.C.S. § 3702(a)); one count of Firearms Not to be Carried Without a License (18 Pa.C.S. § 6106(a)(1)); one count of Possession of Firearms Prohibited (18 Pa.C.S. § 6105(a)(1)); one count of Conspiracy to Commit Robbery (18 Pa.C.S. § 903(c)); and one count of Conspiracy to Commit Homicide (18 Pa.C.S. § 903(c)).  Docket Entry, hereinafter "DE," at 1, 3, 27.

Randall McKinney, Esquire, entered his appearance on April 23, 2012.  DE 5.  Wendy Williams, Esquire, represented the co-defendant, Thaddeus Crumbley.

On May 30, 2012, the Commonwealth filed Notification of Commonwealth's Intention to Present Evidence of Other Crimes pursuant to Rule 404(b)(2).  DE 10.  The Commonwealth argued that it should be permitted to offer evidence of a June 2, 2011 shooting, where co-defendant Crumbley was the shooting victim.  Notification of Commonwealth's Intention to Present Evidence of Other Crimes, Wrongs, or Acts Pursuant to Rule 404(b)(2), filed May 30, 2012, at 2.  According to the Commonwealth, the firearm evidence obtained during the June 2, 2011 shooting

Respondents' Exhibit 49

of Crumbley was also related to the shooting of Todd Mattox in the present case, which occurred several weeks earlier. *Id*. at 2-3. Crumbley's counsel filed a response to this request on July 25, 2012. The matter was litigated during a hearing on July 27, 2012. Matthew's counsel joined in the objections. Notes of Testimony of the July 27, 2012 Motions Hearing, hereinafter "MH," at 7. Crumbley's counsel presented arguments and Matthew's attorney noted that he had nothing further to add. MH 58. The Commonwealth argued and the trial court agreed that this evidence was admissible to show identity. MH 56-58.

Crumbley's counsel filed a Motion to Suppress Identification on August 3, 2012. Docket Entry Part II, hereinafter "DE2," at 60; Stipulation to Supplement Certified Record, filed October 22, 2014, Attachment 2. Matthew's counsel joined in the objections of co-defense counsel, Notes of Testimony of the August 21, 2012 Jury Trial, hereinafter "NT," at 34-35, when the trial court addressed suppression matters at a hearing immediately before the trial on August 21, 2012. NT 28-215. The witness' identification of Matthew was not suppressed. NT 214-15. Matthew was convicted of all counts.

The Commonwealth sought the mandatory minimum sentence at counts three and six, under 42 Pa.C.S. § 9712. DE 32. Sentencing occurred on November 28, 2012. DE 33, 34. Matthew received a life sentence on the homicide conviction and an aggregate sentence of forty-six to ninety-two years of incarceration on the

Respondents' Exhibit 49

0569

remaining counts.  At counts three and six, the court imposed consecutive ten to twenty year sentences, which were above the mandatories.

Attorney McKinney asked to withdraw his appearance on November 30, 2012 and that request was granted by order filed on December 12, 2012.  DE 35, 36.

Appellate Counsel Jessica Herndon, of the Allegheny County Public Defender's Office, was appointed and filed an Emergency Petition for Leave to File Post-Sentence Motions *Nunc Pro Tunc* and a Post-Sentence Motion *Nunc Pro Tunc* on December 19, 2012.  DE 38, 39.  The trial court granted the Motions on December 21, 2012.  DE 40, 41.  A Supplemental Post-Sentence Motion was filed on April 19, 2013.  DE 42.  The Motion was denied by operation of law on June 26, 2013.  DE 45.

Attorney Herndon filed a Notice of Appeal on July 25, 2013.   DE 46. Following the submission of Briefs and argument being scheduled at 1194 WDA 2013, Attorney Herndon filed an Application for Remand in this Court based upon a claim of after-discovered evidence.  This Court granted the request, and ordered the lower court to conducting a hearing on the after discovered evidence to determine whether a new trial was appropriate.  DE 63. The panel did not retain jurisdiction over the case, even though no ruling was made on the issues raised in the first appeal.

On September 2, 2015, undersigned counsel, also from the Public Defender's Office, entered her appearance on Matthew's behalf.  DE 65.  On October 29, 2015,

Respondents' Exhibit 49

the lower court conducted a hearing into the after discovered evidence matter.  Co-defendant Thaddeus Crumbly also participated in this hearing through counsel.  The trial court denied the motion for a new trial on December 22, 2015.  DE 71. A timely Notice of Appeal was filed on January 13, 2016, and a Statement Of Errors Complained of on Appeal on February 2, 2016.  DE 72, 75. This timely brief in support of Matthew's appeal follows.

Respondents' Exhibit 49

B. *Factual History:*

Todd Mattox was shot to death on May 16, 2011.  NT 224, 262.  Saday Robinson testified that she observed Matthew Ebo and Thaddeus Crumbley shoot Mr. Mattox.  NT 526-27, 531.  She looked out of her living room window and saw the co-defendants push Mr. Mattox out of the front door of the building.  NT 527-28.  Mr. Mattox walked backwards and the two perpetrators had their backs to Saday.  NT 577.  She testified that she saw Matthew shoot Mr. Mattox and search his pants pockets, and then she saw Crumbley shoot Mr. Mattox in the head.  NT 531-33.  She observed both men get into Mr. Mattox's white vehicle and leave.  NT 534.  This vehicle was later found after it had been set on fire.  NT 757-59, 782-87.  A lighter fluid can found near the car that had Craig Coleman's fingerprints on it.  NT 767, 807.  None of the prints matched either co-defendant.  NT 836.  Craig Coleman, otherwise known as Craig Clark, testified that his prints were on the can because he took the can to Roman Herring, who burned the car using the lighter fluid.  NT 945.

Multiple casings were recovered from the scene of Mr. Mattox's shooting.  There were two spent .40 caliber S&W casings that were discharged from one firearm.  NT 444-45, 447.  There were five other .40 caliber S&W casings that were discharged from a different firearm.  NT 450.  There were also two .357 Sig caliber cartridge casings that were discharged from another firearm.  NT 454.

Respondents' Exhibit 49

Two nine millimeter caliber bullets were recovered from Mr. Mattox and they were fired from the same firearm.  NT 455-56.  The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon. NT 460-61.

According to the firearm expert, Raymond Everett, there were a total of three different guns discharged.  NT 461.  The firearm expert tried to match the .40 caliber bullets with the Springfield Armory firearm that was subsequently recovered from Asa Thompkins.  The expert noted that the five spent .40 caliber cartridges all came from the same gun and the rifling characteristics matched the test cartridge casings from the Springfield Armory pistol recovered from Asa Thompkins.  NT 450, 475. However, the expert stated that he could not identify or eliminate those casings as having been fired from that gun.  NT 475-76.  In fact, there are many .40 caliber weapons that have the same class characteristics.  NT 476-77.  The expert could not tell whether the projectiles came from the Springfield firearm or another .40 caliber firearm.  NT 477.

John Gardone testified that he saw the shooting from fifteen yards away.  NT 490.  He saw two men chasing Mr. Mattox and one of the men shot Mr. Mattox several times before leaving in a vehicle.  NT 491-92.  He did not identify anyone.

Yurri Lewis saw someone go through Mr. Mattox's pockets and drive away in a white car.  NT 515.  He only heard the shots and he did not know if the person

Respondents' Exhibit 49

going through the pockets was even the shooter.  NT 520.  He never identified anyone.

Brandon Smith saw the shooting.  NT 661.  He heard some sounds in the hallway and then he heard gunshots.  He looked out of the window and saw two men running away.  NT 662.  He never identified the men.

Thomas Brown testified that he heard co-defendant Crumbley say that he killed Mr. Mattox.  NT 698.  Nothing was said about Matthew's involvement. Thomas Brown had a history of offering police information about different homicide cases when he got into criminal trouble.  NT 702-38.  On multiple occasions, he informed police about confessions someone made to him regarding murdering another person.  NT 728.

Co-defendant Crumbley was the victim in a subsequent shooting on June 2, 2011.  NT 843-47.  Thomas Morgan and Deborah Tator testified about Crumbley's shooting on June 2, 2011, as experts in firearms and tool marks.  NT 859-60, 923-25.  There were spent .40 caliber S&W casings and nine millimeter casings found at that scene, which were discharged by two different firearms.  NT 885.  The nine millimeter casings were all discharged by the Ruger firearm that was also discovered at that scene.  NT 869-70, 925.  The spent .40 caliber S&W casings were all fired from the same firearm and matched the Springfield Armory pistol that Asa Thompkins possessed on June 9, 2011.  NT 360, 923-25, 927.  Asa Thompkins

Respondents' Exhibit 49

happened to be present at the scene of Crumbley's shooting on June 2, 2011. NT 847, 852-53, 857.

Asa Thompkins was arrested on June 9, 2011 and, according to Detective Perry, he had a gun "used in the homicide of Mr. Mattox." NT 360. This testimony was somewhat inaccurate.[1] Thompkins said the gun belonged to him. NT 1009-11.

Asa Thompkins and Leron Brown were friends with Crumbley. NT 695-96. Leron Brown and Roman Herring, Crumbley's cousin, were found dead in a car. NT 948, 991. Roman Herring was allegedly involved in burning the white vehicle that the perpetrators used to leave the scene of the Mattox shooting. NT 945. Leron Brown was the son of witness, Thomas Brown, who testified in this case that he heard Crumbley admit to killing Mr. Mattox. NT 695, 698.

Crumbley became a suspect in the Todd Mattox murder in September of 2011, when Detective Anthony Perry received a report that connected a firearm used in Mr. Mattox's homicide with the weapon used in the shooting of Crumbley and when Thomas Brown provided information that Crumbley admitted to killing Mr. Mattox.

---

[1]  Even though casings found at the scene of the Todd Mattox shooting matched the rifling characteristics of the casings discharged from the Springfield Armory firearm, Mr. Mattox was shot with two nine millimeter bullets. NT 450, 455-56, 475. According to one of the firearms experts, the two nine millimeter bullets recovered from the Mattox autopsy could not have been fired from a .40 caliber weapon. NT 460-61. The Springfield Armory firearm was a .40 caliber weapon. NT 927. The expert also noted that he could not identify or eliminate the casings found at the scene as having been fired from that Springfield gun. NT 475-77.

Respondents' Exhibit 49

NT 1017, 1020-21.  Matthew also became a suspect during that time, although the record is unclear exactly why.  NT 1017, 1023.

No prints or DNA connected Matthew to the shooting.  NT 1073-74, 1102.

At trial, the only witness who directly identified Matthew as a shooter was Saday Robinson, who also admitted lying to police.[2]  NT 574, 582, 585, 594-95, 638. According to Saday, she was shown an array with Matthew's image and an array with Crumbley's picture.  NT 548, 549.  She testified that she recognized both men, but she did not identify them because she was scared.  NT 548-49.  Saday testified that she purposely picked out someone who she knew was not involved in the homicide prior to viewing the array of Matthew on November 4, 2011.  NT 59, 551-52, 554, 555, 611-17, 621.  She told police that someone in the array looked like a perpetrator.  NT 555.  She saw an array that had Matthew in it and picked someone that looked like Matthew, even though she knew it was the wrong person.  NT 67, 163, 166-67, 611-18, 640, 641.  The police had no record of that occurring.  NT 410, 1000-01.  Contrary to Saday's testimony, the police noted that the first array presented to her containing Matthew's picture was on November 4, 2011.  NT 416.

---

[2] Richard Carpenter never testified in this case, but the police noted that he identified Matthew as a suspect prior to July 23, 2012, when Ms. Robinson identified Matthew.  Mr. Carpenter received substantial payments from law enforcement and his own criminal sentence was reconfigured "for his own safety."  NT 1037, 1040, 1116-17, 1132, 1230, 1235.

Respondents' Exhibit 49

The police confirmed that she did not pick out Matthew's picture during the November 4, 2011 array.  NT 204-05.

She also looked at photo arrays multiple other times and did not pick anyone as a perpetrator until July 24, 2012.  NT 55, 197-98, 409-10, 604, 607.

Saday also said that she did not discuss this matter with anyone before moving from the area, but she heard rumors about who shot Mr. Mattox.  NT 43, 58, 62-63. Someone named Ace provided her with information about who he thought was responsible for the homicide and she provided that information to police.  NT 603. Also, immediately after the incident, a neighbor told her who that person thought did it.  NT 637.

She told police that a lighter skinned perpetrator, who she now claims is Matthew, was only 5'7" or 5'8" tall.  NT 48, 553, 592-93.  Matthew is actually 6'2" tall.  NT 413.

Saday moved away and returned at the request of the police in the summer of 2012 because the police had suspects in custody and wanted her to testify.  NT 68, 69, 70, 172, 557.  The police told her that they thought they knew who was involved. NT 174.  Saday noted on cross examination:

> DEFENSE COUNSEL: When you were looking at the photo arrays was it your understanding that the men that they arrested were in the photo arrays, some of – at least two of the 25 or 30 pictures they were showing you?
>
> SADAY: Yes.

Respondents' Exhibit 49

DEFENSE COUNSEL: Who told you that?

SADAY: No one.

NT 183-84.

The police provided her with reports while traveling to view the array on July 24, 2012. NT 72, 160, 568. She was shown the array, at which time she identified both Crumbley and Matthew. NT 558, 648-50. This is the first and only time prior to trial that she identified Matthew as a perpetrator. NT 558. She made this identification less than two weeks before trial was supposed to start. NT 574. During the fourteen months from the time of the shooting until Saday made an identification of Matthew, several people talked to her about what occurred that night and who they thought was responsible. NT 559.

She testified that prior to October of 2011, she did not have access to the internet or a computer; however, she had a Facebook account with pictures of her and her child that was created in 2009. NT 628, 633. She said her friend created and maintained the account of her, also commenting on her behalf. NT 632-33, 645-46. She stated that she saw no pictures of either defendant on the internet. NT 638. A local paper published an article on December 15, 2011, which included pictures of the co-defendants. NT 403; DE2 60; Stipulation to Supplement Certified Record, filed October 22, 2014, Attachment 1. Several months after this article was

Respondents' Exhibit 49

published, Saday was able to identify the co-defendants, although she said that she never saw media coverage. NT 68, 71, 158-59, 403-04.

At the October 29, 2015 hearing on after discovered evidence, Saday was the primary witness. Saday had provided a written statement and a video statement to an investigator in which she admitted that her trial testimony was not true. HT[3] 4, 14-16. Both documents state that Saday could not identify the men who shot and killed Todd Mattox. HT 27, 29. When she appeared in court, however, Saday recanted her recantation of her trial testimony, claiming to have been threatened by Mr. Crumbley's baby mama's sister. HT 12-13, 17. Saday also claimed to have been offered $25,000 to make the written statement and the video. HT 23. Saday never reported to police that she was threatened or offered money for her new testimony. HT 23-24. She also did not tell Investigator Fox, who took the video statement and the written statement, that she had been threatened and/or bribed to change her testimony.   HT 49. Once Saday was contacted by county police officers in connection with the recantation, her story changed *again*. HT 50.

---

[3] HT refers to the Hearing Transcript from the October 29, 2015 hearing on the Motion for a New Trial.

Respondents' Exhibit 49

## SUMMARY OF THE ARGUMENT

The sole witness who identified Matthew Ebo as being involved in the shooting death of Todd Mattox recanted her testimony via written statement and video while this case was on appeal.  Because of this, a hearing was conducted to see if a new trial was warranted.  At the hearing, the witness recanted her recantation. The trial court found that the witness's trial testimony was credible.  However, *the jury* must be given all the information about this witness, including her recantation and her second recantation, when deciding the ultimate issue of guilt in this case. There is substantial danger that Matthew Ebo was wrongly convicted, as at least one version of the witness's testimony proves his innocence.  A new jury must pass on the witness's credibility in light of these events.

The trial court erred by admitting irrelevant other crimes evidence that the co-defendant was involved in gun violence weeks after the shooting of Todd Mattox. This incident regarding the co-defendant's involvement in a subsequent shooting had no relation to the issue of whether Matthew Ebo killed Todd Mattox.  This irrelevant information did nothing more than confuse the jury by providing the jury with evidence of gun violence pertaining to an incident that had nothing to do with Matthew.  Even worse, the testimony prejudiced Matthew because it made him appear that he involved himself with individuals who wielded guns and participated

Respondents' Exhibit 49

in gun violence. This was highly prejudicial considering that Matthew was on trial for killing another person with a gun.

Moreover, the highly suggestive pretrial identification procedure tainted the main Commonwealth eyewitness' in-court identification. The only eyewitness who identified Matthew as the shooter at trial had previously failed to identify Matthew as the perpetrator for fourteen months and she even admitted to misidentifying someone else as the shooter. The witness made her identification long after the incident, and only after police showed her Matthew's image multiple times and then told her that the suspect had been apprehended. The eyewitness believed that the perpetrator who killed Mr. Mattox was present in the eight-person array when she viewed the array and identified Matthew as the shooter. As such, any evidence relating to this witness' identification of Matthew should have been suppressed.

Finally, the mandatory sentence imposed here was illegal. The recent Pennsylvania case, *Commonwealth v. Valentine*, 101 A.3d 801 (Pa. Super. 2014), has held the mandatory sentencing statute at 42 Pa.C.S. § 9712 is unconstitutional since facts leading to an increase in a mandatory minimum sentence are elements of a crime that must be submitted to a jury and proven beyond a reasonable doubt. Since that statute was utilized by the sentencing court, rather than the jury, to impose a mandatory sentence in Matthew's case, based only on a preponderance of the evidence, his sentence is illegal and must be remanded for resentencing.

Respondents' Exhibit 49

0581

## **ARGUMENT**

I. **THE TRIAL COURT ABUSED ITS DISCRETION WHEN IT FAILED TO AWARD MATTHEW A NEW TRIAL BASED UPON THE RECANTATION OF THE SOLE WITNESS CONNECTING HIM TO THE CRIME, SADAY ROBINSON.**

A post-sentence motion seeking a new trial based upon after discovered evidence must be filed in writing promptly after such discovery. *See Commonwealth v. Rivera*, 939 A.2d 355, 358-59 (Pa. Super. 2007) (stating procedure when newly discovered evidence is found while the direct appeal was pending). In this case, the evidence of Saday Robinson's recantation of her trial testimony was received on July 29, 2015, and a petition was filed in the Superior Court on August 5, 2015. The petition was timely filed.

Moreover, the standard for determining whether to grant a new trial based upon newly discovered evidence is well-settled: "To warrant relief, after-discovered evidence must meet a four-prong test: (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely." *Id.* at 359. These four prongs have been met in Matthew's case.

Respondents' Exhibit 49

Ms. Saday Robinson did not come forward at any point prior to trial or during trial regarding the testimony contained in the video and supporting affidavit. Prior to trial, Saday was in protective custody and had relocated to another state; she was clearly unavailable to Matthew. HT 10. Further, Saday refused to speak with defense counsel prior to trial.  Only after conviction, when the judgment of sentence was on appeal to the Superior Court of Pennsylvania, did Saday come forward with her recantation. *See* HT 10. Saday explained to defense investigator Fox that she lied at trial and that she wanted to "get this off my chest." HT 12, 14, 22. This information could not have been obtained by due diligence prior to the conclusion of trial.  *See, e.g., Commonwealth v. Loner*, 836 A.2d 125 (Pa. Super. 2003) (*en banc*), *appeal denied*, 852 A.2d 311 (Pa. 2004) (stating that "we reject the Commonwealth's assertion that the victim's recantation in this case is not truly after-discovered evidence because Appellant knew prior to trial that the victim was not telling the truth."); *Commonwealth v. McCracken*, 659 A.2d 541, 545 (Pa. 1995) (holding that recantation testimony qualified as after-discovered evidence because the witness had identified the defendant at the preliminary hearing and at trial, which foreclosed defense counsel's ability to persuade the witness to change her identification at trial through cross-examination).

Saday Robinson's recantation testimony is not merely corroborative as it is substantive, exonerating eyewitness testimony that Matthew did not commit this

Respondents' Exhibit 49

0583

crime.  At trial, Matthew contended that he was not the person who committed the homicide.  Saday's testimony that she saw Matthew there was the *sole* evidence that contradicted his account.[4] The recantation is new evidence, not corroborative of any other evidence that the jury also considered.  Moreover, Saday never testified to the jury about her exculpatory evidence, thus, it is not cumulative.

Notably, at the evidentiary hearing on this matter, Assistant District Attorney Stadtmiller argued that Saday was not the only witness at trial who implicated Matthew.  *This is wholly incorrect.*  Mr. Stadtmiller claimed that Richard Carpenter testified as an eyewitness as well.  Mr. Carpenter _never_ testified in this case.  In fact, during trial, testimony was taken from then Deputy District Attorney (now Judge) Mark Tranquilli about this very witness.  Judge Tranquilli testified: "as I came to meet Mr. Carpenter and prepare him for the preliminary hearing and the testimony at the preliminary hearing, yes, I satisfied myself that he was a witness to this homicide." NT, Jury Trial, Vol. 2, at 1116.  However, Mr. Carpenter did not testify at the preliminary hearing.  *Id.*  Defense counsel asked Judge Tranquilli if Mr. Carpenter had testified in any proceedings in this case, including the current trial. *Id.* at 1116-1117.  The answer was negative.  *Id.*  Thus, despite ADA Stadtmiller's assertion at the hearing that he had another eyewitness, Saday was the *only* witness at trial that connected Matthew to the homicide in this case.

---

[4] This is an important distinction between the two defendants at this trial.

Respondents' Exhibit 49

In *Commonwealth v. McCracken*, 659 A.2d 541, 549-50 (Pa. 1995), our Supreme Court found that the defendant was entitled to a new trial following the recantation of the Commonwealth's main witness. The witness testified at trial that he saw McCracken enter, then leave, a deli where a man had been shot and killed. 659 A.2d at 542-43. Immediately after the incident, the witness had told police that he did not recognize the man who entered the deli. *Id.* at 543. However, three days later, the witness implicated McCracken, stating that he had gone to school with McCracken and recognized him. *Id.* At trial, McCracken offered an alibi and maintained that another had committed the crimes. *Id.* McCracken was found guilty of second-degree murder and other offenses. *Id.*

Several years later, while serving time in a New Jersey prison, the witness contacted McCracken's trial attorney and indicated that he wished to recant his trial testimony. *Id.* At the evidentiary hearing on a motion for a new trial based upon after-discovered evidence, the witness testified that he had not told the truth at trial, that he did not know who it was that he saw entering and leaving the deli, and that he wished to clear his conscience by telling the truth. *Id.* at 544. The witness further testified that he had been beaten in prison, and that he and his family had been threatened by the trial testimony/conviction. *Id.* However, the court found that the threats and intimidation had reasonable explanations other than coercing the witness to recant his trial testimony. *Id.* Although the trial court did not believe the entirety

Respondents' Exhibit 49

of the witness's testimony at the evidentiary hearing, saying that the witness was "no paragon of truth," *id.* at 544-545, the court ordered a new trial.

Even while noting that recantation testimony "is one of the least reliable forms of proof, especially when it constitutes an admission of perjury," the Pennsylvania Supreme Court affirmed the award of a new trial. *Id.* at 545. The Court reasoned:

> [The witness's] recantation is not merely cumulative or corroborative given the tenuous nature of the circumstantial evidence connecting [McCracken] to the crime and the inability of any other witness to make a positive identification of the perpetrator. In this case, where the only Commonwealth witness who identified the perpetrator has recanted his testimony, such evidence can not be considered cumulative or corroborative because the defendant claimed that he did not commit the crime in question. This was the essence of [McCracken's] defense and the ultimate question in [McCracken's] trial. Thus, [the witness's] recantation is neither cumulative, corroborative, nor for impeachment purposes.

*McCracken*, *supra*, 659 A.2d at 545.

Likewise in the case at bar, the recantation of Saday Robinson is not cumulative evidence, corroborative evidence, or impeachment evidence. Rather, the recantation is direct and compelling testimony that Matthew was not present at the scene of the crime. Saday's testimony was the only link between Matthew and the Todd Mattox killing. Matthew has always maintained that he was not there on that day. The jury should have been able to evaluate this evidence during their deliberations. As they were unable to do so, a new trial is required.

Respondents' Exhibit 49

0586

Arguably, the most important consideration in determining whether a new trial is necessary is whether the recantation testimony is of such a character that a new outcome would have resulted had the recantation been disclosed to the jury.  In this case, the recantation is of such immense importance.

The recantation of Saday Robinson as shown by Defense Exhibits A and B is a complete repudiation of her trial testimony.  In both the CD and the affidavit, Saday admits to lying at trial when she identified both Matthew and Mr. Crumbley as the shooters.  She explains that her trial testimony implicated the defendants because the police had promised her assistance with housing and with getting custody of her child if her testimony helped garner a conviction.  Of course, at the evidentiary hearing Saday recanted her recantation, saying now that she only provided the recantation testimony after being offered $25,000 from an associate of one of the defendants, and also after being physically threatened.  At this point, however, Saday's testimony is so full of inconsistencies that a jury must be given the opportunity to consider all variations of it in order to adjudge whether Matthew is guilty.

Specifically, Saday testified on August 20, 2012, during a pre-trial hearing on whether her identification had been tainted by pre-trial publicity.  She also testified in front of the jury as a fact witness.  During this testimony, several different stories emerged, and Saday admitted to giving false information several times.

Respondents' Exhibit 49

When first asked, Saday Robinson testified that nobody had told her who had shot the victim.  NT, Vol. I, at 42. Saday later testified that an upstairs neighbor told her that "Mo" did it, referring to the light skinned defendant, Matthew.  NT, Vol. I, at 43, 169, 180.  Still later, Saday testified that Ace told her that "Mat-Mat"[5] was responsible for the shooting, and the motive was robbery of a pound of marijuana.  NT, Vol. I, at 58, 171.

When being questioned by police immediately after the shooting, Saday described the light-skinned male (Matthew) as being five-foot seven-inches or five-foot eight-inches tall, with a medium build.  NT, Vol. I, at 48, 167. As the trial Court recognized at the evidentiary hearing, Matthew is actually six-feet, two-inches tall, and weighs 270 pounds.  Thus neither the height nor the weight of the light-skinned suspect is anything close to the actual description of Matthew.

Police showed at least three photo arrays to Saday.  The first array was the day after the murder, and no photos were identified as the gunmen.  NT, Vol. I, at 55.  This array may have included only female photos, the testimony was confused about this. *See, e.g.,* NT at 81.

In June of 2011, Saday informed the police of Ace's discussion of "Mat-Mat" being one of the shooters.  NT, Vol. I, at 58.  Police did not show her an array at this time.

---

[5] This is also listed as "Mac-Mac" in the notes of testimony.  NT, Vol. I, at 171.

Respondents' Exhibit 49

In September of 2011, two detectives showed Saday a group of photos in a car near to her Grandmother's home.  NT at 60. Again, Saday did not identify anyone from this array.  NT at 61, 548.  Mr. Crumbley, at least, was included in this array.  NT at 548.  It is unclear whether Matthew's photo was included in this group shown to Saday, although testimony later at trial makes it appear that Ebo's picture was one of the choices. Saday admitted at trial that she recognized Mr. Crumbley's photo, but she neglected to point it out to police at that time.  NT at 548.

In November 2011, following her grandmother's funeral, Saday Robinson was shown several photo arrays.  Saday admitted at the pre-trial hearing that during this photo array she "picked someone out but I didn't pick out the right person" and that she "did it on purpose."  NT at 59, 66, 552, 554-556.  Specifically, Saday told police that some unrelated male "looked like" Matthew.  NT at 67.  This testimony showed that both Matthew and Mr. Crumbley were included in the November arrays but were not identified.  NT at 548-549. Saday also said that she had seen these arrays in a prior interview with police.  NT at 66.  This is why Matthew believes that his picture was also included in the September array.

After the pre-trial hearing, but before Saday returned to the stand to testify in front of the jury, ADA Stadtmiller told the trial court that after his discussion with police and the witness, the "misidentification" at the November array "never happened."  NT at 153.  After returning to the stand, Saday testified that she had not

Respondents' Exhibit 49

seen the photos in the November array previously.  NT at 157.  She also, however, testified about identifying the wrong person at a photo array, and doing so intentionally.  NT at 162.  Saday told police that someone unrelated to the case "looked like" the light-skinned gentleman.  NT at 164-167.

In July of 2012, just weeks before trial, police contacted Saday through another relative to come back to Pittsburgh, look at photos, and perhaps testify at trial.  NT at 69, 557.  One of the officers in connection to this photo array viewing told Saday that police believed that they had arrested the perpetrators who had committed the crime.  NT at 174, 557.  The same arrays were shown, and this time Saday identified Matthew and Mr. Crumbley.  NT at 541-544. This was the only time Saday identified Matthew to police. NT at 558.  She also personally identified them in the courtroom as being responsible for the shooting death of the victim.  NT 528, 531-533.  This identification may have occurred, however, not from seeing the defendants at the scene of the shooting, but rather from seeing their pictures multiple times in the arrays.  Police told Saday that they had captured the men who did it, and they were in these arrays.  It is not inconceivable that Saday would thus choose those pictures most familiar to her, the ones she had seen several times previously.

As a final example, Saday testified at trial that she had no access to the Internet, so she could not have seen news reports that included photos of the two suspects, Matthew and Mr. Crumbley.  NT at 71, 157-159.  Yet, in the recantation

Respondents' Exhibit 49

testimony, Saday indicated that she did see news reports prior to returning to Pittsburgh for trial. This changed at the evidentiary hearing, where she said that she only saw news reports after the trial was concluded.  Also, Saday had a Facebook page, first set up in 2009, which included 29 different profile pictures, as well as photos of her child.  NT at 626-634, 644-646. The Facebook site also included comments that were identified as coming from Saday. Saday claimed that a friend set up the account for her, including uploading all the different pictures and commenting under Saday's name.  While this scenario is possible, her account is improbable; the testimony is clearly not wholly accurate.

Given that Saday's identification is the only evidence linking Matthew to this homicide, and given all the discrepancies in Saday's testimony, including the recantation and the recantation of the recantation, the admission of being deceitful to police and knowingly picking the wrong person from a photo array, or not picking photos even though she recognized them, the contradictory testimony about access to the internet, and the fact that Saday's initial description of the shooter to police does not even slightly match Matthew, a new trial should be ordered in this case.

Again, the evidence against Matthew was far from overwhelming.  The *only* evidence tying Matthew to this incident is the identification by Saday.  Without Saday's testimony, the Commonwealth cannot meet its burden of proving that Matthew was the perpetrator of this crime.  The jury is entitled to all versions of

Respondents' Exhibit 49

0591

Saday's testimony as this information is critical to the outcome of this case.  If the jury believed the recantation testimony as set forth in Exhibits A and B, a not guilty verdict would likely have been issued. Without any evidence against him, Matthew would have been legally entitled to an acquittal.

In *Commonwealth v. Mosteller*, 284 A.2d 786 (Pa. 1971), our Supreme Court considered whether a new trial should be awarded when a prosecutrix recanted her testimony after trial, and that testimony was the only evidence upon which the Commonwealth depended to establish that the defendant was guilty.  The Court stated that a new trial was necessary "so that a new jury may pass on the prosecutrix's credibility in light of subsequent events [i.e., the recantation]."  284 A.2d at 786.

*Mosteller* concerned a situation where a fifteen year old girl, named Frieda, accused her father of entering the bathroom while she was bathing, caressing her bosom, and then taking the girl to his bedroom to have sex with her.  *Id.*  Frieda testified that intercourse lasted for five minutes, that she had no pain, and that no emission occurred. *Id.* The father strenuously denied that these events occurred, admitting to being in the house alone with Frieda but claiming that he was asleep the entire time.  *Id.* at 787. Following his conviction for statutory rape and other offenses, the father submitted a request for a new trial, arguing that Frieda wished to retract her trial testimony. *Id.* Frieda recanted in court, even after the Commonwealth

Respondents' Exhibit 49

attorney explained the penalties of perjury to her. *Id.* The trial court denied the request for a new trial, and the Superior Court affirmed that decision.

The Supreme Court reversed, noting that Frieda gave "the only testimony which could possibly have led to appellant's conviction. Not an iota of other corroborating evidence was offered." *Id.* at 788. Thus, the Supreme Court ruled that it was "a clear abuse of discretion not to award a new trial under these circumstances *and thereby allow a new jury to pass on the child prosecutrix's credibility.*" *Id.* (emphasis added); *see also Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014) (awarding a new trial because the jury should review the credibility of the contradictory testimony to determine which version was credible). Thus, even though the trial court did not believe Frieda's recantation, a new trial was necessary. *See Commonwealth v. McCracken, supra*, 659 A.2d 541, 546 (Pa. 1995) (holding that a new trial was required following the sole incriminating witness's recantation of his trial testimony, even though the trial court discounted much of that witness's testimony at the recantation hearing), *and Commonwealth v. Fiore*, 780 A.2d 704 (Pa. Super. 2001) (co-defendant's statement that the defendant was innocent of the charge of conspiracy to murder another, even though the trial court found it to be of "questionable validity," would have likely affected the outcome of trial; thus, a new trial was ordered).

Respondents' Exhibit 49

The interests of justice require the grant of relief to Matthew in this unusual situation. There is a substantial danger that Matthew was not the perpetrator and he was wrongly convicted. At least one version of Saday's testimony proves that Matthew is innocent. The jury should have access to all of Saday's testimony, including her recantation, before determining which version of her story is credible and making the ultimate decision in this case. Therefore, a new trial is imperative.

Respondents' Exhibit 49

## II.  THE EVIDENCE THAT THE CO-DEFENDANT WAS INVOLVED IN GUN VIOLENCE TWO WEEKS AFTER THE HOMICIDE WAS INADMISSIBLE EVIDENCE OF OTHER BAD ACTS AGAINST MATTHEW EBO.  ALSO, THE IRRELEVANT EVIDENCE HAD NO CONNECTION TO MATTHEW AND IT SHOULD NOT HAVE BEEN PRESENTED AS EVIDENCE THAT MATTHEW WAS SOMEHOW INVOLVED IN THE HOMICIDE.

The bad acts evidence that co-defendant, Thaddeus Crumbley, was involved in a shooting two weeks after the homicide of Todd Mattox was absolutely irrelevant to the issue of whether Matthew Ebo shot Mr. Mattox.  The Commonwealth presented no evidence of a connection between Matthew and the irrelevant gun violence evidence involving Crumbley, which severely prejudiced Matthew in this serious case.  As such, a new trial is warranted.

According to the Pennsylvania Rules of Evidence, evidence of a crime, wrong, or other act is inadmissible to prove a person's character in an attempt to show that on a particular occasion that person acted in accordance with the bad character.  Pa.R.E. 404(b)(1); *see Commonwealth. v. Brown*, 52 A.3d 320, 325 (Pa. Super. 2012) (citations omitted) ("Bad acts evidence is inadmissible to prove a defendant acted in conformity with those acts or to demonstrate a criminal propensity.").

Rule 404(b) seeks to prevent the misuse of the other crimes evidence since jurors could ultimately convict a defendant based on the defendant's bad character

Respondents' Exhibit 49

or propensity to commit crimes.  *Commonwealth v. Cascardo*, 981 A.2d 245, 251 (Pa. Super. 2009) (citations and quotations omitted).   This is important because "[t]he Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts." *Commonwealth v. Ross*, 57 A.3d 85, 98-99 (Pa. Super. 2012) (citations omitted).

Other crimes evidence is inadmissible under Rule 404(b)(1), unless the Commonwealth can present a statutorily acceptable purpose stated in Rule 404(b)(2) for its admission.  Other crimes evidence may be admissible if it is relevant to prove motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident.  However, even if the evidence is admissible for one of these limited purposes, this evidence may not be used if the potential for unfair prejudice outweighs the probative value of the evidence.  Pa.R.E. 404(b)(2).

The other bad acts evidence presented against Matthew here, consisting of subsequent gun violence involving the co-defendant, had no relevant connection to the issue of whether Matthew shot Todd Mattox and it failed to prove his identity as a shooter.

Todd Mattox was killed on May 16, 2011.  NT 224, 262.  Multiple casings were recovered from the scene of Mr. Mattox's shooting.  There were two spent .40 caliber S&W casings that were discharged from one firearm.  NT 444-45, 447.  There

Respondents' Exhibit 49

were five other .40 caliber S&W casings that were discharged by a different firearm. NT 450.  There were also two .357 Sig caliber cartridge casings that were discharged by a firearm.  NT 454.  According to the firearm expert, Raymond Everett, there were a total of three different guns discharged during the incident.  NT 461.

Two nine millimeter caliber bullets were recovered from Mr. Mattox and they were fired from the same firearm.  NT 455-56.  The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon. NT 460-61.

The firearm expert tried to match the .40 caliber bullets discovered at the Todd Mattox scene with the Springfield Armory firearm that was subsequently recovered from Asa Thompkins.  The expert noted that the five spent .40 caliber cartridges all came from the same gun and the rifling characteristics matched the test cartridge casings from the Springfield Armory pistol recovered from Thompkins.  NT 450, 475.  However, the expert stated that he could not identify or eliminate those casings as having been fired from that gun.  NT 475-76.  In fact, there are many .40 caliber weapons that have the same class characteristics.  NT 476-77.  The expert could not tell whether the projectiles came from the Springfield firearm or another .40 caliber firearm.  NT 477.

Crumbley was the victim in a shooting on June 2, 2011.  NT 843-47.  .40 caliber S&W casings, nine millimeter casings, and a Ruger firearm were found at

Respondents' Exhibit 49

the scene.  NT 859-60, 869-70, 885.  The casings were fired from two separate firearms.  NT 885.

Deborah Tator, an expert in firearms and tool marks, testified about the evidence obtained during the shooting of co-defendant Crumbley on June 2, 2011. She examined the spent .40 caliber S&W casings and determined that they were all fired from the same firearm.  NT 923-25.  She also noted that the nine millimeter casings were all discharged by the Ruger firearm that was discovered at that scene. NT 925.  The spent .40 caliber S&W casings matched Asa Thompkins' Springfield Armory pistol[6].  NT 360, 927.

Thompkins was arrested on June 9, 2011 and according to Detective Perry, Thompkins had a gun "used in the homicide of Mr. Mattox."  NT 360.  However, to clarify, even though casings found at the scene of the Todd Mattox shooting might or might not have been fired from the Springfield Armory firearm, Mr. Mattox was shot with two nine millimeter bullets.  NT 455-56.  The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon. NT 460-61. The Springfield Armory firearm was a .40 caliber weapon, NT 927, so it could not have been used to kill Mr. Mattox.  Moreover, the firearms expert could

---

[6] Thompkins said the gun belonged to him and he happened to be present at the scene of Crumbley's shooting on June 2, 2011.  NT 847, 852-53, 857, 1009-11.

Respondents' Exhibit 49

not definitively connect the Springfield gun to the .40 caliber casings discovered at the scene of the Mattox shooting.  NT 475-76.

Asa Thompkins' Springfield firearm, discovered in his possession, almost a month after the homicide was completely irrelevant to the issue of whether Matthew committed the homicide of Mr. Mattox.  Additionally, the shooting of co-defendant Crumbley and the Ruger firearm discovered at that scene had no relevance to Matthew's trial.

The Springfield firearm was connected to Thompkins and to co-defendant Crumbley.  However, no evidence presented by the Commonwealth connected the Springfield gun, the Ruger gun, or any other evidence related to Crumbley's June 2, 2011 shooting to Matthew in any way.  This evidence was completely irrelevant to the issue of whether Matthew killed Todd Mattox.  There was absolutely no probative value to this extremely prejudicial other bad acts evidence involving Crumbley and Thompkins.

The Commonwealth argued at the hearing that this information was necessary, stating, "[I]t is physical evidence that would link Mr. Crumbley to the crime scene of the shooting[.]"  Notes of Testimony from the July 27, 2012 Motions Hearing, hereinafter "MH," at 56.  The Commonwealth noted:

Respondents' Exhibit 49

> [T]here was a .40-caliber handgun used during the May 16th shooting death[7], and that .40-caliber under 404(b) on June 2, 17 days later, was discharged at least eight times during the shoot-out and the casings are inside the car. A week after that, on June 9th, Asa Thompkins, the witness we are speaking about got arrested with that .40-caliber handgun and has been linked scientifically.

MH 35.  The Commonwealth later said, "The other crime is that he was involved in an exchange of gunfire.  That's criminal activity.  Having casings in your car is not a crime, but it is physical evidence of a link to the previous incident."  MH 59.  The Commonwealth said nothing about how this incident involving Crumbley linked Matthew to the Mattox shooting.

Matthew's counsel joined in the objections made by Crumbley's attorney at the beginning of the hearing on these various pretrial motions and objections.  MH 7.  At the conclusion of the arguments presented by Crumbley's counsel, Matthew's attorney noted that he had no further arguments to add.  MH 58.

The trial court allowed the evidence in to show identity of both Matthew and Crumbley as participating in the Mattox shooting.  MH 55-56.  In order to properly admit other crimes evidence to show identity, there must be such a high correlation in the details of the crimes, that proof that someone committed one of the crimes

---

[7] The firearms expert could not definitively connect the Springfield gun to the casings discovered at the scene of the Mattox shooting.  NT 475-76.

Respondents' Exhibit 49

makes it unlikely that a different person committed the other crime. *Commonwealth v. Ross*, 57 A.3d 85, 102 (Pa. Super. 2012) (citations and quotations omitted).

Contrary to the reasoning by both the Commonwealth and the trial court, the admission of this firearm does not prove *Matthew's* identity as the shooter in the Mattox homicide.  When discussing the admission of this other crimes evidence, the parties seemed to be addressing how this evidence showed co-defendant *Crumbley's* identity, not Matthew's identity.  No evidence was presented that Matthew had any connection to the Springfield gun, that he had any connection to Crumbley's shooting on June 2, 2011 where the Springfield gun was involved, or that he had any connection at all with Asa Thompkins, who was at the scene of the June 2, 2011 shooting of Crumbley and who was in possession of the Springfield firearm on June 9, 2011.

To find that a subsequent gun battle involving Crumbley or that Thompkin's possession of the Springfield firearm that ejected casings that may have been found at the Mattox murder scene somehow identifies Matthew as the shooter in the Todd Mattox homicide case is pure speculation.  Even if that firearm somehow connected Thompkins or Crumbley to the scene of Mr. Mattox's murder, it in no way tied Matthew to that scene.  The evidence should not have been admissible under Pa.R.E. 404(b)(1).

Respondents' Exhibit 49

0601

In *Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998), the Pennsylvania Supreme Court disagreed with a somewhat analogous argument made by the Commonwealth. In *Robinson*, the Court found it erroneous for the trial court to have admitted photographs of a defendant posing with a nine millimeter handgun to show that he had experience with nine millimeter guns, when the testimony showed that a different make of nine millimeter gun was used in the murder. *Id*. at 351.

In *Robinson*, someone shot the defendant's ex-girlfriend and killed her paramour. The ex-girlfriend identified the defendant as the shooter. Police recovered nine millimeter casings at the scene, which were all fired from the same gun. The murder weapon would have been manufactured by one of four possible companies, one of which was Lorcin. *Id.* at 349. The police searched the defendant's residence and found documents in a locked safe relating to a nine millimeter Lorcin gun. They did not find the murder weapon. They also found a picture of the defendant holding a nine millimeter Star gun, a Federal .44 SPL revolver with ammunition, and a bulletproof vest. *Id.* at 350.

The defendant argued that the revolver, the ammunition, the bulletproof vest, and the photographs of the defendant with guns were not relevant. *Id* The Commonwealth stated that the photographs showed that the defendant was capable of using a nine millimeter gun, the type of gun used in the murder. *Id*. at 351. The Supreme Court disagreed, noting that there was no evidence that the nine millimeter

Respondents' Exhibit 49

Star gun shown in the photograph was used to commit the murder; thus, it was simply not relevant. *Id*. Even if the photographs of the defendant with a nine millimeter gun were relevant to show experience with nine millimeter guns, the Court held that the prejudicial impact of these photographs outweighed any probative value. *Id*. The Commonwealth used the pictures to show that the defendant was a person capable of committing these crimes. *Id*. The Court also held that the unrelated revolver was not relevant or admissible since the revolver was not used in the shooting. *Id*. at 352. Finally, the bulletproof vest and the ammunition were irrelevant because there was no logical connection between that evidence and the issues presented.[8] *Id*. at 353.

*Robinson* provides guidance here because the gun evidence was not relevant to any issues in Matthew's trial. Although the firearm found on Thompkins may have had a connection to the Todd Mattox crime scene and it definitively had a connection to the Crumbley shooting, it in no way connected *Matthew* to these incidents. Just because this evidence may somehow connect Crumbley to the Todd Mattox murder scene, it does not automatically mean that Matthew is also connected just because he was charged as a co-defendant. For these reasons, the gun evidence

---

[8] These errors were harmless since there was substantial properly admitted evidence at trial establishing the defendant's guilt. *Robinson,* 721 A.2d at 351-53.

Respondents' Exhibit 49

0603

admitted against Matthew was completely irrelevant and did not show Matthew's identity as a shooter.

To the extent that this Honorable Court finds the evidence relevant, this Court may still exclude relevant evidence if the probative value is outweighed by the danger of its unfair prejudicial effect, its ability to confuse the issues, or the danger that it will mislead the jury. Pa.R.E. 403. Unfair prejudice involves a tendency to suggest a decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially. Pa.R.E. 403, *Comment*.

This evidence that Crumbley was involved in a subsequent shooting and that Crumbley may have had a connection to a gun used at the Mattox crime scene was confusing since it had nothing to do with Matthew. The jury could have inferred that the presentation of this evidence somehow connected Matthew with the Mattox crime scene and the subsequent gun violence involving Crumbley. It was prejudicial since it appeared that Matthew, as a co-defendant of Crumbley, had some kind of connection with these men who involved themselves with gun violence, thereby making it more likely that he shot Mr. Mattox. Crumbley's subsequent shooting had no bearing on Matthew's trial and likely diverted the jury's attention from the issue at hand, which was whether Matthew committed the intentional murder of Todd Mattox in May of 2011. The absolute irrelevance of this evidence makes the prejudice all the worse. *See also Commonwealth v. Brown*, 52 A.3d 320, 325, 332-

Respondents' Exhibit 49

33 (Pa. Super. 2012) (the prior bad act – that a physician- as irrelevant to whether, many years later, he engaged in illegal drug transactions; because of the prejudicial effect of this evidence a new trial was required).

The admission of this evidence was not harmless error.  An error is not harmless if there is a reasonable possibility that the error could have contributed to the verdict.  *Commonwealth v. Laich*, 777 A.2d 1057, 1062 (Pa. 2001).  The Commonwealth must show that either the error did not prejudice the defendant, the erroneously admitted evidence was cumulative of other untainted, substantially similar evidence, or the properly admitted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.  *Id*. at 1062-63.

Matthew was on trial for murder and he faced the severe consequence of a life in prison.  It was imperative that the members of the jury address the facts of this case without any type of prejudicial or confusing information biasing them in making their decision.  The fact that the Commonwealth presented the jury with this information and the jury had it for consideration when deciding Matthew's fate prejudiced him in this life-changing case.

This Court in *Commonwealth v. Miles,* 846 A.2d 132 (Pa. Super. 2004), found that the trial court error in admitting evidence of other bad acts so significantly prejudiced the defendant that a new trial was warranted.  *Id.* at 137-38.  In *Miles*, the

Respondents' Exhibit 49

evidence of the defendant's guilt consisted of the testimony of the two victims, who each identified the defendant as the perpetrator and indicated that the defendant robbed them within a short period of time in the same geographic vicinity. *Id.* at 138. The Commonwealth presented other bad acts testimony consisting of the defendant's commission of another robbery in the same location. The evidence that the defendant involved himself in another crime was not *de minimus*, it was not cumulative of other evidence, and the prejudicial impact was significant enough to have contributed to the verdict. *Id.* This other crimes evidence of an unrelated robbery provided a compelling fact from which the jury could have inferred and concluded that the defendant committed the robberies for which he was on trial. This Court noted that although two victims identified the defendant, the severe prejudice that resulted from admitting evidence of other bad acts outweighed the identification evidence presented by the two victims. *Id.*

Similarly, in the present case, this other crimes evidence relating to Crumbley was confusing and it likely contributed to Matthew's verdict. The evidence of Matthew's guilt was not overwhelming as it was limited to basically one witness's testimony, making the admission of this prejudicial evidence extremely harmful. There were no fingerprints or DNA evidence tying Matthew to the scene. NT 836, 1073-74, 1102. Saday Robinson admitted to lying to police throughout the investigation and she misidentified someone else as the perpetrator. NT 551-52,

Respondents' Exhibit 49

0606

554, 574, 582, 585, 594-95, 611-17, 638.  She saw an array that had Matthew in it and picked someone that looked like Matthew, even though she knew that person was not the shooter.  NT 617-18, 640, 641.  She finally identified Matthew as a shooter fourteen months after the incident and mere weeks before trial was scheduled to begin.  NT 558, 574, 648-50.  During the fourteen months from the time of the shooting until Saday made her identification, people talked to her about what occurred that night and who they thought was responsible for the Todd Mattox murder.  NT 559.

When considering the very limited evidence connecting Matthew to the shooting of Todd Mattox, the fact that the trial court admitted irrelevant evidence of Crumbley's subsequent connections to gun violence was absolutely confusing and prejudicial.  It lacked any connection to Matthew's case and the jury could only infer that Matthew had something to do with the subsequent gun activities involving Crumbley and Thompkins.  This no doubt affected the jury and contributed to the verdict.  For the above reasons, the trial court's error in admitting this irrelevant other crimes evidence significantly prejudiced Matthew, thereby necessitating a new trial.

Respondents' Exhibit 49

### III.  THE HIGHLY SUGGESTIVE PRETRIAL IDENTIFICATION PROCEDURE TAINTED THE MAIN COMMONWEALTH EYEWITNESS' IDENTIFICATION OF MATTHEW EBO AND ANY INFORMATION ABOUT THE WITNESS' PHOTO ARRAY IDENTIFICATION AND HER SUBSEQUENT IN-COURT IDENTIFICATION SHOULD HAVE BEEN SUPPRESSED.

Saday Robinson's identification of Matthew Ebo was tainted and should have been suppressed.  The police continued to show her photo arrays that included the image of Matthew even though Saday did not identify him, or anyone, for approximately fourteen months.  Finally, the police told her that they had the two individuals in custody a few weeks before trial was scheduled to begin and that the individuals were in the photo array.  At that point, Saday suddenly identified Matthew as a perpetrator.  This suggestive procedure tainted her subsequent in-court identification.

The United States Supreme Court has stated that the danger of an incorrect identification is increased if the police show a person "the pictures of several persons among which the photograph of a single such individual recurs or is in some way emphasized.  The chance of misidentification is also heightened if the police indicate to the witness that they have other evidence that one of the persons pictured committed the crime."  *Simmons v. United States*, 390 U.S. 377, 383 (1968) (citations omitted).  The witness is therefore likely to retain the image of the photograph, rather than of the person that she actually witnessed, which reduces the

Respondents' Exhibit 49

0608

trustworthiness of subsequent lineup or courtroom identification.  *Id*. (citations omitted).

In the present case, Saday Robinson, the only witness to present trial testimony that she saw Matthew shoot Todd Mattox, identified Matthew after the highly suggestive photographic identification procedure.  Saday was not able to identify Matthew until fourteen months after the incident.  NT 558.  Law enforcement created a photo array containing Matthew's photograph in October of 2011 and showed it to Saday on November 4, 2011.  NT 338-39, 415-16.  She could not identify anyone at that time.[9]  NT 204-205, 1000-01.  According to police, they also showed her an array containing Matthew's photograph on July 24, 2012.  NT 338.  That was the first time that she identified Matthew as a perpetrator.  NT 648-49.  Saday testified that she looked at a third array that contained Matthew's picture and she identified a different person, but the police had no record of that occurring.[10]  NT 66-67, 193-94, 409-10, 551-52, 622-23.

---

[9] She later testified that she failed to identify anyone prior to July 24, 2012 because she was scared. NT 548.

[10] There arguably seemed to be an issue with police keeping track of the many photo arrays shown to Ms. Robinson in this case.  In addition to the police having no record of Ms. Robinson identifying another person during a photo array involving Matthew, the police also noted that one of the arrays of co-defendant Crumbley was missing from the file, although the police still had the pictures.  NT 356-58, 1249.  Detective Perry also testified they were unaware that Ms. Robinson was shown a photo array of women the day after the incident.  NT 197, 637-38.  Detective Perry said no one was in charge of this investigation, while Detective Hitchings said that Detective Perry was the lead detective.  NT 1030-31, 1256.

Respondents' Exhibit 49

Police showed up at Saday's grandmother's house while Saday was in Pittsburgh on November 4, 2011. NT 156. They wanted to show her some photos. NT 157. She failed to identify Matthew at that time. NT 188, 205, 413-16.

Interestingly, months later, immediately prior to Saday identifying Matthew as the perpetrator, the police told her that they knew who was responsible for the Mattox killing, that they had arrested two people in relation to this crime, and it was her understanding that the two perpetrator's pictures were in the arrays police showed her on July 24, 2012. NT 174, 182, 183-84.

Detective Perry had contacted Saday's grandmother, asking that Saday contact him. NT 69. Saday contacted Detective Perry around the beginning of July 2012. NT 69-70. He inquired whether she would travel back to Pittsburgh to look at another photo array and testify in court. She agreed. NT 70. He also testified that she was subpoenaed to testify at trial and he made her aware of that fact. He told her that since she lived far away no one could harm her. NT 417.

Detective Perry picked her up at the hotel and had her review her first interview with police. NT 71-72, 380. He told her that two perpetrators had been arrested in this case. NT 380-82. He thought that telling her this would put her at ease. NT 381-82.

This identification procedure was highly suggestive. Law enforcement showed Saday a photo array including Matthew's picture on at least two occasions,

Respondents' Exhibit 49

arguably more.  Saday was familiar with Matthew from her neighborhood and she saw him with Crumbley.  NT 536-37.  They were always together when she saw them.  NT 537.  Crumbley's photograph was also shown to Saday on multiple occasions.  Saday very well could have made an association that Matthew was involved in the Mattox shooting due to the fact that the police kept showing her photographs of Matthew and Crumbley, who she knew associated with one another. If she saw Crumbley at the scene of Todd Mattox's shooting, she may have inferred that Matthew was there as well when police showed her arrays including his picture on multiple occasions.

Moreover, the police procedure was extremely suggestive considering that prior to the array on July 24, 2012, the police told her that they had arrested the two suspects and they needed her to testify at the upcoming trial on this case.  She moved away and returned at the request of the police in the summer of 2012 since the police had suspects in custody and they wanted her to testify.  NT 68, 69, 70, 172, 557.  The police told her that they thought they knew who was involved.  NT 174.

It was her belief that the two perpetrators were included in the photo arrays. Saday noted on cross examination:

> DEFENSE COUNSEL: When you were looking at the photo arrays was it your understanding that the men that they arrested were in the photo arrays, some of – at least two of the 25 or 30 pictures they were showing you?
>
> SADAY: Yes.

Respondents' Exhibit 49

DEFENSE COUNSEL: Who told you that?

SADAY: No one.

NT 183-84.

The police provided her with reports while traveling to view the array on July 24, 2012. NT 72, 160, 568. She was shown the array, at which time she identified both Crumbley and Matthew. NT 558, 648-50. This is the first and only time that she identified Matthew as a perpetrator prior to trial. NT 558. She made this identification less than two weeks before trial was supposed to start. NT 574. Considering that she reviewed Matthew's picture believing that the perpetrator was in the array, she had been shown his image multiple times over the course of this investigation, and she knew Matthew from the area as an associate of Crumbley, she would have been more likely to identify him even if he was not involved. For the above reasons, any evidence pertaining to Saday's identification of Matthew from the photo array should have been suppressed.

Due to the suggestiveness of the photo identification procedure, Saday's in-court identification of Matthew was tainted. The Commonwealth bears the burden of establishing that any identification testimony offered is free from taint of the initial illegality. *Commonwealth v. Moore,* 633 A.2d 1119, 1125 (Pa. 1993) (citations omitted). "In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed

Respondents' Exhibit 49

during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification." *Id.* (citing *Simmons v. United States,* 390 U.S. 377 (1968); *Neil v. Biggers,* 409 U.S. 188 (1972)).

Improper employment of photographs by law enforcement can cause witnesses to err in identifying perpetrators. It is this likelihood of misidentification that violates a defendant's right to due process. *Commonwealth v. Fowler*, 352 A.2d 17, 25 (Pa. 1976) (citing *Simmons v. United States,* 390 U.S. 377, 383 (1968); *Neil v. Biggers*, 409 U.S. 188, 198 (1972)).

"Following a suggestive pre-trial identification procedure, a witness should not be permitted to make an in court identification unless the prosecution establishes by clear and convincing evidence that the totality of the circumstances affecting the witness's identification did not involve a substantial likelihood of misidentification." *Commonwealth v. Fowler,* 352 A.2d 17, 19 (Pa. 1976) (citations omitted).

The trial court "should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of time between the incident and the court identification." *Moore,* 633 A.3d at 1125-26 (citations omitted).

Respondents' Exhibit 49

When reviewing the totality of the circumstances, in the present case, there was no sufficient independent basis for Saday's identification of Matthew.  Saday saw the incident in the evening at approximately 7:37 p.m.  NT 387.  Although it was still daylight outside and she said that she watched the perpetrator for about five minutes, Saday was approximately eighty feet from where the incident occurred.  NT 384-85, 536, 538.  She thought she was only ten or fifteen feet away, but law enforcement confirmed that she was actually approximately eighty feet away.  NT 168-69, 384-85.  She was understandably very upset and very nervous by what she witnessed.  NT 1172.  This may have affected her focus on the incident and the perpetrators.

In fact, she initially told police that the person who she ultimately identified as Matthew was 5'7" or 5'8" tall with a medium build, even though Matthew was much taller and heavier at 6'2" and 230 pounds.  NT 48, 167, 413, 553, 1166, 1183.  She also provided very general information that the perpetrator was a light-skinned black male, with a mini-afro and goatee, wearing black pants, a black hoody, and a white tee-shirt.  NT 1166.  This description could fit many people.

Furthermore, even though Saday viewed Matthew's picture in the past, she failed to identify him until fourteen months after the incident and she testified that she previously misidentified someone as the perpetrator.  NT 66-67, 193-94, 409-10, 551-52, 622-23, 648-49.

Respondents' Exhibit 49

Considering the discrepancies between Saday's description and Matthew's appearance, her failure to previously identify him, her testimony of a prior misidentification, and the fact that fourteen months elapsed between the incident and her identification of Matthew, the suggestive identification procedure very well could have swayed Saday's in-court identification of Matthew.

In *Commonwealth v. Fowler*, 352 A.2d 17 (Pa. 1976), the Pennsylvania Supreme Court addressed a situation involving a highly suggestive photographic identification, which entitled the defendant to a new trial. *Id*. at 19. In *Fowler,* two men entered the premises and a woman who was present glimpsed them. She got face-down on the floor and she heard one of the men tell the other to shoot her father. She heard shots and her father fell. She remained on the floor until the men fled. Her father died. *Id*. at 23. The woman described one man to police. *Id.* As a result of an independent investigation, the defendant became a suspect. Over the next three months, the woman was repeatedly shown groups of photographs to see if she could identify anyone as the perpetrator. She testified that the defendant's picture was included multiple times in the hundreds of photographs. Each time that she saw his photograph, she held it out because she thought that he resembled the perpetrator; however, she never identified him. *Id.*

The woman was interviewed numerous times within a three month period. There were no records regarding the photographs shown to her; however, the defense

Respondents' Exhibit 49

was able to establish that she was shown the defendant's picture on at least three occasions. *Id*. The defendant's picture differed slightly from most of the other photographs, in that his photograph was not a mug shot. *Id*. at 23-24. During this three month period, the woman saw the defendant in a restaurant and she heard his voice. She notified police and they showed her another photo array, but she still could not identify anyone. *Id.* at 24.

Police arrested the defendant and placed him in a lineup. The woman asked him to speak and she was suddenly able to identify him as the perpetrator. *Id*. At trial, she identified him. *Id*.

Our Supreme Court concluded that based on the totality of the circumstances, this identification process was unnecessarily suggestive and the Commonwealth failed to establish that the in-court identification had an independent basis in the witness' observations at the time of the incident. *Id*. The repetitive display of the defendant's photograph, along with the fact that the defendant's photograph was different, increased the danger that the process could lead to misidentification. *Id*. at 24-25. Furthermore, when viewing the totality of the circumstances, the Court concluded that the witness' in-court identification did not originate in her observations at the time of the homicide. She had little opportunity to view the perpetrator, her description of the perpetrator was general, and her description of the age of the perpetrator did not match the defendant. *Id*. at 25. Finally, only after

Respondents' Exhibit 49

three months of repeated viewings of his photograph was the witness able to recognize the defendant. *Id.* Since this pretrial identification procedure was so suggestive, the Court reversed the defendant's conviction and granted him a new trial. *Id.*

The situation in *Fowler* has many similarities to Matthew's case. For example, Saday was unable to identify Matthew as a perpetrator until fourteen months after the incident and after she reviewed his photograph in arrays multiple times. Also, like the situation in *Fowler*, Saday provided a description of Matthew that did not match his physical characteristics. Her description of Matthew's height and weight differed significantly and the rest of the information that she provided about the perpetrator was very general. There are many light-skinned black males with mini-afros and facial hair who own black clothing. Like the situation in *Fowler*, the suggestive identification procedure here tainted Saday's in-court identification of Matthew. *Cf. Commonwealth v. Davis*, 17 A.3d 390, 394-95 (Pa. Super. 2011) (an independent basis for the identification existed, even though the identification was suggestive, since the witness described the defendant in detail to police and the description remained unchanged throughout the pendency of the case, the witness identified the defendant quickly and decisively, and the witness observed the defendant from several feet away).

62

Respondents' Exhibit 49

In the present case, Saday failed to identify Matthew as the perpetrator until fourteen months after the incident, after police had presented her with his picture multiple times and told her that they had the perpetrators in custody awaiting trial. This taint affected her in-court identification, especially considering that she was also unable to provide reliable details about Matthew to police and she misidentified someone in a photo array. For these reasons, any evidence relating to her identification of Matthew should have been suppressed.

Respondents' Exhibit 49

**IV.   THE TRIAL COURT'S IMPOSITION OF THE MANDATORY MINIMUM SENTENCE UNDER 42 PA.C.S. § 9712, AN UNCONSTITUTIONAL STATUTE, WAS ILLEGAL SINCE THE FACTFINDER NEVER FOUND THE REQUIRED FACTS BEYOND A REASONABLE DOUBT FOR THE IMPOSITION OF THE MANDATORY.**

Based on the United States Supreme Court holding in *Alleyne v. United States*, 133 S.Ct. 2151 (2013), and the recent holdings in *Commonwealth v. Valentine*, 101 A.3d 801 (Pa. Super. 2014) and *Commonwealth v. Newman*, 99 A.3d 86 (Pa. Super. 2014), Matthew's mandatory sentence, imposed under 42 Pa.C.S. § 9712, is illegal and unconstitutional. As required by *Alleyne,* the jury never made the determination that the mandatory elements applied based on proof beyond a reasonable doubt; thus, the imposition of the mandatory sentence is illegal here.

A claim raising the legality of the sentence is not waivable and can be entertained by the appellate court as long as that court has jurisdiction. *Commonwealth v. Munday*, 78 A.3d 661, 664 (Pa. Super. 2013) (citation omitted). A claim implicating the rule in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), presents an illegal sentencing claim. *Munday*, 78 A.3d at 664 (citation omitted). This is the type of illegal sentencing claim presented in the instant case and it cannot be waived.

In *Apprendi*, the United States Supreme Court held, "Other than the fact of a prior conviction, any fact that increases the penalty for a

64

Respondents' Exhibit 49

crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000). The Court also noted that it is unconstitutional for the legislature to remove from the factfinder the assessment of facts that increase the range of penalties to which a defendant is exposed and such facts must be established by proof beyond a reasonable doubt. *Id.* (citations and quotations omitted).

The Supreme Court went further in *Alleyne v. United States*, 133 S.Ct. 2151, 2155 (2013), stating that, "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Id.* (citations omitted) Under *Alleyne*, the jury, as factfinder, must make this decision based on proof beyond a reasonable doubt. *Id.* at 2160-61 (citations omitted).

In *Commonwealth v. Newman*, 99 A.3d 86, 89-90 (Pa. Super. 2014), even though the appellant initially failed to challenge his mandatory sentence based on *Alleyne* on direct appeal, the appellant was able to raise this illegal sentencing question for the first time in an application for reconsideration/reargument since the legality of the sentence could not be waived on appeal. *See also Valentine*, 101 A.3d at 809 (even though the appellant did not raise the claim that 42 Pa.C.S. § 9712 was

Respondents' Exhibit 49

unconstitutional before the trial court, this issue was not waived on appeal because the application of a mandatory minimum was an illegal sentencing issue).  As such, in the present case, even though this illegal sentencing claim was not preserved below, it can be raised for the first time on appeal.

The application of the mandatory under section 9712 is illegal in Matthew's case since that statute is unconstitutional under *Alleyne* and the jury never made the determination beyond a reasonable doubt whether all of the factors applied in order to validly impose the mandatory on Matthew.

In the recent Superior Court case, *Commonwealth v. Valentine*, this Honorable Court confirmed that the mandatory sentencing statute, 42 Pa.C.S. § 9712, which was the sentencing statute utilized in Matthew's case, was unconstitutional under both *Alleyne* and *Newman* since the sentencing judge decided that these elements applied based on the wrong burden of proof.  *Valentine*, 101 A.3d at 811-12.

In the instant case, when Matthew was sentenced, according to the language in section 9712, the Commonwealth had to demonstrate to the sentencing court by a preponderance of the evidence that Matthew visibly possessed a gun and the victim was placed in reasonable fear of death for the mandatory to apply.  42 Pa.C.S. § 9712. However, under *Alleyne*, any facts that lead to an increase in the mandatory minimum are elements of the crime and must be addressed by the jury and proven beyond a reasonable doubt.  *Valentine*, 101 A.3d at 809 (citation omitted).  The

Respondents' Exhibit 49

0621

*Alleyne* decision renders Pennsylvania's mandatory minimum statutes, such as section 9712, infirm since they permit a sentencing judge to automatically increase a defendant's sentence based on a preponderance of the evidence standard. *Id*. at 811-12 (citations and quotations omitted). *See also Newman*, 99 A.3d at 103 (*Alleyne* rendered 42 Pa.C.S. § 9712.1 unconstitutional so the application of the mandatory minimum under section 9712.1 cannot stand).

The sentencing court in the present case found by a preponderance of the evidence that certain facts were proven to support the imposition of the mandatory, even though the facts, such as whether Matthew visibly possessed a firearm, were never specifically submitted to the factfinder to find beyond a reasonable doubt. "[A]ny fact that served to aggravate the minimum sentence must be found by a jury beyond a reasonable doubt." *Newman,* 99 A.3d at 96. This finding by the sentencing court based on a preponderance of the evidence standard makes the sentence illegal.

In conclusion, since the sentencing court, rather than the jury, found by a preponderance of the evidence, rather than beyond a reasonable doubt, that the unconstitutional mandatory sentencing statute applied at counts three and six, Matthew is entitled to a new sentencing hearing without consideration of this unconstitutional sentencing provision.

Respondents' Exhibit 49

## **CONCLUSION**

For the foregoing reasons, Matthew requests that this Honorable Court vacate the judgment of sentence, remand to the trial court for a new trial, remand to the trial court for resentencing, or grant any other relief that law and justice require.


Respectfully Submitted,

ELLIOT HOWSIE
Public Defender

BRANDON P. GING
Deputy - Appellate Division


_____*/s/ Victoria H. Vidt*_____
VICTORIA H. VIDT
Assistant Public Defender
PA I.D. # 67385
Appellate Counsel
Counsel of Record

Respondents' Exhibit 49

0623

## **CERTIFICATE OF COMPLIANCE**

The applicable portions of the Brief for Appellant do not exceed 14,000 words.

Respectfully submitted,

*/s/ Victoria H. Vidt*

VICTORIA H. VIDT
Assistant Public Defender
PA I.D. # 67385
Appellate Counsel
*Counsel of Record*

Respondents' Exhibit 49

IN THE SUPERIOR COURT OF PENNSYLVANIA
WESTERN DISTRICT

_____

COMMONWEALTH OF PENNSYLVANIA,
        Appellee

      v.                                  92 WDA 2016

MATTHEW EBO,
           Appellant

## PROOF OF SERVICE

      I, Victoria H. Vidt, Assistant Public Defender and Appellate Counsel, hereby

certify that a true and correct copy of this Appellant's Brief have been served by e-

delivery upon the following counsel of record:

> Michael W. Streily, Deputy District Attorney
> Office of the District Attorney
> Appellate Division
> 401 Allegheny County Courthouse
> 436 Grant Street
> Pittsburgh, PA 15219

Respectfully submitted,


_____ */s/ Victoria H. Vidt* _____

VICTORIA H. VIDT
PA I.D. # 67385
Appellate Counsel
Counsel of Record


DATE:  May 16, 2016

Respondents' Exhibit 49