Received 6/24/2016 2:14:41 PM Superior Court Western District

Filed 6/24/2016 2:11:00 PM Superior Court Western District
92 WDA 2016

IN THE

SUPERIOR COURT OF PENNSYLVANIA

PITTSBURGH DISTRICT
_____

NO.  92   WDA  2016
_____

COMMONWEALTH OF PENNSYLVANIA,
*Appellee*

V.

MATTHEW EBO      ,
*Appellant*
_____

BRIEF FOR APPELLEE
_____

Appeal from the Judgment of Sentence entered November 28, 2012 at No. CP-02-CR-02821-2012 in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division as made final by the denial of post sentence motions on June 26, 2013 and denial of the motion for new trial on December 22, 2015 pursuant to the remand Order of this Court at No. 1194 WDA 2013.
_____

STEPHEN A. ZAPPALA, JR.
*District Attorney*

MICHAEL W. STREILY*
*Deputy District Attorney*
PA. I.D. NO. 43593

Office of the District Attorney
401 Allegheny County Courthouse
Pittsburgh, Pennsylvania 15219-2489
(412) 350-4377

***Counsel of Record**

Respondents' Exhibit 50

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT .................................................................. 1

ARGUMENT ............................................................................................ 2

    I.    THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING APPELLANT'S REQUEST FOR A NEW TRIAL ON THE BASIS OF AFTER-DISCOVERED EVIDENCE. ........................................ 2

    II.   THE TRIAL COURT DID NOT ERR IN ADMITTING EVIDENCE OF A SUBSEQUENT SHOOTING INCIDENT INVOLVING CO-DEFENDANT CRUMBLEY. ................................................................... 21

    III.  THE TRIAL COURT DID NOT ERR IN ADMITTING TESTIMONY CONCERNING MS. ROBINSON'S IDENTIFICATION OF APPELLANT IN A PHOTO ARRAY AND DID NOT ERR IN ADMITTING MS. ROBINSON'S IN-COURT IDENTIFICATION OF APPELLANT. ......................................................................................... 44

    IV.  42 PA.C.S.§99712 HAS BEEN FOUND UNCONSTITUTIONAL ............. 54

CONCLUSION ......................................................................................... 55

CCERTIFICATE OF COMPLIANCE............................................................. 55

Respondents' Exhibit 50

0627

<u>Cases</u>

*Commonwealth v. Brown,* 359 A.2d 393 (Pa. 1976) ...................................................... 34

*Commonwealth v. Clayton,* 532 A.2d 385 (Pa.1987) ..................................................... 34

*Commonwealth v. Collins,* 703 A.2d 418 (Pa. 1997) ..................................................... 39

*Commonwealth v. Dennis,* 618 A.2d 972 (Pa. 1992) ..................................................... 34

*Commonwealth v. Evans,* 481 A.2d 625 (Pa. Super. 1984) reversed on other grounds

    512 A.2d 626 (Pa. 1986) ...................................................................................... 39

*Commonwealth v. Flamer,* 53 A.3d 82 (Pa. Super. 2012) .............................................. 38

*Commonwealth v. Fulmore,* 25 A.3d 340 (Pa. Super. 2011) .......................................... 52

*Commonwealth v. Green,* 505 A.2d 321 (Pa. Super. 1986) ..................................... 26, 39

*Commonwealth v. Hoover,* 16 A.3d 1148 (Pa. 2011). .................................................... 25

*Commonwealth v. Kendricks,* 30 A.3d 499 (Pa. Super. 2011) ...................................... 45

*Commonwealth v. Moore,* 633 A.2d 1119 (Pa. 1993) .................................................... 44

*Commonwealth v. Mosteller,* 284 A.2d 786 (Pa. 1971) ........................................... 16, 20

*Commonwealth v. Reid,* 626 A.2d 118 (Pa. 1993) ......................................................... 35

*Commonwealth v. Robinson,* 721 A.2d 344 (Pa. 1998).................................................. 42

*Commonwealth v. Sherwood,* 982 A.2d 483 (Pa. 2009)................................................. 25

*Commonwealth v. Tolbert,* 670 A.2d 1172 (Pa. Super. 1995) ....................................... 34

*Commonwealth v. Valentine,* 101 A.3d 801 (Pa. Super. 2014) ..................................... 54

Respondents' Exhibit 50

0628

*Commonwealth v. Watley,* 81 A.3d 108 (Pa. Super. 2013) ........................................... 54

*State v. Collins,* 10 A.3d 1005 (Supreme Court of Connecticut, 2011)......................... 38

*United States v. Snead,* 447 F.Supp. 1321 (E.D.Pa.).............................................. 34, 35

<u>Rules</u>

Pa.R.A.P. 2117 .......................................................................................................... 21

Pa.R.A.P. 302 ........................................................................................................... 21

Respondents' Exhibit 50

## SUMMARY OF THE ARGUMENT

Judge Lazzara properly found that the statement of recantation was not truthful and does not warrant a new trial.  Ms. Robinson took the stand and explained why she lied in the statement; and totally disavowed its content.  Once again under oath she testified that she saw appellant shoot the victim.

Given the evidence that appellant and co-defendant Crumbley conspired and acted as accomplices to kill Mr. Mattox, evidence establishing that the murder weapon was subsequently fired in a vehicle in which Crumbley was riding, and was later recovered, was relevant in establishing appellant's identity/guilt as an accomplice and principle in the murder as well as in the conspiracy to murder Mr. Mattox.

In the present case, police did not suggest that Ms. Robinson should pick out appellant's photograph, Ms. Robinson explained her inability to select appellant's photo from earlier arrays, and she also affirmatively stated that she hadn't seen appellant's photograph on television or social media; which she again repeated at the evidentiary hearing held pursuant to this Court's Order.  She selected his photo from the array because, in her own testimonial words: "I seen him shoot the victim."  This Court has ruled 42 Pa.C.S. §9712 to be unconstitutional.

1

Respondents' Exhibit 50

0630

<u>ARGUMENT</u>

I.      THE TRIAL COURT DID NOT ABUSE ITS DISCRETION IN DENYING APPELLANT'S REQUEST FOR A NEW TRIAL ON THE BASIS OF AFTER-DISCOVERED EVIDENCE.

On August 7, 2015 this Honorable Court issued the following

PER CURIAM ORDER at 1194 WDA 2013:

> We grant Appellant's Petition for Remand, and remand this case for an evidentiary hearing and a determination of whether a new trial is warranted based on after discovered evidence.  ***See*** Pa.R.Crim.P. 720(C).
> We direct the trial court to schedule a hearing on this matter within ninety days of remand.  The Prothonotary is directed to remove this matter from the argument list of Tuesday, August 11, 2015.  Jurisdiction relinquished.

Initially the Commonwealth takes issue with appellant's claim that the prosecutor misrepresented facts to the trial court at the evidentiary hearing held pursuant to the Order of this Court.  With all respect to appellant, it is his brief to this Court that is misleading and inaccurate. Appellant asserts the following:

> Notably, at the evidentiary hearing on this matter, Assistant District Attorney Stadtmiller argued that Saday was not the only witness at trial who implicated Matthew.  *This is wholly incorrect.*  Mr. Stadtmiller claimed that Richard Carpenter testified as an eyewitness as well.  Mr. Carpenter <u>never</u> testified in this case. (…)

Brief for Appellant at p.29 (emphasis in original).

During the trial, counsel for co-defendant Crumbley elicited the

2

Respondents' Exhibit 50

following testimony from Detective Anthony Perry, Allegheny County Police, Homicide Division, to which appellant's counsel <u>did not</u> object:

> Q     What happens between July 30, 2011 and three weeks ago when you showed her Asa Thompkins' photo array again in this case that made him not a suspect?
>
> A     By all witnesses' accounts there were two individuals that shot Mr. Mattox.  We believe we have the two individuals that shot Mr. Mattox so - -
>
> Q     So, other than Mr. Crumbley being arrested and Mr. Ebo, what happened in the case?  What information did you have between the photo array right before trial that caused Asa Thompkins to be eliminated as a suspect?
>
> A     By all witnesses' accounts there were two individuals that shot Mr. Mattox.  We had two eyewitnesses come forward and pick the defendants, two defendants, so there were no other people that were suspects at that time.

> \*          \*          \*          \*

> Q     So Richard Carpenter - - because Richard Carpenter identified Mr. Crumbley as an actor in this case, that's why Asa Thompkins became a non-suspect or was not a suspect anymore, is that your testimony?
>
> A     Because Richard Carpenter identified Mr. Ebo and Mr. Crumbley and we had information from other eyewitnesses that there were only two shooters, that's why Mr. Thompkins was not ruled out but he wasn't a suspect anymore.
>
> Q     And did you show Mr. Crumbley's photo array or Mr. Ebo's photo array to any other eyewitnesses before Mr. Carpenter picked Mr. Crumbley and Mr. Ebo out?
>
> A     No.

> \*          \*          \*          \*

> Q     Do you consider him a credible witness?
>
> A     I do.
>
> Q     So solely based on Mr. Carpenter's word Asa Thompkins, the guy who got arrested with the murder weapon and was

3

Respondents' Exhibit 50

eliminated as a suspect in this case?

A    No, based on Miss Robinson's picking the individuals out of a photo array, based on independent eye witnesses who say there were only two shooters who shot Mr. Mattox and based on Mr. Carpenter's picking out the two defendants from a photo array, that's what we based - - again, I want - - I don't want to say ruled out, that's why Asa Thompkins wasn't a suspect.

TT 362-363; 364-366. [1]

At the evidentiary hearing Deputy District Attorney Stadtmiller stated the following in regards to that testimony:

And if you believe the tape and the letter over what you have observed in person, then at that point you would apply the test and determine whether they are entitled, the defendants are entitled to a new trial.

As part of that, you would be able to look at the other evidence in the case in addition to Ms. Robinson's testimony. And we all lived this case for how long, but just to briefly remind the Court, the identification of Richard Carpenter was brought into the case, identifying both defendants as having been the shooter. The gun was connected to an associate of Mr. Crumbley, and was involved in a shoot-out in Swissvale being fired from Mr. Crumbley's car. That would be the murder weapon. So there was additional - - and the burning of the victim's, Mr. Mattox's car by a relative of Mr. Crumbley. All of that additional evidence, we would submit, a jury could find beyond a reasonable doubt absent testimony of Ms. Robinson.

HT 70-71.

_____

[1]    Numerals preceded by the leters "TT" refer to pages of the trial transcript. "HT" will refer to pages of the hearing held pursuant to this Court's remand Order.

4

Respondents' Exhibit 50

0633

Deputy District Attorney Stadtmiller was entirely correct in his recitation to Judge Lazzara.  The identification of Richard Carpenter was brought into the trial and it was noted that he identified both defendants as being involved in the shooting.  **Mr. Stadtmiller did not argue that Mr. Carpenter actually testified**. And certainly, after hearing the testimony elicited by Crumbley's counsel and not objected to by appellant's counsel, the jury knew that Ms. Robinson was not the only witness who implicated appellant in the shooting.  Appellant's lack of candor and effort to mislead this Court by casting unwarranted allegations of misconduct onto the prosecutor is disturbing.

At trial Ms. Saday Robinson identified appellant as one of the shooters.   This shooting occurred right outside of Ms. Robinson's apartment.  She watched the whole incident, which lasted between 5 and 10 minutes.  When the actors exited the building they were approximately 10 feet from her window.   When they shot the victim, they were approximately 70 feet from her window.  Ms. Robinson had the opportunity to look at appellant's face.   She had seen appellant in the apartment complex on prior occasions:

> Q    When you were living in Leechburg Garden Apartments you said that you saw Mr. Ebo a number of times before the shooting?
> A    Yes.

Respondents' Exhibit 50

*          *          *          *

Q      I'm talking about the day of the shooting.

A      Oh, I seen him when he came out my front building door.

Q      How long did this whole incident last until they left in the car?

A      I want to say about ten minutes.

Q      Okay.  Did you watch the whole time or part of the time?

A      I watched the whole thing.

Q      Someone told you MO did it, someone told you Mac-Mac did it, you said earlier you didn't know anyone by those names. Did you pick out Mr. Ebo's picture because someone told you Mo and Mac-Mac did it or did you pick him out because you recognized him?

A      Because I recognized him.

Q      When you picked out his picture did you know - - did you yet know anybody - - know anybody named Mo or Mac-Mac?

A      No.

Q      Did you know Mr. Ebo's name when you picked his picture out?

A      No.

*          *          *          *

Q      Why did you pick him out of the photo array?

A      Because I seen him shoot the victim.

Q      Did you see his face?

A      Yes.

Q      Had you seen him before that?

A      Yes.

Q      How many times?

A      About three or four times.

Q      Those three or four times how close were they, where was it you did see him?

A      In the building behind me.

Q      That's in Leechburg Garden Apartments?

A      Yes.

Q      And how far in advance of the shooting on May 16 of 2011 did you see him in that complex?

A      I seen him probably a week after the shooting.

Q      How about before the shooting?

6

Respondents' Exhibit 50

A      A couple of days, I'm not quite sure.

Q      How many times did you see him before the shooting?

A      Three or four times.

                *                  *                  *                *

Q      Do you remember telling them that you could absolutely pick out the light-skinned actor if you saw him again because you had seen him numerous times in the complex but that you could not be certain of the other male as he had a hoody over his head?

A      Yes.

                *                  *                  *                *

Q      Did you have any trouble seeing?

A      No.

Q      Could you see their faces?

A      Yes.

Q      Did either of them have a hoody on?

A      Yes.

Q      Who did?

A      The gentleman in the yellow shirt.

Q      So Crumbley had a hoody on?

A      Yes.

Q      How could you see his face then?

A      When he was going back to the car

Q      Had you ever seen his face before that day?

A      Yes.

Q      Where?

A      In the apartment building.

Q      How many times would you say you had seen him before you saw him do this killing?

A      About two or three times I seen him up there.

Q      Did you ever see Mr. Ebo before?

A      Yes.

Q      Where?

A      At Leechburg Gardens.

Q      About how many times?

A      The same amount, two or three times.

Q      Did you ever see them together?

7

Respondents' Exhibit 50

A      Yes.

*          *          *          *

Q      This event that you have described to the jury observing, how long did it last from the time you heard the banging upstairs, coming outside, the shootings, the shot to the head and driving off in the case, how much time elapsed?

A      About ten minutes.

Q      Of this ten minutes how much of that time were they outside for you to observe them?

A      About five.

Q      Was there anything covering defendant Ebo's face during that five minutes?

A      No.

Q      How good a look did you get at Mr. Crumbley who had the hoody on?

A      I got a good look.

*          *          *          *

Q      Before you came back to look at the photo arrays, did you indicate whether you would be able to pick the suspect out of the photo arrays?

A      Yes.

Q      What did you say?

A      I said that I would be able to pick them out.

Q      Why did you think you would be able to pick them out?

A      Because I seen their faces.

Q      It had been 15 months, were you concerned that you wouldn't be able to?

A      No.

Q      Why?

A      Because their faces were stuck in my head.

(TT 177, 178-179, 44, 48, 536-537, 538, 547).

Ms. Robinson thus had a clear sight of the shooting and watched the entire event unfold.  Nothing interfered with her observation of

8

appellant's face.  She was familiar with appellant, having seen him before.

The jury knew that she was a young woman of 20 with a young son and

she was afraid to get too involved with the police investigation, given the

fact that informants often got killed and her own family advised her not to

identify the shooters.   She honestly admitted to intentionally failing to

identify appellant in various photo arrays because she was fearful.  It was

not until she had moved out of state that she felt secure enough to fully

cooperate with the investigation:

> Q     This happened in May and you testified earlier that you
> told the police you had seen them before and can I.D. them, do
> you remember that?
> A     Yes.
> Q     In the end of September of 2011, about four months after,
> did the police show you this photo array, No. 51, with these
> pictures and the picture of Mr. Crumbley in it?
> A     Yes.
> Q     Did you see Mr. Crumbley in that photo array?
> A     Yes.
> Q     Did you recognize him?
> A     Yes.
> Q     Did you tell the police that's him at that time in September
> of 2011?
> A     No.
> Q     Why not?
> A     Because my friends and family were telling me not to get
> involved and I was scared.
> Q     Why were you supposed to not be involved?
> A     Because they didn't want something to happen to me.
> Q     Same thing with this photo array, Commonwealth Exhibit
> 52, the one with defendant Ebo in it.  Did you see this photo
> array in early November of 2011?
> A     Yes.

Respondents' Exhibit 50

Q      And did you recognize Mr. Ebo when you saw it in 2011?
A      Yes.
Q      And did you point him out for the police at that time?
A      No.
Q      Why not?
A      Because I was scared and my friends and family told me not to get involved.

          *          *          *          *

Q      What changed between September and November and July of 2012 that you decided to testify here today and to pick these two men out of the photo array?
A      Well, me and my girlfriend were talking and she said if it was the right thing to do, she told he what if it was my brother or my uncle or someone.
Q      Has your new location had any impact on your desire to testify?
A      Yes.
Q      Why is that?
A      Because I was far away.

TT 547-550.

While appellant's original appeal was pending before this Court at 1194 WDA 2013 he requested a remand to explore a claim of after-discovered evidence, asserting that Ms. Robinson had provided a statement recanting her trial testimony and would now testify that she had not seen appellant shoot the victim.  On August 7, 2015 this Court issued

Respondents' Exhibit 50

an Order remanding this case for an evidentiary hearing.[2]   A hearing was held before Judge Lazzara on October 29, 2015.   At that hearing Ms. Robinson testified that her trial testimony was true and accurate and that the statement she had provided to appellant's investigator after trial was a lie she had made up due to the fact that she had been both threatened with bodily injury and promised $25,000 if she changed her trial testimony. Thus, to the extent that appellant now asserts that Ms. Robinson offered recanted "testimony" that is inaccurate.  **Ms. Robinson's testimony at the hearing ordered by this Court was that her trial testimony was accurate, that she had only made the statement out of fear and a desire to get money, that the statement was a lie, and that she had seen both appellant and his co-defendant shoot the victim, just as she had testified at trial**:

> Q    So you met with the investigator.  Was anybody with him?
> A    One of his associates.
> Q    And you met with them at McDonald's, is that right?
> A    Yes.
> Q    Did you discuss the case with him?
> A    Yes.
> Q    Do you remember what you told him?

---

[2]    This Court subsequently remanded appellant's co-defendant's case for the same hearing.  That appeal had been filed at No. 1997 WDA 2012 (Commonwealth v. Thomas Crumbley).

Respondents' Exhibit 50

**0640**

A    A lie pretty much.
Q    What was the lie that you told him?
A    That the police had me point out Mr. Crumbley and that I didn't see anything, pretty much.
Q    So you told a lie?
A    Yes.
Q    But you had agreed to meet with him?
A    Yes.  I had no choice.
Q    Why did you have no choice?
A    I was threatened.
Q    By whom?
A    I want to say my nephew's aunt.  I don't know her name. Whatever her name is, she threatened me.  First I was offered money, then I was threatened.
Q    Were you threatened directly?
A    Over the phone.

HT at 12-13;

Q    Did you tell Mr. Fox, the investigator, that you had been threatened or offered something?
A    No, I didn't know if he knew anything about it.  The girl told me not to say anything to him.
Q    So when you met with them, you gave them a statement where you said basically that you lied when you made the identification of the defendants, is that right?
A    Yes.

HT at 14;

Q    When you were contacted by Mr. Fox about your attendance at a hearing, such as today, did you tell him I can't testify because what I said was a lie?
A    No.  I told him that I will not testify because I will not help a guilty person get out of jail.

HT at 18;

Q    So how was it that you came to appear here today?
A    I chose to tell the truth.  I don't want a guilty person out of jail.

Respondents' Exhibit 50

He belongs in jail.  We don't need a new hearing.

Q      I'm sorry.  I didn't understand your last comment.

A      He belongs in jail.  He is guilty, he doesn't deserve to be on the streets.

HT at 19;

Q      But still over the course of some time back in 2014 you had extended conversations with the investigator, Mr. Fox, where you indicated, no, I want to get this off my chest, I didn't tell the truth about the identification?

A      I'm going to put it to you this way.  I'd rather have lied than lose my life.  Okay.

Q      You would rather have lied than lose your life?

A      Yes.

Q      So you were that afraid of losing your life, is that correct?

A      Yes.

Q      But you didn't contact any authorities to say they are doing this to me?

A      Because I thought if I make the video and the statement they would leave me alone.  There you go.  They offered me $25,000.

Q      Who offered you $25,000?

A      I don't know if it was Mr. Crumbley or Ebo.  I don't know.  The lady said, they are willing to pay you $25,000 if you make the video and a statement, and if not, it will be a cat and mouse game and you know what happens.

HT at 22-23;

Q      Is it safe to say that - - first of all what was the threat that was issued against your life over the phone?  Do you remember the exact words?

A      This is a cat and mouse game and you already know what happens to the mouse.

Q      What did that mean to you?

A      I took it as a threat, like, a cat chases a mouse.  When a cat catches a mouse, the cat kills the mouse, and I'm the mouse.

Q      And you also said they kept finding you, who is they?

A      I don't know if it's his people, but my nephew's people because of my family.

13

Respondents' Exhibit 50

Q      And you said they kept finding you?  Were you moving?
A      Yes.
Q      And each time you moved, they would find you again?
A      Yes.
Q      And what would they talk to you about when they found you again?
A      Pretty much the same thing, can you testify, make a statement. If not, feel sorry for you.  If you don't - - if you do, it's beneficial to you.
Q      And they offered you $25,000 to give the statement?
A      Yes.
Q      And did you ever receive $25,000?
A      No.
Q      You didn't go to the police because they threatened your life?
A      Yes.
Q      You thought if you went to the police they might follow through?
A      Yes.
Q      Your son, how old is he now?
A      Nine.
Q      When you gave this taped statement and wrote the letter, it was your impression that that would end this all and they would just leave you alone?
A      Yes.
Q      Specifically, in the letter that you wrote, where you said you could not I.D. the two guys that shot and killed Todd Mattox, that's a lie?
A      Yes.
Q      You were able to see them?
A      Yes.
Q      And you identified them in court?
A      (Indicating).
Q      You did.  Not right now, but you did in court before?
A      Yes.
Q      And that was the truth?
A      Yes, it was.
Q      And the people that you saw do the shooting, are there here in court today?
A      Yes, they are.
Q      Point them out for the judge.
A      Right there (indicating).

14

Respondents' Exhibit 50

0643

MR. STADTMILLER:   May the record reflect she has identified Defendants Crumbley and Ebo?

THE COURT:  The record will so reflect the identification.

BY MR. STADTIMILLER:

Q      You said you were at your mom's house and she knew why you did this?
A      Yeah.
Q      What did she know?
A      Originally I was coming up there to see my son anyway.  And when I got up there I told her what happened, and she said, well, you might as well do it and just get the money so they don't kill you and it will just be all over.
Q      You told her about the threats and about the bribe?
A      Yeah.
Q      And she said just get it over with?
A      Uh-huh, and just do it.  Tell them to come here.  You guys can make the video and the statement in the dining room and I'll just close the door for you guys.
Q      Well, the video that you made pretty much is everything that you wrote in the letter, right?
A      Pretty much, yes.
Q      So is the video a lie also?
A      Yes, it's a fraud.

HT 25-29.

The standard of review applied to claims of after-discovered evidence and recantation testimony is well established:

This Court has often reiterated that:

'. . . 'A new trial in a criminal case will be awarded on the ground of after-discovered evidence where the evidence in question (1) has been discovered after the trial and could not have been obtained at or prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely

15

Respondents' Exhibit 50

corroborative or cumulative; (3) will not be used solely for impeaching credibility of a witness; and (4) is of such nature and character that a different verdict will likely result if a new trial is granted.''

Commonwealth v. Coleman, 438 Pa. 373, 376-377, 264 A.2d 649, 651 (1970).

Our general view of recanting testimony is equally settled:
> 'The well-established rule is that an appellate court may not interfere with the denial or granting of a new trial where the sole ground is the alleged recantation of state witnesses unless there has been a clear abuse of discretion. Commonwealth v. Green, 387 Pa. 515, 128 A.2d 577 (1957); Commonwealth v. Sholder, 201 Pa.Super. 642, 644-645, 193 A.2d 632 (1963).

> 'Recanting testimony is exceedingly unreliable, and it is the duty of the court to deny a new trial where it is not satisfied that such testimony is true. Commonwealth v. Scull, 200 Pa.Super. 122, 130, 186 A.2d 854 (1962). There is no less reliable form of proof, especially when it involves an admission of perjury. Commonwealth ex rel. Leeper v. Russell, 199 Pa.Super. 93, 96, 184 A.2d 149 (1962), Commonwealth v. Sholder, supra.'

*Commonwealth v. Mosteller,* 284 A.2d 786, 788 (Pa. 1971).

Contrary to appellant's assertion the court's decision in *Mosteller, Id.,* does not compel relief in this case.  In *Mosteller,* the victim was a 15 year old girl who had testified that her father had sexually assaulted her.   Shortly after the alleged attack the victim's mother examined her genitals and saw nothing to indicate that she had had intercourse.   The day after the alleged incident of sexual intercourse the

16

Respondents' Exhibit 50

victim was examined at a hospital and showed no sign of physical trauma in her genital area.  Witnesses who saw the victim after the alleged attack testified that she did not appear upset in any way.  Two days after the verdict the witness alleged that her testimony had not been true.  Witnesses then came forward to testify that the victim had told them before the trial that no assault had occurred.  And the victim testified at a hearing, despite being warned of possible perjury, that she had lied at her father's trial.  *Id.,* 284 A.2d at 787-788.  Under these unique circumstances, the court decided that a new trial was required.

That is not the case herein.  Ms. Robinson had always been a reluctant witness due to her concern that she might be killed for being a "snitch."  The recanting statement was not made voluntarily; it was made under threat of harm and the promise of money.  Ms. Robinson was being hounded by people demanding that she recant, and she was scared.  At the hearing she testified that the statement was a lie and that her trial testimony, identifying appellant as one of the shooters, was accurate and truthful. Ms. Robinson was never informed by appellant's investigator that recanting could subject her to perjury (HT 24-25).  She continued to hold firm to her prior testimony that she had not seen appellant's photo on the internet until after the trial (HT 35).  The issue should be affirmed on the

Respondents' Exhibit 50

basis of the trial court's Opinion:

>As noted by the parties, Saday Robinson provided testimony at the October 29, 2015 evidentiary hearing, during which she recanted the statements that she had made to defense investigator Barry Fox in videotaped and handwritten form.  The videotaped and handwritten statements served as the recantation evidence upon which the Defendants have relied in seeking a new trial based on after-discovered/newly discovered evidence.  It should be noted that Ms. Robinson never took an oath to tell the truth prior to giving the videotaped statement and did not write the handwritten statement under penalty of perjury.  During her testimony at the October 29, 2015 hearing, Ms. Robinson explained that the statements that she had made in video and written form were untruthful.  She explained that she had lied to defense investigator Barry Fox because she had been threatened by people associated with the Defendants.  Additionally, she had been offered a substantial sum of money - - $25,000 - - to recant her trial testimony.

>The court paid extremely close attention to Ms. Robinson's demeanor throughout the evidentiary hearing, and it finds highly credible her explanation for why she initially attempted to recant her trial testimony to defense investigator Barry Fox.  Ms. Robinson acknowledged that she is in fear for her life from the Defendants.  Her fear is due, in part, to her knowledge of the reputation of the Defendants, their friends, associates and families, as well as the events she herself witnessed.  She indicated, convincingly, that she would rather have lied than lost her life.  Ms. Robinson was in fear from the Defendants, given that people associated with them kept finding her despite several moves.  Further, she testified credibly that she believed that, if she cooperated with the defense efforts, she would be left alone by the Defendants.  The court also found highly credible her explanation for why she recanted her post-trial recantation statements during the evidentiary hearing.  Ms. Robinson indicated that she did not want guilty people to be let out of jail and that the Defendants deserved to be in jail for what they had done.  Ms. Robinson did not waver in her testimony at the evidentiary hearing and was

Respondents' Exhibit 50

0647

adamant that her post-trial recantation statements were made out of fear and not as a result of any crisis of conscience that she was experiencing as to the certainty of her observations. At the October 29, 2015 hearing, Ms. Robinson very clearly, convincingly, and without hesitation, identified the Defendants as the perpetrators of the murder.  It must be noted that this was the second time that she made her identification of the Defendants as murderers in a courtroom, in the presence of the Defendants and under oath.

This court had the benefit of sitting through the original homicide trial, and it observed firsthand Ms. Robinson's demeanor when she provided the eyewitness account of the brutal murder and identified the Defendants as the perpetrators. Ms. Robinson shook uncontrollably throughout her testimony and was clearly frightened to be involved in the case.  As the Commonwealth noted in its brief, Ms. Robinson had *nothing to gain and everything to lose* by recanting the unsworn recantation statements that she made to Barry Fox.  She continues to place herself in danger of retribution by maintaining her position that the Defendants were the perpetrators of the murder, which makes her identification testimony all the more credible.  The fact that she maintains her identification of the Defendants as murderers when under oath and forced to confront them face-to-face, and in light of her fear of the Defendants based on their reputations, threats made to her, and her inability to remain hidden, makes Ms. Robinson's identification ring with truthfulness and credibility.

Accordingly, after taking into account the strength of Saday Robinson's identification testimony at trial and after finding Ms. Robinson's testimony at the evidentiary hearing credible in all respects, this court finds that a new trial is not warranted under these circumstances.  Given that Ms. Robinson has consistently identified the Defendants while under oath, and given that her identification testimony has been very credible each time, the court does not find that the purported recantation evidence would "likely result in a different verdict if a new trial were granted."  *Commonwealth v. Padillas,* 997 A.2d 356, 363 (Pa. Super. 2010).

As our appellate courts have consistently recognized, "recanting testimony is exceedingly unreliable, and it is the duty

Respondents' Exhibit 50

of the court to deny a new trial where it is not satisfied that such testimony is true." *Commonwealth v. Coleman,* 264 A.2d 649, 651 (Pa. 1970); *See also Commonwealth v. Mosteller,* 284 A.2d 786, 788 (Pa. 1971). Indeed, "a prerequisite to such relief is that the evidence upon which the relief is sought must be credible to the trial court." *Commonwealth v. Loner,* 836 A.2d 125, 135 (Pa. Super. 2003).

For the aforementioned reasons, the court finds that a new trial is not warranted because Ms. Robinson credibly recanted her unsworn recantation statements, and the court finds that her explanation for why she originally made the statements and why she recanted them to be credible, believable and trustworthy.

Opinion at pp. 2-5.[3]

---

[3]     It is noted that there are two Opinions in this case and appellant has failed to attach the Opinion dealing with Issues II and III to his brief.

Respondents' Exhibit 50

0649

II.   THE TRIAL COURT DID NOT ERR IN ADMITTING EVIDENCE OF A SUBSEQUENT SHOOTING INCIDENT INVOLVING CO-DEFENDANT CRUMBLEY.

Initially, the Commonwealth requests that this Honorable Court determine whether the present issue has been properly preserved.   The Commonwealth respectfully disagrees with appellant's statement that the following referenced comment of trial counsel preserved this issue for appellant: "Matthew's counsel joined in the objections made by Crumbley's attorney at the beginning of the hearing on these various pretrial motions and objections. MH 7."   (Brief for Appellant at p.45; see also p.14 of appellant's brief).[4]

Pa.R.A.P. 302 **Requisites for Reviewable Issue** provides in relevant part:

> **(a)   General rule.**   Issues not raised in the lower court are waived and cannot be raised for the first time on appeal.

Pa.R.A.P. 2117(c) **Statement of the Case** requires an appellant to, *inter alia,* reference the portion of the record where the issue was preserved.

_____

[4]   It is noted that some of the transcripts in this case are contained in the record filed at No. 127 WDA 2016 involving co-defendant Crumbley's appeal.

21

Respondents' Exhibit 50

0650

Prior to trial the Commonwealth filed a Notification pursuant to Pa.R.E. 404(b)(2) in which it asserted:

> 2.   At the above trial, the Commonwealth intends to offer evidence tending to prove that the co-defendant, Thaddeus Crumbley has committed other crimes, wrongs, or acts that bear upon the motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. Specifically, the Commonwealth intends to offer evidence tending to prove that:
>
> > (a)  on June 2, 2012 (sic), the co-defendant, Thaddeus Crumbley, was involved in a shootout in Swissvale, Pennsylvania, during which a .40 caliber handgun was discharged in his automobile 8 times.  Eight .40 caliber casings were located by police in Crumbley's vehicle during the investigation of the June 2, 2011 shooting. These .40 caliber casings were matched to one of the two handguns that were used to shoot and kill Todd Mattox in the Criminal Homicide presently before the Court.   A Firearms expert from the Allegheny County Crime Lab will testify that the .40 caliber casings found at the May 16, 2011 Homicide of Todd Mattox and the .40 caliber casings found in the car Thaddeus Crumbley was in during the June 2, 2011 Shooting in Swissvale were all discharged from the same handgun.
>
> 3.   Discovery materials pertaining to evidence of such other crimes, wrongs, or acts have been disclosed to the defendant.
>
> 4.   It is believed and therefore averred that the probative value of evidence of such other crimes, wrongs, or acts outweighs its potential for prejudice, especially in light of the availability of a proper cautionary instruction, in that it places the Murder weapon from the within case in a car with Crumbley 17 days after the Homicide occurred.

Docket Entry 10.

Respondents' Exhibit 50

A similar notification was filed in co-defendant Crumbley's case (see record at No. 127 WDA 2016; docket entry 10).  Crumbley's counsel filed responses to the Commonwealth's pretrial filings and a hearing was held on July 27, 2012 (See Docket Entry 86 in the Crumbley Appeal at No. 127 WDA 2016).   The first issue addressed at that hearing concerned admission of photographs.   The comment of appellant's counsel, which appellant provides to this Court in an effort to demonstrate preservation, was made in response to the issue concerning admission of various photographs, it had nothing to do with the admission of 404(b) evidence:

> MR. STADTMILLER:   There is one that is extremely inflammatory that I am not going to be introducing unless we come to the issue.  It is the skull where the bullet went through the top of the head.   It is not coming in unless something relevant comes in.
>
> MS. WILLIAMS:  My position of these, number one - -
>
> MR. STADTMILLER:  They are not numbered.
>
> MS. WILLIAMS:  Number one, the first picture we were shown, which is a bullet, deformed gray metal bullet core next to an envelope, bullet envelope marked number one, I don't have any objection to on behalf of Mr. Crumbley.  The second photo - -
>
> MR. McKINNEY:  No objection on behalf of Mr. Ebo.
>
> MS. WILLIAMS:   The second photo is a bullet, and it was recovered from the femoral head, and I would object to this being shown in color.   There is blood, it looks like possibly tissue matter, things like that.   I think this photo would be

23

Respondents' Exhibit 50

identical descriptive and of evidentiary value in black and white.
    With respect to number three, which is a bullet core recovered from the lower lumbar spine, we would have no objection to that photo.

THE COURT:  Mr. McKinney?

MR. McKINNEY:  I would join in Ms. Williams' objections and non-objections.

Docket Entry 86, No. 127 WDA 2016, at pp. 6-7.

The comment of appellant's counsel went directly to the issue of the photographs and the "objections" and "non-objections" co-defendant Crumbley's attorney had to the photo (i.e., the color photograph was objectionable but the same photograph in black and white would not be objectionable); not to other issues which had not yet been discussed, and not to the admission of 404(b) evidence.  After the photograph issue was resolved, other issues were dealt with by the court.  The final issue involved the 404(b) evidence:

THE COURT:  Okay.  So the call is in.  I am thinking this is the last issue - - correct me if I'm wrong - - notification of Commonwealth's intention to present evidence of other crimes, wrongs, or acts pursuant to Rule 404(b)(2). (…)

Docket Entry 86, No. 127 WDA 2016, at p.55.  The court heard argument from the Commonwealth and Crumbley's attorney on the issue.  When invited by the court to make an argument, appellant's counsel had "nothing to add" and **did not** join Crumbley's counsel's argument:

24

0653

> THE COURT:  All evidence is prejudicial.  I mean, that's the whole idea behind presenting it.  You would not want to present it if it was not prejudicial.  It is.  Is it more fairly prejudicial is the inquiry.
>
> There is circumstantial evidence of him being the person who was the shooter in the prior incident.  That doesn't mean you can't rebut it.  I think you have good arguments to rebut that, and you can raise those.  I think that all goes to the weight of the evidence as opposed to admissibility.  I am inclined at this point to allow it in.  Mr. McKinney?
>
> MR. McKINNEY:  I have nothing to add, Your Honor.

Docket Entry 86, No. 127 WDA 2016, at p.58.  The issue was not litigated by appellant and he did not explicitly join co-defendant's effort to have the evidence excluded.  When Mr. McKinney wanted to join in a motion which was being litigated by Ms. Williams, he explicitly informed the court of that decision.  **See** TT 34.  The issue is waived.

Even if this Court finds the issue preserved, it lacks merit.

"The admissibility of evidence is a matter for the discretion of the trial court and a ruling thereon will be reversed on appeal only upon a showing that the trial court committed an abuse of discretion." *Commonwealth v. Sherwood,* 982 A.2d 483, 495 (Pa. 2009).  "An abuse of discretion is not a mere error in judgment but, rather, involves bias, ill will, partiality, prejudice, manifest unreasonableness, or misapplication of law." *Commonwealth v. Hoover,* 16 A.3d 1148, 1150 (Pa. 2011).

Respondents' Exhibit 50

The general rule, of course, prohibits testimony regarding unrelated criminal acts of the accused. *Commonwealth v. Beasley,* 505 Pa. 279, 479 A.2d 460 (1984); *Commonwealth v. Reiss,* 503 Pa. 45, 468 A.2d 451 (1983); *Commonwealth v. Davis,* 331 Pa.Super. 285, 480 A.2d 1035 (1984); *Commonwealth v. Shealey,* 324 Pa.Super. 56, 471 A.2d 459 (1984). There are, however, special circumstances justifying exceptions to the general rule: for example, when the evidence of other criminal acts tends to prove (1) motive; (2) intent; (3) absence of mistake or accident; (4) a common scheme, plan, or design embracing the commission of two or more crimes so related to each other that proof of one tends to prove the others; (5) the identity of the person charged with the commission of the crime on trial; or (6) that the evidence is part of the same transaction as the case on trial. *Commonwealth v. Murphy,* 346 Pa.Super. 438, 499 A.2d 1080 (1985); *Commonwealth v. Shirey,* 333 Pa.Super. 85, 481 A.2d 1314 (1984); *Commonwealth v. Thomas,* 328 Pa.Super. 393, 477 A.2d 501 (1984); *Commonwealth v. Shealey, supra; Commonwealth v. Boyd,* 315 Pa.Super. 308, 461 A.2d 1294 (1983). Even if one of these exceptions applies, however, the trial court must balance the need for the evidence against its potential prejudice in order to determine its admissibility. *Commonwealth v. Ulatoski, supra; Commonwealth v. Shirey, supra; Commonwealth v. Middleton, supra.*

*Commonwealth v. Green,* 505 A.2d 321, 324-325 (Pa. Super. 1986).

In the present case the victim, Todd Mattox, was shot to death on May 16, 2011 at the Leechburg Gardens Apartment complex in Penn Hills, Allegheny County.   Saday Robinson testified that on the day of the shooting she lived at the complex in a first floor apartment.   Immediately prior to the shooting she was in her apartment when she heard screaming and loud noises coming from the third floor of her apartment building.   She

Respondents' Exhibit 50

went out into the hallway to investigate but retreated into her apartment as the noises got closer to her first floor apartment.  While looking out her window she saw appellant and Thaddeus Crumbley push Mr. Mattox out the front door.  Both appellant and Crumbley had guns in their hands.  The victim backed up towards the parking lot with his hands in the air while saying to appellant and Crumbley: "Don't shoot me.  I'll give you everything I have."  Appellant fired approximately 3 shots and the victim fell to the ground.  Appellant and Crumbley then ran to a nearby vehicle at which time Ms. Robinson saw the victim pull out a gun while lying on the ground. (Brandon Smith, who also witnessed part of the shooting, also testified that he saw the victim with a gun and it was lying on the ground after the victim was shot.)  Ms. Robinson heard 2 shots being fired as appellant and Crumbley ran towards the car.  After the shots, she saw appellant return to the victim and go through his pockets, taking some of his belongings. Appellant returned to the vehicle at which point Crumbley walked over to the victim and shot him in the head.  Appellant and Crumbley fled in a vehicle which was subsequently set afire by Roman Herring, a cousin to Mr. Crumbley.  Another cousin of Mr. Crumbley's-Craig Clark, provided Mr. Herring with the accelerant used to torch the getaway vehicle (TT 525-640; 939-973).

27

Respondents' Exhibit 50

Police officers and forensic personnel investigating the scene of the shooting found seven .40 caliber shell casings and two 357 Sig shell casings.  Tests revealed that two of the .40 caliber shell casings were fired from one gun; five of the .40 caliber shell casings were fired from another gun; and the two 357 caliber shell casings were fired from a third gun. Thus, three different guns had been fired during the shooting incident involving Mr. Mattox. One spent bullet projectile was found by the victim's head and one was found in a beam of one of the apartment buildings.  No murder weapon was found at the scene and the gun possessed by the victim was missing from the scene when police arrived (TT 277-297; 440-470).

An autopsy revealed that Mr. Mattox had been shot three times. One bullet wound was in his upper back; one wound was in his buttocks and this bullet fractured his hip socket; he had also suffered a fatal bullet wound to his head.  During the autopsy of Mr. Mattox the Medical Examiner recovered 3 bullets from the victim's body.  Two of the bullets, recovered from the back and buttocks wounds, were 9 mm bullets and matched each other.  The remaining bullet from the head wound was not suitable for comparison purposes although rifling characteristics (lands, grooves, twist) were able to be observed (TT 241-261; 440-470).

Respondents' Exhibit 50

On June 2, 2011 at approximately 1:08 a.m. Crumbly was in a vehicle with 2 other people, which was involved in a shootout.  Sergeant Tony Costa of the Swissvale Police was called to the scene.  Upon arrival he saw Crumbley walking down the street while being assisted by a female. Crumbley was bleeding profusely and had been shot.  A male by the name of Asa Thompkins was observed at the scene by Sergeant Costa.  It would later be learned that Mr. Thompkins had been in the vehicle with Mr. Crumbley.  Mr. Thompkins was detained by police and then released (TT 843-859).

A forensic examination of the vehicle in which Crumbley was traveling when shot revealed a number of spent cartridge casings inside the vehicle, confirming that the occupants had also fired shots at whoever was firing at them.  Spent casings were found outside of the vehicle, too.  A 9mm handgun was also found outside the vehicle on the driver's side of the car.  The spent casings in the vehicle were of two different types-9mm and .40 caliber (TT 440-470, 859-938).

On June 9, 2011 Asa Thompkins was a passenger in a vehicle which was stopped by police.  A search of the vehicle revealed a .40 caliber Springfield Armory pistol.  A test fire of that gun resulted in spent

29

Respondents' Exhibit 50

projectiles that had the same characteristics, in terms of lands, grooves, and twist, as one of the spent projectiles recovered from Mr. Mattox's body (the bullet in his head). The .40 caliber casings found at the Mattox shooting matched the casings which were test fired from the gun recovered from Mr. Thompkins:

[Testimony of Raymond Everett, Forensic Firearms Examiner:]

A    The bullets in this case, 40 caliber bullets as I stated before the one projectile was not suitable for identification purposes.  It did not have enough individual characteristics for me to make an identification.  However, it did have the same - - it did have the same rifling characteristics of six lands and grooves with a right-hand twist and those class characteristics were the same as the class characteristics on a Springfield Armory pistol, serial number US365053.  Now, that comparison was made because the item 1A2 cartridge cases though were the five spent 40 caliber S&W caliber cartridge cases, those matched the test cartridge cases from that Springfield Armory pistol with serial number US365053.

 (TT 475; See further TT 440-470, 922-938).

The .40 caliber casings found at the scene of the Crumbley shootout were also determined to have been fired from the Springfield Armory pistol recovered from Mr. Asa Thompkins:

[Testimony of Thomas Morgan, Forensic Examiner:]

Q    And so as to what you examined, how many handguns can you definitively rule in and rule out as being fired at tis

Respondents' Exhibit 50

scene?

A      Once again I didn't perform that actual firearm tool mark examination of all of the evidence here.   There is another scientist that will follow my testimony I believe that will be able to shed some light on that.

Q      Well, I am just asking for your answer as to what you examined.

A      For my answer I did test fire the Springfield Armory pistol that I mentioned before and I did make a comparison with the 40 caliber S&W caliber cartridge casings from the scene.   And what I can say for sure is one firearm was fired.

(TT 901).

Appellant and Crumbley were both charged with the murder of Mr. Mattox; as principals as well as coconspirators.   The evidence of the June 2, 2011 shootout established that Crumbley was present in a vehicle in which a gun was fired and that gun, when fired, left markings on its casings which were identical to the markings found on casings at the Mattox shooting, and also left characteristics on its bullets which were similar to the lands, grooves, and twist on a bullet recovered from Mr. Mattox's body, thus supporting the inference that Crumbley had been involved with appellant in the Mattox shooting and had used that gun to shoot Mr. Mattox in the head, after appellant had brought him to the ground with 2 shots from a 9 mm.   Given the evidence establishing that appellant

Respondents' Exhibit 50

and Crumbley conspired and acted as accomplices[5] to kill Mr. Mattox, any evidence linking Crumbley to the murder was also relevant in establishing appellant's guilt as an accomplice in the murder as well as in the conspiracy to murder Mr. Mattox.  Given the fact that two 9 mm bullets were recovered from the body of Mr. Mattox and appellant was identified as being the individual who first fired his weapon which resulted in Mr. Mattox failing to the ground; and given the fact that forensic evidence proved that a .40 caliber weapon had also been fired and a bullet was recovered in Mr. Mattox's head and testimony established that Mr. Crumbley stood over Mr. Mattox and fired a shot into his head, the evidence was circumstantial evidence which established the conspiracy and supported the credibility of the witnesses who described the separate and shared roles and actions of appellant and Crumbly in the murder.  The trial court explained its rationale in admitting this evidence as follows:

---

[5] "An accomplice knowingly or voluntarily cooperates with or aids another in the commission of a crime. *Commonwealth v. Manchas,* 430 Pa.Super. 63, 633 A.2d 618, 627 (1993), *allocatur denied,* 539 Pa. 647, 651 A.2d 535 (1994). The aid rendered makes that person guilty of the substantive offense."  *Commonwealth v. Tolbert,* 670 A.2d 1172, 1185 (Pa. Super. 1995).

Respondents' Exhibit 50

0661

Evidence of other crimes may be admitted for other relevant purposes, such as "proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident," though such evidence should only be admitted if the probative value of the evidence outweighs its potential for prejudice.   Pa.R.E. 404(b)(2)-(3), *Commonwealth v. Tedford,* 960 A.2d 1, 37 (Pa. 2008).   The particular prejudice that Rule 404(b)(3) seeks to prevent is the misuse of other-offense evidence.   Specifically, the rule is designed to generally eliminate other-offense evidence, unless admissible for some specific purpose as indicated above, so that jurors do not convict a defendant simply because they perceive that the defendant has a bad character or a propensity to commit crimes.   *Reese, supra,* at 723,   Evidence that the defendant possessed a device or instrument that could have been the murder weapon is admissible.   *See Commonwealth v. Miller,* 897 A.2d 1281 (Pa. Super. 2006).   Evidence will not be prohibited merely because it is harmful to the defendant. *Commonwealth v. Dillon,* 925 A.2d 131, 141 (Pa. 2007).  When other-offense evidence is admitted, the Defendant is entitled to request a jury instruction explaining to the jury that the specific evidence was only admitted for a limited purpose. *Commonwealth v. Billa,* 555 A.2d 835, 841-842 (Pa. 1989). The trial court is permitted to use its own form of expression to explain difficult legal concepts to the jury.   *Commonwealth v. Spotz,* 759 A.2d 1280, 1287 (Pa. 2000).

Here, the evidence regarding the shooting on June 2, 2011 and the presence of the Ruger handgun were properly admitted.  While certainly prejudicial to the Defendants, as all evidence tends to be, the evidence of the subsequent bad acts was relevant to make a fact in the case, i.e., whether Defendant Crumbley was present at the scene of the Todd Mattox murder two (2) weeks earlier, more or less probable.  The evidence also was relevant to support the inference that Defendant Crumbley was in possession of the .40 caliber gun used in Mr. Mattox's murder.  Clearly, the evidence of the June 2nd shooting is not dispositive of these issues, but there is no requirement in the law that the evidence of other bad acts be dispositive on some disputed issue.  The jurors had the opportunity to hear

Respondents' Exhibit 50

effective cross-examination on the evidence presented, as well as hear the informed arguments of all counsel on the relevance of the subsequent shooting.

The fact that the jurors found the Defendants guilty of all charges does not mean that they misused the evidence of the June 2nd shooting. Certainly, the strength and compelling nature of the eyewitness testimony from the time of Mr. Mattox's murder led more to the verdict than evidence of this subsequent event. This court committed no error in the admission of this evidence.

Opinion at pp. 25-27.

The trial court did not err. "[A] jury is entitled to infer an agreement between participants from the actions they take[.]" *Commonwealth v. Tolbert,* 670 A.2d 1172, 1182 (Pa. Super. 1995). "[T]he law imposes upon a conspirator full responsibility for the natural and probable consequences of acts committed by his fellow conspirator or conspirators [even if he was not physically present when the acts were committed] if such acts are done in pursuance of the common design or purpose of the conspiracy." *Commonwealth v. Dennis,* 618 A.2d 972, 977 (Pa. 1992). "[T]he use of a deadly weapon on a vital part of the body can be the basis for a finding of specific intent to kill[.]" *Id., at 1181.* Even where a weapon cannot conclusively be identified as the weapon used in a crime, where circumstances justify that inference, the weapon can be admitted. *See Commonwealth v. Brown,* 359 A.2d 393 (Pa. 1976); *Commonwealth v. Clayton,* 532 A.2d 385 (Pa.1987). *See also United*

34

*States v. Snead,* 447 F.Supp. 1321 (E.D.Pa.), affirmed 577 F.2d 730 (3rd Cir.), cert. denied 436 U.S. 930, 98 S.Ct. 2829, 56 L.Ed.2d 775 and 439 U.S. 851, 99 S.Ct. 156, 58 L.Ed.2d 154 (1978) (testimony clearly relevant and probative with respect to one defendant was properly admitted over co-defendant's claim of prejudice).  By establishing that the weapon that was capable of, and had most likely caused the death of Mr. Mattox, was tied to Crumbley and that Crumbley and appellant had both been identified as shooters in the death of Mr. Mattox, the Commonwealth was able to establish appellant's shared responsibility for the killing as both an accomplice and coconspirator.

The Commonwealth directs this Court to the decision in *Commonwealth v. Reid,* 626 A.2d 118 (Pa. 1993).  The facts of *Reid* were as follows:

> The facts of the case are that in the early evening of March 7, 1989 a group of boys was throwing snowballs at passing cars in the neighborhood of 29th and Tasker Streets in Philadelphia. The car driven by Reid was struck as it drove by. Reid stopped the car and got out. The boys scattered as Reid shouted at them. Reid's two passengers also exited the car. Reid asked two bystanders whether they were involved in throwing the snowballs and they denied any participation. Reid reached his hand inside his jacket and replied, "You better hope none was your family." To his passengers he said, "Well, let's at least get one of them." A third bystander, apparently not

Respondents' Exhibit 50

realizing what Reid intended, suggested that Reid ride around the corner in order to "get one."

As Reid and his passengers drove around the block, some of the boys who had thrown the snowballs pulled a stop sign into the middle of a street which Reid would drive down. When he reached the stop sign, Reid drove the car on the sidewalk, and then gunfire came from the passenger side of Reid's car. Michael Waters, a sixteen year old youth, was killed by a bullet of unknown caliber, which struck him in the back and exited his chest. Reid and his passengers then fled. Two bullets and two shell casings were found. One thirty-eight caliber bullet fell from Waters' jacket at the hospital; another was recovered from a window frame. The bullet in Waters' jacket had not entered his body. The two shell casings were ten millimeter caliber.

Six days later, in a separate incident, Reid used a ten millimeter handgun to murder another victim, Neal Wilkinson. In this incident, Reid and a confederate, Bowman, asked Wilkinson and Woods to accompany them to collect a debt. When Wilkinson and Woods ascended stairs in the projects in order to knock on the door of the alleged debtor, Bowman shot them both with a shotgun, and then Reid shot them again with a handgun. Miraculously, Woods survived and gave police a statement naming Reid as one of two shooters. Ten millimeter shell casings found at the Wilkinson murder scene were fired from the same gun as was used in the Waters shooting six days earlier.

*Id.,* 626 A.2d at 119-120.  In ruling that the Trial Court properly allowed the Commonwealth to introduce evidence of the subsequent shooting during the trial arising from the snowball killing, the Supreme Court held:

Reid's first claim is that it was error for the trial court to allow into evidence testimony about an unrelated murder which

Respondents' Exhibit 50

occurred six days after the Waters murder. The Commonwealth's reason for seeking to admit this information was its theory that empty shell casings found at both murder scenes from the same handgun and Reid's identification as one of two shooters in the second murder make the evidence admissible to show that Reid was a shooter in both murders. In short, the evidence with respect to the second murder was offered to establish the identity of Reid as a shooter in the first murder.

In *Commonwealth v. Jones,* 457 Pa. 563, 575, 319 A.2d 142, 149 (1974), this court held testimony that a defendant charged with murder was in possession of the murder weapon two to five hours after the murder is admissible because it tends to show the identity of the person who committed the murder. In the present case, as in *Jones,* there were no eyewitnesses. Evidence of Reid's guilt, therefore, must be circumstantial. Reid asserts that admission of evidence concerning the second murder does not establish his identity as the shooter in the first murder because (1) no one established that he was in possession of any weapon, including a ten millimeter handgun; (2) the shooting came from the passenger side of Reid's car when Reid was driving, and two other persons were in the car; (3) the shell casings found at the scene of the first murder may have been there for some time before the murder; (4) the witness-victim in the second murder recanted his earlier statements to police and testified at trial that Reid did not shoot him or the other victim; (5) this witness stated that at the time the witness was shot, Reid possessed a .357 magnum which he had obtained from someone else, not a ten millimeter handgun; and finally, (6) that the only conclusion which may be drawn from the Commonwealth's evidence is that shell casings from the same ten millimeter handgun were found at both murder scenes.

The Commonwealth asserts that as to the first murder (boys throwing snowballs), Reid could easily have leaned across the seat to shoot from the passenger side of the car; the ten millimeter shell casings came from the same weapon as the casings found at the scene of the second murder; although the

Respondents' Exhibit 50

projectile which killed the boy in the first murder was not recovered, so its caliber is not known, the projectile recovered from the head of the victim in the second murder was of ten millimeter caliber. As to the second murder (shotgun and handgun wounds inflicted at close range in a hallway), the Commonwealth asserts that the surviving witness who denied at trial that Reid was one of the two people who shot him and left him for dead had given statements to police shortly after the shooting identifying Reid as one of the shooters, the one who used a handgun.

Since the circumstances of the second murder (shotgun and handgun wounds inflicted at close range in a hallway) place a weapon used in both murders in the hands of Reid at the time of the second murder, the question is whether a jury may draw an inference that Reid was the shooter in the first murder. Because empty shell casings from the same weapon were found at both murder scenes, and Reid was identified as the handgun shooter in the second murder, in which a ten millimeter bullet was found in the victim's head, evidence of the second murder is admissible to establish Reid's identity as the shooter in the first. Reid's real objection, although couched in terms of admissibility of evidence, is to the weight of the evidence. That is for the jury. This claim of error is without merit.

*Id.,* 626 A.2d at 120-121. *See also State v. Collins,* 10 A.3d 1005 (Supreme Court of Connecticut, 2011) which discusses the issue and collects cases favoring admission of this type of evidence.

Another decision which supports the trial court's decision in this case is *Commonwealth v. Flamer,* 53 A.3d 82 (Pa. Super. 2012) where this Court ruled that a murder committed by a third party was relevant evidence

Respondents' Exhibit 50

in the defendant's pending trial for murder.  *See also Commonwealth v. Evans,* 481 A.2d 625 (Pa. Super. 1984) reversed on other grounds 512 A.2d 626 (Pa. 1986) (evidence of burglary by two accomplices in which they stole weapon used in charged offense admissible against defendant even though he was not involved in the prior crime).

The fact that the Crumbley shooting occurred after the murder of Mr. Mattox is not controlling and does not render it inadmissible under Rule 404(b).  "[E]vidence of a subsequent offense can still show the defendant's intent at the time of the prior offense."  *Commonwealth v. Collins,* 703 A.2d 418, 423 (Pa. 1997).  *See also Commonwealth v. Wattley,* 880 A.2d 682 (Pa. Super. 2005); *Commonwealth v. Green,* 505 A.2d 321, 324-325 (Pa. Super. 1986)(footnote omitted):

> Appellant argues that the trial court erred in admitting testimony during the trial that appellant was involved in a later conspiracy to rob a convenience store. Specifically, part of appellant's written statement to the police contained the following exchange, which was admitted into evidence at trial:
>
> Q. Did you ask Pew why he shot the man?
> A. Yeah. He said so the dude couldn't identify him.
> Q. Did you after that go to the AM–PM Mini Mart at 17th and Derry?
> A. We walked to the crossroads, me, him, and about two more people. There was a whole lot of peoples with us.
> Q. How many shots did Pew fire that night?
> A. One. That's all I know of. We was down at the AM–PM and I couldn't find him. And then I went back to 14th and Regina and

Respondents' Exhibit 50

we couldn't find him. And we went back to the AM–PM again,
when I seen Pew again.
Q. I thought you still had the gun. Explain that statement.

_____

A. Pew gave me the gun back. Then he wanted to rob the AM–
PM and I gave the gun back to him. Then later on at the AM–
PM, I got it back from him.
Q. Did Pew rob the AM–PM store?
A. No. He said there was too many people there.
N.T., Trial, at 104–05.

Appellant objected to this testimony on the ground that the
statement involved evidence of an unrelated robbery.

Where the trial court has admitted evidence of other crimes
committed by a defendant and his cofelon(s), our scope of review is
whether the trial court abused its discretion in allowing the admission
of such evidence. *Commonwealth v. Ulatoski,* 472 Pa. 53, 371 A.2d
186 (1977); *Commonwealth v. Middleton,* 320 Pa.Super. 533, 467
A.2d 841 (1983).

The general rule, of course, prohibits testimony regarding
unrelated criminal acts of the accused. *Commonwealth v. Beasley,*
505 Pa. 279, 479 A.2d 460 (1984); *Commonwealth v. Reiss,* 503 Pa.
45, 468 A.2d 451 (1983); *Commonwealth v. Davis,* 331 Pa.Super.
285, 480 A.2d 1035 (1984); *Commonwealth v. Shealey,* 324
Pa.Super. 56, 471 A.2d 459 (1984). There are, however, special
circumstances justifying exceptions to the general rule: for example,
when the evidence of other criminal acts tends to prove (1) motive;
(2) intent; (3) absence of mistake or accident; (4) a common scheme,
plan, or design embracing the commission of two or more crimes so
related to each other that proof of one tends to prove the others; (5)
the identity of the person charged with the commission of the crime
on trial; or (6) that the evidence is part of the same transaction as the
case on trial. *Commonwealth v. Murphy,* 346 Pa.Super. 438, 499
A.2d 1080 (1985); *Commonwealth v. Shirey,* 333 Pa.Super. 85, 481
A.2d 1314 (1984); *Commonwealth **325 v. Thomas,* 328 Pa.Super.
393, 477 A.2d 501 (1984); *Commonwealth v. Shealey, supra;
Commonwealth v. Boyd,* 315 Pa.Super. 308, 461 A.2d 1294 (1983).

Respondents' Exhibit 50

Even if one of these exceptions applies, however, the trial court must balance the need for the evidence against its potential prejudice in order to determine its admissibility. *Commonwealth v. Ulatoski, supra; Commonwealth v. Shirey, supra; Commonwealth v. Middleton, supra.*

The lower court admitted the contested testimony as evidence going to show appellant's state of mind. "Evidence of an unrelated crime is admissible to show state of mind only when it is so close in time to the alleged offense as to have bearing upon [the accused's] state of mind at that time." *Commonwealth v. Martinez,* 301 Pa.Super. 121, 127, 447 A.2d 272, 275 (1982). (quotations omitted). While we recognize that evidence of *subsequent* offenses is less strongly probative of intent than *prior* offenses since it does not establish that a defendant possessed the requisite intent prior to the commission of the crime being tried, *id.,* we nonetheless agree with the lower court that the testimony admitted went to show the state of mind or intent of appellant at the time the victim was killed.

At trial, appellant denied that he and Mr. Pew had formulated a plan to rob someone, or that he had obtained the gun for purpose of robbing someone. In effect, appellant testified that he was an unwitting bystander, who just happened to be in Pew's company, when Pew suddenly held up the victim and shot him. Furthermore, appellant stated at trial that after he ran from the site of the murder, he did not see Pew later at the AM–PM store, or anywhere else until the next day. Obviously this testimony was in direct conflict with appellant's inculpatory statement made at the time of his arrest, and subsequently admitted at trial.

The testimony concerning the planned robbery of the AM–PM store took place close in time and space to the slaying of the victim. The same weapon was involved. The same persons were involved.

> Because the testimony is relevant to events close in time and place to the shooting of [the victim], it tends to demonstrate the appellant's criminal intent with regard to the shooting. Moreover, the testimony shows the appellant's continued association with [Pew] and participation in further criminal acts that evening. As such it tends to rebut the appellant's assertion

Respondents' Exhibit 50

that he lacked the necessary state of mind to establish second degree murder....

*Commonwealth v. Middleton, supra,* 320 Pa. at 550–51, 467 A.2d at 849–50. *See also Commonwealth v. Styles,* 494 Pa. 524, 431 A.2d 978 (1981); *Commonwealth v. Brown,* 489 Pa. 285, 414 A.2d 70 (1980); *Commonwealth v. Evans,* 460 Pa. 313, 333 A.2d 743 (1975); *Commonwealth v. Barnhart,* 290 Pa.Super. 182, 434 A.2d 191 (1981). We cannot say that the lower court abused its discretion in admitting the statement concerning the AM–PM store.

Appellant's reliance on *Commonwealth v. Robinson,* 721 A.2d 344 (Pa. 1998) is inapposite.  In the present case the .40 caliber Springfield Armory pistol was demonstrated, via the markings that it left on casings, to be one of the weapons that was used to murder Mr. Mattox.  The rifling characteristics that it left on test bullets, although not definitive, added further weight to that finding.  Crumbley and appellant were identified by an eyewitness as having been the shooters.  Appellant ignores the fact that relevance is established because appellant and Crumbley were coconspirator and accomplices in this murder.  The probative value clearly outweighed any prejudice.  Neither Crumbley or Asa Thompkins were charged as a result of the June 2nd shootout.  Crumbley was simply a victim.  The trial court offered to instruct the jury that the evidence of the June 2nd shooting should only be considered for identification purposes as it related to Mr. Crumbley's role in the shooting of Mr. Mattox.  When the

42

Respondents' Exhibit 50

court first offered to instruct the jury, Crumbley's counsel didn't want the instruction and appellant's counsel never bothered to voice an opinion either way (TT 1318-1323).  When the court again offered to give a limiting instruction, appellant's counsel didn't want the instruction (TT 1411).  The evidence was properly admitted.

Respondents' Exhibit 50

III.   THE TRIAL COURT DID NOT ERR IN ADMITTING TESTIMONY CONCERNING MS. ROBINSON'S IDENTIFICATION OF APPELLANT IN A PHOTO ARRAY AND DID NOT ERR IN ADMITTING MS. ROBINSON'S IN-COURT IDENTIFICATION OF APPELLANT.

As to an allegation of taint involving a witness' identification:

[T]he Commonwealth bears the burden of establishing that any identification testimony to be offered at trial is free from taint of initial illegality. *Commonwealth v. Turner,* 454 Pa. 520, 314 A.2d 496 (1974); Pa.R.Crim.P. 323(h). In ruling on whether the Commonwealth has met its burden, the trial court must determine whether there has been suggestiveness employed during the process of photographic identification which creates a very substantial likelihood of irreparable misidentification. *Simmons v. United States,* 390 U.S. 377, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Neil v. Biggers,* 409 U.S. 188, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972). In making this determination, the court should normally consider the manner in which the identification procedure was conducted, the witness' prior opportunity to observe, the existence of any discrepancies between the witness' description and the defendant's appearance, any previous identification, any prior misidentification, any prior failure of the witness to identify the defendant, and the lapse of **1126 time between the incident and the court identification. *Commonwealth v. Fowler,* 466 Pa. 198, 352 A.2d 17 (1976); *United States v. Higgins,* 458 F.2d 461 (3d Cir.1972).

*Commonwealth v. Moore,* 633 A.2d 1119, 1125-1126 (Pa. 1993).

When an out-of-court identification is alleged to be tainted, an in-court identification may still stand if, considering the totality of the circumstances, the identification "had an origin sufficiently distinguishable to be purged of the primary taint." *Commonwealth v. Abdul–Salaam,* 544 Pa. 514, 678 A.2d 342 (1996); *see also Commonwealth v. James,* 506 Pa. 526, 486 A.2d 376 (1985). The factors a court should consider in determining whether there was an independent basis for the

44

identification include: (1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness's degree of attention; (3) the accuracy of the witness's prior description of the criminal; (4) the level of certainty demonstrated by the witness during the confrontation; and (5) the length of time between the crime and the confrontation. *Id.* at 380.

*Commonwealth v. Kendricks,* 30 A.3d 499, 506 (Pa. Super. 2011).

Judge Lazzara has provided this Court with a very extensive and well-reasoned discussion on this issue. Opinion at pp. 14-22. That discussion is incorporated herein. The trial court did not err in this regard.

This incident occurred right outside of Ms. Robinson's apartment. She watched the whole incident which lasted between 5 and 10 minutes. When the actors exited the building they were approximately 10 feet from her window. When they shot the victim, they were approximately 70 feet from her window. Ms. Robinson had the opportunity to look at appellant's face. She had seen appellant in the apartment complex on prior occasions:

> Q     When you were living in Leechburg Garden Apartments you said that you saw Mr. Ebo a number of times before the shooting?
> A     Yes.
>
>                    *                    *                    *                    *
> Q     I'm talking about the day of the shooting.
> A     Oh, I seen him when he came out my front building door.
> Q     How long did this whole incident last until they left in the car?
> A     I want to say about ten minutes.

45

Respondents' Exhibit 50

Q      Okay.  Did you watch the whole time or part of the time?

A      I watched the whole thing.

Q      Someone told you MO did it, someone told you Mac-Mac did it, you said earlier you didn't know anyone by those names. Did you pick out Mr. Ebo's picture because someone told you Mo and Mac-Mac did it or did you pick him out because you recognized him?

A      Because I recognized him.

Q      When you picked out his picture did you know - - did you yet know anybody - - know anybody named Mo or Mac-Mac?

A      No.

Q      Did you know Mr. Ebo's name when you picked his picture out?

A      No.

                *                *                *                *

Q      Why did you pick him out of the photo array?

A      Because I seen him shoot the victim.

Q      Did you see his face?

A      Yes.

Q      Had you seen him before that?

A      Yes.

Q      How many times?

A      About three or four times.

Q      Those three or four times how close were they, where was it you did see him?

A      In the building behind me.

Q      That's in Leechburg Garden Apartments?

A      Yes.

Q      And how far in advance of the shooting on May 16 of 2011 did you see him in that complex?

A      I seen him probably a week after the shooting.

Q      How about before the shooting?

A      A couple of days, I'm not quite sure.

Q      How many times did you see him before the shooting?

A      Three or four times.

                *                *                *                *

Q      Do you remember telling them that you could absolutely pick out the light-skinned actor if you saw him again because

46

Respondents' Exhibit 50

you had seen him numerous times in the complex but that you could not be certain of the other male as he had a hoody over his head?

A     Yes.

\*                    \*                    \*                    \*

Q     Did you have any trouble seeing?
A     No.
Q     Could you see their faces?
A     Yes.
Q     Did either of them have a hoody on?
A     Yes.
Q     Who did?
A     The gentleman in the yellow shirt.
Q     So Crumbley had a hoody on?
A     Yes.
Q     How could you see his face then?
A     When he was going back to the car
Q     Had you ever seen his face before that day?
A     Yes.
Q     Where?
A     In the apartment building.
Q     How many times would you say you had seen him before you saw him do this killing?
A     About two or three times I seen him up there.
Q     Did you ever see Mr. Ebo before?
A     Yes.
Q     Where?
A     At Leechburg Gardens.
Q     About how many times?
A     The same amount, two or three times.
Q     Did you ever see them together?
A     Yes.

\*                    \*                    \*                    \*

Q     This event that you have described to the jury observing, how long did it last from the time you heard the banging upstairs, coming outside, the shootings, the shot to the head and driving off in the case, how much time elapsed?

47

Respondents' Exhibit 50

A      About ten minutes.

Q      Of this ten minutes how much of that time were they outside for you to observe them?

A      About five.

Q      Was there anything covering defendant Ebo's face during that five minutes?

A      No.

Q      How good a look did you get at Mr. Crumbley who had the hoody on?

A      I got a good look.

*          *          *          *

Q      Before you came back to look at the photo arrays, did you indicate whether you would be able to pick the suspect out of the photo arrays?

A      Yes.

Q      What did you say?

A      I said that I would be able to pick them out.

Q      Why did you think you would be able to pick them out?

A      Because I seen their faces.

Q      It had been 15 months, were you concerned that you wouldn't be able to?

A      No.

Q      Why?

A      Because their faces were stuck in my head.

(TT 177, 178-179, 44, 48, 536-537, 538, 547).

Ms. Robinson thus had a clear sight of the shooting and watched the entire event unfold.  Nothing interfered with her observation of appellant's face.  She was familiar with appellant, having seen him before. The jury knew that she was a young woman of 20 with a young son and she was afraid to get too involved with the police investigation, given the fact that informants often got killed and her own family advised her not to

48

Respondents' Exhibit 50

identify the shooters. She honestly admitted to intentionally failing to identify appellant in various photo arrays because she was fearful. It was not until she had moved out of state that she felt secure enough to fully cooperate with the investigation:

> Q     This happened in May and you testified earlier that you told the police you had seen them before and can I.D. them, do you remember that?
> A     Yes.
> Q     In the end of September of 2011, about four months after, did the police show you this photo array, No. 51, with these pictures and the picture of Mr. Crumbley in it?
> A     Yes.
> Q     Did you see Mr. Crumbley in that photo array?
> A     Yes.
> Q     Did you recognize him?
> A     Yes.
> Q     Did you tell the police that's him at that time in September of 2011?
> A     No.
> Q     Why not?
> A     Because my friends and family were telling me not to get involved and I was scared.
> Q     Why were you supposed to not be involved?
> A     Because they didn't want something to happen to me.
> Q     Same thing with this photo array, Commonwealth Exhibit 52, the one with defendant Ebo in it. Did you see this photo array in early November of 2011?
> A     Yes.
> Q     And did you recognize Mr. Ebo when you saw it in 2011?
> A     Yes.
> Q     And did you point him out for the police at that time?
> A     No.
> Q     Why not?
> A     Because I was scared and my friends and family told me not to get involved.

49

Respondents' Exhibit 50

*              *              *              *

Q      What changed between September and November and
July of 2012 that you decided to testify here today and to pick
these two men out of the photo array?
A      Well, me and my girlfriend were talking and she said if it
was the right thing to do, she told he what if it was my brother
or my uncle or someone.
Q      Has your new location had any impact on your desire to
testify?
A      Yes.
Q      Why is that?
A      Because I was far away.

TT 547-550.

Ms. Robinson was insistent that she had not seen the

defendant's photographs on television or social media and that she did not

have access to a computer until she started school in October of 2011.

When she returned to Allegheny County the police told her that they

thought that they knew who committed the killing but they did not provide

her with any names of the suspects, did not tell her that photographs of the

alleged shooters would be in the arrays, and certainly did not suggest that

she pick the defendant's photo from the array (TT 158-159, 172-177, 183-

184).  She again insisted at the evidentiary hearing that she had not seen

appellant's photograph on the internet until after trial (HT 35).

Contrary to appellant's assertion, the fact that police showed

Ms. Robinson multiple arrays containing appellant's photo between May

50

2011 and July 2012 does not make the identification tainted.  Nor does the

fact that she described appellant as being between 5'7" and 5'9" (TT 167,

591-592) when he is actually 6'2" (TT 413) render the identification

improper.  Ms. Robinson looked at appellant in court and testified that even

though he might be taller than 6 foot, he still looked like he was shorter to

her:

> Q     But when you first talked to the police you said you
> wanted to I.D. the people, do everything you could, did that
> change?
> A     Yes.
> Q     How so?
> A     I was scared and my family said don't get involved.
> Q     I mean, when you are talking to the police right after it?
> A     Yes.
> Q     How did that - - why did that change?
> A     Because I wanted to corroborate but in the back of my
> head I didn't.
> Q     Five-eight, five-nine, how tall does Ebo look to you, the
> same as when you saw him the day of the shooting, taller,
> shorter?
> A     The same.
>
> MR. MCKINNEY:  Objection, I would like Mr. Ebo to stand up
> before we guess what his height is.
>
>                    *          *          *          *
> Q     Miss Robinson, how tall are you?
> A     Five-six.
> Q     You're five-six?
> A     Yes.
> Q     Mr. Ebo, can you stand up.  You realize the difference
> between five-six and five-seven is one inch, right?
> A     Yes.
> Q     Does Mr. Ebo look like he is one inch taller than you?

Respondents' Exhibit 50

A     Yes.

TT 639, 643.  The Pennsylvania Supreme Court has recognized that the stress of a criminal episode may cause some witnesses to be unsure of various details including the number of people present and the height and weight of the alleged perpetrator; yet such discrepancies do not render an identification *per se* unreliable; nor does the fact that an array containing multiple pictures of the same defendant is shown to a witness render an identification suggestive and tainted.  *See Commonwealth v. Moore, supra,* 633 A.2d at 1126.

In *Commonwealth v. Fulmore,* 25 A.3d 340, 347-348 (Pa. Super. 2011) this Court was confronted with the following issue and resolved it in the Commonwealth's favor:

> We now turn to the suppression court's concern relating to Detective Harrigan's usage of the phrase "which one comes to mind." (Order, 4/20/09 at 4, ¶ 25.) Detective Harrigan's instruction to Hernandez to close his eyes, think back on the incident, and tell him which one of the individuals depicted comes to mind may have implied that the assailant was included within the array. However, as there was no evidence that Detective Harrigan directed Hernandez's attention to a specific picture, the phrase may have been construed as merely a "catch phrase" of no special significance. Moreover, providing such information to the witness before he views the lineup does not render the identification procedure unduly suggestive. After all, why else would a victim be shown a photo

52

array unless the police believed the suspect's photo was included.

For instance, in *Kubis, supra,* the detective told the witness the suspect's picture was in the array. After the witness picked out two photos, the witness was told one of the people he selected was the suspect. A panel of our court found that procedure did not produce a substantial likelihood of misidentification. *Kubis,* 978 A.2d at 397. In *Love, supra,* we upheld an identification where "the detective told the victim there was a suspect in custody" during the identification procedure. *Love,* 646 A.2d at 1236. Thus, we do not find that Detective Harrigan's statements created a substantial likelihood for misidentification. We conclude that the witnesses' belief that one of the pictures included in the photographic array was the perpetrator did not render the pre-trial identification unnecessarily suggestive.

In the present case, police did not suggest that Ms. Robinson should pick out appellant's photograph, Ms. Robinson explained her inability to select appellant's photo from earlier arrays, and she also affirmatively stated that she hadn't seen appellant's photograph on television or social media.  She selected his photo from the array because, in her own testimonial words: "I seen him shoot the victim."  (TT 44).

Respondents' Exhibit 50

IV.    42 PA.C.S.§99712 HAS BEEN FOUND UNCONSTITUTIONAL

The Commonwealth sought a mandatory minimum sentence pursuant to 42 Pa.C.S. §9712 on counts three (Robbery) and six (Conspiracy).   Despite the fact that the trial court sentenced beyond the mandatory minimum of 42 Pa.C.S.§9712 on those counts, the case law of this Court requires a remand for resentencing as that statute has been found to be unconstitutional.   *Commonwealth v. Watley,* 81 A.3d 108 (Pa. Super. 2013); *Commonwealth v. Valentine,* 101 A.3d 801 (Pa. Super. 2014).

54

Respondents' Exhibit 50

CONCLUSION

WHEREFORE, the Commonwealth respectfully requests that the Judgment of Sentence be affirmed.

Respectfully submitted,

STEPHEN A. ZAPPALA, JR.
DISTRICT ATTORNEY

MICHAEL W. STREILY
DEPUTY DISTRICT ATTORNEY
PA. I.D. NO. 43593

Attorneys for Appellee

C

55

Respondents' Exhibit 50

CERTIFICATE OF COMPLIANCE

The Commonwealth certifies that its brief does not exceed the 14,000 word limit imposed by Pa.R.A.P. 2135.

Respondents' Exhibit 50

PROOF OF SERVICE

I hereby certify that I am this day serving two (2) copies of the within Brief for Appellee upon Counsel for Appellant in the manner indicated below which service satisfies the requirements of Pa. R.A.P 121:

**Service by PACfile electronic service mail addressed as follows:**

Victoria H. Vidt, Esquire
Office of the Public Defender
400 County Office Building
542 Forbes Avenue
Pittsburgh, PA 15219-2904
(412) 350-2403

Dated: June 24th , 2016

/s/ Michael W. Streily
MICHAEL W. STREILY
DEPUTY DISTRICT ATTORNEY
PA. I.D. NO. 43593

Office of the District Attorney
401 Allegheny County Courthouse
Pittsburgh, PA 15219
(412) 350-4377

Respondents' Exhibit 50