Received 7/14/2017 2:34:25 PM Supreme Court Western District

Filed 7/14/2017 2:34:00 PM Supreme Court Western District
279 WAL 2017

IN THE SUPREME COURT OF PENNSYLVANIA, WESTERN DISTRICT

No.      W. D. Allocatur Docket 2017

_____

COMMONWEALTH OF PENNSYLVANIA,
Respondent

v.

MATTHEW EBO,
Petitioner
_____

## PETITION FOR ALLOWANCE OF APPEAL
_____

Petition for Allowance of Appeal from the Judgment of the Superior Court dated June 21, 2017, at Docket No. 92 WDA 2016, that affirmed the Judgment of Sentence entered November 28, 2012, in the Court of Common Pleas of Allegheny County, by the Honorable Beth A. Lazzara.

_____

ELLIOT C. HOWSIE                          VICTORIA H. VIDT
Public Defender                    Assistant Public Defender
                                          Appellate Counsel
BRANDON P. GING                          Pa. ID No. 67385
Deputy – Appellate Division

OFFICE OF THE PUBLIC DEFENDER
542 Forbes Avenue
Pittsburgh, PA 15219
(412) 350-2368

Respondents' Exhibit 54

# TABLE OF CONTENTS

PETITION FOR ALLOWANCE OF APPEAL ......................................................1

OPINIONS IN THE COURTS BELOW.................................................................1

ORDER IN QUESTION .........................................................................................3

STATEMENT OF THE QUESTIONS INVOLVED ............................................4

STATEMENT OF THE CASE

    *Procedural history*.............................................................................................5

    *Factual history* ...............................................................................................9

REASON FOR ALLOWANCE OF APPEAL .....................................................19

    I.   When there is only one witness who identifies a defendant as the perpetrator of a crime, and that witness has recanted her story, and then recanted the recantation, the defendant must be granted a new trial so that the jury, not the trial judge, may evaluate the witness's credibility. ...........................................................19

    II. When the evidence against a defendant consists of one purported eye-witness's testimony, and the defendant is tried jointly with a co-defendant, the trial court should have granted the motion *in limine* to preclude the Commonwealth from presenting evidence of a second shooting that was only admissible against the co-defendant, is wholly irrelevant to Matthew's guilt or innocence, and is more prejudicial than probative?  In other words, is the defendant's right to a fair trial

i

Respondents' Exhibit 54

violated by the admission of Pa.R.E. 404(b) evidence that is only relevant against the co-defendant? ...........................................................34

PRAYER FOR RELIEF ...........................................................................49

CERTIFICATE OF COMPLIANCE WITH PA.R.A.P. 1115(f) .......................50

Appendix A -- Judgment and Memorandum Opinion of the Superior Court of Pennsylvania, No. 92 WDA 2016, dated June 21, 2017.

Appendix B -- Opinion in the lower court by the Honorable Beth A. Lazzara, filed June 25, 2014.

Appendix C – Order of Court by the Honorable Beth A. Lazzara, addressing the rationale for denying a new trial on the after-discovered evidence issue, dated December 22, 2015.

Appendix D -- Indictment and Sentencing Papers for Docket Number CP-02-CR-0002821-2012.

Respondents' Exhibit 54

# TABLE OF CITATIONS

## *Cases*

*Commonwealth v. Brown,* 52 A.3d 320 (Pa. Super. 2012) ..............................35, 47

*Commonwealth v. Cascardo,* 981 A.2d 245 (Pa. Super. 2009) ............................35

*Commonwealth v. Coleman*, 264 A.2d 649 (Pa. 1970) ..........................................33

*Commonwealth v. Fiore,* 780 A.2d 704 (Pa. Super. 2001)....................................32

*Commonwealth v. Laich,* 777 A.2d 1057 (Pa. 2001)..............................................47

*Commonwealth v. Loner*, 836 A.2d 125 (Pa. Super. 2003)(*en banc*)
    *appeal denied,* 852 A.2d 311 (Pa. 2004) ........................................................22

*Commonwealth v. McCracken*, 659 A.2d 541 (Pa. 1995).................... 22, 24-26, 32

*Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014) ...............................31

*Commonwealth v. Mosteller,* 284 A.2d 786 (Pa. 1971) ...................................30, 31

*Commonwealth v. Rivera*, 939 A.2d 355 (Pa. Super. 2007) ................................21

*Commonwealth v. Robinson,* 721 A.2d 344 (Pa. 1998) .............................43, 44, 45

*Commonwealth v. Ross*, 57 A.3d 85 (Pa. Super. 2012) ...................................35, 41

*Duncan v. Louisiana*, 391 U.S. 145 (1968)............................................................33

Respondents' Exhibit 54

## *Rules*

Pa.R.E. 403 ................................................................................................46

Pa.R.E. 404(b) .................................................................4, 34, 35, 36, 42

Respondents' Exhibit 54

IN THE SUPREME COURT OF PENNSYLVANIA
WESTERN DISTRICT

COMMONWEALTH OF PENNSYLVANIA,
Respondent

v.                          ___ W.D. Allocatur Docket, 2016

MATTHEW EBO,
                    Petitioner

## PETITION FOR ALLOWANCE OF APPEAL

AND NOW COMES the Petitioner, MATTHEW EBO, by his counsel, Elliot C. Howsie, Public Defender of Allegheny County, Brandon P. Ging, Chief – Appellate Division, and Victoria H. Vidt, Assistant Public Defender and Appellate Counsel, and respectfully requests this Honorable Court to grant an allowance of appeal from the within Judgment of the Superior Court of Pennsylvania entered on June 21, 2017, and in support thereof, sets forth the following:

## OPINIONS IN THE COURTS BELOW

On June 21, 2017, by Memorandum Opinion entered at No. 92 WDA 2016, the Superior Court of Pennsylvania affirmed the Judgment of

1

Respondents' Exhibit 54

0716

Sentence entered on November 28, 2012, by the Honorable Beth A. Lazzara, at CC No. 201202821.  A true and correct copy of the Memorandum Opinion of the Superior Court is attached hereto, incorporated herein by reference, and referred to hereinafter as "Appendix A."

The Opinion of the Honorable Beth A. Lazzara, of the Court of Common Pleas of Allegheny County, Criminal Division, filed June 25, 2014, in support of the Judgment of Sentence, is attached hereto, incorporated herein by reference, and referred to hereinafter as "Appendix B."

The Order of Court issued by the Honorable Beth A. Lazzara, of the Court of Common Pleas of Allegheny County, Criminal Division, filed on December 22, 2015, which denied the request for a new trial based upon after-discovered evidence, is attached hereto, incorporated herein by reference, and referred to hereinafter as "Appendix C."

Respondents' Exhibit 54

0717

## ORDER IN QUESTION

The Judgment of the Superior Court of Pennsylvania entered on June 21, 2017, at No. 92 WDA 2016, is as follows:

Judgment of sentence vacated.   Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

/s/ Joseph D. Seletyn
Joseph D. Seletyn, Esq.
Prothonotary

DATE:   6/21/2017

(A copy of the Judgment is attached hereto as Appendix "A.")

3

Respondents' Exhibit 54

## STATEMENT OF THE QUESTIONS INVOLVED

I.     When there is only one witness who identifies a defendant as the perpetrator of a crime, and that witness has recanted her story, and then recanted the recantation, should not the defendant be granted a new trial so that the jury, not the trial judge, may evaluate the witness's credibility?

II.     When the evidence against a defendant consists of one purported eye-witness's testimony, and the defendant is tried jointly with a co-defendant, should not the trial court have granted the motion *in limine* to preclude the Commonwealth from presenting evidence of a second shooting that only admissible against the co-defendant, is wholly irrelevant to the defendant's guilt or innocence, and is more prejudicial than probative?  In other words, is the defendant's right to a fair trial violated by the admission of Pa.R.E. 404(b) evidence that is only relevant against the co-defendant?

4

Respondents' Exhibit 54

0719

# STATEMENT OF THE CASE

***Procedural History:***

Matthew Ebo (hereinafter "Matthew") was charged by criminal information at CC 201202821 and convicted after a jury trial of one count of First Degree Murder (18 Pa.C.S. § 2502(a)); one count of Robbery – Inflict Serious Bodily Injury (18 Pa.C.S. § 3701(a)(1)(i)); one count of Robbery of a Motor Vehicle (18 Pa.C.S. § 3702(a)); one count of Firearms Not to be Carried Without a License (18 Pa.C.S. § 6106(a)(1)); one count of Possession of Firearms Prohibited (18 Pa.C.S. § 6105(a)(1)); one count of Conspiracy to Commit Robbery (18 Pa.C.S. § 903(c)); and one count of Conspiracy to Commit Homicide (18 Pa.C.S. § 903(c)).

On May 30, 2012, the Commonwealth filed Notification of Commonwealth's Intention to Present Evidence of Other Crimes pursuant to Rule 404(b)(2). The Commonwealth argued that it should be permitted to offer evidence of a June 2, 2011 shooting, where co-defendant Thaddeus Crumbley was the victim. According to the Commonwealth, the firearm evidence obtained during the June 2, 2011 shooting of Crumbley was also

5

Respondents' Exhibit 54

related to the shooting of Todd Mattox in the present case, which occurred several weeks earlier.  Crumbley's counsel filed a response to this request on July 25, 2012.  The matter was litigated during a hearing on July 27, 2012.   Matthew's counsel joined in the objections to this evidence. Crumbley's counsel presented arguments and Matthew's attorney noted that he had nothing further to add.   The trial court agreed with the Commonwealth that this evidence was admissible to show identity.

Crumbley's counsel filed a Motion to Suppress Identification on August 3, 2012.  Matthew's counsel joined in the objections of co-defense counsel when the trial court addressed suppression matters at a hearing immediately before the trial on August 21, 2012. The witness's identification of Matthew was not suppressed.  Matthew was convicted of all counts.

The Commonwealth sought the mandatory minimum sentence at counts three and six under 42 Pa.C.S. § 9712.  Sentencing occurred on November 28, 2012. Matthew received a life sentence on the homicide conviction and an aggregate sentence of forty-six to ninety-two years of

6

Respondents' Exhibit 54

incarceration on the remaining counts.  At counts three and six, the court imposed consecutive ten to twenty year sentences, which were above the mandatories.

Appellate Counsel Jessica Herndon, of the Allegheny County Public Defender's Office, was appointed to represent Matthew following sentencing and filed an Emergency Petition for Leave to File Post-Sentence Motions *Nunc Pro Tunc* and a Post-Sentence Motion *Nunc Pro Tunc*.  The trial court granted the Motions on December 21, 2012.  A Supplemental Post-Sentence Motion was filed on April 19, 2013.  The Motion was denied by operation of law on June 26, 2013.

Attorney Herndon filed a Notice of Appeal on July 25, 2013. Following the submission of Briefs and argument being scheduled at 1194 WDA 2013, Attorney Herndon filed an Application for Remand in the Superior Court based upon a claim of after-discovered evidence.  The Court granted the request, and ordered the trial court to conduct a hearing on the after discovered evidence claim to determine whether a new trial

7

was appropriate. The panel did not retain jurisdiction over the case, even though no ruling was made on the issues raised in the first appeal.

On September 2, 2015, undersigned counsel, also from the Public Defender's Office, entered her appearance on Matthew's behalf.   On October 29, 2015, the lower court conducted a hearing into the after discovered evidence matter.   Co-defendant Thaddeus Crumbly also participated in this hearing through counsel.   The trial court denied the motion for a new trial on December 22, 2015.   A timely Notice of Appeal was filed on January 13, 2016, and a Statement Of Errors Complained of on Appeal on February 2, 2016.   The Brief for Appellant in support of Matthew's appeal was filed on May 16, 2016.   The Commonwealth's brief was filed on June 24, 2016.   Following oral argument, the Superior Court agreed that the trial court's use of mandatory sentences was unconstitutional and remanded the case for re-sentencing on counts three and six only.   In all other respects, Matthew's judgment of sentence was affirmed on June 21, 2017.   This timely Petition for Allowance of Appeal now follows.

8

Respondents' Exhibit 54

**B. *Factual History:***

   Todd Mattox was shot to death on May 16, 2011. NT 224, 262. Saday Robinson testified that she observed Matthew Ebo and Thaddeus Crumbley shoot Mr. Mattox. NT 526-27, 531. She looked out of her living room window and saw the co-defendants push Mr. Mattox out of the front door of the building. NT 527-28. Mr. Mattox walked backwards and the two perpetrators had their backs to Saday. NT 577. She testified that she saw Matthew shoot Mr. Mattox and search his pants pockets, and then she saw Crumbley shoot Mr. Mattox in the head. NT 531-33. She observed both men get into Mr. Mattox's white vehicle and leave. NT 534. This vehicle was later found after it had been set on fire. NT 757-59, 782-87. A lighter fluid can found near the burned car had the fingerprints of a third party, Craig Coleman, on it. NT 767, 807. None of the prints matched either co-defendant. NT 836. Craig Coleman, otherwise known as Craig Clark, testified that his prints were on the can because he took the can to Roman Herring, who burned the car using the lighter fluid. NT 945.

Respondents' Exhibit 54

Multiple casings were recovered from the scene of Mr. Mattox's shooting. There were two spent .40 caliber S&W casings that were discharged from one firearm. NT 444-45, 447. There were five other .40 caliber S&W casings that were discharged from a different firearm. NT 450. There were also two .357 Sig caliber cartridge casings that were discharged from a third firearm. NT 454.

The firearm expert, Raymond Everett, tried to match the .40 caliber bullets with the Springfield Armory firearm that was subsequently recovered from Asa Thompkins, who had been present at the second shooting where Crumbley was the victim. The expert noted that the five spent .40 caliber cartridges all came from the same gun and the rifling characteristics matched the test cartridge casings from the Springfield Armory pistol recovered from Asa Thompkins. NT 450, 475. However, the expert stated that he could not identify or eliminate those casings as having been fired from that gun. NT 475-76. In fact, there are many .40 caliber weapons that have the same class characteristics. NT 476-77. The expert

10

Respondents' Exhibit 54

could not tell whether the projectiles came from the Springfield firearm or another .40 caliber firearm.  NT 477.

John Gardone testified that he saw the shooting from fifteen yards away.  NT 490.  He saw two men chasing Mr. Mattox and one of the men shot Mr. Mattox several times before leaving in a vehicle.  NT 491-92.  He did not identify anyone.

Yurri Lewis saw someone go through Mr. Mattox's pockets and drive away in a white car.  NT 515.  He only heard the shots and he did not know if the person going through the pockets was even the shooter.  NT 520.  He never identified anyone.

Brandon Smith saw the shooting.  NT 661.  He heard some sounds in the hallway and then he heard gunshots.  He looked out of the window and saw two men running away.  NT 662.  He never identified the men.

Thomas Brown, a jailhouse informant, testified that he heard co-defendant Crumbley say that he killed Mr. Mattox.  NT 698.  Nothing was said about Matthew's involvement.  Thomas Brown had a history of offering police information about different homicide cases when he got into

11

Respondents' Exhibit 54

criminal trouble.  NT 702-38.  On multiple occasions, he informed police about confessions someone made to him regarding murdering another person.  NT 728.

Thomas Morgan and Deborah Tator testified about Crumbley's shooting on June 2, 2011, as experts in firearms and tool marks.  NT 859-60, 923-25.  Spent .40 caliber S&W casings and nine millimeter casings found at that scene had been discharged by two different firearms.  NT 885.  The nine millimeter casings were all discharged by the Ruger firearm that was also discovered at that scene.  NT 869-70, 925.  The spent .40 caliber S&W casings were all fired from the same firearm and matched the Springfield Armory pistol that Asa Thompkins possessed on June 9, 2011.  NT 360, 923-25, 927.  Asa Thompkins happened to be present at the scene of Crumbley's shooting on June 2, 2011.  NT 847, 852-53, 857.

Asa Thompkins was arrested on June 9, 2011 and, according to Detective Perry, he had a gun "used in the homicide of Mr. Mattox."  NT

Respondents' Exhibit 54

360.  This testimony was somewhat inaccurate. [1]  Thompkins said the gun belonged to him.  NT 1009-11.

Asa Thompkins and Leron Brown were friends with Crumbley.  NT 695-96.  Leron Brown and Roman Herring, Crumbley's cousin, were found dead in a car sometime after these shootings.  NT 948, 991.  Roman Herring was allegedly involved in burning the white vehicle that the perpetrators used to leave the scene of the Mattox shooting.  NT 945.  Leron Brown was the son of witness, Thomas Brown, who testified in this case that he heard Crumbley admit to killing Mr. Mattox.  NT 695, 698.

Crumbley became a suspect in the Todd Mattox murder in September of 2011, when Detective Anthony Perry received a report that connected a firearm used in Mr. Mattox's homicide with the weapon used in the shooting of Crumbley and when Thomas Brown provided

---

[1]  Even though casings found at the scene of the Todd Mattox shooting matched the rifling characteristics of the casings discharged from the Springfield Armory firearm, Mr. Mattox was shot with two nine millimeter bullets.  NT 450, 455-56, 475.  According to one of the firearms experts, the two nine millimeter bullets recovered from the Mattox autopsy could not have been fired from a .40 caliber weapon.  NT 460-61. The Springfield Armory firearm was a .40 caliber weapon.  NT 927.  The expert also noted that he could not identify or eliminate the casings found at the scene as having been fired from that Springfield gun.  NT 475-77.

Respondents' Exhibit 54

information that Crumbley admitted to killing Mr. Mattox.  NT 1017, 1020-21.  Matthew also became a suspect during that time, although the record is unclear exactly why.  NT 1017, 1023.

No prints or DNA evidence connected Matthew to the shooting.  NT 1073-74, 1102.

At trial, the only witness who directly identified Matthew as a shooter was Saday Robinson, who also admitted lying to police.[2]  NT 574, 582, 585, 594-95, 638.  According to Saday, she was shown an array with Matthew's image and an array with Crumbley's picture.  NT 548, 549.  She testified that she recognized both men, but she did not identify them because she was scared.  NT 548-49.  Saday testified that she purposely picked out someone who she knew was not involved in the homicide prior to viewing the array of Matthew on November 4, 2011.  NT 59, 551-52, 554, 555, 611-17, 621.  She told police that someone in the array looked like a

---

[2] Richard Carpenter never testified in this case, but the police noted that he identified Matthew as a suspect prior to July 23, 2012, when Ms. Robinson identified Matthew. Mr. Carpenter received substantial payments from law enforcement and his own criminal sentence was reconfigured "for his own safety."  NT 1037, 1040, 1116-17, 1132, 1230, 1235.

14

Respondents' Exhibit 54

0729

perpetrator.  NT 555.  She saw an array that had Matthew in it and picked someone that looked like Matthew, even though she knew it was the wrong person.  NT 67, 163, 166-67, 611-18, 640, 641.  Police had no record of that occurring.  NT 410, 1000-01.  Contrary to Saday's testimony, the police noted that the first array presented to her containing Matthew's picture was on November 4, 2011.  NT 416.  The police confirmed that she did not pick out Matthew's picture during the November 4, 2011 array.  NT 204-05.  She also looked at photo arrays multiple other times and did not pick anyone as a perpetrator until July 24, 2012.  NT 55, 197-98, 409-10, 604, 607.

Saday also said that she did not discuss this matter with anyone before moving from the area, but she heard rumors about who shot Mr. Mattox.  NT 43, 58, 62-63.  Someone named Ace provided her with information about who he thought was responsible for the homicide and she provided that information to police.  NT 603.  Also, immediately after the incident, a neighbor told her who that person thought did it.  NT 637.

Respondents' Exhibit 54

She told police that the lighter-skinned perpetrator, who she now claims is Matthew, was only 5′7″ or 5′8″ tall.  NT 48, 553, 592-93.  Matthew is actually 6′2″ tall.  NT 413.

Saday moved away and returned at the request of the police in the summer of 2012 because she was told that police had suspects in custody and wanted her to testify.  NT 68, 69, 70, 172, 557.  The police told her that they thought they knew who was involved.  NT 174.  Saday noted on cross examination:

> DEFENSE COUNSEL: When you were looking at the photo arrays was it your understanding that the men that they arrested were in the photo arrays, some of – at least two of the 25 or 30 pictures they were showing you?
>
> SADAY: Yes.
>
> DEFENSE COUNSEL: Who told you that?
>
> SADAY: No one.

NT 183-84.

Police provided Saday with reports while traveling to view the array on July 24, 2012.  NT 72, 160, 568.  She was shown the array, at which time

16

Respondents' Exhibit 54

she identified both Crumbley and Matthew.  NT 558, 648-50.  This is the first and only time prior to trial that she identified Matthew as a perpetrator.  NT 558.  She made this identification less than two weeks before trial was supposed to start.  NT 574.  During the fourteen months from the time of the shooting until Saday made an identification of Matthew, several people talked to her about what occurred that night and who they thought was responsible.  NT 559.

Saday testified that prior to October of 2011, she did not have access to the internet or a computer; however, she had a Facebook account with pictures of her and her child that was created in 2009.  NT 628, 633.  She said her friend created and maintained the account of her, also commenting on her behalf.  NT 632-33, 645-46.  She stated that she saw no pictures of either defendant on the internet.  NT 638.  A local paper published an article on December 15, 2011, which included pictures of the co-defendants.  NT 403; DE2 60.  Several months after this article was published, Saday was able to identify the co-defendants, although she said that she never saw media coverage.  NT 68, 71, 158-59, 403-04.

17

At the October 29, 2015 hearing on after discovered evidence, Saday was the primary witness. Saday had provided a written statement and a video statement to Crumbley's investigator in which she admitted that her trial testimony was not true. HT[3] 4, 14-16. Both documents state that Saday could not identify the men who shot and killed Todd Mattox. HT 27, 29. When she appeared in court, however, Saday recanted the recantation of her trial testimony, claiming to have been threatened by Mr. Crumbley's baby mama's sister. HT 12-13, 17. Saday also claimed to have been offered $25,000 to make the written statement and the video. HT 23. Saday never reported to police that she was threatened or offered money for her new testimony. HT 23-24. She also did not tell Investigator Fox, who took the video statement and the written statement, that she had been threatened and/or bribed to change her testimony. HT 49. Once Saday was contacted by county police officers in connection with the recantation, her story changed *again*. HT 50.

---

[3] HT refers to the Hearing Transcript from the October 29, 2015 hearing on the Motion for a New Trial.

Respondents' Exhibit 54

## REASON FOR ALLOWANCE OF APPEAL

**I.    When there is only one witness who identifies a defendant as the perpetrator of a crime, and that witness has recanted her story, and then recanted the recantation, the defendant must be granted a new trial so that the jury, not the trial judge, may evaluate the witness's credibility.**

**Reason for Allowance of Appeal:**   In this case, Saday Robinson is the Commonwealth's only evidence linking the death of Mr. Mattox to Matthew Ebo.  Saday has told a variety of stories to police and to the trial court.  In some of them, she watches Matthew commit the crime with his co-defendant.  In other stories, she does not see Matthew.  Saday has also admitted under oath to lying to the police and investigators.  A new trial must be awarded so that a jury can properly evaluate her credibility based upon the several versions of her testimony.  This decision should not be made by the trial judge.

Two  co-defendants  had  a  joint  homicide  trial,  and  both  were

convicted of first-degree murder.  The evidence against the co-defendant,

Thaddeus Crumbley, was significant.  The evidence against the petitioner,

Matthew Ebo, consisted of testimony from one eyewitness.  No physical

evidence  linked  Matthew  to  this  crime.   No  other  testifying  witnesses

linked Matthew to this crime.  Just one witness, Saday Robinson.

The  problem  with  Saday  Robinson  is  that  she  is  a  liar.   Saday

admitted on the witness stand that she had lied to police.  Saday identified

Respondents' Exhibit 54

Matthew at trial as one of two shooters. Yet, after trial, Saday recanted her trial testimony in full.   She now said that she could not identify Matthew Ebo or his co-defendant as the shooters, and explained to an investigator that the police had told her what to say.  Saday signed an affidavit to this effect, and went on video with her statement. At a hearing to bring this after-discovered evidence to the Court's attention, Saday again changed her story, saying that her initial identification was correct.   Saday now claimed that family members of the defendants had threatened her and offered her money to recant.

The <u>jury</u> should have been able to evaluate Saday's credibility with this third (and fourth) story being put before them.  Instead, the trial judge found Saday's in-court recantation of her recantation to be credible.  But the judge should not have made this decision because of the critical nature of Saday's testimony – the only testimony by which Matthew Ebo was convicted.

Unlike the co-defendant, the *only evidence* against Matthew Ebo is Saday's testimony.   In such a situation, with the guilty verdict hanging

Respondents' Exhibit 54

upon the credibility of one witness, it is improper for the trial court to make the ultimate determination of credibility.   In essence, this is tantamount to denying Matthew Ebo his right to a jury trial, as the trial judge has made the credibility determination.  This cannot stand.

A new trial based upon newly discovered evidence should be awarded when: "(1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely." *Commonwealth v. Rivera*, 939 A.2d 355, 359 (Pa. Super. 2007).   These four prongs have been met in Matthew's case.

Ms. Saday Robinson did not come forward at any point prior to trial or during trial regarding the testimony contained in the video and supporting affidavit. Prior to trial, Saday was in protective custody and had relocated to another state; she was clearly unavailable to Matthew.  HT 10. Further, Saday refused to speak with defense counsel prior to trial.

21

Respondents' Exhibit 54

Only after conviction, when the judgment of sentence was on appeal to the Superior Court, did Saday come forward with her recantation. *See* HT 10. Saday explained to defense investigator Fox that she had lied at trial and that she wanted to "get this off my chest." HT 12, 14, 22. This information could not have been obtained by due diligence prior to the conclusion of trial. *See, e.g., Commonwealth v. Loner*, 836 A.2d 125 (Pa. Super. 2003) (*en banc*), *appeal denied*, 852 A.2d 311 (Pa. 2004) (stating that "we reject the Commonwealth's assertion that the victim's recantation in this case is not truly after-discovered evidence because Appellant knew prior to trial that the victim was not telling the truth."); *Commonwealth v. McCracken*, 659 A.2d 541, 545 (Pa. 1995) (holding that recantation testimony qualified as after-discovered evidence because the witness had identified the defendant at the preliminary hearing and at trial, which foreclosed defense counsel's ability to persuade the witness to change her identification at trial through cross-examination).

Saday Robinson's recantation testimony is not merely corroborative; it is substantive, exonerating, eyewitness testimony that Matthew did not

Respondents' Exhibit 54

0737

commit this crime.  At trial, Matthew contended that he was not the person who committed the homicide.  Saday's testimony that she saw Matthew there was the *sole* evidence that contradicted his account.[4]  The recantation is new evidence, not corroborative of any other evidence that the jury also considered.  Moreover, Saday never testified to the jury about her exculpatory evidence, thus, it is not cumulative.

Notably, at the evidentiary hearing on this matter, Assistant District Attorney Stadtmiller argued that Saday was not the only witness at trial who implicated Matthew.  *This is wholly incorrect.*  Mr. Stadtmiller claimed that Richard Carpenter was an eyewitness as well.  Mr. Carpenter <u>never</u> testified in this case.  In fact, during trial, testimony was taken from then Deputy District Attorney (now Judge) Mark Tranquilli about this very witness.  Judge Tranquilli testified: "as I came to meet Mr. Carpenter and prepare him for the preliminary hearing and the testimony at the preliminary hearing, yes, I satisfied myself that he was a witness to this

---

[4] This is an important distinction between the two defendants at this trial.

Respondents' Exhibit 54

homicide." NT, Jury Trial, Vol. 2, at 1116.  However, Mr. Carpenter did not

testify at the preliminary hearing.  *Id.*  Defense counsel asked Judge

Tranquilli if Mr. Carpenter had testified in any proceedings in this case,

including the current trial.  *Id.* at 1116-1117.  The answer was negative.  *Id.*

Thus, despite ADA Stadtmiller's assertion at the hearing that he had

another eyewitness, Saday was the *only* witness at trial that connected

Matthew to the homicide in this case.

In *Commonwealth v. McCracken*, 659 A.2d 541, 549-50 (Pa. 1995), this

Honorable Court found that the defendant was entitled to a new trial

following the recantation of the Commonwealth's main witness.  The

witness testified at trial that he saw McCracken enter, then leave, a deli

where a man had been shot and killed.  659 A.2d at 542-43.  Immediately

after the incident, the witness had told police that he did not recognize the

man who entered the deli.  *Id.* at 543.  However, three days later, the

witness implicated McCracken, stating that he had gone to school with

McCracken and recognized him.  *Id.*  At trial, McCracken offered an alibi

Respondents' Exhibit 54

and maintained that another had committed the crimes. *Id.* McCracken was found guilty of second-degree murder and other offenses. *Id.*

Several years later, while serving time in a New Jersey prison, the witness contacted McCracken's trial attorney and indicated that he wished to recant his trial testimony. *Id.* At the evidentiary hearing on a motion for a new trial based upon after-discovered evidence, the witness testified that he had not told the truth at trial, that he did not know who it was that he saw entering and leaving the deli, and that he wished to clear his conscience by telling the truth. *Id.* at 544. The witness further testified that he had been beaten in prison, and that he and his family had been threatened by the trial testimony/conviction. *Id.* However, the court found that the threats and intimidation had reasonable explanations other than coercing the witness to recant his trial testimony. *Id.* Although the trial court did not believe the entirety of the witness's testimony at the evidentiary hearing, saying that the witness was "no paragon of truth," *id.* at 544-545, the court ordered a new trial.

Respondents' Exhibit 54

Even while noting that recantation testimony "is one of the least reliable forms of proof, especially when it constitutes an admission of perjury," this Court affirmed the award of a new trial, *id.* at 545, reasoning:

> [The witness's] recantation is not merely cumulative or corroborative given the tenuous nature of the circumstantial evidence connecting [McCracken] to the crime and the inability of any other witness to make a positive identification of the perpetrator. In this case, where the only Commonwealth witness who identified the perpetrator has recanted his testimony, such evidence can not be considered cumulative or corroborative because the defendant claimed that he did not commit the crime in question. This was the essence of [McCracken's] defense and the ultimate question in [McCracken's] trial. Thus, [the witness's] recantation is neither cumulative, corroborative, nor for impeachment purposes.

*McCracken*, *supra*, 659 A.2d at 545.

Likewise in the case at bar, the recantation of Saday Robinson is not cumulative evidence, corroborative evidence, or impeachment evidence. Rather, the recantation is direct and compelling testimony that Matthew was not present at the scene of the crime. Saday's testimony was the only link between Matthew and the Todd Mattox killing. Matthew has always maintained that he was not there on that day. The circumstantial evidence

26

Respondents' Exhibit 54

connecting Matthew to the killing is virtually non-existent. Other eyewitnesses testified at trial - none of them identified Matthew. Because of the extreme importance of this testimony, the jury should have been able to evaluate this new evidence during their deliberations. As they were unable to do so, a new trial is required.

Arguably, the most important consideration in determining whether a new trial is necessary is whether the recantation testimony is of such a character that a new outcome would have resulted had the recantation been disclosed to the jury. In this case, the recantation is of such immense importance.

Saday Robinson's recantation is a complete repudiation of her trial testimony.[5] In both the CD and the affidavit, Saday admits to lying at trial when she identified both Matthew and Mr. Crumbley as the shooters. She explains that her trial testimony implicated the defendants because the police had promised her assistance with housing and with getting custody

---

[5] These were added to the Certified Record in the companion case of *Commonwealth v. Crumbley*, 127 WDA 2016, and incorporated into the record of Mr. Ebo's case via the Superior Court Order dated March 8, 2017.

27

Respondents' Exhibit 54

of her child if her testimony helped garner a conviction. Of course, at the evidentiary hearing Saday recanted her recantation, saying now that she only provided the recantation testimony after being offered $25,000 from an associate of one of the defendants, and also after being physically threatened. At this point, however, Saday's testimony is so full of inconsistencies that a jury must be given the opportunity to consider all variations of it in order to adjudge whether Matthew is guilty. These inconsistencies, in addition to the identification issue, include:

(1) Saday admitted to giving false information regarding pre-trial publicity of this case;

(2) Saday first said that no one else had told her who had shot Mattox; later she testified to two people giving her names of the potential shooter;

(3) Saday first described the "light skinned" (Matthew) shooter as being 5'7" or 5'8" tall, with a medium build, Matthew is actually 6'2" and weighs 270 pounds;

(4) Saday was shown at least three photo arrays at different times, and only at the last interview, just two weeks before trial, did she identify Matthew and his co-defendant, Saday also admitted to lying to police and falsely identifying others;

28

Respondents' Exhibit 54

(5)  Saday testified at trial that she had no access to the Internet at the time of the shootings, yet she had a Facebook page, first set up in 2009, which included 29 different profile pictures, as well as photos of her child.

Given that Saday's identification is the only evidence linking Matthew to this homicide, and given all the discrepancies in Saday's testimony, including the recantation and the recantation of the recantation, the admission of being deceitful to police and knowingly picking the wrong person from a photo array, or not picking photos even though she recognized them, the contradictory testimony about access to the internet, and the fact that Saday's initial description of the shooter to police does not even slightly match Matthew, a new trial should be ordered in this case.

The jury is entitled to hear all versions of Saday's testimony as this information is critical to the outcome of this case.  If the jury believed the recantation testimony, a not guilty verdict would likely have been issued. Without any evidence against him, Matthew would have been legally entitled to an acquittal.

29

Respondents' Exhibit 54

New trials have been awarded many times when there is a recanting witness, especially when there is no other evidence against the defendant. In *Commonwealth v. Mosteller*, 284 A.2d 786 (Pa. 1971), this Court considered whether a new trial should be awarded when a prosecutrix recanted her testimony after trial, and that testimony was the only evidence upon which the Commonwealth depended to establish that the defendant was guilty. The Court stated that a new trial was necessary "so that a new jury may pass on the prosecutrix's credibility in light of subsequent events [i.e., the recantation]." 284 A.2d at 786.

*Mosteller* concerned a situation where a fifteen year old girl named Frieda accused her father of entering the bathroom while she was bathing, caressing her bosom, and then taking the girl to his bedroom to have sex with her. *Id.* Frieda testified that intercourse lasted for five minutes, that she had no pain, and that no emission occurred. *Id.* The father strenuously denied that these events occurred, admitting to being in the house alone with Frieda but claiming that he was asleep the entire time. *Id.* at 787. Following his conviction for statutory rape and other offenses, the father

30

submitted a request for a new trial, arguing that Frieda wished to retract her trial testimony. *Id.* Frieda recanted in court, even after the Commonwealth attorney explained the penalties of perjury to her. *Id.* The trial court denied the request for a new trial, and the Superior Court affirmed that decision.

This Court reversed, noting that Frieda gave "the only testimony which could possibly have led to appellant's conviction. Not an iota of other corroborating evidence was offered." *Id.* at 788. Thus, the Supreme Court ruled that it was "a clear abuse of discretion not to award a new trial under these circumstances *and thereby allow a new jury to pass on the child prosecutrix's credibility*." *Id.* (emphasis added); *see also Commonwealth v. Medina*, 92 A.3d 1210 (Pa. Super. 2014) (awarding a new trial because the jury should review the credibility of the contradictory testimony to determine which version was credible). Thus, even though the trial court did not believe Frieda's recantation, a new trial was necessary. *See Commonwealth v. McCracken, supra*, 659 A.2d 541, 546 (Pa. 1995) (holding that a new trial was required following the sole incriminating witness's

31

Respondents' Exhibit 54

recantation of his trial testimony, even though the trial court discounted much of that witness's testimony at the recantation hearing), *and Commonwealth v. Fiore*, 780 A.2d 704 (Pa. Super. 2001) (co-defendant's statement that the defendant was innocent of the charge of conspiracy to murder another, even though the trial court found it to be of "questionable validity," would have likely affected the outcome of trial; thus, a new trial was ordered).

Notably, the Superior Court memorandum opinion does not discuss *any* of the above cases, nor does it attempt to distinguish Matthew's case from those provided. Instead, they rely upon the trial court's justification for taking this critical evidentiary function away from the jury – the trial court did not find the recantation to be credible. But in the cases cited above, the courts noted that even when the judge did not find the recantation to be credible, a new trial was awarded.

The interests of justice require the grant of relief to Matthew in this unusual situation. There is a substantial danger that Matthew was not the perpetrator and he was wrongly convicted. At least one version of Saday's

32

testimony proves that Matthew is innocent.  The jury should have access to all of Saday's testimony, including her recantation, before determining which version of her story is credible and making the ultimate decision in this case. Therefore, a new trial is imperative.  *See Commonwealth v. Coleman,* 264 A.2d 649, 652 (Pa. 1970) (Roberts, J., dissenting) (when noting that recantation testimony must be presented <u>to a jury</u> for a credibility evaluation, "We should not forget our 'reluctance to entrust plenary powers over the life and liberty of the citizen to one judge or to a group of judges.' *Duncan v. Louisiana,* 391 U.S. 145 (1968). Appellant deserves the right to have a jury pass on the credibility of the recanting testimony.").

Respondents' Exhibit 54

**II.     When the evidence against a defendant consists of one purported eye-witness's testimony, and the defendant is tried jointly with a co-defendant, the trial court should have granted the motion *in limine* to preclude the Commonwealth from presenting evidence of a second shooting that was only admissible against the co-defendant, is wholly irrelevant to Matthew's guilt or innocence, and is more prejudicial than probative?  In other words, is the defendant's right to a fair trial violated by the admission of Pa.R.E. 404(b) evidence that is only relevant against the co-defendant?**

The bad acts evidence that co-defendant, Thaddeus Crumbley, was involved in a shooting two weeks after the homicide of Todd Mattox was absolutely irrelevant to the issue of whether Matthew Ebo shot Mr. Mattox. The Commonwealth presented no evidence of a connection between Matthew and the irrelevant gun violence evidence involving Crumbley, which severely prejudiced Matthew in this serious case.  As such, a new trial is warranted.

According to the Pennsylvania Rules of Evidence, evidence of a crime, wrong, or other act is inadmissible to prove a person's character in an attempt to show that on a particular occasion that person acted in accordance with the bad character.  Pa.R.E. 404(b)(1); *see Commonwealth. v.*

34

*Brown*, 52 A.3d 320, 325 (Pa. Super. 2012) (citations omitted) ("Bad acts evidence is inadmissible to prove a defendant acted in conformity with those acts or to demonstrate a criminal propensity.").

Rule 404(b) seeks to prevent the misuse of the other crimes evidence since jurors could ultimately convict a defendant based on the defendant's bad character or propensity to commit crimes. *Commonwealth v. Cascardo*, 981 A.2d 245, 251 (Pa. Super. 2009) (citations and quotations omitted). This is important because "[t]he Commonwealth must prove beyond a reasonable doubt that a defendant has committed the particular crime of which he is accused, and it may not strip him of the presumption of innocence by proving that he has committed other criminal acts." *Commonwealth v. Ross*, 57 A.3d 85, 98-99 (Pa. Super. 2012) (citations omitted).

Other crimes evidence is inadmissible under Rule 404(b)(1), unless the Commonwealth can present a statutorily acceptable purpose stated in Rule 404(b)(2) for its admission. Other crimes evidence may be admissible if it is relevant to prove motive, opportunity, intent, preparation, plan,

35

knowledge, identity, absence of mistake, or lack of accident.  However, even if the evidence is admissible for one of these limited purposes, this evidence may not be used if the potential for unfair prejudice outweighs the probative value of the evidence.  Pa.R.E. 404(b)(2).

The other "bad acts" evidence presented against Matthew, the subsequent incident of gun violence involving the co-defendant, had no relevant connection to the issue of whether Matthew shot Todd Mattox. This evidence failed prove Matthew's identity as a shooter, his motive, any plan, knowledge of the shooting, or any other use permitted by the Rule.

Todd Mattox was killed on May 16, 2011.  NT 224, 262.  Multiple casings were recovered from the scene of Mr. Mattox's shooting.  There were two spent .40 caliber S&W casings that were discharged from one firearm.  NT 444-45, 447.  There were five other .40 caliber S&W casings that were discharged by a different firearm.  NT 450.  There were also two .357 Sig caliber cartridge casings that were discharged by a firearm.  NT 454.  According to the firearm expert, Raymond Everett, there were a total of three different guns discharged during the incident.  NT 461.

36

Respondents' Exhibit 54

Two nine millimeter caliber bullets were recovered from Mr. Mattox and they were fired from the same firearm.  NT 455-56.  The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon.  NT 460-61.

The firearm expert tried to match the .40 caliber bullets discovered at the Todd Mattox scene with the Springfield Armory firearm that was subsequently recovered from Asa Thompkins.  The expert noted that the five spent .40 caliber cartridges all came from the same gun and the rifling characteristics matched the test cartridge casings from the Springfield Armory pistol recovered from Thompkins.  NT 450, 475.  However, the expert stated that he could not identify or eliminate those casings as having been fired from that gun.  NT 475-76.  In fact, there are many .40 caliber weapons that have the same class characteristics.  NT 476-77.  The expert could not tell whether the projectiles came from the Springfield firearm or another .40 caliber firearm.  NT 477.

Crumbley was the victim in a shooting on June 2, 2011.  NT 843-47. .40 caliber S&W casings, nine millimeter casings, and a Ruger firearm were

37

Respondents' Exhibit 54

found at the scene.  NT 859-60, 869-70, 885.  The casings were fired from two separate firearms.  NT 885.

Deborah Tator, an expert in firearms and tool marks, testified about the evidence obtained during the shooting of co-defendant Crumbley on June 2, 2011.  She examined the spent .40 caliber S&W casings and determined that they were all fired from the same firearm.  NT 923-25.  She also noted that the nine millimeter casings were all discharged by the Ruger firearm that was discovered at that scene.  NT 925.  The spent .40 caliber S&W casings matched Asa Thompkins' Springfield Armory pistol[6]. NT 360, 927.

Thompkins was arrested on June 9, 2011 and according to Detective Perry, Thompkins had a gun "used in the homicide of Mr. Mattox."  NT 360.  However, to clarify, even though casings found at the scene of the Todd Mattox shooting might or might not have been fired from the Springfield Armory firearm, Mr. Mattox was shot with two nine millimeter

---

[6] Thompkins said the gun belonged to him and he happened to be present at the scene of Crumbley's shooting on June 2, 2011.  NT 847, 852-53, 857, 1009-11.

Respondents' Exhibit 54

bullets. NT 455-56. The two nine millimeter bullets recovered from the autopsy could not have been fired from a .40 caliber weapon. NT 460-61. The Springfield Armory firearm was a .40 caliber weapon, NT 927, so it could not have been used to kill Mr. Mattox. Moreover, the firearms expert could not definitively connect the Springfield gun to the .40 caliber casings discovered at the scene of the Mattox shooting. NT 475-76.

Asa Thompkins' Springfield firearm, discovered in his possession, almost a month after the homicide was completely irrelevant to the issue of whether Matthew committed the homicide of Mr. Mattox. Additionally, the shooting of co-defendant Crumbley and the Ruger firearm discovered at that scene had no relevance to Matthew's trial.

The Springfield firearm was connected to Thompkins and to co-defendant Crumbley. However, no evidence connected Matthew to the Springfield gun, the Ruger gun, or any other evidence related to Crumbley's June 2, 2011 shooting in any way. This evidence was completely irrelevant to the case against Matthew. There was absolutely

39

Respondents' Exhibit 54

no probative value to this extremely prejudicial other bad acts evidence involving Crumbley and Thompkins.

The Commonwealth argued at the hearing that this information was necessary, stating, "[I]t is physical evidence that would link Mr. Crumbley to the crime scene of the shooting[.]"  Notes of Testimony from the July 27, 2012 Motions Hearing, hereinafter "MH," at 56.   The Commonwealth noted:

> [T]here was a .40-caliber handgun used during the May 16th shooting death[7], and that .40-caliber under 404(b) on June 2, 17 days later, was discharged at least eight times during the shoot-out and the casings are inside the car.  A week after that, on June 9th, Asa Thompkins, the witness we are speaking about got arrested with that .40-caliber handgun and has been linked scientifically.

MH 35.  The Commonwealth later said, "The other crime is that he was involved in an exchange of gunfire.   That's criminal activity.   Having casings in your car is not a crime, but it is physical evidence of a link to the

---

[7] The firearms expert could not definitively connect the Springfield gun to the casings discovered at the scene of the Mattox shooting.  NT 475-76.

Respondents' Exhibit 54

previous incident."  MH 59.  The Commonwealth said nothing about how this incident involving Crumbley linked Matthew to the Mattox shooting.

Matthew's counsel joined in the objections made by Crumbley's attorney at the beginning of the hearing on these various pretrial motions and objections.  MH 7.  At the conclusion of the arguments presented by Crumbley's counsel, Matthew's attorney noted that he had no further arguments to add.  MH 58.

The trial court allowed the evidence in to show identity of both Matthew and Crumbley as participating in the Mattox shooting.  MH 55-56. In order to properly admit other crimes evidence to show identity, there must be such a high correlation in the details of the crimes, that proof that someone committed one of the crimes makes it unlikely that a different person committed the other crime.  *Commonwealth v. Ross*, 57 A.3d 85, 102 (Pa. Super. 2012) (citations and quotations omitted).

Contrary to the reasoning by both the Commonwealth and the trial court, the admission of this firearm does not prove *Matthew's* identity as the shooter in the Mattox homicide.  When discussing the admission of this

41

Respondents' Exhibit 54

other crimes evidence, the parties seemed to be addressing how this evidence showed co-defendant *Crumbley's* identity, not Matthew's identity. No evidence was presented that Matthew had any connection to the Springfield gun, that he had any connection to Crumbley's shooting on June 2, 2011 where the Springfield gun was involved, or that he had any connection at all with Asa Thompkins, who was at the scene of the June 2, 2011 shooting of Crumbley and who was in possession of the Springfield firearm on June 9, 2011.

To find that a subsequent gun battle involving Crumbley or that Thompkin's possession of the Springfield firearm that ejected casings that may have been found at the Mattox murder scene somehow identifies Matthew as the shooter in the Todd Mattox homicide case is pure speculation. Even if that firearm somehow connected Thompkins or Crumbley to the scene of Mr. Mattox's murder, it in no way tied Matthew to that scene. The evidence should not have been admissible under Pa.R.E. 404(b)(1).

42

Respondents' Exhibit 54

In *Commonwealth v. Robinson*, 721 A.2d 344 (Pa. 1998), the Pennsylvania Supreme Court disagreed with a somewhat analogous argument made by the Commonwealth. In *Robinson*, the Court found it erroneous for the trial court to have admitted photographs of a defendant posing with a nine millimeter handgun to show that he had experience with nine millimeter guns, when the testimony showed that a different make of nine millimeter gun was used in the murder. *Id*. at 351.

In *Robinson*, someone shot the defendant's ex-girlfriend and killed her paramour. The ex-girlfriend identified the defendant as the shooter. Police recovered nine millimeter casings at the scene, which were all fired from the same gun. The murder weapon would have been manufactured by one of four possible companies, one of which was Lorcin. *Id.* at 349. The police searched the defendant's residence and found documents in a locked safe relating to a nine millimeter Lorcin gun. They did not find the murder weapon. They also found a picture of the defendant holding a nine millimeter Star gun, a Federal .44 SPL revolver with ammunition, and a bulletproof vest. *Id.* at 350.

43

Respondents' Exhibit 54

The defendant argued that the revolver, the ammunition, the bulletproof vest, and the photographs of the defendant with guns were not relevant. *Id*  The Commonwealth stated that the photographs showed that the defendant was capable of using a nine millimeter gun, the type of gun used in the murder. *Id*. at 351.  The Supreme Court disagreed, noting that there was no evidence that the nine millimeter Star gun shown in the photograph was used to commit the murder; thus, it was simply not relevant.  *Id*.  Even if the photographs of the defendant with a nine millimeter gun were relevant to show experience with nine millimeter guns, the Court held that the prejudicial impact of these photographs outweighed any probative value.  *Id.*  The Commonwealth used the pictures to show that the defendant was a person capable of committing these crimes.  *Id*.  The Court also held that the unrelated revolver was not relevant or admissible since the revolver was not used in the shooting.  *Id*. at 352.  Finally, the bulletproof vest and the ammunition were irrelevant

Respondents' Exhibit 54

because there was no logical connection between that evidence and the issues presented.[8]  *Id.* at 353.

*Robinson* provides guidance here because the gun evidence was not relevant to any issues in Matthew's trial.  Although the firearm found on Thompkins may have had a connection to the Todd Mattox crime scene and it definitively had a connection to the Crumbley shooting, it in no way connected *Matthew* to these incidents.  Just because this evidence may somehow connect Crumbley to the Todd Mattox murder scene, it does not automatically mean that Matthew is also connected just because he was charged as a co-defendant.  For these reasons, the gun evidence admitted against Matthew was completely irrelevant and did not show Matthew's identity as a shooter.

To the extent that this Honorable Court finds the evidence relevant, this Court may still exclude relevant evidence if the probative value is outweighed by the danger of its unfair prejudicial effect, its ability to

---

[8] These errors were harmless since there was substantial properly admitted evidence at trial establishing the defendant's guilt.  *Robinson,* 721 A.2d at 351-53.

Respondents' Exhibit 54

confuse the issues, or the danger that it will mislead the jury.  Pa.R.E. 403.

Unfair prejudice involves a tendency to suggest a decision on an improper

basis or to divert the jury's attention away from its duty of weighing the

evidence impartially.  Pa.R.E. 403, *Comment*.

This evidence that Crumbley was involved in a subsequent shooting

and that Crumbley may have had a connection to a gun used at the Mattox

crime scene was confusing to the jury since it had nothing to do with

Matthew.  The jury could have inferred that the presentation of this

evidence somehow connected Matthew with the Mattox crime scene and

the subsequent gun violence involving Crumbley.  It was prejudicial since

it appeared that Matthew, as a co-defendant of Crumbley, had some kind

of connection with these men who involved themselves with gun violence,

thereby making it more likely that he shot Mr. Mattox.  Crumbley's

subsequent shooting had no bearing on Matthew's trial and likely diverted

the jury's attention from the issue at hand, which was whether Matthew

committed the intentional murder of Todd Mattox in May of 2011.  The

absolute irrelevance of this evidence makes the prejudice all the worse.  *See*

Respondents' Exhibit 54

*also Commonwealth v. Brown*, 52 A.3d 320, 325, 332-33 (Pa. Super. 2012) (the prior bad act – that a physician had improperly obtained his medical degree and license – was irrelevant to whether, many years later, he engaged in illegal drug transactions; because of the prejudicial effect of this evidence a new trial was required).

The admission of this evidence was not harmless error.  An error is not harmless if there is a reasonable possibility that the error could have contributed to the verdict.  *Commonwealth v. Laich*, 777 A.2d 1057, 1062 (Pa. 2001).   The Commonwealth must show that either the error did not prejudice the defendant, the erroneously admitted evidence was cumulative of other untainted, substantially similar evidence, or the properly admitted evidence of guilt was so overwhelming and the prejudicial effect of the error so insignificant by comparison that the error could not have contributed to the verdict.  *Id*. at 1062-63.

Matthew was on trial for murder and he faced the severe consequence of a life in prison.  It was imperative that the members of the jury address the facts of this case without any type of prejudicial or

47

Respondents' Exhibit 54

confusing information biasing them in making their decision.  The fact that the Commonwealth presented the jury with this information and the jury had it for consideration when deciding Matthew's fate prejudiced him in this life-changing case.

When considering the very limited evidence connecting Matthew to the shooting of Todd Mattox, the fact that the trial court admitted irrelevant evidence of Crumbley's subsequent connections to gun violence was absolutely confusing and prejudicial.  It lacked any connection to Matthew's case and the jury could only infer that Matthew had something to do with the subsequent gun activities involving Crumbley and Thompkins.  This no doubt affected the jury and contributed to the verdict. For the above reasons, the trial court's error in admitting this irrelevant other crimes evidence significantly prejudiced Matthew, thereby necessitating a new trial.

Respondents' Exhibit 54

## PRAYER FOR RELIEF

Wherefore, for the above stated reasons, the petitioner, Matthew Ebo, prays that this Honorable Court will allow an appeal from the Memorandum Opinion and Judgment entered by the Superior Court on June 21, 2017.

Respectfully submitted,

Elliot C. Howsie
Public Defender

Brandon P. Ging
Chief – Appellate Division

By _____/s/ *Victoria H. Vidt*_____,
Victoria H. Vidt
Assistant Public Defender
Appellate Counsel

49

Respondents' Exhibit 54

IN THE SUPREME COURT OF PENNSYLVANIA

WESTERN DISTRICT

COMMONWEALTH OF PENNSYLVANIA
       Respondent

       v.                      ____ W.D. Allocatur Docket 2017

MATTHEW EBO,
       Petitioner

## **CERTIFICATE OF COMPLIANCE**

By signature below, appellate counsel verifies that the applicable portions of the Petition for Allowance of Appeal in this case does not exceed 9,000 words, as required by Pa.R.A.P. 1115(f).

Respectfully submitted,

_____*/s/ Victoria H. Vidt*_____
VICTORIA H. VIDT
Appellate Counsel
PA I.D. # 67385

Respondents' Exhibit 54