0856

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| | ) | |
| v. | ) | CC #   2012-2820 |
| | ) | |
| THADDEUS CRUMBLEY, | ) | |
| | ) | |
| Defendant | ) | |
| | ) | |
| _____ | ) | |
| | ) | |
| COMMONWEALTH OF PENNSYLVANIA | ) | |
| | ) | |
| v. | ) | CC # 2012-2821 |
| | ) | |
| MATTHEW EBO, | ) | |
| | ) | |
| Defendant. | ) | |

ORIGINAL
Criminal Division
Dept. Of Court Records
Allegheny County, PA

## MEMORANDUM ORDER

AND NOW, this __13th__ day of December, 2019, upon

consideration of the Defendants' counseled PCRA petitions, filed on August

14, 2018 (Def. Crumbley), and June 29, 2018 (Def. Ebo), the

Commonwealth's Answers thereto, filed on November 19, 2018 (Def.

Crumbley) and December 3, 2018 (Def. Ebo), and upon further

consideration of the evidence and argument presented at the EVIDENTIARY

HEARING held on May 10, 2019, and the post-hearing submissions filed on

behalf of the Defendants and the Commonwealth, **the court HEREBY**

**FINDS THAT THE DEFENDANTS ARE NOT ENTITLED TO PCRA RELIEF**

1

Respondents' Exhibit 70

**based on their after-discovered evidence claim under 42 Pa. C.S.A. §9543(a)(2)(vi).** The court offers the following rationale in support of this Order denying PCRA relief.

## A. RELEVANT PROCEDURAL HISTORY

Following a jury trial that led to their First-Degree Murder convictions, the Defendants were sentenced on November 28, 2012.  The Defendants pursued direct appeals before the Superior Court of Pennsylvania.  Prior to their brief submissions, the Defendants filed Applications for Remand based on After-Discovered Evidence.  The Defendants claimed that Saday Robinson, the central eyewitness who testified at their joint trial, had subsequently recanted her identification of the Defendants as the perpetrators of the Todd Mattox murder.

On August 6, 2015, the Superior Court remanded the case back to the trial court so that it could conduct an evidentiary hearing and determine whether a new trial was warranted on that basis.  However, at the evidentiary hearing that took place on October 29, 2015, Saday Robinson recanted her post-trial, unsworn recantation, claiming that she had been threatened by the Defendants' associates into recanting her trial testimony.  In an Order dated December 22, 2015, this court found that a new trial was not warranted based on Ms. Robinson's unsworn "recantation" that she had made to defense investigators.

2

Respondents' Exhibit 70

0858

The case was sent back to the Superior Court, and this court's finding that a new trial was not warranted based on Ms. Saday's "recantation" was included as one of the issues raised in the Defendants' appeals. On June 21, 2017, the Superior Court affirmed the Defendants' convictions but vacated Defendant Ebo's sentences at Counts Three (3) and Six (6) based on <u>Alleyne</u> violations.[1] (Superior Court Opinion (Ebo), Docket No. 92 WDA 2016, p. 17); (Superior Court Opinion (Crumbley), Docket No. 127 WDA 2016).

The Defendants subsequently filed Petitions for Allowance of Appeal ("PAA") before the Pennsylvania Supreme Court, which were both denied on December 13, 2017.  The Defendants did not seek relief before the United States Supreme Court.

## B. <u>TIMELINESS OF PETITIONS</u>

The Defendants' PCRA Petitions are timely pursuant to 42 Pa. C.S.A. § 9545(b).   Defendant Ebo was resentenced on February 28, 2018.  Though he subsequently filed a direct appeal, his attorney discontinued that appeal on May 30, 2018. The Superior Court issued its Certification of Discontinuance that same day. Accordingly, Defendant Ebo's judgment of sentence became final on May 30, 2018. <u>Commonwealth v. McKeever</u>, 947 A.2d 782, 785 (Pa. Super. 2008) ("[T]he record reveals that Appellant's

---

[1] Defendant Ebo was convicted of Robbery of a Motor Vehicle at Count Three (3) and Conspiracy to commit Robbery – Serious Bodily Injury at Count Six (6).

Respondents' Exhibit 70

judgment of sentence became final on . . . the date Appellant discontinued his direct appeal.").

Since Defendant Crumbley did not require re-sentencing, and the Pennsylvania Supreme Court denied his PAA petition on December 13, 2017, his judgment of sentence became final on March 13, 2018, when the 90-day period for seeking a *writ of certiorari* expired.  Commonwealth v. Ruiz, 131 A.3d 54, n. 8 (Pa. Super. 2015). Accordingly, Defendant Crumbley had until March 13, 2019 to file a timely PCRA petition and Defendant Ebo had until May 30, 2019 to do the same.  (*See* 42 Pa. C.S.A. § 9545(b)) (requiring timely petitions to be filed within one year of the judgment of sentence becoming final).

Defendant Crumbley filed his *pro se* PCRA petition on February 13, 2018, while Defendant Ebo filed his *pro se* PCRA petition on January 17, 2018.[2]  Therefore, each of the Defendants' petitions are timely under the PCRA, and the issues raised therein have not been previously litigated on direct appeal.

## C. <u>AFTER-DISCOVERED EVIDENCE CLAIM</u>

After the appointment of PCRA Counsel, Defendant Crumbley submitted an Amended PCRA Petition on August 14, 2018, and Defendant Ebo submitted his Amended PCRA Petition on June 29, 2018. In these

---

[2] Defendant Ebo's *pro se* PCRA petition was held in abeyance pending his resentencing and any subsequent post-sentence motions/appeals.

Respondents' Exhibit 70

petitions, the Defendants claimed that they had discovered that a man named Robert Raglin witnessed the May 16, 2011 murder[3] of Todd Mattox and that he would be willing to testify that the Defendants were not the perpetrators of that crime.  (*See* "Witness Statement" of Robert Raglin, dated July 31, 2018, and attached to Def. Crumbley's Amended PCRA Petition, filed on August 14, 2018); (*See* Sworn Notarized Statement of Robert Raglin, dated May 4, 2018 and attached as "Exhibit A" to Def. Ebo's PCRA petition, filed 6/29/18).  Given the nature of these claims, the court held a PCRA hearing on May 10, 2019 to determine the validity and credibility of this potential after-discovered evidence.

At the PCRA Hearing, Mr. Raglin appeared and testified to the following set of facts:

a. On May 16, 2011, the day Todd Mattox was shot to death at the Leechburg Gardens Apartments in Penn Hills, Mr. Raglin was working as a jitney driver. (PCRA Hearing Transcript ("HT"), held 5/10/19, pp. 4-5, 23).

b. That evening, shortly before the shooting occurred, Mr. Raglin picked up two (2) African American men and drove them to the Leechburg Gardens apartment. (HT, pp. 5-7, 23-24). He claimed that he recognized these men because they had used his jitney

---

[3] The facts relating to the murder of Todd Mattox were set forth in the Trial Court Opinion ("TCO") that was filed on June 25, 2014.

Respondents' Exhibit 70

services "more than ten" times in the past. (HT, pp. 5-7). He described one of the men as being "really tall" with "dark skin," approximately 6'8 in height. (HT, p. 6). He described the other man as being "short" and "light-skinned." (HT, p. 6).

c.  When presented with photographs that were marked as Defense Exhibits A and B, he was able to identify the individuals in those pictures as the men he had driven to the Leechburg Gardens apartment that day. (HT, pp. 7-8). He had nicknamed them "stretch" and "young buck" but recalled that they referred to each other as "Ron and Rome or something like that." (HT, pp. 8-9, 26).

d.  Mr. Raglin testified that he dropped these men off at the Leechburg Gardens at approximately 7:00 p.m., when it was getting dim outside.  (HT, pp. 10, 29).

e.  After he dropped them off, Mr. Raglin testified to the following series of events:

> I was turning my car around so I could go out. I had to go to the bathroom by the fire hydrant and the big Christmas tree. As I'm standing up peeing, a white car comes in [the parking lot], two guys started busting off caps, and everybody started shooting at each other. I dove on the ground, crawled in my car, dropped my seat back and pulled out. (HT, p. 10).

f.  Mr. Raglin testified that he "clearly" saw that "Ron and Rome" were firing their guns "[o]ver in that direction towards the

Respondents' Exhibit 70

parking lot in that area" where the white car was located. (HT, pp. 11, 36).

g. However, he also testified that he "wasn't paying no attention" to what or who they were shooting at because he dropped to the ground as soon as he saw "the sparks and fires." (HT, pp. 10-11). As he described it: "I dropped down, peed on myself, crawled in my car, kicked my seat back and just pulled off. I started lifting my head up as I am pulling out." (HT, p. 30).

h. After Mr. Raglin got back inside of his vehicle, he noticed that the white car had pulled out behind him, and he thought that the people inside of the white car were going after him because of what he had just witnessed. (HT, pp. 11, 31).

i. Even though Mr. Raglin saw Ron and Rome shooting at the people in the white car, Mr. Raglin thought that Ron and Rome were now in the white car behind him. (HT, pp. 12, 31). However, Mr. Raglin never saw anyone get in or out of the white car, and he could not see inside of the vehicle at any point. (HT pp. 11, 43-44).

j. Mr. Raglin was able to retreat safely from the scene, but he never went to the police to report the shooting that he had allegedly witnessed, and, at that time, he was unaware that

Respondents' Exhibit 70

anyone had been killed in the shootout. (HT, pp. 12, 19). Law

enforcement also never attempted to contact him in 2011

about the shooting. (HT, p. 18).

k.   When asked why he decided to come forward with this

information in 2018, Mr. Raglin testified as follows:

> I was in the [Allegheny] county jail, and I was on the
> fourth floor just coming in, and these gentlemen was
> talking and they was pointing at me. So they called me to
> be released. As I am coming downstairs to be released,
> **some young guy told me** - - he was from Turtle Creek or
> something - - **he told me that I was there. And I said,
> "[w]here?" He says "you was there for the
> ["Leechburg, Penn Hills"] shooting." And he goes,
> "say that you wasn't, and I'll jump on you." I'm like,
> what the hell? So I put my foot on the bunk and
> stood up to fight to defend myself.** (HT, pp. 12-
> 13)(emphasis added).

l.  Mr. Raglin testified that this young man was a fellow inmate

whom he did not know and had never seen before. (HT, pp.

12-13, 24, 33-34). This unidentified inmate told Mr. Raglin

that he knew Mr. Raglin was there that night because he was

there too. (HT, pp. 12, 34).

m. Mr. Raglin stated that the inmate provided the details of the

incident, telling him "exactly where it happened, exactly what

time it was. [The inmate] said the guy's name that died." The

inmate also told him that "these were the two men that did

it." (HT, pp. 24-25, 33).

8

Respondents' Exhibit 70

n. Mr. Raglin testified that he was scared that this inmate was going to physically assault him.  (HT, pp. 13, 33, 34-35). He "felt threatened enough . . . to jump on the bunk and brace" himself "for just two of them against me." (HT, p. 35). The jail guards had to step in to prevent an altercation. (HT, pp. 13-14, 35).

o. Mr. Raglin testified that he "didn't know any of this [information]" and that he was "in shock" because he was "being attacked" so he "had to do research on why" he was "being attacked." (HT, pp. 25, 33, 45).

p. Mr. Raglin testified that when he was released from jail shortly thereafter, he had a friend of his fact-check the information that the inmate had provided on her cell phone because he wanted to know why he "was threatened for my life in jail." (HT, pp. 13-14, 25, 45-46). He asked his friend to google "the days, dates, things like that." (HT, pp. 14, 39, 45).

q. When he saw the pictures of the Defendants and learned that they had been convicted of the murder, he "knew [they were not] the people that" he had driven to the complex. (HT, p 14). This prompted Mr. Raglin to write a letter to Defendant

Respondents' Exhibit 70

Crumbley telling him "that I knew they were innocent because I was there." (HT, pp. 14-15).

r. Mr. Raglin testified that he decided to reach out to Mr. Crumbley because he had a brother in prison who he believes was wrongfully convicted, and he did not "want an innocent man to be in jail." (HT, pp. 15-16, 33, 39-40).

s. Mr. Raglin further testified that he does not know and has never seen any member of the Crumbley or Ebo family and that the Defendants were not present during the shooting incident that he witnessed. (HT, pp. 16-17, 36).

t. Mr. Raglin confirmed that the witness statements that were attached to the PCRA petitions were true. (HT, p. 23). Though he claimed he saw "something in one line somewhere" when he was reading it that was a discrepancy, but he never scratched anything out or attempted to correct this purported discrepancy. (HT, p. 23).

u. Mr. Raglin also testified that he did not attempt to contact law enforcement or the District Attorney's Office with the information he had relayed to Defendant Crumbley through his letter.   (HT, pp. 39-41).

v. When questioned by this court, Mr. Raglin clarified that he did not actually see anyone get struck by a bullet, he did not see

10

Respondents' Exhibit 70

0866

what the victim looked like at any point, and he did not see

anyone laying on the ground. (HT, pp. 42-43).  He also

testified that he never saw anyone get out of the white car

before the shooting started and he did not see who entered

the white car after the shooting because he "wasn't paying

attention" and "everything happened in a tenth of a second."

(HT, pp. 43-44).

### Application of Law to Facts

In <u>Commonwealth v. Burton</u>, 158 A.3d 618, 629 (Pa. 2017), the

Pennsylvania Supreme Court reiterated the requirements necessary to

establish a successful after-discovered evidence claim pursuant to 42 Pa.

C.S.A. § 9543(a)(2)(vi):

> "[W]here a petition is otherwise timely, to prevail on an after-
> discovered evidence claim for relief under subsection
> 9543(a)(2)(vi), a petitioner must prove that (1) the exculpatory
> evidence has been discovered after trial and could not have been
> obtained at or prior to trial through reasonable diligence; (2) the
> evidence is not cumulative; (3) it is not being used solely to
> impeach credibility; **and** (4) it would likely compel a different
> verdict. <u>Commonwealth v. D'Amato</u>, 579 Pa. 490, 856 A.2d 806,
> 823 (2004); see Cox, 146 A.3d at 227–28 ("Once jurisdiction
> has been properly invoked (by establishing either that the
> petition was filed within one year of the date judgment became
> final or by establishing one of the three exceptions to the PCRA's
> time-bar), the relevant inquiry becomes whether the claim is
> cognizable under [Section 9543] of the PCRA.") (emphasis
> added).

In this case, this court finds that Robert Raglin's testimony fails to

satisfy the third and fourth prongs of this test.

Respondents' Exhibit 70

### *Evidence Solely Used For Impeachment*

With respect to the third prong, our appellate court in <u>Commonwealth v. Padilla</u>, 997 A.2d 356, 365 (Pa. Super. 2010) offered the following guidance:

> "Whenever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness, it constitutes impeachment...." <u>Commonwealth v. Weis</u>, 416 Pa. Super. 623, 611 A.2d 1218, 1229 (1992). **Where eyewitness identification tied the defendant to the crime charged and the defendant challenged the identification in his trial, third-party testimony exculpating the defendant impeaches the eyewitness**. <u>Commonwealth v. Moore</u>, 534 Pa. 527, 561, 633 A.2d 1119, 1136 (1993), cert. denied, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995) (rejecting witness' statement against penal interest as reliable after-discovered evidence, where sole purpose of statement was to impeach testimony connecting defendant to crime) (emphasis added).

Here, the Defendants are offering Mr. Raglin's testimony to exculpate them, which in turn, impeaches the credibility of Saday Robinson, the central eyewitness who consistently, and very convincingly, identified the Defendants as the men who murdered Todd Mattox. The Defendants challenged Ms. Robinson's identification testimony all throughout the lower court proceedings and direct appeal.

Indeed, an appellate remand was even required to address the post-trial attempt made by the Defendants' associates to persuade Ms. Robinson to recant her trial testimony. (*See* Order of Court dated 10/29/15, pp. 2-4) ("During her testimony at the October 29, 2015 hearing, Ms. Robinson explained that the statements that she had made in video and written form

Respondents' Exhibit 70

were untruthful. She explained that she had lied to [the] defense

investigator . . . because she had been threatened by people associated with

the defendants. Additionally, she had been offered a substantial sum of

money - - $ 25,000 - - to recant her trial testimony.").

The Defendants have argued that such evidence is not being solely

used to impeach because it constitutes substantive, exculpatory evidence

which unequivocally establishes their innocence.  Having presided over the

original trial, the after-discovered evidence hearing, and the PCRA hearing,

this court has little trouble disagreeing with that argument.

At the PCRA hearing, this court paid careful attention to Mr. Raglin as

he testified, studying his tone, demeanor, and overall credibility, which was

substantially lacking. Although Mr. Raglin claimed to have "clearly" seen

"Ron and Rome" firing their guns at the white car, and although he

maintained that the Defendants were not present at the scene, that

testimony must be considered against other portions of his testimony

relating to what he did *not* see at the time of the shooting. (HT, pp. 11, 17).

Mr. Raglin never saw the individuals in the white car, never saw

anyone get struck by bullets, and never saw anyone laying on the ground.

(HT, pp. 42-43). Significantly, Mr. Raglin repeatedly testified that he was not

paying any attention to the details after he heard gunfire because he

dropped to the ground and was focused on getting out of the parking lot

alive. (HT, pp. 10-11) ("I wasn't paying no attention. I was hitting the

Respondents' Exhibit 70

0869

ground. When I saw the sparks and fires, I dropped."). Mr. Raglin also testified to the presence of a "big *Christmas* tree" in the apartment complex, which this court finds to be curious considering the fact that the murder took place in the middle of May. (HT, pp. 10, 44).

*At best,* Mr. Raglin's testimony established that he may have been present at the scene of a shootout but it fell far short of establishing that he was an eyewitness to the Todd Mattox murder, especially when compared to Saday Robinson's testimony.  As recounted in its Trial Court Opinion, Ms. Robinson observed first-hand each of the Defendants, with guns in their hands, shoot the victim. To be sure:

> . . . Saday Robinson [] described the sounds of an altercation above her apartment in the minutes before the shooting, followed by the noise of people running down stairs. (Trial Transcript ("TT"), held 8/20/12, pp. 527-28). She then saw Mr. Mattox being pushed out the front door of the apartment complex by two (2) African-American males with handguns. (TT, 8/20/12, pp. 528-29). She was able to hear Mr. Mattox pleading for his life, offering the two (2) males everything that he had, and backing away from them with his hands up. (TT, pp. 529-31). [She] described seeing a man that she later identified as Defendant Ebo shooting at Mr. Mattox three (3) times. (TT, p. 531). Mr. Mattox fell to the ground after the gunshots were fired. (TT, p. 531). [She] then described seeing Defendant Ebo going through the pants pockets of Mr. Mattox before she saw a person that she later identified as Defendant Crumbley walk up to Mr. Mattox, stand []over his body as it lay in the parking lot, and shoot him directly in the head. (TT, p. 532-34). She then indicated that she saw the Defendants get into Mr. Mattox's white Nissan and speed out of the parking lot. (TT, p. 534).

14

Respondents' Exhibit 70

Saday Robinson has repeatedly, and to her own detriment, identified the Defendants as the shooters, under oath in open court, at trial and then again during the after-discovered evidence hearing.  Moreover, as this court further explained in its October 29, 2015 Order:

> This court had the benefit of sitting through the original homicide trial, and it observed firsthand Ms. Robinson's demeanor when she provided her eyewitness account of the brutal murder and identified the Defendants as the perpetrators.  Ms. Robinson shook uncontrollably throughout her testimony and was clearly frightened to be involved in the case.  As the Commonwealth noted in its brief, Ms. Robinson had *nothing to gain and everything to lose* by testifying against the Defendants during the homicide trial.

Accordingly, the court finds that Mr. Raglin's testimony, which is far from credible, is being presented solely to impeach the strong, unwavering identification testimony of Saday Robinson, and that fact alone defeats their after-discovered evidence claim.

### *Evidence is Unlikely to Compel a Different Verdict*

With respect to the fourth prong, the court finds that it is unlikely that Mr. Raglin's testimony would compel a different verdict at trial when considered against the evidence as a whole.  In addition to Ms. Robinson's clear and unequivocal eyewitness testimony, other circumstantial evidence linked the Defendants to the shooting. (*See* Trial Court Opinion, filed 6/25/14).

Ultimately, this court did not consider Mr. Raglin's testimony to be credible because of the inconsistencies contained therein and because of the

15

Respondents' Exhibit 70

clear motive to fabricate his testimony out of fear for his life. For example, Mr. Raglin's witness statement says he had driven Ron and Rome in his jitney "two to three" times prior to the day of the shooting, but at the hearing he testified that he had driven them around "more than ten times." (Defendant's Crumbley's Amended PCRA Petition); (HT, p. 7).  In his testimony he said he had taken Ron and Rome to Leechburg Gardens before, but in his witness statement he says that was the first time he had ever taken them there. (Defendant's Crumbley's Amended PCRA Petition); (HT, p. 18). In his witness statement, the "friend" who helped him research the shooting after he was released from jail was a male, but at the hearing, Mr. Raglin testified that this friend was a female. (Defendant's Crumbley's Amended PCRA Petition); (HT, pp. 13-14, 25).

As Mr. Raglin noted several times throughout the hearing, he was approached by an inmate who told him, "you was there for the shooting . . . **[s]ay that you wasn't, and I'll jump on you.**" (HT, p. 13) (emphasis added). The inmate told him who was killed, who the shooters were, and the time and location of the shooting. As Mr. Raglin put it, the inmate "was mentioning so much. It was just too much chaos." (HT, pp. 24-25). Thus, it is impossible to discern whether Mr. Raglin's testimony is purely a product of his memory or the information he had been threatened into "remembering" seven (7) years after the murder.  The court also questions why this unidentified inmate who allegedly was present at the shooting and

16

Respondents' Exhibit 70

possessed this information, threatened Mr. Raglin into coming forward and has not come forward himself to corroborate his testimony

Another factor that further diminishes Mr. Raglin's credibility is the fact that his alleged motive to come forward, after his life was threatened, was to help clear the name of purportedly innocent men, yet he never contacted the authorities, or the District Attorney's Office, with the information he had about their "wrongful" convictions.  The court is also compelled to note that, somewhat conveniently, the men known as "Ron and Rome" were found dead in the same vehicle in early 2012, and "Rome" was Defendant Crumbley's cousin. (TT, pp. 945, 948, 991).  Accordingly, for all these reasons, the court finds that the Defendants have not established a successful after-discovered evidence claim, and no PCRA relief is warranted.


BY THE COURT:

_____, J.

BETH A. LAZZARA, JUDGE

17

Respondents' Exhibit 70