**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| MATTHEW EBO | : | |
| | : | |
| Appellant | : | No. 58 WDA 2020 |

Appeal from the PCRA Order Entered December 13, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at No(s):  CP-02-CR-0002821-2012

BEFORE:   OLSON, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                **FILED FEBRUARY 19, 2021**

Appellant, Matthew Ebo, appeals from the December 13, 2019 order dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

The record demonstrates that on September 14, 2012, a jury found Appellant guilty of criminal homicide (first-degree murder), robbery – infliction of serious bodily injury, robbery of a motor vehicle, carrying a firearm without a license, conspiracy to commit robbery – infliction of serious bodily injury, and conspiracy to commit murder in connection with the May 16, 2011 shooting death of the victim.[1]  On November 28, 2012, the

---

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2501(a), 3701(a)(1)(i), 3702(a), 6106(a)(1), 903(c), and 903(c), respectively.  Appellant was tried jointly with co-defendant,

Respondents' Exhibit 76

trial court sentenced Appellant to life imprisonment without parole for his criminal homicide conviction and an aggregate, consecutive 46 to 92 years' imprisonment for the remaining convictions.[2]

While Appellant's case was pending on direct appeal before this Court, Appellant filed an application for remand based upon alleged after-discovered evidence.[3] In a *per curiam* order issued on August 6, 2015, this Court remanded Appellant's case and instructed the trial court to conduct a hearing to address Appellant's request for a new trial based upon this after-discovered evidence. On December 22, 2015, the trial court denied Appellant's request, and Appellant subsequently filed a notice of appeal. On June 21, 2017, this Court affirmed Appellant's convictions but vacated his unlawful sentences for

---

Thaddaeus Crumbley ("co-defendant"). The trial court, in a bench trial, convicted Appellant of possession of a firearm prohibited, 18 Pa.C.S.A. § 6105(a)(1).

[2] The trial court imposed a sentence of ten to twenty years' imprisonment for robbery of a motor vehicle, three and one-half to seven years' imprisonment for carrying a firearm without a license, two and one-half to five years' imprisonment for possession of a firearm prohibited, ten to twenty years' imprisonment for conspiracy to commit robbery – infliction of serious bodily injury, and twenty to forty years' imprisonment for conspiracy to commit murder. All of these sentences were to run consecutive to Appellant's life sentence.

[3] Appellant's direct appeal was docketed with this Court at 1194 WDA 2013. The after-discovered evidence included the unsworn statement of a witness who testified at Appellant's trial ("trial witness"), in which the trial witness recanted her pre-trial and in-court identifications of Appellant and his co-defendant as the shooters involved in the victim's murder. ***See Commonwealth v. Ebo***, 174 A.3d 91 (Pa. Super. 2017) (unpublished memorandum).

Respondents' Exhibit 76

robbery of a motor vehicle and conspiracy to commit robbery – infliction of serious bodily injury.  **Commonwealth v. Ebo**, 174 A.3d 91 (Pa. Super. 2017) (unpublished memorandum) (finding, that the mandatory minimum sentences imposed pursuant to Section 9712 of the Pennsylvania Sentencing Code were illegal under **Alleyne v. United States**, 570 U.S. 99 (2013), as determined by this Court in **Commonwealth v. Valentine**, 101 A.3d 801 (Pa. Super. 2014), *appeal denied*, 124 A.3d 309 (Pa. 2015)).  Appellant filed a petition for allowance of appeal, which our Supreme Court subsequently denied on December 13, 2017.

On January 17, 2018, Appellant filed *pro se* a PCRA petition, his first. The PCRA court appointed counsel to represent Appellant but held Appellant's petition in abeyance because of Appellant's pending resentencing procedure. On February 28, 2018, the trial court resentenced Appellant to life imprisonment without parole for his criminal homicide conviction together with an aggregate, consecutive sentence of 46 to 92 years' imprisonment for his remaining convictions.[4]  Appellant filed a post-sentence motion, which the trial court subsequently denied on April 11, 2018.  Counsel for Appellant filed a

---

[4] The trial court fashioned the same length of consecutive sentences for Appellant's convictions of robbery of a motor vehicle, carrying a firearm without a license, possession of a firearm prohibited, conspiracy to commit robbery – infliction of serious bodily injury, and conspiracy to commit murder without imposing mandatory minimum sentences pursuant to 42 Pa.C.S.A. § 9712.

- 3 -

notice of appeal on May 8, 2018.[5]  This Court, in a May 30, 2018 *per curiam* order, discontinued Appellant's direct appeal from resentencing at Appellant's request.[6]  Appellant's judgment of sentence, therefore, became final on May 30, 2018.  **See Commonwealth v. McKeever**, 947 A.2d 782, 785 (Pa. Super. 2008) (holding, that for purposes of the PCRA, a petitioner's judgment of sentence becomes final on the date he, or she, discontinued the direct appeal).

On June 29, 2018, Appellant amended his original PCRA petition raising a claim for relief based upon after-discovered evidence.  Appellant subsequently filed a supplement to his amended PCRA petition setting forth, in detail, the argument that Appellant was entitled to a new trial based upon after-discovered, exculpatory eyewitness testimony.  On May 10, 2019, the PCRA court held a hearing on Appellant's PCRA petition, and subsequently denied Appellant's petition on December 13, 2019.  This appeal followed.[7]

Appellant raises the following issues for our review:

---

[5] Appellant filed *pro se* a notice of appeal on May 16, 2018.  While Pennsylvania's prohibition against hybrid representation does not nullify Appellant's *pro se* notice of appeal since Appellant has a constitutional right to an appeal, Appellant's *pro se* notice is of no consequence since counsel previously instituted appellate proceedings on his behalf.  **See Commonwealth v. Williams**, 151 A.3d 621, 623-624 (Pa. Super. 2016).

[6] This Court docketed Appellant's appeal at 679 WDA 2018.

[7] Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

- 4 -

Respondents' Exhibit 76

> [1.] [Whether] the PCRA court erred in denying relief where [Appellant] established his after-discovered evidence claim through [] exculpatory eyewitness testimony[?]
>
> [2.] [Whether] the PCRA court erred in denying relief by incorrectly concluding that [the eyewitness's] testimony was offered solely to impeach [the trial witness], when in fact [the eyewitness's testimony] was [] offered as substantive, exculpatory evidence [to establish Appellant's] innocence[?]
>
> [3.] [Whether] the PCRA court erred in denying relief because [the eyewitness's] testimony is likely to compel a different verdict at a new trial[?]

Appellant's Brief at 5 (extraneous capitalization omitted).

In sum, Appellant contends the PCRA court erred in finding that the after-discovered evidence, namely the exculpatory testimony of an eyewitness to the murder, did not merit post-conviction relief. Appellant's Brief at 17-34.

Proper appellate review of a PCRA court's dismissal of a PCRA petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error." **Commonwealth v. Miller**, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted). "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record." **Commonwealth v. Lawson**, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted). "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding." **Commonwealth v. Hickman**, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted). In contrast, we review the PCRA court's legal conclusions *de novo*. **Commonwealth v. Henkel**, 90

Respondents' Exhibit 76

A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014).

To receive a new trial based on after-discovered evidence, a petitioner must satisfy a four-part test requiring

> the petitioner to demonstrate the [after-discovered] evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

**Commonwealth v. Small**, 189 A.3d 961, 972 (Pa. 2018), *citing* **Commonwealth v. Pagan**, 950 A.2d 270 (Pa. 2008), *cert. denied*, 555 U.S. 1198 (2009). "The test is conjunctive; the [petitioner] must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted." **Commonwealth v. Padillas**, 997 A.2d 356, 363 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (Pa. 2010). In addition, the after-discovered evidence must be producible and admissible. **Small**, 189 A.3d at 972.

The "salutary goal of the after-discovered evidence rule [is] to limit continued litigation without being so rigid as to shut out [after-]discovered evidence **from a credible source** which may lead to a true and proper judgment." **Small**, 189 A.3d at 975 (citation omitted, emphasis added). As is the case with recantation testimony, when the after-discovered evidence is exculpatory eyewitness testimony, a request for a new trial based on the exculpatory eyewitness testimony hinges on the credibility of the testimony.

Respondents' Exhibit 76

*Id.* "[T]he inquiry into whether the evidence would likely result in a different verdict [is] the lodestar of the after-discovered evidence analysis." *Id.* at 976 n.12 (stating, the second and third parts of the after-discovered evidence test are subsumed by the fourth part regarding likelihood of a different outcome), *citing* **Commonwealth v. Perrin**, 59 A.3d 663, 669 (Pa. Super. 2013) (Wecht, J., concurring), *vacated*, 103 A.3d 1224 (Pa. 2014). In short, only credible testimony satisfies the fourth part of the after-discovered evidence test.

In determining whether the after-discovered evidence is of such nature and character that it would compel a different verdict if a new trial were granted, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." **Padillas**, 997 A.2d at 365 (citations omitted). It is axiomatic that if the after-discovered evidence is incredible, then it would not compel a different outcome, and as a result, the PCRA court must deny the request for a new trial regardless of whether a petitioner satisfied the first three parts of the test. **Small**, 189 A.3d at 977. The precedent set by our Supreme Court in **Small** requires the PCRA court, as the fact-finder at the evidentiary hearing, to make definitive findings of fact, which are supported by the record, and conclusions of law with regard to the credibility of the after-discovered evidence. *Id.* at 978. The PCRA court is in the superior position to make credibility determinations and assess

- 7 -

Respondents' Exhibit 76

whether the credible after-discovered evidence is of such importance that it will change the outcome of the case. *Id.*

Here, the PCRA court made the following findings of fact based upon the eyewitness's testimony:

> On May 16, 2011, the day [the victim] was shot to death at the Leechburg Gardens Apartments in Penn Hills, [Pennsylvania, the eyewitness] was working as a jitney driver. That evening, shortly before the shooting occurred, [the eyewitness] picked up two [] African American men and drove them to the Leechburg Gardens [A]partment[s]. [The eyewitness] claimed that he recognized these men because they had used his jitney services "more than ten" times in the past. He described one of the men as being "really tall" with "dark skin," approximately [six foot, eight inches] in height. He described the other man as being "short" and "light-skinned." When presented with photographs[,] he was able to identify the individuals in those pictures as the men he had driven to the Leechburg Gardens [A]partment[s on May 16, 2011]. He [] nicknamed them "stretch" and "young buck" but recalled that they referred to each other as "Ron and Rome or something like that."
>
> [The eyewitness] dropped these men off at the Leechburg Gardens [Apartments] at approximately 7:00 p.m., when it was getting dim outside. After he dropped them off, [the eyewitness] testified to the following series of events:
>
>> I was turning my car around [in the parking lot] so I could [exit the parking lot]. I [] had to go the bathroom by the fire hydrant and the big Christmas tree. As I'm standing up peeing, a white car comes in the parking lot, two guys started busting off caps, and everybody started shooting at each other. I dove on the ground, crawled in my car, dropped my seat back[,] and pulled out [of the parking lot].
>
> [The eyewitness] testified that he "clearly" saw that "Ron and Rome" were firing their guns "over in that direction towards the parking lot in that area" where the white car was located. However, he also testified that he "wasn't paying no attention" to what or who they were shooting at because he dropped to the ground as soon as he saw "the sparks and fires." As he described

- 8 -

Respondents' Exhibit 76

it: "I dropped down, peed on myself, crawled in my car, kicked my seat back and just pulled off. I started lifting my head up as I am pulling out [of the parking lot]." After [the eyewitness] got back inside of his vehicle [and exited the parking lot], he noticed that the white car had pulled out behind him[. H]e thought that the people inside of the white car were going after him because of what he had just witnessed. Even though [the eyewitness] saw Ron and Rome shooting at the people in the white car, [he] thought that Ron and Rome were now in the white car behind him. However, [the eyewitness] never saw anyone get in or out of the white car, and he could not see inside of the vehicle at any point.

[The eyewitness] was able to retreat safely from the scene, but he never went to the police to report the shooting that he [] allegedly witnessed, and, at that time, he was unaware that anyone had been killed in the shootout. Law enforcement also never attempted to contact him in 2011[,] about the shooting. When asked why he decided to come forward with this information in 2018, [the eyewitness] testified as follows:

> I was in the Allegheny [C]ounty jail, and I was on the fourth floor just coming in, and these gentlemen was talking and they was pointing at me. So they called me to be released. As I am coming downstairs to be released, **some young guy told me** - he was from Turtle Creek or something - **he told me that I was there. And I said, "[w]here?" He says "you was there for the [Leechburg Gardens Apartments'] shooting." And he goes, "say that you wasn't, and I'll jump on you." I'm like, what the hell? So I put my foot on the bunk and stood up to fight to defend myself.**

[The eyewitness] testified that this young man was a fellow inmate whom he did not know and had never seen before. This unidentified inmate told [the eyewitness] that he knew [the eyewitness] was [at the apartment complex] that night because [the inmate] was [also at the apartment complex that night]. [T]he inmate provided the details of the incident, telling [the eyewitness] "exactly where it happened, exactly what time it was. The inmate said the guy's name that died." The inmate also told [the eyewitness] that "[Ron and Rome] were the two men that did it." [The eyewitness] was scared that this inmate was going to physically assault him. He "felt threatened enough to jump on the bunk and brace" himself "for just two of them against me." The jail guards had to [] prevent an altercation. [The eyewitness]

- 9 -

Respondents' Exhibit 76

testified that he "didn't know any of this [information the inmate provided]" and that he was "in shock" because he was "being attacked" so he "had to do research on why" he was "being attacked."

[W]hen [the eyewitness] was released from jail shortly thereafter, he had a friend of his fact-check the information that the inmate [] provided on her cell[ular tele]phone because he wanted to know why he "was threatened for my life in jail." He asked his friend to [search] "the days, dates things like that." When he saw the pictures of [Appellant and his co-defendant] and learned that they had been convicted of the murder, he "knew they were not the people that" he had driven to the [apartment] complex. This prompted [the eyewitness] to write a letter to [the co-defendant] telling him "that I knew they were innocent because I was there."

[The eyewitness] decided to reach out to [the co-defendant] because he had a brother in prison who he believes was wrongfully convicted, and he did not "want an innocent man to be in jail." [The eyewitness] further testified that he does not know and has never seen any member of the [co-defendant's] or [Appellant's] family and that [Appellant and the co-defendant] were not present during the shooting incident that he witnessed.

[The eyewitness] confirmed that the witness statements that were attached to [Appellant's] PCRA petition[] were true. [Although the eyewitness] claimed he saw "something in one line somewhere" when he was reading [the typed witness statement] that was a discrepancy, [] he never scratched anything out or attempted to correct this purported discrepancy. [The eyewitness] did not attempt to contact law enforcement or the [Allegheny County] District Attorney's Office with the information he [] relayed to [the co-defendant] through his letter.

When questioned by [the PCRA] court, [the eyewitness] clarified that he did not actually see anyone get struck by a bullet, he did not see what the victim looked like at any point, and he did not see anyone laying on the ground. He also testified that he never saw anyone get out of the white car before the shooting started and he did not see who entered the white car after the shooting because he "wasn't paying attention" and "everything happened in a tenth of a second."

Respondents' Exhibit 76

PCRA Court Opinion, 2/5/20, at 5-11 (formatting, original brackets, ellipsis, and record citations omitted; emphasis in original).

Appellant argues that the PCRA court erroneously applied the four-part after-discovered evidence test when reviewing his claim for relief based upon the eyewitness's exculpatory testimony. Appellant's Brief at 26. While Appellant agrees with the PCRA court's finding that he satisfied the first two parts of the after-discovered evidence test, Appellant asserts that he satisfied his burden of proof as to the third and fourth parts, as well. *Id.* at 25. Specifically, Appellant contends that the eyewitness's testimony was not offered solely to impeach the testimony of any other witness who testified at trial but, rather, would provide exculpatory evidence identifying two male perpetrators, other than Appellant and his co-defendant, who were responsible for the shooting death of the victim. *Id.* Appellant further contends that the PCRA court erred in making a determination as to the credibility of the eyewitness's testimony and whether this testimony would compel a different verdict. *Id.* as 27. In arguing that it was the role and function of the jury to determine the credibility of the eyewitness's testimony and whether the testimony would compel a different verdict, Appellant asserts,

> It would be for the jury to consider [the trial witness's] testimony, [the eyewitness's] testimony, [and] all other testimonial evidence, whether direct or circumstantial, to assist in reaching a reliable verdict. [Appellant] did not proceed to a bench trial. Thus, it was not for the PCRA court to compare [the trial witness's] testimony [] to [the eyewitness's testimony] and to decide that [the

- 11 -

Respondents' Exhibit 76

eyewitness's] testimony would not have compelled a different verdict.

***Id.***

The PCRA court found that the eyewitness's testimony failed to satisfy the third and fourth parts of the after-discovered evidence test. We, however, conclude that Appellant met the third criteria under that test.[8] Nonetheless, Appellant's failure to establish any one part of the four-part after-discovered evidence test is fatal to his request for a new trial. ***Small***, 189 A.3d at 972. Thus, while we conclude that Appellant met the third part of the after-discovered evidence test, we review the PCRA court's determination that Appellant failed to establish that the eyewitness's testimony would likely result in a different verdict if a new trial were granted.

With regard to the fourth part of the after-discovered evidence test, the PCRA court stated,

> the [PCRA] court finds that it is unlikely that [the eyewitness's] testimony would compel a different verdict at trial when considered against the evidence as a whole. In addition to [the trial witness's] clear and unequivocal [in-court testimony in which

---

[8] The PCRA court found that the eyewitness's testimony was "presented solely to impeach the strong, unwavering identification testimony of [the trial witness.]" PCRA Opinion, 2/5/20, at 15. We disagree with this assessment. Although the eyewitness's testimony, in part, would impeach that of the trial witness, the PCRA court erred in determining that it was offered **solely** for impeachment purposes. If a new trial were granted, the eyewitness's testimony would be used to identify two male shooters, neither of whom were Appellant or his co-defendant, and no other evidence offered at trial identified individuals, other than Appellant and his co-defendant, as the shooters. Consequently, we find, and the record supports, that Appellant proved the third part of the after-discovered evidence test.

- 12 -

Respondents' Exhibit 76

she identified Appellant and his co-defendant as the shooters involved in the victim's murder], other circumstantial evidence linked [Appellant and his co-defendant] to the shooting. (**See** Trial Court Opinion, [] 6/25/14).

Ultimately, [the PCRA] court did not consider [the eyewitness's] testimony to be credible because of the inconsistencies contained therein and because of the clear motive to fabricate his testimony out of fear for his life.  For example, [in his witness statement, the eyewitness stated] he had driven Ron and Rome in his jitney "two to three" times prior to the day of the shooting, but at the hearing he testified that he had driven them [] "more than ten times."  In his testimony[,] he said he had taken Ron and Rome to [the] Leechburg Gardens [Apartments] before, but in his witness statement[,] he says [the evening of the incident] was the first time he had ever taken them there.  In his witness statement, the "friend" who helped him research the shooting after he was released from jail was a male, but at the hearing, [the eyewitness] testified that this friend was a female.

As [the eyewitness] noted several times throughout the hearing, he was approached by an inmate who told him, "you was there for the shooting say that you wasn't, and I'll jump on you."  The inmate told him who was killed, who the shooters were, and the time and location of the shooting.  As [the eyewitness] put it, the inmate "was mentioning so much.  It was just too much chaos." Thus, it is impossible to discern whether [the eyewitness's] testimony is purely a product of his memory or the information he had been threatened into "remembering" seven [] years after the murder.  The [PCRA] court also questions why this unidentified inmate[,] who allegedly was present at the shooting and possessed this information, threatened [the eyewitness] into coming forward and has not come forward himself to corroborate [the eyewitness's] testimony

Another factor that further diminishes [the eyewitness's] credibility is the fact that his alleged motive to come forward, after his life was threatened, was to help clear the name of purportedly innocent men[.  Y]et he never contacted the authorities, or the District Attorney's Office, with the information he had about their "wrongful" convictions.  The [PCRA] court is also compelled to note that, somewhat conveniently, the men known as "Ron and Rome" were found dead[, together,] in the same vehicle in early 2012, and "Rome" was [the co-defendant's] cousin.

- 13 -

Respondents' Exhibit 76

PCRA Court Opinion, 2/5/20, at 15-17 (ellipsis, original brackets, and some record citations omitted).

Contrary to Appellant's argument, when presented with a request for a new trial based upon after-discovered evidence, it is the role and function of the PCRA court to determine the credibility of the witness and assess whether the credible after-discovered evidence would likely result in a different verdict. **See Small**, 189 A.3d at 978 (stating, it is the duty of the PCRA court to assess the credibility of the witness, explicitly setting forth its determination, and if credible, determine the significance, if any, the new testimony would likely have on reaching a different verdict).  Here, the record supports the PCRA court's explicit determination that the eyewitness was not credible.  A review of the record demonstrates significant inconsistencies between the eyewitness's hand-written statement, the typed witness statement prepared by a private investigator that the eyewitness reviewed and initialed, and the testimony he offered at the PCRA evidentiary hearing.  For example, in his hand-written statement, the eyewitness stated, "I think the guys['] names were Ro [and] Ron.  I called them bro Ro or young bucks."  In the typed witness statement, the eyewitness stated, "I do not know their real names but . . . I call them Ron and Rome."  When asked at the evidentiary hearing whether he knew the men's names, the eyewitness testified, "I call one Stretch and the other one Young Buck."  N.T., 5/10/19, at 8.  The eyewitness stated that when he transported the two men, he heard them call each other "Ron and Rome[.]"  **Id.** at 9, 26.  Aside from the discrepancies noted by the

- 14 -

Respondents' Exhibit 76

PCRA court, the eyewitness also testified at the evidentiary hearing that he hand-wrote his statement and sent it to the co-defendant after obtaining the co-defendant's prison address from an internet search. ***Id.*** at 37, 39-41. In his typed witness statement, the eyewitness stated, "I found out the name of the attorney that represented [the co-defendant] and wrote her a letter saying that her client was not guilty of the shooting and that the wrong man had been convicted of the murder." **See** Commonwealth Exhibit 1. Finally, the eyewitness offered no explanation as to why, or how, an inmate at the Allegheny County Jail, who was unknown to the eyewitness, recognized him seven years after the shooting, how the inmate could approach the eyewitness while he was being released, and why the inmate would allegedly provide the eyewitness with exculpatory evidence, including the names of the two shooters, while simultaneously admitting that he was also an eyewitness. Based upon the record before us, we discern no abuse of discretion in the PCRA court's determination that the eyewitness was not credible.[9] Therefore, Appellant failed to satisfy the fourth part of the after-discovered evidence test,

---

[9] Moreover, we concur with the PCRA court that the after-discovered evidence, namely the eyewitness's testimony, would not likely result in a different verdict. The trial witness definitively identified Appellant and the co-defendant as the shooters, observed the victim fall to the ground after being shot, and witnessed Appellant and the co-defendant flee in the victim's white car. Conversely, the eyewitness stated that he did not see anyone get shot, he never saw anyone lying on the ground after being shot, he never saw the driver of the white car, and he never witnessed anyone get out of, or into, the white vehicle. N.T., 5/10/19, at 42-44.

- 15 -

1005

Respondents' Exhibit 76

and the PCRA court did not abuse its discretion or commit an error of law in dismissing Appellant's PCRA petition.

    Order affirmed.

Judgment Entered.

*[signature]*

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/2021