Received 3/3/2021 4:52:08 PM Supreme Court Western District

Filed 3/3/2021 4:52:00 PM Supreme Court Western District
61 WAL 2021

# IN THE
# SUPREME COURT OF PENNSYLVANIA
# WESTERN DISTRICT

## No. _____ WD Allocatur Docket 2021

### COMMONWEALTH OF PENNSYLVANIA,
### Respondent

### V.

### MATHEW EBO,
### Petitioner

## PETITION FOR ALLOWANCE OF APPEAL

**Petition for Allowance of Appeal from the Memorandum and Order of the Superior Court at 58 WDA 2020 filed February 19, 2021, affirming the Order entered December 13, 2019, dismissing the PCRA Petition at No. CP-02-CR-2821-2012 in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division.**

### ATTORNEY FOR PETITIONER:

**Diana Lynn Stavroulakis, Esquire**
**PA ID #59255**

**P.O. Box 15479**
**Pittsburgh, PA 15237**

**(412) 600-8608**

**Diana@Stavroulakislaw.com**

Respondents' Exhibit 77

## **TABLE OF CONTENTS**

TABLE OF CITATIONS…………………………………… 4

RULES AND STATUTES…………………………………. 4

QUESTIONS PRESENTED FOR REVIEW ……………….. 5

ORDER IN QUESTION…………………………………….. 6

OPINIONS OF THE COURTS BELOW…………………… 7

STATEMENT OF THE SCOPE AND STANDARD OF REVIEW.. 8

STATEMENT OF THE CASE……………………………… 9

REASONS RELIED UPON FOR ALLOWANCE OF APPEAL …… 17

I.   The Superior Court erred in affirming the Order of the PCRA Court where Ebo established his after-discovered evidence claim through Raglin's exculpatory eyewitness testimony. ………………………………… 17

II.  The Superior Court erred in affirming the Order of the PCRA Court because Raglin's testimony is likely to compel a different verdict at a new trial. 26

CONCLUSION……………………………………………… 28

CERTIFICATION OF WORD COUNT COMPLIANCE ……. 29

CERTIFICATION OF REDACTION COMPLIANCE ………. 30

VERIFICATION OF *IN FORMA PAUPERIS* STATUS …… 31

SUPERIOR COURT MEMORANDUM AND ORDER
          Dated February 19, 2021 ……………………………..          Appendix A

ORDER IN LIEU OF 1925(A) OPINION
          Dated –February 5, 2020 ………......................……          Appendix B

Respondents' Exhibit 77

1009

ORDER & OPINION DISMISSING PCRA PETITION
     Dated – December 13, 2019 ….. ....................................……   Appendix C

*IN FORMA PAUPERIS* ORDER APPOINTING COUNSEL ..…   Appendix D

Respondents' Exhibit 77

1010

## TABLE OF CITATIONS

*Commonwealth v. Burkett*, 5 A.3d 1260 (Pa.Super. 2010). ......        18

*Commonwealth v. Carter*, 21 A.3d 680 (Pa.Super.2011). ……..        18

*Commonwealth v. Colavita*, 993 A.2d 874 (Pa. 2010). ………..        18

*Commonwealth v. Ford*, 44 A.3d 1190 (Pa.Super.2012). ……..        18

*Commonwealth v. Paddy*, 15 A.3d 431 (Pa. 2011) ……………..        18

*Commonwealth v. Rivera*, 939 A.2d 355 (Pa. Super. 2007) …..        19

*Commonwealth v. Reaves*, 923 A.2d 1119 (Pa. 2007). …………..        18

*Commonwealth v. Small*, 189 A.3d 961 (Pa. 2018) ……………..        23

*Commonwealth v. Widmer*, 744 A.2d 745 (Pa. 2000) …………..        8

## RULES, STATUTES AND MISCELLANEOUS

18 Pa.C.S.A. §903(c) …………………………………………        9

18 Pa.C.S.A. §2502(a) ………………………………………        9

18 Pa.C.S.A. §3701(a)(1)(i) ……………………………………        9

18 Pa.C.S.A.  §3702(a) ………………………………………..        9

18 Pa.C.S.A. §6105(a)(1) ……………………………………..        9

18 Pa.C.S.A. §6106(a)(1) ……………………………………...        9

42 Pa.C.S.A. §9543, *et seq* …………………………………        *passim*

Respondents' Exhibit 77

1011

## QUESTIONS PRESENTED FOR REVIEW

I.   The Superior Court erred in affirming the Order of the PCRA Court where Ebo established his after-discovered evidence claim through Raglin's exculpatory eyewitness testimony.

II.  The Superior Court erred in affirming the Order of the PCRA Court because Raglin's testimony is likely to compel a different verdict at a new trial.

Respondents' Exhibit 77

1012

## <u>ORDER IN QUESTION</u>

This is an appeal from the Memorandum and Order of a panel of the Superior Court entered February 19, 2021, at 58 WDA 2020, which affirmed the Order at No. CP-02-CR-2821-2012 in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division, which dismissed the PCRA Petition. The Superior Court's Memorandum and Order is attached hereto as **Appendix A**.

Respondents' Exhibit 77

1013

## <u>OPINIONS OF THE COURTS BELOW</u>

A Memorandum and Order of the Superior Court at 58 WDA 2020 was filed February 19, 2021, a copy of which is attached as **Appendix A.**

The PCRA Court filed an Order in lieu of Opinion at No. CP-02-CR-2821-2012 in the Court of Common Pleas of Allegheny County, Pennsylvania, Criminal Division, on February 5, 2020, a copy of which is attached as **Appendix B**.

Respondents' Exhibit 77

1014

## <u>STATEMENT OF THE SCOPE AND STANDARD OF REVIEW</u>

The appellate court's scope of review consists of an examination of the certified record on appeal.  By reviewing those things contained within the certified record, the appellate court can determine if the lower court's ruling is supported in the record.  *Commonwealth v. Widmer*, 744 A.2d 745, 750 (Pa. 2000).

Respondents' Exhibit 77

1015

# STATEMENT OF THE CASE

## A. PROCEDURAL HISTORY

Matthew Ebo (Ebo) was charged by criminal information at CC 201202821. Represented at trial by Randall McKinney, Esq., Ebo proceeded to a jury trial along with his co-defendant, Thaddeus Crumbley (Crumbley), who was represented by Wendy Williams, Esq. The jury convicted Ebo of one count each of First Degree Murder, 18 Pa.C.S.A. §2502(a); Robbery – Inflict Serious Bodily Injury, 18 Pa.C.S.A. §3701(a)(1)(i); Robbery of a Motor Vehicle, 18 Pa.C.S.A.  §3702(a); Firearms Not to be Carried Without a License, 18 Pa.C.S.A. §6106(a)(1); Possession of Firearms Prohibited, 18 Pa.C.S.A. §6105(a)(1); Conspiracy to Commit Robbery, 18 Pa.C.S.A. §903(c); and Conspiracy to Commit Homicide, 18 Pa.C.S.A. § 903(c).

On November 28, 2012, the court imposed a sentence of life imprisonment on the homicide conviction, and an aggregate sentence of 46 to 92 years on the remaining counts.  Attorney McKinney was permitted to withdraw his appearance at that point, and Attorney Jessica Herndon, of the Allegheny County Public Defender's Office, was appointed to represent Ebo.

The Court granted counsel's motion to file post-sentence motions, *nunc pro tunc*.  Consequently, a Supplemental Post-Sentence Motion was filed on April 19, 2013, and was denied by operation of law on June 26, 2013.

Respondents' Exhibit 77

1016

A timely Notice of Appeal was filed on July 25, 2013.  After the briefs were filed at 1194 WDA 2013, Attorney Herndon filed an Application for Remand based on after-discovered evidence.  The Superior Court granted the request, relinquished jurisdiction, and ordered the trial court to conduct a hearing on the after-discovered evidence to determine if a new trial should be granted.

On remand, Victoria Vidt, Esquire, of the Public Defender's Office, proceeded as Ebo's attorney. A hearing was held for both Ebo and his co-defendant, Crumbley, on October 29, 2015. On December 22, 2015, the Court entered an Order denying the motion for a new trial.

A timely Notice of Appeal was filed on January 13, 2016. At 92 WDA 2016. A panel of the Superior Court filed a Memorandum and Order dated June 21, 2017, affirming the conviction but vacating the sentence and remanding the case for resentencing, as the sentence initially imposed pursuant to 42 Pa.C.S. §9712 was unconstitutional under *Alleyne v. United States,* 570 U.S. 99 (2013) and *Commonwealth v. Newman*, 99 A.3d 86 (Pa. Super. 2014). [1]

---

[1]On January 17, 2018, Ebo filed a *pro se* PCRA Petition. Present counsel was appointed to represent Ebo on his collateral proceeding. However, the case had been remanded for resentencing and proceeding on the petition would have been improper at that point. In essence, the petition was stayed until Ebo was resentenced, the post-sentence motions were denied, and he determined not to proceed with the direct appeal.

10

Respondents' Exhibit 77

1017

On July 14, 2017, Ebo filed a Petition for Allowance of Appeal to the Supreme Court of Pennsylvania. By Order dated December 13, 2017, allocatur was denied at 279 WDA 2017.

On February 28, 2018, the court resentenced Ebo but structured the sentence so that, ultimately, it was the same sentence initially imposed: a period of life imprisonment and an aggregate 46 to 92 years. Timely post-sentence motions were filed on March 6, 2018. Motions were denied by Order filed April 11, 2018, prompting Ebo to file a Notice of Appeal to the Superior Court of Pennsylvania.

On May 30, 2018, Attorney Vidt file a Praecipe to Discontinue the Appeal at 679 WDA 2018 so that Ebo could, instead, pursue the within Post-Conviction Relief Act Petition. That same day the Superior Court filed a Certification of Discontinuance.

Present counsel filed an Amended Post-Conviction Relief Act Petition with request for additional time to supplement the petition, and Motion for Appointment of Investigator on June 29, 2018. By Order of July 5, 2018, the Court granted the extension. Also by Order of July 5, 2018, the Court granted Ebo funds for an investigator.

On August 24, 2018, counsel filed another request for extension of time which was granted by Order dated August 28, 2018. The Supplement was filed on November 30, 2018. The Commonwealth filed its Answer on December 3, 2018.

Respondents' Exhibit 77

An Evidentiary Hearing was held May 10, 2019. Counsel requested permission to file a memorandum of law following the hearing, which the Court granted, and which counsel filed on June 11, 2019.

On December 13, 2019, the PCRA Court filed a Memorandum Opinion and Order which denied the PCRA Petition. (Appendix C) A timely Notice of Appeal was filed to this Honorable Court. As directed, counsel filed a Concise Statement of Issues On Appeal. The PCRA Court entered an Order in lieu of Opinion to satisfy the requirements of a 1925(a) Opinion. (Appendix B)

A timely appeal to the Superior Court followed. A panel of the Superior Court at 58 WDA 2021 affirmed the Order of the PCRA Court by Memorandum and Order filed February 19, 2021.

This timely petition for allowance of appeal follows.

## B. RELEVANT FACTS

In the Trial Court's 1925(a) Opinion, filed June 25, 2014, the facts of the case were summarized as follows:

> On May 16, 2011, Todd Mattox was shot to death in the parking lot of the Leechburg Garden apartments in Penn Hills. (T.R.

12

Respondents' Exhibit 77

1019

8/20/12, p. 240)[2] He had suffered three (3) gunshot wounds, two (2) to the trunk and one (1) fatal shot to the head. (T.R. 8/20/12, pp. 246-261, Ex. 4-16).

An eyewitness, Saday Robinson, described the sounds of an altercation above her apartment in the minutes before the shooting, followed by the noise of people running down stairs. (T.R. 8/20/12, pp. 527-528). She then saw Mr. Mattox being pushed out the front door of the apartment complex by two (2) African-American males with handguns. (T.R. 8/20/12, pp. 528-529). She was able to hear Mr. Mattox pleading for his life, offering the two (2) males everything that he had, and backing away from them with his hands up. (T.R. 8/20/12, pp. 529, 531). The eyewitness described seeing a man that she later identified as Defendant Ebo shooting at Mr. Mattox three (3) times. (T.R. 8/20/12, p. 531). Mr. Mattox fell to the ground after the gunshots were fired. (T.R. 8/20/12, p. 531). The witness then described seeing Defendant Ebo going through the pants pockets of Mr. Mattox before she saw a person that she later identified as Defendant Crumbley walk up to Mr. Mattox, stand over his body as it lay in the parking lot, and shoot him directly in the head. (T.R. 8/20/12, pp. 532-534). She then indicated that she saw the Defendants get into Mr. Mattox's white Nissan and speed out of the parking lot. (T.R. 8/20/12, p. 534). Mr. Mattox's vehicle was later found after it had been set on fire on Hill Street in Penn Hills. (T.R. 8/20/12, pp. 757-759, 762-780, 782-787, 804, 818, 841; Ex. 58-63, Ex. 66-67).

…

John Gardone also testified that Mr. Mattox was chased by two (2) African-American males before he was shot several times in the parking lot of the Leechburg Gardens. (T.R. 8/20/12, pp. 591-592). He also saw the two (2) suspects enter a white vehicle and speed from the parking lot. (T.R. 8/20/12, pp. 492-493). Another witness, Yurri Lewis, heard multiple shots that day,

---

[2] The notation "T.R. 8/20/12" refers to Volumes I and II of the trial transcript for August 20, 2012 through September 4, 2012.

Respondents' Exhibit 77

1020

although he did not witness the shooting. (T.R. 8/20/12, p. 513). He did, however, see an African-American male going through the pockets of a man lying in the parking lot of Leechburg Garden Apartments. (T.R. 8/20/12, p. 515). He saw the man who had been rifling through the victim's pockets enter a white car and speed out of the parking lot. (T.R. 8/20/12, p. 515) Detective Anthony Perry confirmed that the right front pants pocket of Mr. Mattox was pulled out when he arrived at the scene. (T.R. 8/20/12, pp. 302-304, 330-334, Ex. 41). The left front pocket was in its normal position. (T.R. 8/20/12, pp. 302-304.

Despite the fact that there were several eyewitnesses to the events that occurred on May 16, 2011, none of the witnesses interviewed by either Penn Hills police officers or Allegheny County detectives were able to positively identify the actors.

The Defendants became suspects in the Todd Mattox murder following a string of events occurring over the course of the several months following the slaying. On June 2, 2011, Defendant Crumbley was involved in a shooting in Swissvale, in which he was shot several times. (T.R. 8/20/12, pp. 855-858). Two types of shell casings were recovered from the scene, including the same type of shell casings that were found at the Todd Mattox murder scene, those being from a .40 caliber Smith and Wesson Springfield Armory pistol. (T.R. 8/20/12, pp. 885-886). A friend of Defendant Crumbley's, Asa Thompkins, was present at the scene of the shooting. (T.R. 8/20/12, pp. 847, 852). One week later, on June 9, 2011, Asa Thompkins was pulled over for a traffic stop in South Park. (T.R. 8/3/12, p. 20; TR 8/20/12, p. 1009). A Springfield Armory pistol was found under the front passenger seat of the car, and Mr. Thompkins said that the gun was his. (T.R. 8/20/12, pp. 1010-1011).

On September 6, 2011, Thomas Julian Brown wrote a letter from the Allegheny County Jail to Detective Garlicki, of the Allegheny County Police, asking that he be put in touch with the detective who was handling the Todd Mattox homicide. (T.R. 8/20/12, p. 697). He indicated that he was willing to provide information on that case. (T.R. 8/20/12, pp. 697-698). Mr. Brown

Respondents' Exhibit 77

further indicated that he had heard, several months earlier, Defendant Crumbley saying that he had "smoked" Todd Mattox. (T.R. 8/20/12, pp. 698-699). Mr. Brown's cousin was Asa Thompkins, and Mr. Brown's son, Leron Brown, was a friend of Defendant Crumbley. (T.R. 8/20/12, pp. 695-696). Leron Brown was found shot dead in January or February 2012, inside a car with Roman Herring, a cousin of Defendant Crumbley's, who was also found dead in that same car. (T.R.   8/20/12, pp. 948, 991). Roman Herring was allegedly involved in the burning of a vehicle on Hill Street in Penn Hills. (T.R. 8/20/12, p. 945).

Defendant Crumbley became a suspect in the Todd Mattox murder in September 2011, after Detective Anthony Perry received a report connecting the handguns used in the Todd Mattox homicide with the weapons used in the Swissvale shooting on June 2, 2011, and after witness Thomas brown came forward with information about the homicide. (T.R. 8/20/11, pp. 1017, 1020, 1021, 1025). Defendant Ebo also became a suspect at that tie. (T.R. 8/20/11, p. 1017).

Eyewitness Saday Robinson was shown photo arrays containing photographs of the Defendants on September 16, 2011 (Defendant Crumbley only) and November 4, 2011 (both Defendants). (T.R. 8/20/12, pp. 356-357). However, on neither date did she select either of the Defendants from the arrays, although she testified that she was aware at the time of the viewing the arrays  that the Defendants were present in them. (T.R. 8/20/12, pp. 548-549). She indicated that she did not make the identifications on these dates because she was afraid, and her family and friends were telling her not to get involved. (T.R. 8/20/12, p. 548). Ms. Robinson also indicated in her testimony that she identified someone as "looking like" Defendant Ebo during one of the times when she was presented with photo arrays. (T.R. 8/20/12, p. 548). She indicated that she did that deliberately. (T.R. 8/20/12, p. 549). However, no detective involved with presenting her with photo arrays ever indicated that there had been an identification of anyone one either September 16, 2011 or November 4, 2011. (T.R. 8/20/12, pp. 349-356, 337-344). Ms. Robinson moved out of Leechburg

15

Respondents' Exhibit 77

1022

Gardens in July 2011. She left the Allegheny County area and moved across the country in October 2011. (T.R. 8/20/12, p. 546).  She returned to the area to testify upon the request of the police, who informed her that they had suspects in custody. (T.R. 8/20/12, p. 546). She was shown photo arrays on July 24, 2012, at which time she identified Defendant Crumbley after an approximately fifteen (15) second pause, and she identified Defendant Ebo immediately. (T.R. 8/20/12, pp. 540-543).

*Trial Court Opinion*, filed June 25, 2014, at 4-8.

Respondents' Exhibit 77

## <u>REASONS RELIED UPON FOR ALLOWANCE OF APPEAL</u>

The Superior Court erred and incorrectly applied the law to the facts of this case when determining to affirm the ruling of the PCRA Court. Ebo's claim of after-discovered evidence through the testimony of eyewitness Raglin warrants the granting of a new trial. Citing the appropriate standard, the Superior Court incorrectly applied it to the facts of this case, and the record does not support the lower court's decision. While the Superior Court correctly determined that the PCRA Court got part of its determination wrong, it nonetheless erred in reaching its ultimate conclusion.  Raglin's testimony was not merely impeachment evidence, and it would have altered the outcome of the case.

Ebo is entitled to a new trial where he can present the testimony of Raglin to the Jury. In turn, the Jury will consider Raglin's testimony, as well as all testimony offered by the prosecution. Ebo's issues warrant encouragement, and allowance of appeal should be granted.

**I.     The Superior Court erred in affirming the Order of the PCRA Court where Ebo established his after-discovered evidence claim through Raglin's exculpatory eyewitness testimony.**

The Superior Court was tasked with reviewing the  ruling of the PCRA Court using the following standard:

17

Respondents' Exhibit 77

1024

We review an order dismissing a petition under the PCRA in the light most favorable to the prevailing party at the PCRA level. *Commonwealth v. Burkett*, 5 A.3d 1260, 1267 (Pa.Super. 2010). This review is limited to the findings of the PCRA court and the evidence of record. *Id.* We will not disturb a PCRA court's ruling if it is supported by evidence of record and is free of legal error. *Id.* This Court may affirm a PCRA court's decision on any grounds if the record supports it. *Id.* We grant great deference to the factual findings of the PCRA court and will not disturb those findings unless they have no support in the record. *Commonwealth v. Carter*, 21 A.3d 680, 682 (Pa.Super.2011). However, we afford no such deference to its legal conclusions. *Commonwealth v. Paddy*, 609 Pa. 272, 15 A.3d 431, 442 (2011); *Commonwealth v. Reaves*, 592 Pa. 134, 923 A.2d 1119, 1124 (2007). Further, where the petitioner raises questions of law, our standard of review is *de novo* and our scope of review is plenary. *Commonwealth v. Colavita*, 606 Pa. 1, 993 A.2d 874, 886 (2010).

*Commonwealth v. Ford*, 44 A.3d 1190, 1194 (Pa.Super.2012).   Applying this standard, it is obvious that the record does not support the PCRA Court's ruling, and the Superior Court erred in concluding to the contrary. Consequently, this Court must grant review.

Ebo offered after-discovered evidence, requesting a new trial. He met the standard for establishing after-discovered evidence. To wit:

To warrant relief, after-discovered evidence must meet a four-prong test: (1) the evidence could not have been obtained before the conclusion of the trial by reasonable diligence; (2) the evidence is not merely corroborative or cumulative; (3) the evidence will not be used solely for purposes of impeachment; and (4) the evidence is of such a nature and character that a different outcome is likely. At an

18

Respondents' Exhibit 77

evidentiary hearing, an appellant must show by a
preponderance of the evidence that each of these factors has
been met in order for a new trial to be warranted.

*Commonwealth v. Rivera,* 939 A.2d 355, 359 (Pa. Super. 2007)

(citation omitted).   Raglin's testimony is exculpatory in nature, as the Superior

Court correctly concluded. Raglin's testimony was unavailable to Ebo at the time

of trial because Ebo had no way of knowing Raglin was present during the

shooting. This information was brought to Ebo's attention after the trial was over.

Most importantly, had Raglin's testimony been offered at trial, the outcome of the

case would have been different. Ebo was entitled to relief, and the PCRA Court's

denial of relief was in error under 42 Pa.C.S.A. §9543(a)(2)(vi).

It is important that this Court grant allowance of appeal on the basis of after-

discovered evidence. The Superior Court's conclusion that Raglin's testimony was

exculpatory (contrary to the incorrect assessment of the PCRA Court) should have

prompted the intermediate appellate court to vacate the Order of the PCRA Court

and to remand the case for a new trial.

The specifics of Raglin's testimony is crucial to an understanding of why

review should be granted. Robert Raglin, (Raglin), who was subjected to direct and

cross-examination during an Evidentiary Hearing, as well as supplemental

questioning directly from the PCRA Court, established that Ebo was not present

during the underlying incident and that he is innocent. Raglin testified that in 2011

19

Respondents' Exhibit 77

he was employed as a jitney driver, providing transportation services similar to that of a Taxi driver. (HT 4)  An incident transpired on May 16, 2011, that stood out in Raglin's memory because it happened a week before his birthday – which is May 22nd. (HT 42). That day, he drove two African American males to Leechburg Gardens in Penn Hills around dusk, 7:00PM. (HT 10, 23, 29) He described the two passengers as one being 6'8 or 6'9, really tall, with a dark complexion, who had to have his seat all the way back; and the other passenger was short with a light complexion and sat behind Raglin. (HT 5-6) Raglin remembered driving these two individuals more than ten times before that night.  (HT 6, 17) He identified the two men he jitneyed that evening as pictured in Defense Exhibit "A" and Defense Exhibit "B," (pictures offered to the witness to identify), with the shorter male being pictured in Defense Exhibit B. (HT 7-8)  Raglin didn't personally know these two men. However, he referred to the taller one as "Stretch," and the shorter one as "Young Buck." (HT 8-9, 24) He heard the two men refer to each other as "Ron" and "Rome." (HT 9, 26)

After the two men got out of his vehicle, Raglin turned his car around and got out to "relieve himself" by the fire hydrant and big "Christmas Tree." (HT 10) He saw a white car pull into the parking area. "Stretch" and "Young Buck" had guns and started shooting in the area of the white car, and someone else was shooting back. This was no more than 10 or 15 feet from where Raglin was

Respondents' Exhibit 77

1027

standing. (HT 10-11, 29) Raglin dove to the ground, crawled into his car, put his seat back and drove out of the parking area, with the white car following behind. (HT 10-11, 30, 43) Raglin did not know who was driving that white car. (HT 11) He was concerned that the white car was pursuing him because he witnessed the shooting. (HT 11-12) Raglin was not aware at that time that anyone was killed during that shooting incident. (HT 12)

In 2018, Raglin was in the Allegheny County Jail on the Fourth Floor, having just been brought in, when he noticed some inmates talking and pointing at him. (HT 12) Just before he was released, an inmate approached him and told him that he was there for the shooting incident. (HT 12-13, 25, 33-34)  This unidentified inmate named who was killed in the shooting in Penn Hills, Leechburg Gardens, but Raglin did not remember what he said. (HT 13) This confrontation stuck with Raglin because he thought the other inmate was going to assault him, and the jail guards became involved. (HT 13-14, 35)

Raglin was curious about the situation and had his friend google the Leechburg Gardens incident on her cell phone after he was released. (HT 14, 25, 35) The information his friend located online coincided with the date and time from the incident he had described about getting out of his car to relieve himself after dropping off "Stretch" and "Young Buck" that evening, and diving to the ground and crawling into his car to leave when he saw those men firing their guns

21

1028

in the direction of a white car that had entered the parking lot that day. (HT 14) However, the information retrieved on Google identified two other African American males as being convicted for the homicide as a result of that shooting incident. Raglin knew the two men had been wrongly convicted because it was the men he knew as "Stretch" and "Young Buck" who were involved in the shooting that evening. (HT 14, 25) Consequently, Raglin located Crumbley's institutional address and wrote to him to share that he witnessed the shooting and he knew Ebo and Crumbley had been wrongly convicted. (HT 14-15) Raglin explained that he contacted Crumbley because he didn't want an innocent person to be in jail. (HT 15)

Raglin felt compelled to tell Ebo and Crumbley what he witnessed that evening because he knew what it felt like to have a family member wrongly convicted. Raglin stated that it was like the entire family being in prison. (HT 15-16, 32) Raglin testified that he did not know, nor was he friends with, Crumbley or Ebo; he had never spoken to either of them; and he did not know their families. (HT 17-18, 36) Moreover, he specifically stated that on the night of the incident he could see very clearly, and neither Ebo nor Crumbley were present at Leechburg Gardens on May 16, 2011, and they were not the two men he witnessed shooting the victim. (HT 17, 36)

22

Respondents' Exhibit 77

Raglin was not interviewed by the police after the shooting, and he did not

go to the police immediately following the shooting, as he was not aware at that

time that someone was killed. (HT 18-19) He clarified that even if he did know

that someone died at that time, he wouldn't have gone to the police because it is

"taboo in the black community to be talking to the police about anything." (HT 19,

32, 34) He also mentioned that since reaching out to Crumbley and Ebo, and

giving a written statement in this case, he has been harassed by the police and the

District Attorney's Office. He informed the Court that if he had known he would

be harassed in this way, he would not have come forward. (HT 33-34)

Ebo established Raglin's testimony was unavailable at the time of trial, and

undiscoverable through the exercise of due diligence; it was not merely

corroborative or cumulative in nature, and was exculpatory; it wasn't merely

impeachment testimony; and it would prompt a different outcome at a new trial.

*Commonwealth v. Small*, 189 A.3d 961, 972 (Pa. 2018). Ebo was entitled to relief

under the Post-Conviction Relief Act, and the Superior Court erred in affirming the

PCRA Court's conclusion to the contrary.  42 Pa.C.S.A. §9543(a)(2)(vi).

When applying the four-part test to Raglin's testimony, the PCRA Court

determined that the first two prongs were satisfied, i.e., that Raglin's testimony

was unavailable at the time of trial, and not merely corroborative or cumulative.

The Superior Court determined that the testimony was exculpatory, and not merely

23

Respondents' Exhibit 77

impeachment evidence, thus breaking with the PCRA Court's determination and concluding that Ebo met that prong of the standard. Thus, it is only the fourth prong that Ebo must establish, according to the Superior Court. The panel's decision that Ebo didn't meet this prong is wrong, as the Court did not properly apply the law to the facts, and the record does not support the incorrect conclusion.

The PCRA Court incorrectly concluded that Raglin's testimony would not compel a different verdict in light of Robinson's testimony and other circumstantial evidence presented at trial. (Trial Court Opinion, December 13, 2019, at 15) The Superior Court agreed.  This decision involves an erroneous application of existing law to the facts of record. This Court must grant review.  A new jury should have the chance to consider Raglin's testimony, and all of the Commonwealth's evidence, and then make their own credibility determinations. The jury, as fact-finder, makes this decision, and not the PCRA Court. The jury must be given an opportunity to consider Robinson's testimony, Raglin's testimony, and all other testimonial evidence, whether direct or circumstantial, to assist in reaching a reliable verdict. It was improper for the PCRA Court to compare Robinson's testimony to Raglin's, and to decide that Raglin's testimony would not have compelled a different verdict. The Superior Court's agreement with this ruling is improper and is not supported by the law or the record.

Respondents' Exhibit 77

Ebo points to the following information of record. The police began to focus on co-defendant Crumbley as the shooter after a September 6, 2011, letter was sent to the Allegheny County Police by Thomas Julian Brown. In that letter, Mr. Brown indicated he wanted to provide information about the Todd Mattox homicide. (TT 697-698)[3]  The information Mr. Brown contributed was that, at a prior point, he heard Crumbley say that he "smoked" Todd Mattox. (TT 698-699) This circumstantial evidence takes on a new character when you realize that Mr. Brown is the father of Leron Brown, (TT 695-696), a/k/a "Ron,"  and you consider that Raglin testified that Ron was one of the two men involved in the May 16, 2011, shooting at Leechburg Gardens.

Similarly, Detective Hitchings interviewed Craig Clark on July 10, 2012, and informed him that his prints were found on a can of lighter fluid near a car that had been set on fire, which was connected to the Todd Mattox murder. (TT 939-943)  Clark stated that he took the lighter fluid from his sister's house and gave it to Roman Herring, (a/k/a "Rome.") (TT 944-945) Clark testified that Roman set that car on fire. (TT 945, 949, 958)  Assistant District Attorney Stadtmiller asked Clark if Roman was about 6'6. Clark responded he was very tall. (TT 946-947)

---

[3] References to the Jury Trial Transcripts appear as "TT ____."

Respondents' Exhibit 77

Raglin testified that it was "Rome" (Roman) that he drove to Leechburg gardens that day.

Raglin's testimony is exculpatory evidence for Ebo. When considered in the greater context of other information presented at trial, it's obvious that LeRon Brown and Roman Herring were the two actors involved in the May 16, 2011, shooting in Leechburg Gardens. Brown and Herring are responsible for Todd Mattox's death, not Ebo. Where the record supports this conclusion, it is inconceivable that the Superior Court would affirm the PCRA Court's Order denying Ebo a new trial.

## II.   The Superior Court erred in affirming the Order of the PCRA Court because Raglin's testimony is likely to compel a different verdict at a new trial.

The overall impact of Raglin's testimony in conjunction with other testimony that was offered during the trial establishes Ebo's innocence. The PCRA Court's Order is not supported by the record, and involves an incorrect application of the law to the facts. The Superior Court's affirmance of that decision is in error and must be reviewed by this Honorable Court.

This Court must consider the facts of record. Initially, the police focused on co-defendant Crumbley as the shooter when a September 6, 2011, letter was sent to the Allegheny County Police by Thomas Julian Brown. Mr. Brown wanted to

26

Respondents' Exhibit 77

provide information about the Todd Mattox homicide. (TT 697-698)  He told police that he heard Crumbley say he "smoked" Todd Mattox. (TT 698-699) Mr. Brown is the father of Leron Brown, (TT 695-696), a/k/a "Ron," who Raglin testified was one of the two men involved in the May 16, 2011, shooting at Leechburg Gardens.

Detective Hitchings interviewed Craig Clark on July 10, 2012, and informed him that his prints were found on a can of lighter fluid near a car that had been set on fire, connected to the Todd Mattox murder. (TT 939-943)  Clark took the lighter fluid from his sister's house and gave it to Roman Herring, (a/k/a "Rome"), who set the car on fire. (TT 944-945, 949, 958) Clark stated Roman was very tall. (TT 946-947)

These witnesses link Ron and Rome to the crime. Raglin is an eyewitness who places Ron and Rome at the shooting. Therefore, Raglin's testimony is unquestionably exculpatory and must be presented to a new jury.  Raglin's testimony confirms that LeRon Brown and Roman Herring were the two actors involved in the May 16, 2011, shooting in Leechburg Gardens, and the two men responsible for Todd Mattox's death. Ebo was entitled to collateral relief, and it is unconscionable that the Superior Court didn't vacate the PCRA Court's Order. This Court must allow the appeal to proceed.

Respondents' Exhibit 77

1034

## <u>CONCLUSION</u>

**WHEREFORE,** the petition for allowance of appeal must be granted and this Court must enter an Order allowing the issues stated herein to proceed to a full briefing.

**RESPECTFULLY SUBMITTED:**


<u>**s/Diana Lynn Stavroulakis**</u>
**Diana Lynn Stavroulakis**
**Attorney for Petitioner**

28

Respondents' Exhibit 77

## <u>CERTIFICATION OF WORD COUNT COMPLIANCE</u>

Undersigned counsel hereby certifies that the Petition For Allowance Of Appeal contains 4,793 words, excluding those portions which are exempt from the applicable word-count, in compliance with Pa.R.A.P. Rule 1115(f), which directs that a Petition For Allowance Of Appeal shall not exceed 9,000 words.

**Date: <u>March 3, 2021</u>**                                       **<u>s/Diana Stavroulakis</u>**
                                                                           **Diana Stavroulakis, Esquire**
                                                                           **Attorney for Petitioner**

Respondents' Exhibit 77

## <u>CERTIFICATE OF COMPLIANCE</u>

I certify that this filing complies with the provisions of the *Public Access Policy of the Unified Judicial System of Pennsylvania: Case Records Of The Appellate And Trial Courts* that require filing confidential information and documents differently than non-confidential information and documents.

**Date: March 3, 2021**                         **Submitted by:**

<u>**s/Diana Stavroulakis**</u>
**Diana Stavroulakis, Esquire**
**PA ID #59255**
**3362 Babcock Boulevard**
**P.O. Box 15479**
**Pittsburgh, PA 15237**

Respondents' Exhibit 77

1037

## <u>COUNSEL'S VERIFICATION OF CLIENT'S CONTINUED</u>
## <u>*IN FORMA PAUPERIS* STATUS</u>

I, Diana Lynn Stavroulakis, the undersigned individual and court-appointed attorney in the instant case, do hereby verify and state that the following information is true and correct to the best of this attorney's knowledge, information and belief:

1. Petitioner, Matthew Ebo, has no financial means to pay for his own

    attorney on appeal;

2. Petitioner was granted *In Forma Pauperis* status in the Court of

    Common Pleas, due to the Court's findings and conclusion that he was

    eligible to proceed with *In Forma Pauperis* status; and,

3. Petitioner's financial status and means have not substantially changed

    since receiving *In Forma Pauperis* status.


Wherefore, the undersigned verifies to this Honorable Court that her client's financial status has in no way substantially changed and that Mr. Ebo should be permitted to continue with *In Forma Pauperis* status.

> **Respectfully Submitted and Verified:**
> **s/<u>Diana Lynn Stavroulakis 3/3/21</u>**
> **Diana Lynn Stavroulakis**

Respondents' Exhibit 77

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| MATTHEW EBO | : | |
| | : | |
| Appellant | : | No. 58 WDA 2020 |

Appeal from the PCRA Order Entered December 13, 2019
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0002821-2012

BEFORE:   OLSON, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY OLSON, J.:                **FILED FEBRUARY 19, 2021**

Appellant, Matthew Ebo, appeals from the December 13, 2019 order dismissing his petition filed pursuant to the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

The record demonstrates that on September 14, 2012, a jury found Appellant guilty of criminal homicide (first-degree murder), robbery – infliction of serious bodily injury, robbery of a motor vehicle, carrying a firearm without a license, conspiracy to commit robbery – infliction of serious bodily injury, and conspiracy to commit murder in connection with the May 16, 2011 shooting death of the victim.[1]  On November 28, 2012, the

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 2501(a), 3701(a)(1)(i), 3702(a), 6106(a)(1), 903(c), and 903(c), respectively.  Appellant was tried jointly with co-defendant,

Respondents' Exhibit 77

trial court sentenced Appellant to life imprisonment without parole for his criminal homicide conviction and an aggregate, consecutive 46 to 92 years' imprisonment for the remaining convictions.[2]

While Appellant's case was pending on direct appeal before this Court, Appellant filed an application for remand based upon alleged after-discovered evidence.[3]   In a *per curiam* order issued on August 6, 2015, this Court remanded Appellant's case and instructed the trial court to conduct a hearing to address Appellant's request for a new trial based upon this after-discovered evidence.  On December 22, 2015, the trial court denied Appellant's request, and Appellant subsequently filed a notice of appeal.  On June 21, 2017, this Court affirmed Appellant's convictions but vacated his unlawful sentences for

_____

Thaddaeus Crumbley ("co-defendant").  The trial court, in a bench trial, convicted Appellant of possession of a firearm prohibited, 18 Pa.C.S.A. § 6105(a)(1).

[2] The trial court imposed a sentence of ten to twenty years' imprisonment for robbery of a motor vehicle, three and one-half to seven years' imprisonment for carrying a firearm without a license, two and one-half to five years' imprisonment for possession of a firearm prohibited, ten to twenty years' imprisonment for conspiracy to commit robbery − infliction of serious bodily injury, and twenty to forty years' imprisonment for conspiracy to commit murder.  All of these sentences were to run consecutive to Appellant's life sentence.

[3] Appellant's direct appeal was docketed with this Court at 1194 WDA 2013. The after-discovered evidence included the unsworn statement of a witness who testified at Appellant's trial ("trial witness"), in which the trial witness recanted her pre-trial and in-court identifications of Appellant and his co-defendant as the shooters involved in the victim's murder.  ***See Commonwealth v. Ebo***, 174 A.3d 91 (Pa. Super. 2017) (unpublished memorandum).

- 2 -

Respondents' Exhibit 77

1040

robbery of a motor vehicle and conspiracy to commit robbery – infliction of serious bodily injury. **Commonwealth v. Ebo**, 174 A.3d 91 (Pa. Super. 2017) (unpublished memorandum) (finding, that the mandatory minimum sentences imposed pursuant to Section 9712 of the Pennsylvania Sentencing Code were illegal under **Alleyne v. United States**, 570 U.S. 99 (2013), as determined by this Court in **Commonwealth v. Valentine**, 101 A.3d 801 (Pa. Super. 2014), *appeal denied*, 124 A.3d 309 (Pa. 2015)).  Appellant filed a petition for allowance of appeal, which our Supreme Court subsequently denied on December 13, 2017.

On January 17, 2018, Appellant filed *pro se* a PCRA petition, his first. The PCRA court appointed counsel to represent Appellant but held Appellant's petition in abeyance because of Appellant's pending resentencing procedure. On February 28, 2018, the trial court resentenced Appellant to life imprisonment without parole for his criminal homicide conviction together with an aggregate, consecutive sentence of 46 to 92 years' imprisonment for his remaining convictions.[4]  Appellant filed a post-sentence motion, which the trial court subsequently denied on April 11, 2018.  Counsel for Appellant filed a

_____

[4] The trial court fashioned the same length of consecutive sentences for Appellant's convictions of robbery of a motor vehicle, carrying a firearm without a license, possession of a firearm prohibited, conspiracy to commit robbery – infliction of serious bodily injury, and conspiracy to commit murder without imposing mandatory minimum sentences pursuant to 42 Pa.C.S.A. § 9712.

Respondents' Exhibit 77

notice of appeal on May 8, 2018.[5]  This Court, in a May 30, 2018 *per curiam* order, discontinued Appellant's direct appeal from resentencing at Appellant's request.[6]  Appellant's judgment of sentence, therefore, became final on May 30, 2018.  ***See Commonwealth v. McKeever***, 947 A.2d 782, 785 (Pa. Super. 2008) (holding, that for purposes of the PCRA, a petitioner's judgment of sentence becomes final on the date he, or she, discontinued the direct appeal).

On June 29, 2018, Appellant amended his original PCRA petition raising a claim for relief based upon after-discovered evidence.  Appellant subsequently filed a supplement to his amended PCRA petition setting forth, in detail, the argument that Appellant was entitled to a new trial based upon after-discovered, exculpatory eyewitness testimony.  On May 10, 2019, the PCRA court  held a hearing on Appellant's PCRA petition, and subsequently denied Appellant's petition on December 13, 2019.  This appeal followed.[7]

Appellant raises the following issues for our review:

---

[5] Appellant filed *pro se* a notice of appeal on May 16, 2018.  While Pennsylvania's prohibition against hybrid representation does not nullify Appellant's *pro se* notice of appeal since Appellant has a constitutional right to an appeal, Appellant's *pro se* notice is of no consequence since counsel previously instituted appellate proceedings on his behalf.  ***See Commonwealth v. Williams***, 151 A.3d 621, 623-624 (Pa. Super. 2016).

[6] This Court docketed Appellant's appeal at 679 WDA 2018.

[7] Both Appellant and the PCRA court complied with Pa.R.A.P. 1925.

Respondents' Exhibit 77

> [1.]   [Whether] the PCRA court erred in denying relief where [Appellant] established his after-discovered evidence claim through [] exculpatory eyewitness testimony[?]
>
> [2.]   [Whether] the PCRA court erred in denying relief by incorrectly concluding that [the eyewitness's] testimony was offered solely to impeach [the trial witness], when in fact [the eyewitness's testimony] was [] offered as substantive, exculpatory evidence [to establish Appellant's] innocence[?]
>
> [3.]   [Whether] the PCRA court erred in denying relief because [the eyewitness's] testimony is likely to compel a different verdict at a new trial[?]

Appellant's Brief at 5 (extraneous capitalization omitted).

In sum, Appellant contends the PCRA court erred in finding that the after-discovered evidence, namely the exculpatory testimony of an eyewitness to the murder, did not merit post-conviction relief.  Appellant's Brief at 17-34.

Proper appellate review of a PCRA court's dismissal of a PCRA petition is limited to the examination of "whether the PCRA court's determination is supported by the record and free of legal error."  ***Commonwealth v. Miller***, 102 A.3d 988, 992 (Pa. Super. 2014) (citation omitted).  "The PCRA court's findings will not be disturbed unless there is no support for the findings in the certified record."  ***Commonwealth v. Lawson***, 90 A.3d 1, 4 (Pa. Super. 2014) (citations omitted).  "This Court grants great deference to the findings of the PCRA court, and we will not disturb those findings merely because the record could support a contrary holding."  ***Commonwealth v. Hickman***, 799 A.2d 136, 140 (Pa. Super. 2002) (citation omitted).  In contrast, we review the PCRA court's legal conclusions *de novo*.  ***Commonwealth v. Henkel***, 90

Respondents' Exhibit 77

J-S49006-20

A.3d 16, 20 (Pa. Super. 2014) (*en banc*), *appeal denied*, 101 A.3d 785 (Pa. 2014).

To receive a new trial based on after-discovered evidence, a petitioner must satisfy a four-part test requiring

> the petitioner to demonstrate the [after-discovered] evidence: (1) could not have been obtained prior to the conclusion of the trial by the exercise of reasonable diligence; (2) is not merely corroborative or cumulative; (3) will not be used solely to impeach the credibility of a witness; and (4) would likely result in a different verdict if a new trial were granted.

***Commonwealth v. Small***, 189 A.3d 961, 972 (Pa. 2018), *citing* ***Commonwealth v. Pagan***, 950 A.2d 270 (Pa. 2008), *cert. denied*, 555 U.S. 1198 (2009).  "The test is conjunctive; the [petitioner] must show by a preponderance of the evidence that each of these factors has been met in order for a new trial to be warranted."  ***Commonwealth v. Padillas***, 997 A.2d 356, 363 (Pa. Super. 2010), *appeal denied*, 14 A.3d 826 (Pa. 2010).  In addition, the after-discovered evidence must be producible and admissible. ***Small***, 189 A.3d at 972.

The "salutary goal of the after-discovered evidence rule [is] to limit continued litigation without being so rigid as to shut out [after-]discovered evidence **from a credible source** which may lead to a true and proper judgment."  ***Small***, 189 A.3d at 975 (citation omitted, emphasis added).  As is the case with recantation testimony, when the after-discovered evidence is exculpatory eyewitness testimony, a request for a new trial based on the exculpatory eyewitness testimony hinges on the credibility of the testimony.

- 6 -

Respondents' Exhibit 77

***Id.***  "[T]he inquiry into whether the evidence would likely result in a different verdict [is] the lodestar of the after-discovered evidence analysis." ***Id.*** at 976 n.12 (stating, the second and third parts of the after-discovered evidence test are subsumed by the fourth part regarding likelihood of a different outcome), *citing* **Commonwealth v. Perrin**, 59 A.3d 663, 669 (Pa. Super. 2013) (Wecht, J., concurring), *vacated*, 103 A.3d 1224 (Pa. 2014).  In short, only credible testimony satisfies the fourth part of the after-discovered evidence test.

In determining whether the after-discovered evidence is of such nature and character that it would compel a different verdict if a new trial were granted, "a court should consider the integrity of the alleged after-discovered evidence, the motive of those offering the evidence, and the overall strength of the evidence supporting the conviction." **Padillas**, 997 A.2d at 365 (citations omitted).  It is axiomatic that if the after-discovered evidence is incredible, then it would not compel a different outcome, and as a result, the PCRA court must deny the request for a new trial regardless of whether a petitioner satisfied the first three parts of the test. **Small**, 189 A.3d at 977. The precedent set by our Supreme Court in **Small** requires the PCRA court, as the fact-finder at the evidentiary hearing, to make definitive findings of fact, which are supported by the record, and conclusions of law with regard to the credibility of the after-discovered evidence. ***Id.*** at 978.  The PCRA court is in the superior position to make credibility determinations and assess

- 7 -

Respondents' Exhibit 77

whether the credible after-discovered evidence is of such importance that it will change the outcome of the case. ***Id.***

Here, the PCRA court made the following findings of fact based upon the eyewitness's testimony:

On May 16, 2011, the day [the victim] was shot to death at the Leechburg Gardens Apartments in Penn Hills, [Pennsylvania, the eyewitness] was working as a jitney driver. That evening, shortly before the shooting occurred, [the eyewitness] picked up two [] African American men and drove them to the Leechburg Gardens [A]partment[s]. [The eyewitness] claimed that he recognized these men because they had used his jitney services "more than ten" times in the past. He described one of the men as being "really tall" with "dark skin," approximately [six foot, eight inches] in height. He described the other man as being "short" and "light-skinned." When presented with photographs[,] he was able to identify the individuals in those pictures as the men he had driven to the Leechburg Gardens [A]partment[s on May 16, 2011]. He [] nicknamed them "stretch" and "young buck" but recalled that they referred to each other as "Ron and Rome or something like that."

[The eyewitness] dropped these men off at the Leechburg Gardens [Apartments] at approximately 7:00 p.m., when it was getting dim outside. After he dropped them off, [the eyewitness] testified to the following series of events:

> I was turning my car around [in the parking lot] so I could [exit the parking lot]. I [] had to go the bathroom by the fire hydrant and the big Christmas tree. As I'm standing up peeing, a white car comes in the parking lot, two guys started busting off caps, and everybody started shooting at each other. I dove on the ground, crawled in my car, dropped my seat back[,] and pulled out [of the parking lot].

[The eyewitness] testified that he "clearly" saw that "Ron and Rome" were firing their guns "over in that direction towards the parking lot in that area" where the white car was located. However, he also testified that he "wasn't paying no attention" to what or who they were shooting at because he dropped to the ground as soon as he saw "the sparks and fires." As he described

- 8 -

Respondents' Exhibit 77

it: "I dropped down, peed on myself, crawled in my car, kicked my seat back and just pulled off.  I started lifting my head up as I am pulling out [of the parking lot]."  After [the eyewitness] got back inside of his vehicle [and exited the parking lot], he noticed that the white car had pulled out behind him[.  H]e thought that the people inside of the white car were going after him because of what he had just witnessed.  Even though [the eyewitness] saw Ron and Rome shooting at the people in the white car, [he] thought that Ron and Rome were now in the white car behind him.  However, [the eyewitness] never saw anyone get in or out of the white car, and he could not see inside of the vehicle at any point.

[The eyewitness] was able to retreat safely from the scene, but he never went to the police to report the shooting that he [] allegedly witnessed, and, at that time, he was unaware that anyone had been killed in the shootout.  Law enforcement also never attempted to contact him in 2011[,] about the shooting.  When asked why he decided to come forward with this information in 2018, [the eyewitness] testified as follows:

> I was in the Allegheny [C]ounty jail, and I was on the fourth floor just coming in, and these gentlemen was talking and they was pointing at me.  So they called me to be released.  As I am coming downstairs to be released, **some young guy told me** - he was from Turtle Creek or something - **he told me that I was there.  And I said, "[w]here?"  He says "you was there for the [Leechburg Gardens Apartments'] shooting."  And he goes, "say that you wasn't, and I'll jump on you."  I'm like, what the hell?  So I put my foot on the bunk and stood up to fight to defend myself.**

[The eyewitness] testified that this young man was a fellow inmate whom he did not know and had never seen before.  This unidentified inmate told [the eyewitness] that he knew [the eyewitness] was [at the apartment complex] that night because [the inmate] was [also at the apartment complex that night].  [T]he inmate provided the details of the incident, telling [the eyewitness] "exactly where it happened, exactly what time it was.  The inmate said the guy's name that died."  The inmate also told [the eyewitness] that "[Ron and Rome] were the two men that did it."  [The eyewitness] was scared that this inmate was going to physically assault him.  He "felt threatened enough to jump on the bunk and brace" himself "for just two of them against me."  The jail guards had to [] prevent an altercation.  [The eyewitness]

- 9 -

Respondents' Exhibit 77

testified that he "didn't know any of this [information the inmate provided]" and that he was "in shock" because he was "being attacked" so he "had to do research on why" he was "being attacked."

[W]hen [the eyewitness] was released from jail shortly thereafter, he had a friend of his fact-check the information that the inmate [] provided on her cell[ular tele]phone because he wanted to know why he "was threatened for my life in jail." He asked his friend to [search] "the days, dates things like that." When he saw the pictures of [Appellant and his co-defendant] and learned that they had been convicted of the murder, he "knew they were not the people that" he had driven to the [apartment] complex. This prompted [the eyewitness] to write a letter to [the co-defendant] telling him "that I knew they were innocent because I was there."

[The eyewitness] decided to reach out to [the co-defendant] because he had a brother in prison who he believes was wrongfully convicted, and he did not "want an innocent man to be in jail." [The eyewitness] further testified that he does not know and has never seen any member of the [co-defendant's] or [Appellant's] family and that [Appellant and the co-defendant] were not present during the shooting incident that he witnessed.

[The eyewitness] confirmed that the witness statements that were attached to [Appellant's] PCRA petition[] were true. [Although the eyewitness] claimed he saw "something in one line somewhere" when he was reading [the typed witness statement] that was a discrepancy, [] he never scratched anything out or attempted to correct this purported discrepancy. [The eyewitness] did not attempt to contact law enforcement or the [Allegheny County] District Attorney's Office with the information he [] relayed to [the co-defendant] through his letter.

When questioned by [the PCRA] court, [the eyewitness] clarified that he did not actually see anyone get struck by a bullet, he did not see what the victim looked like at any point, and he did not see anyone laying on the ground. He also testified that he never saw anyone get out of the white car before the shooting started and he did not see who entered the white car after the shooting because he "wasn't paying attention" and "everything happened in a tenth of a second."

Respondents' Exhibit 77

J-S49006-20

PCRA Court Opinion, 2/5/20, at 5-11 (formatting, original brackets, ellipsis, and record citations omitted; emphasis in original).

Appellant argues that the PCRA court erroneously applied the four-part after-discovered evidence test when reviewing his claim for relief based upon the eyewitness's exculpatory testimony. Appellant's Brief at 26. While Appellant agrees with the PCRA court's finding that he satisfied the first two parts of the after-discovered evidence test, Appellant asserts that he satisfied his burden of proof as to the third and fourth parts, as well. *Id.* at 25. Specifically, Appellant contends that the eyewitness's testimony was not offered solely to impeach the testimony of any other witness who testified at trial but, rather, would provide exculpatory evidence identifying two male perpetrators, other than Appellant and his co-defendant, who were responsible for the shooting death of the victim. *Id.* Appellant further contends that the PCRA court erred in making a determination as to the credibility of the eyewitness's testimony and whether this testimony would compel a different verdict. *Id.* as 27. In arguing that it was the role and function of the jury to determine the credibility of the eyewitness's testimony and whether the testimony would compel a different verdict, Appellant asserts,

> It would be for the jury to consider [the trial witness's] testimony, [the eyewitness's] testimony, [and] all other testimonial evidence, whether direct or circumstantial, to assist in reaching a reliable verdict. [Appellant] did not proceed to a bench trial. Thus, it was not for the PCRA court to compare [the trial witness's] testimony [] to [the eyewitness's testimony] and to decide that [the

- 11 -

Respondents' Exhibit 77

eyewitness's] testimony would not have compelled a different verdict.

*Id.*

The PCRA court found that the eyewitness's testimony failed to satisfy the third and fourth parts of the after-discovered evidence test. We, however, conclude that Appellant met the third criteria under that test.[8] Nonetheless, Appellant's failure to establish any one part of the four-part after-discovered evidence test is fatal to his request for a new trial. *Small*, 189 A.3d at 972. Thus, while we conclude that Appellant met the third part of the after-discovered evidence test, we review the PCRA court's determination that Appellant failed to establish that the eyewitness's testimony would likely result in a different verdict if a new trial were granted.

With regard to the fourth part of the after-discovered evidence test, the PCRA court stated,

> the [PCRA] court finds that it is unlikely that [the eyewitness's] testimony would compel a different verdict at trial when considered against the evidence as a whole. In addition to [the trial witness's] clear and unequivocal [in-court testimony in which

---

[8] The PCRA court found that the eyewitness's testimony was "presented solely to impeach the strong, unwavering identification testimony of [the trial witness.]" PCRA Opinion, 2/5/20, at 15. We disagree with this assessment. Although the eyewitness's testimony, in part, would impeach that of the trial witness, the PCRA court erred in determining that it was offered **solely** for impeachment purposes. If a new trial were granted, the eyewitness's testimony would be used to identify two male shooters, neither of whom were Appellant or his co-defendant, and no other evidence offered at trial identified individuals, other than Appellant and his co-defendant, as the shooters. Consequently, we find, and the record supports, that Appellant proved the third part of the after-discovered evidence test.

- 12 -

Respondents' Exhibit 77

she identified Appellant and his co-defendant as the shooters involved in the victim's murder], other circumstantial evidence linked [Appellant and his co-defendant] to the shooting. (**See** Trial Court Opinion, [] 6/25/14).

Ultimately, [the PCRA] court did not consider [the eyewitness's] testimony to be credible because of the inconsistencies contained therein and because of the clear motive to fabricate his testimony out of fear for his life.  For example, [in his witness statement, the eyewitness stated] he had driven Ron and Rome in his jitney "two to three" times prior to the day of the shooting, but at the hearing he testified that he had driven them [] "more than ten times."  In his testimony[,] he said he had taken Ron and Rome to [the] Leechburg Gardens [Apartments] before, but in his witness statement[,] he says [the evening of the incident] was the first time he had ever taken them there.  In his witness statement, the "friend" who helped him research the shooting after he was released from jail was a male, but at the hearing, [the eyewitness] testified that this friend was a female.

As [the eyewitness] noted several times throughout the hearing, he was approached by an inmate who told him, "you was there for the shooting say that you wasn't, and I'll jump on you."  The inmate told him who was killed, who the shooters were, and the time and location of the shooting.  As [the eyewitness] put it, the inmate "was mentioning so much.  It was just too much chaos."  Thus, it is impossible to discern whether [the eyewitness's] testimony is purely a product of his memory or the information he had been threatened into "remembering" seven [] years after the murder.  The [PCRA] court also questions why this unidentified inmate[,] who allegedly was present at the shooting and possessed this information, threatened [the eyewitness] into coming forward and has not come forward himself to corroborate [the eyewitness's] testimony

Another factor that further diminishes [the eyewitness's] credibility is the fact that his alleged motive to come forward, after his life was threatened, was to help clear the name of purportedly innocent men[.  Y]et he never contacted the authorities, or the District Attorney's Office, with the information he had about their "wrongful" convictions.  The [PCRA] court is also compelled to note that, somewhat conveniently, the men known as "Ron and Rome" were found dead[, together,] in the same vehicle in early 2012, and "Rome" was [the co-defendant's] cousin.

- 13 -

Respondents' Exhibit 77

PCRA Court Opinion, 2/5/20, at 15-17 (ellipsis, original brackets, and some record citations omitted).

Contrary to Appellant's argument, when presented with a request for a new trial based upon after-discovered evidence, it is the role and function of the PCRA court to determine the credibility of the witness and assess whether the credible after-discovered evidence would likely result in a different verdict. *See Small*, 189 A.3d at 978 (stating, it is the duty of the PCRA court to assess the credibility of the witness, explicitly setting forth its determination, and if credible, determine the significance, if any, the new testimony would likely have on reaching a different verdict). Here, the record supports the PCRA court's explicit determination that the eyewitness was not credible. A review of the record demonstrates significant inconsistencies between the eyewitness's hand-written statement, the typed witness statement prepared by a private investigator that the eyewitness reviewed and initialed, and the testimony he offered at the PCRA evidentiary hearing. For example, in his hand-written statement, the eyewitness stated, "I think the guys['] names were Ro [and] Ron. I called them bro Ro or young bucks." In the typed witness statement, the eyewitness stated, "I do not know their real names but . . . I call them Ron and Rome." When asked at the evidentiary hearing whether he knew the men's names, the eyewitness testified, "I call one Stretch and the other one Young Buck." N.T., 5/10/19, at 8. The eyewitness stated that when he transported the two men, he heard them call each other "Ron and Rome[.]" *Id.* at 9, 26. Aside from the discrepancies noted by the

- 14 -

Respondents' Exhibit 77

PCRA court, the eyewitness also testified at the evidentiary hearing that he hand-wrote his statement and sent it to the co-defendant after obtaining the co-defendant's prison address from an internet search. *Id.* at 37, 39-41. In his typed witness statement, the eyewitness stated, "I found out the name of the attorney that represented [the co-defendant] and wrote her a letter saying that her client was not guilty of the shooting and that the wrong man had been convicted of the murder." *See* Commonwealth Exhibit 1. Finally, the eyewitness offered no explanation as to why, or how, an inmate at the Allegheny County Jail, who was unknown to the eyewitness, recognized him seven years after the shooting, how the inmate could approach the eyewitness while he was being released, and why the inmate would allegedly provide the eyewitness with exculpatory evidence, including the names of the two shooters, while simultaneously admitting that he was also an eyewitness. Based upon the record before us, we discern no abuse of discretion in the PCRA court's determination that the eyewitness was not credible.[9] Therefore, Appellant failed to satisfy the fourth part of the after-discovered evidence test,

---

[9] Moreover, we concur with the PCRA court that the after-discovered evidence, namely the eyewitness's testimony, would not likely result in a different verdict. The trial witness definitively identified Appellant and the co-defendant as the shooters, observed the victim fall to the ground after being shot, and witnessed Appellant and the co-defendant flee in the victim's white car. Conversely, the eyewitness stated that he did not see anyone get shot, he never saw anyone lying on the ground after being shot, he never saw the driver of the white car, and he never witnessed anyone get out of, or into, the white vehicle. N.T., 5/10/19, at 42-44.

Respondents' Exhibit 77

and the PCRA court did not abuse its discretion or commit an error of law in dismissing Appellant's PCRA petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/19/2021

Respondents' Exhibit 77

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION

**ORIGINAL**
Criminal Division
Dept. Of Court Records
Allegheny County, PA

COMMONWEALTH OF PENNSYLVANIA )
                                  )
                v.             ) CC # 2012-2821
                                    )
MATTHEW EBO,                      )
                                    )
            Defendant.       )

**ORDER OF COURT**

**AND NOW**, this _____ day of February, 2020, **it is HEREBY**

**ORDERED that the Clerk of Courts shall transmit the record on this**

**matter to the Superior Court of Pennsylvania forthwith.** On February

1, 2020, the Defendant filed a timely Concise Statement of Matters

Complained of on Appeal ("Concise Statement") pursuant to Pa.R.A.P.

1925(b). In his Concise Statement, the Defendant challenges this court's

December 13, 2019 Order denying PCRA relief.

The court's PCRA Order directly addresses the issues raised in the

Defendant's Concise Statement. A copy of this Order is attached hereto.

This satisfies the requirements of Pa.R.A.P 1925(a)(1) that the court set

forth its reasons for issuing the Order appealed from.[1] A copy of this Order

---

[1] Pa. R.A.P. 1925(a)(1) provides in relevant part: " . . . upon receipt of the notice of appeal, the judge who entered the order giving rise to the notice of appeal, ***if the reasons for the order do not already appear of record***, shall forthwith file of record at least a brief opinion of the reasons for the order, or for the rulings or other errors complained of, or ***shall specify in***

1

has been served upon Counsel for the Defendant by regular mail, and upon

the Office of the District Attorney/Appeals Division, by interoffice mail.


BY THE COURT:


BETHA. CAZZARA, JUDGE , J.

_____

*writing the place in the record where such reasons may be found.*"
(emphasis added).

2

Respondents' Exhibit 77

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

CRIMINAL DIVISION



COMMONWEALTH OF PENNSYLVANIA )
                              )
                    v.        )   CC #   2012-2820
                              )
THADDEUS CRUMBLEY,            )
                              )
        Defendant             )
                              )
_____)
                              )
COMMONWEALTH OF PENNSYLVANIA  )
                              )
                    v.        )   CC # 2012-2821
                              )
MATTHEW EBO,                  )
                              )
        Defendant.            )

### MEMORANDUM ORDER

AND NOW, this ⎣3ᵗʰ day of December, 2019, upon

consideration of the Defendants' counseled PCRA petitions, filed on August

14, 2018 (Def. Crumbley), and June 29, 2018 (Def. Ebo), the

Commonwealth's Answers thereto, filed on November 19, 2018 (Def.

Crumbley) and December 3, 2018 (Def. Ebo), and upon further

consideration of the evidence and argument presented at the EVIDENTIARY

HEARING held on May 10, 2019, and the post-hearing submissions filed on

behalf of the Defendants and the Commonwealth, **the court HEREBY**

**FINDS THAT THE DEFENDANTS ARE NOT ENTITLED TO PCRA RELIEF**

1

1057

**based on their after-discovered evidence claim under 42 Pa. C.S.A. §9543(a)(2)(vi).** The court offers the following rationale in support of this Order denying PCRA relief.

## A. RELEVANT PROCEDURAL HISTORY

Following a jury trial that led to their First-Degree Murder convictions, the Defendants were sentenced on November 28, 2012. The Defendants pursued direct appeals before the Superior Court of Pennsylvania. Prior to their brief submissions, the Defendants filed Applications for Remand based on After-Discovered Evidence. The Defendants claimed that Saday Robinson, the central eyewitness who testified at their joint trial, had subsequently recanted her identification of the Defendants as the perpetrators of the Todd Mattox murder.

On August 6, 2015, the Superior Court remanded the case back to the trial court so that it could conduct an evidentiary hearing and determine whether a new trial was warranted on that basis. However, at the evidentiary hearing that took place on October 29, 2015, Saday Robinson recanted her post-trial, unsworn recantation, claiming that she had been threatened by the Defendants' associates into recanting her trial testimony. In an Order dated December 22, 2015, this court found that a new trial was not warranted based on Ms. Robinson's unsworn "recantation" that she had made to defense investigators.

2

Respondents' Exhibit 77

The case was sent back to the Superior Court, and this court's finding that a new trial was not warranted based on Ms. Saday's "recantation" was included as one of the issues raised in the Defendants' appeals. On June 21, 2017, the Superior Court affirmed the Defendants' convictions but vacated Defendant Ebo's sentences at Counts Three (3) and Six (6) based on <u>Alleyne</u> violations.[1] (Superior Court Opinion (Ebo), Docket No. 92 WDA 2016, p. 17); (Superior Court Opinion (Crumbley), Docket No. 127 WDA 2016).

The Defendants subsequently filed Petitions for Allowance of Appeal ("PAA") before the Pennsylvania Supreme Court, which were both denied on December 13, 2017.  The Defendants did not seek relief before the United States Supreme Court.

## B. <u>TIMELINESS OF PETITIONS</u>

The Defendants' PCRA Petitions are timely pursuant to 42 Pa. C.S.A. § 9545(b).   Defendant Ebo was resentenced on February 28, 2018.  Though he subsequently filed a direct appeal, his attorney discontinued that appeal on May 30, 2018. The Superior Court issued its Certification of Discontinuance that same day. Accordingly, Defendant Ebo's judgment of sentence became final on May 30, 2018. <u>Commonwealth v. McKeever</u>, 947 A.2d 782, 785 (Pa. Super. 2008) ("[T]he record reveals that Appellant's

---

[1] Defendant Ebo was convicted of Robbery of a Motor Vehicle at Count Three (3) and Conspiracy to commit Robbery – Serious Bodily Injury at Count Six (6).

3

Respondents' Exhibit 77

judgment of sentence became final on . . . the date Appellant discontinued his direct appeal.").

Since Defendant Crumbley did not require re-sentencing, and the Pennsylvania Supreme Court denied his PAA petition on December 13, 2017, his judgment of sentence became final on March 13, 2018, when the 90-day period for seeking a *writ of certiorari* expired. Commonwealth v. Ruiz, 131 A.3d 54, n. 8 (Pa. Super. 2015). Accordingly, Defendant Crumbley had until March 13, 2019 to file a timely PCRA petition and Defendant Ebo had until May 30, 2019 to do the same.  (*See* 42 Pa. C.S.A. § 9545(b)) (requiring timely petitions to be filed within one year of the judgment of sentence becoming final).

Defendant Crumbley filed his *pro se* PCRA petition on February 13, 2018, while Defendant Ebo filed his *pro se* PCRA petition on January 17, 2018.[2]  Therefore, each of the Defendants' petitions are timely under the PCRA, and the issues raised therein have not been previously litigated on direct appeal.

## C. **AFTER-DISCOVERED EVIDENCE CLAIM**

After the appointment of PCRA Counsel, Defendant Crumbley submitted an Amended PCRA Petition on August 14, 2018, and Defendant Ebo submitted his Amended PCRA Petition on June 29, 2018. In these

---

[2] Defendant Ebo's *pro se* PCRA petition was held in abeyance pending his resentencing and any subsequent post-sentence motions/appeals.

4

Respondents' Exhibit 77

**1060**

petitions, the Defendants claimed that they had discovered that a man

named Robert Raglin witnessed the May 16, 2011 murder[3] of Todd Mattox

and that he would be willing to testify that the Defendants were not the

perpetrators of that crime. (*See* "Witness Statement" of Robert Raglin,

dated July 31, 2018, and attached to Def. Crumbley's Amended PCRA

Petition, filed on August 14, 2018); (*See* Sworn Notarized Statement of

Robert Raglin, dated May 4, 2018 and attached as "Exhibit A" to Def. Ebo's

PCRA petition, filed 6/29/18).  Given the nature of these claims, the court

held a PCRA hearing on May 10, 2019 to determine the validity and

credibility of this potential after-discovered evidence.

At the PCRA Hearing, Mr. Raglin appeared and testified to the

following set of facts:

    a. On May 16, 2011, the day Todd Mattox was shot to death at the

        Leechburg Gardens Apartments in Penn Hills, Mr. Raglin was

        working as a jitney driver. (PCRA Hearing Transcript ("HT"), held

        5/10/19, pp. 4-5, 23).

    b. That evening, shortly before the shooting occurred, Mr. Raglin

        picked up two (2) African American men and drove them to the

        Leechburg Gardens apartment. (HT, pp. 5-7, 23-24). He claimed

        that he recognized these men because they had used his jitney

---

[3] The facts relating to the murder of Todd Mattox were set forth in the Trial
Court Opinion ("TCO") that was filed on June 25, 2014.

**Respondents' Exhibit 77**

services "more than ten" times in the past. (HT, pp. 5-7). He

described one of the men as being "really tall" with "dark skin,"

approximately 6'8 in height. (HT, p. 6). He described the other man

as being "short" and "light-skinned." (HT, p. 6).

c. When presented with photographs that were marked as Defense

Exhibits A and B, he was able to identify the individuals in those

pictures as the men he had driven to the Leechburg Gardens

apartment that day. (HT, pp. 7-8). He had nicknamed them

"stretch" and "young buck" but recalled that they referred to each

other as "Ron and Rome or something like that." (HT, pp. 8-9, 26).

d. Mr. Raglin testified that he dropped these men off at the Leechburg

Gardens at approximately 7:00 p.m., when it was getting dim

outside.  (HT, pp. 10, 29).

e. After he dropped them off, Mr. Raglin testified to the following

series of events:

> I was turning my car around so I could go out. I had to go
> to the bathroom by the fire hydrant and the big Christmas
> tree. As I'm standing up peeing, a white car comes in [the
> parking lot], two guys started busting off caps, and
> everybody started shooting at each other. I dove on the
> ground, crawled in my car, dropped my seat back and
> pulled out. (HT, p. 10).

f. Mr. Raglin testified that he "clearly" saw that "Ron and Rome"

were firing their guns "[o]ver in that direction towards the

6

parking lot in that area" where the white car was located. (HT, pp. 11, 36).

g. However, he also testified that he "wasn't paying no attention" to what or who they were shooting at because he dropped to the ground as soon as he saw "the sparks and fires." (HT, pp. 10-11). As he described it: "I dropped down, peed on myself, crawled in my car, kicked my seat back and just pulled off. I started lifting my head up as I am pulling out." (HT, p. 30).

h. After Mr. Raglin got back inside of his vehicle, he noticed that the white car had pulled out behind him, and he thought that the people inside of the white car were going after him because of what he had just witnessed. (HT, pp. 11, 31).

i. Even though Mr. Raglin saw Ron and Rome shooting at the people in the white car, Mr. Raglin thought that Ron and Rome were now in the white car behind him. (HT, pp. 12, 31). However, Mr. Raglin never saw anyone get in or out of the white car, and he could not see inside of the vehicle at any point. (HT pp. 11, 43-44).

j. Mr. Raglin was able to retreat safely from the scene, but he never went to the police to report the shooting that he had allegedly witnessed, and, at that time, he was unaware that

7

Respondents' Exhibit 77

anyone had been killed in the shootout. (HT, pp. 12, 19). Law

enforcement also never attempted to contact him in 2011

about the shooting. (HT, p. 18).

k.  When asked why he decided to come forward with this

information in 2018, Mr. Raglin testified as follows:

> I was in the [Allegheny] county jail, and I was on the fourth floor just coming in, and these gentlemen was talking and they was pointing at me. So they called me to be released. As I am coming downstairs to be released, **some young guy told me** - - he was from Turtle Creek or something - - **he told me that I was there. And I said, "[w]here?" He says "you was there for the ["Leechburg, Penn Hills"] shooting." And he goes, "say that you wasn't, and I'll jump on you." I'm like, what the hell? So I put my foot on the bunk and stood up to fight to defend myself.**  (HT, pp. 12-13)(emphasis added).

l.  Mr. Raglin testified that this young man was a fellow inmate

whom he did not know and had never seen before. (HT, pp.

12-13, 24, 33-34). This unidentified inmate told Mr. Raglin

that he knew Mr. Raglin was there that night because he was

there too. (HT, pp. 12, 34).

m. Mr. Raglin stated that the inmate provided the details of the

incident, telling him "exactly where it happened, exactly what

time it was. [The inmate] said the guy's name that died." The

inmate also told him that "these were the two men that did

it." (HT, pp. 24-25, 33).

8

Respondents' Exhibit 77

n. Mr. Raglin testified that he was scared that this inmate was going to physically assault him.  (HT, pp. 13, 33, 34-35). He "felt threatened enough . . . to jump on the bunk and brace" himself "for just two of them against me." (HT, p. 35). The jail guards had to step in to prevent an altercation. (HT, pp. 13-14, 35).

o. Mr. Raglin testified that he "didn't know any of this [information]" and that he was "in shock" because he was "being attacked" so he "had to do research on why" he was "being attacked." (HT, pp. 25, 33, 45).

p. Mr. Raglin testified that when he was released from jail shortly thereafter, he had a friend of his fact-check the information that the inmate had provided on her cell phone because he wanted to know why he "was threatened for my life in jail." (HT, pp. 13-14, 25, 45-46). He asked his friend to google "the days, dates, things like that." (HT, pp. 14, 39, 45).

q. When he saw the pictures of the Defendants and learned that they had been convicted of the murder, he "knew [they were not] the people that" he had driven to the complex. (HT, p 14). This prompted Mr. Raglin to write a letter to Defendant

9

**Respondents' Exhibit 77**

Crumbley telling him "that I knew they were innocent because I was there." (HT, pp. 14-15).

r. Mr. Raglin testified that he decided to reach out to Mr. Crumbley because he had a brother in prison who he believes was wrongfully convicted, and he did not "want an innocent man to be in jail." (HT, pp. 15-16, 33, 39-40).

s. Mr. Raglin further testified that he does not know and has never seen any member of the Crumbley or Ebo family and that the Defendants were not present during the shooting incident that he witnessed. (HT, pp. 16-17, 36).

t. Mr. Raglin confirmed that the witness statements that were attached to the PCRA petitions were true. (HT, p. 23). Though he claimed he saw "something in one line somewhere" when he was reading it that was a discrepancy, but he never scratched anything out or attempted to correct this purported discrepancy. (HT, p. 23).

u. Mr. Raglin also testified that he did not attempt to contact law enforcement or the District Attorney's Office with the information he had relayed to Defendant Crumbley through his letter.   (HT, pp. 39-41).

v. When questioned by this court, Mr. Raglin clarified that he did not actually see anyone get struck by a bullet, he did not see

10

Respondents' Exhibit 77

what the victim looked like at any point, and he did not see

anyone laying on the ground. (HT, pp. 42-43).  He also

testified that he never saw anyone get out of the white car

before the shooting started and he did not see who entered

the white car after the shooting because he "wasn't paying

attention" and "everything happened in a tenth of a second."

(HT, pp. 43-44).

### *Application of Law to Facts*

In Commonwealth v. Burton, 158 A.3d 618, 629 (Pa. 2017), the

Pennsylvania Supreme Court reiterated the requirements necessary to

establish a successful after-discovered evidence claim pursuant to 42 Pa.

C.S.A. § 9543(a)(2)(vi):

> "[W]here a petition is otherwise timely, to prevail on an after-
> discovered evidence claim for relief under subsection
> 9543(a)(2)(vi), a petitioner must prove that (1) the exculpatory
> evidence has been discovered after trial and could not have been
> obtained at or prior to trial through reasonable diligence; (2) the
> evidence is not cumulative; (3) it is not being used solely to
> impeach credibility; **and** (4) it would likely compel a different
> verdict. Commonwealth v. D'Amato, 579 Pa. 490, 856 A.2d 806,
> 823 (2004); see Cox, 146 A.3d at 227–28 ("Once jurisdiction
> has been properly invoked (by establishing either that the
> petition was filed within one year of the date judgment became
> final or by establishing one of the three exceptions to the PCRA's
> time-bar), the relevant inquiry becomes whether the claim is
> cognizable under [Section 9543] of the PCRA.") (emphasis
> added).

In this case, this court finds that Robert Raglin's testimony fails to

satisfy the third and fourth prongs of this test.

11

Respondents' Exhibit 77

### Evidence Solely Used For Impeachment

With respect to the third prong, our appellate court in <u>Commonwealth</u> <u>v. Padilla</u>, 997 A.2d 356, 365 (Pa. Super. 2010) offered the following guidance:

> "Whenever a party offers a witness to provide evidence that contradicts other evidence previously given by another witness, it constitutes impeachment...." <u>Commonwealth v. Weis</u>, 416 Pa. Super. 623, 611 A.2d 1218, 1229 (1992). **Where eyewitness identification tied the defendant to the crime charged and the defendant challenged the identification in his trial, third-party testimony exculpating the defendant impeaches the eyewitness**. <u>Commonwealth v. Moore</u>, 534 Pa. 527, 561, 633 A.2d 1119, 1136 (1993), cert. denied, 513 U.S. 1114, 115 S.Ct. 908, 130 L.Ed.2d 790 (1995) (rejecting witness' statement against penal interest as reliable after-discovered evidence, where sole purpose of statement was to impeach testimony connecting defendant to crime) (emphasis added).

Here, the Defendants are offering Mr. Raglin's testimony to exculpate them, which in turn, impeaches the credibility of Saday Robinson, the central eyewitness who consistently, and very convincingly, identified the Defendants as the men who murdered Todd Mattox. The Defendants challenged Ms. Robinson's identification testimony all throughout the lower court proceedings and direct appeal.

Indeed, an appellate remand was even required to address the post-trial attempt made by the Defendants' associates to persuade Ms. Robinson to recant her trial testimony. (*See* Order of Court dated 10/29/15, pp. 2-4) ("During her testimony at the October 29, 2015 hearing, Ms. Robinson explained that the statements that she had made in video and written form

12

were untruthful. She explained that she had lied to [the] defense investigator . . . because she had been threatened by people associated with the defendants. Additionally, she had been offered a substantial sum of money - - $ 25,000 - - to recant her trial testimony.").

The Defendants have argued that such evidence is not being solely used to impeach because it constitutes substantive, exculpatory evidence which unequivocally establishes their innocence. Having presided over the original trial, the after-discovered evidence hearing, and the PCRA hearing, this court has little trouble disagreeing with that argument.

At the PCRA hearing, this court paid careful attention to Mr. Raglin as he testified, studying his tone, demeanor, and overall credibility, which was substantially lacking. Although Mr. Raglin claimed to have "clearly" seen "Ron and Rome" firing their guns at the white car, and although he maintained that the Defendants were not present at the scene, that testimony must be considered against other portions of his testimony relating to what he did *not* see at the time of the shooting. (HT, pp. 11, 17).

Mr. Raglin never saw the individuals in the white car, never saw anyone get struck by bullets, and never saw anyone laying on the ground. (HT, pp. 42-43). Significantly, Mr. Raglin repeatedly testified that he was not paying any attention to the details after he heard gunfire because he dropped to the ground and was focused on getting out of the parking lot alive. (HT, pp. 10-11) ("I wasn't paying no attention. I was hitting the

13

Respondents' Exhibit 77

ground. When I saw the sparks and fires, I dropped."). Mr. Raglin also testified to the presence of a "big *Christmas* tree" in the apartment complex, which this court finds to be curious considering the fact that the murder took place in the middle of May. (HT, pp. 10, 44).

*At best,* Mr. Raglin's testimony established that he may have been present at the scene of a shootout but it fell far short of establishing that he was an eyewitness to the Todd Mattox murder, especially when compared to Saday Robinson's testimony. As recounted in its Trial Court Opinion, Ms. Robinson observed first-hand each of the Defendants, with guns in their hands, shoot the victim. To be sure:

> . . . Saday Robinson [] described the sounds of an altercation above her apartment in the minutes before the shooting, followed by the noise of people running down stairs. (Trial Transcript ("TT"), held 8/20/12, pp. 527-28). She then saw Mr. Mattox being pushed out the front door of the apartment complex by two (2) African-American males with handguns. (TT, 8/20/12, pp. 528-29). She was able to hear Mr. Mattox pleading for his life, offering the two (2) males everything that he had, and backing away from them with his hands up. (TT, pp. 529-31). [She] described seeing a man that she later identified as Defendant Ebo shooting at Mr. Mattox three (3) times. (TT, p. 531). Mr. Mattox fell to the ground after the gunshots were fired. (TT, p. 531). [She] then described seeing Defendant Ebo going through the pants pockets of Mr. Mattox before she saw a person that she later identified as Defendant Crumbley walk up to Mr. Mattox, stand []over his body as it lay in the parking lot, and shoot him directly in the head. (TT, p. 532-34). She then indicated that she saw the Defendants get into Mr. Mattox's white Nissan and speed out of the parking lot. (TT, p. 534).

14

Respondents' Exhibit 77

Saday Robinson has repeatedly, and to her own detriment, identified the Defendants as the shooters, under oath in open court, at trial and then again during the after-discovered evidence hearing. Moreover, as this court further explained in its October 29, 2015 Order:

> This court had the benefit of sitting through the original homicide trial, and it observed firsthand Ms. Robinson's demeanor when she provided her eyewitness account of the brutal murder and identified the Defendants as the perpetrators. Ms. Robinson shook uncontrollably throughout her testimony and was clearly frightened to be involved in the case. As the Commonwealth noted in its brief, Ms. Robinson had *nothing to gain and everything to lose* by testifying against the Defendants during the homicide trial.

Accordingly, the court finds that Mr. Raglin's testimony, which is far from credible, is being presented solely to impeach the strong, unwavering identification testimony of Saday Robinson, and that fact alone defeats their after-discovered evidence claim.

### *Evidence is Unlikely to Compel a Different Verdict*

With respect to the fourth prong, the court finds that it is unlikely that Mr. Raglin's testimony would compel a different verdict at trial when considered against the evidence as a whole. In addition to Ms. Robinson's clear and unequivocal eyewitness testimony, other circumstantial evidence linked the Defendants to the shooting. (*See* Trial Court Opinion, filed 6/25/14).

Ultimately, this court did not consider Mr. Raglin's testimony to be credible because of the inconsistencies contained therein and because of the

15

Respondents' Exhibit 77

clear motive to fabricate his testimony out of fear for his life. For example, Mr. Raglin's witness statement says he had driven Ron and Rome in his jitney "two to three" times prior to the day of the shooting, but at the hearing he testified that he had driven them around "more than ten times." (Defendant's Crumbley's Amended PCRA Petition); (HT, p. 7).  In his testimony he said he had taken Ron and Rome to Leechburg Gardens before, but in his witness statement he says that was the first time he had ever taken them there. (Defendant's Crumbley's Amended PCRA Petition); (HT, p. 18). In his witness statement, the "friend" who helped him research the shooting after he was released from jail was a male, but at the hearing, Mr. Raglin testified that this friend was a female. (Defendant's Crumbley's Amended PCRA Petition); (HT, pp. 13-14, 25).

As Mr. Raglin noted several times throughout the hearing, he was approached by an inmate who told him, "you was there for the shooting . . . **[s]ay that you wasn't, and I'll jump on you."** (HT, p. 13) (emphasis added). The inmate told him who was killed, who the shooters were, and the time and location of the shooting. As Mr. Raglin put it, the inmate "was mentioning so much. It was just too much chaos." (HT, pp. 24-25). Thus, it is impossible to discern whether Mr. Raglin's testimony is purely a product of his memory or the information he had been threatened into "remembering" seven (7) years after the murder.  The court also questions why this unidentified inmate who allegedly was present at the shooting and

16

Respondents' Exhibit 77

possessed this information, threatened Mr. Raglin into coming forward and has not come forward himself to corroborate his testimony

Another factor that further diminishes Mr. Raglin's credibility is the fact that his alleged motive to come forward, after his life was threatened, was to help clear the name of purportedly innocent men, yet he never contacted the authorities, or the District Attorney's Office, with the information he had about their "wrongful" convictions.  The court is also compelled to note that, somewhat conveniently, the men known as "Ron and Rome" were found dead in the same vehicle in early 2012, and "Rome" was Defendant Crumbley's cousin. (TT, pp. 945, 948, 991).  Accordingly, for all these reasons, the court finds that the Defendants have not established a successful after-discovered evidence claim, and no PCRA relief is warranted.

BY THE COURT:

_____, J.
BETH A. LAZZARA, JUDGE

17

Respondents' Exhibit 77

IN THE COURT OF COMMON PLEAS OF ALLEGHENY COUNTY, PENNSYLVANIA

COMMONWEALTH OF PENNSYLVANIA,        CRIMINAL DIVISION

v.                                    CC No.: 2012-2821

MATTHEW EBO,

Defendant.

### ORDER

AND NOW, this ___24th___ day of ___January___, 2018, it is hereby ORDERED, ADJUDGED and DECREED as follows:

1.      On January 17, 2018, the Defendant filed a *pro se* Petition under the Post-Conviction Relief Act ("PCRA").

2.      Attorney Diana Stavroulakis, Esquire (262 Elm Court, Pittsburgh, PA 15237) is **HEREBY APPOINTED** as PCRA Counsel.

3.      An Amended PCRA Petition or No-Merit Letter shall be filed within **90 days** from the date of this Order.

4.      The Defendant is indigent, and any fees shall be paid by Allegheny County.

BY THE COURT:

_____, J.

BETH A. LAZZARA, JUDGE

2018 JAN 24 AM 11:56
ORIGINAL DIVISION
ALLEGHENY COUNTY, PA

App. 88

Respondents' Exhibit 77